**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DAN MCCONCHIE, in his official capacity as Minority Leader of the Illinois Senate and individually as a registered voter, and JIM DURKIN, in his official capacity as Minority Leader of the Illinois House of Representatives and individually as a registered voter,<br><br>       Plaintiffs,<br><br>v.<br><br>ILLINOIS STATE BOARD OF ELECTIONS, CHARLES W. SCHOLZ, IAN K. LINNABARY, WILLIAM M. MCGUFFAGE, WILLIAM J. CADIGAN, KATHERINE S. O'BRIEN, LAURA K. DONAHUE, CASANDRA B. WATSON, and WILLIAM R. HAINE, in their official capacities as members of the Illinois State Board of Elections, EMANUEL CHRISTOPHER WELCH, in his official capacity as Speaker of the Illinois House of Representatives, the OFFICE OF SPEAKER OF THE ILLINOIS HOUSE OF REPRESENTATIVES, DON HARMON, in his official capacity as President of the Illinois Senate, and the OFFICE OF THE PRESIDENT OF THE ILLINOIS SENATE,<br><br>      Defendants. | Case No. 1:21-CV-3091 |

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiffs DAN MCCONCHIE, in his official capacity as Minority Leader of the Illinois Senate and individually as a registered voter, and JIM DURKIN, in his official capacity as Minority Leader of the Illinois House of Representatives and individually as a registered voter, bring this action challenging the constitutionality of the apportionment of state legislative districts against Defendants ILLINOIS STATE BOARD OF ELECTIONS, CHARLES W. SCHOLZ, IAN K. LINNABARY, WILLIAM M. MCGUFFAGE, WILLIAM J. CADIGAN, KATHERINE S. O'BRIEN, LAURA K. DONAHUE, CASANDRA B. WATSON, and

WILLIAM R. HAINE, in their official capacities as members of the Illinois State Board of Elections, EMANUEL CHRISTOPHER WELCH, in his official capacity as Speaker of the Illinois House of Representatives, the OFFICE OF SPEAKER OF THE ILLINOIS HOUSE OF REPRESENTATIVES, DON HARMON, in his official capacity as President of the Illinois Senate, and the OFFICE OF THE PRESIDENT OF THE ILLINOIS SENATE.

Plaintiffs allege and aver as follows:

## I.
## INTRODUCTION

1.      Plaintiffs bring this lawsuit to protect the fundamental rights of Illinois voters and to invalidate the state legislative redistricting plan passed by the Illinois General Assembly on May 28, 2021 and signed into law by Governor Pritzker on June 4, 2021 (the "Redistricting Plan" or "Plan").[1] In its zeal to rush a plan through the legislature, the General Assembly drew the legislative districts in the Plan using population estimates derived from a survey rather than waiting a few months for the U.S. Census Bureau (the "Census Bureau" or "Bureau") to provide redistricting data containing official population counts from the 2020 decennial census. Plaintiffs seek a declaration that the Plan is unconstitutional, invalid, and thus void *ab initio*. Plaintiffs also seek an order directing Defendants Emanuel Christopher Welch and Don Harmon to appoint members to a bipartisan redistricting commission ("Commission") per Article IV, Section 3 of the Illinois Constitution, or alternatively granting other appropriate relief that allows for the drafting and implementation of a redistricting plan based on the official 2020 decennial census counts, including appointing a Special Master to draft a valid and lawful redistricting plan.

---

[1] *See* Public Act 102-0010 (https://www.ilga.gov/legislation/publicacts/102/PDF/102-0010.pdf) ("Pub. Act 102-0010").

2.     Any state legislative redistricting plan must satisfy the principles of the U.S. Constitution. Key among these requirements is the equal protection guarantee of "one person, one vote," requiring state legislative districts to be of equal, or at the very least, substantially equal population. Under this requirement, a plan that results in a greater-than-10% population deviation between the largest and smallest legislative districts is "presumptively impermissible."[2] Even if the plan results in a smaller maximum population deviation, the plan will still be held invalid if the districts are drawn using arbitrary or discriminatory criteria.[3]

3.     The decennial census's official population counts have long been recognized as the best source of population data to achieve such equality and are presumptively valid for redistricting purposes.[4] The Census Bureau usually sends the states redistricting data with the official census counts by April 1st of the year after the census. Although delayed this year, the Bureau has stated in court filings and other official channels that it will provide the states with the data files necessary for redistricting by August 16, 2021.[5]

4.     The General Assembly passed the Redistricting Plan, and Governor Pritzker signed it into law, despite lacking the official population counts from the census.[6] Instead of the official census counts, the Plan uses the American Community Survey's (the "ACS") five-year

---

[2] *Evenwel v. Abbott*, 577 U.S. 937, ---, 136 S. Ct. 1120, 1124 (2016).

[3] *See Roman v. Sincock*, 377 U.S. 369, 710 (1964).

[4] *See, e.g.*, *Karcher v. Daggett*, 462 U.S. 725, 738 (1983) ("the census count represents the 'best population data available'" for redistricting and "is the only basis for good-faith attempts to achieve population equality") (quoting *Kirkpatrick v. Preisler*, 394 U.S. 526, 528 (1969)).

[5] *See* U.S. Census Bureau Statement on Release of Legacy Format Summary Redistricting Data File, Census.gov (Mar. 15, 2021) (https://www.census.gov/newsroom/press-releases/2021/statement-legacy-format-redistricting.html) ("Bureau March 2021 Statement").

[6] *See* Bill Status of HB2777, Illinois General Assembly (https://www.ilga.gov/legislation/billstatus.asp?DocNum=2777&GAID=16&GA=102&DocTypeID=HB&LegID=131631&SessionID=110#actions).

population estimates from 2015 through 2019 as the main source of population data.[7] While the Census Bureau conducts the ACS, the estimates from that survey are not intended to be, and are not, a proper substitute for the official census counts. Nor is it proper to use ACS estimates for redistricting. Indeed, the Bureau itself expressly warns that ACS estimates are not a viable alternative to the official decennial census counts:

**American Community Survey**
**Key Facts**

- **WHAT IT IS *NOT*.** The American Community Survey is not the official source of population counts. The official population count — including population by age, sex, race and Hispanic origin — comes from the once-a-decade census, supplemented by annual population estimates (the Population Estimates Program). American Community Survey data are designed to show the *characteristics* of the nation's population and should not be used as actual population counts or housing totals for the nation, states or counties.

U S C E N S U S B U R E A U
*Helping You Make Informed Decisions*

www.census.gov [8]

5.      There are substantial differences between the population estimates derived from ACS responses and the census counts. The Redistricting Plan uses the 2015-2019 ACS estimates, which reflect that Illinois has a total resident population of 12,770,577.[9] However, the statewide 2020 decennial census count, which the Bureau released on April 26, 2021, indicates the total

---

[7] Pub. Act 102-0010 at § 5(d) (explaining that Plan is based on 2015-2019 ACS estimates).

[8]   ACS Key Facts, Census.gov (https://www.census.gov/content/dam/Census/programs-surveys/acs/news/10ACS_keyfacts.pdf) ("ACS Key Facts"), at p. 1; *see also Pope v. Cty. of Albany*, No. 1:11-CV-0736 LEK/CFH, 2014 WL 316703, at *13 n.22. (N.D.N.Y. Jan. 28, 2014) (noting warnings from Census Bureau that ACS estimates are "less reliable than [decennial] Census data and not intended to be used in redistricting").

[9] Pub. Act 102-0010 § 5(d).

resident population of Illinois as 12,812,508 as of April 1, 2020.[10] Thus, the five-year ACS estimates fail to account for nearly 42,000 Illinois residents counted in the decennial census.

6. Because it uses ACS estimates for population data, the Redistricting Plan does not ensure that the Senate and Representative Districts satisfy the constitutional mandate of substantially equal populations.[11] The Redistricting Plan fails to ensure substantial population equality for a number of key reasons:

      a.    Unlike the decennial census, which represents a complete count of the population, the ACS estimates represent a small sampling of addresses and are therefore subject to sampling errors and imprecision, which can be considerable for small geographic areas and population groups;

      b.    The ACS single-year estimates are available only for geographic areas with populations of 65,000 or more, and the five-year ACS estimates, which are the only available estimates for more sparsely populated geographic areas, are based on outdated survey responses dating back more than five years before the census date and fail to fully represent population changes that have occurred since that time;

      c.    Unlike the decennial census, which is supported by substantial federal, state, and local funding for public outreach campaigns, the ACS receives far less funding and has a lower response rate, which creates further imprecision;

      d.    The ACS estimates are not available for each individual "Census Block" but are instead reported in larger "Census Tracts" or "Block Groups" (depending on the particular estimates) and must be manipulated to attempt to fit the applicable Census Blocks; and

      e.    The ACS estimates are based on the 2010 census geographic boundaries and must be manipulated to fit the updated 2020 census boundaries.

---

[10] Resident Population for the 50 States, the District of Columbia, and Puerto Rico: 2020 Census, Census.gov (https://www2.census.gov/programs-surveys/decennial/2020/data/apportionment/apportionment-2020-table02.pdf).

[11] The Illinois Constitution defines the districts from which state senators are elected as "Legislative Districts" and defines the districts from which state representatives are elected as "Representative Districts." Ill Const. 1970, art. IV, § 1. For clarity, Plaintiffs use the phrase "Senate Districts" to describe districts from which state senators are elected and use the phrase "Representative Districts" to describe the districts from which state representatives are elected.

7.     For these reasons, any redistricting plan based on ACS estimates *cannot* create substantially equal legislative districts. Experts have run comparisons of computer-generated plans drawn using the 2005-2009 ACS estimates to the official 2010 census counts, which show that the use of ACS estimates inevitably results in population disparities well in excess of 10%. Among a *thousand* computer-generated plans drawn using the 2005-2009 ACS estimates, while controlling for compactness and majority-minority districts, not a single plan had a maximum population deviation within 10% when subsequently analyzed against the 2010 census counts. Instead, the plans based on ACS estimates showed maximum population deviations that were generally between 23% and 55%, far beyond the constitutional limits.

8.     Because the Redistricting Plan does not contain substantially equal legislative districts, the Plan violates the "one person, one vote" principle derived from the Equal Protection Clause in the Fourteenth Amendment to the Constitution. In addition to the fact that the Plan violates the "one person, one vote" principle, the Plan also violates the Equal Protection Clause because it is both arbitrary and discriminatory.[12]

9.     First, use of ACS estimates as the base population data is arbitrary. The General Assembly did not establish any substantive legislative record to support the use of ACS estimates. In fact, in committee hearings and floor debates, the Plan's legislative sponsors professed to have *no* knowledge of precisely what data were used, how the data were manipulated to work for redistricting purposes, or even who drew the maps. During a legislative hearing on May 25, 2021, after the Plan was publicly unveiled and shortly before its passage, Dr. Allan Lichtman, an expert retained by the House and Senate Democratic Caucuses, stated that he

---

[12] *See Daly v. Hunt*, 93 F.3d 1212, 1220 (4th Cir. 1996) (redistricting plan violates the Equal Protection Clause when the redistricting process had a "taint of arbitrariness or discrimination") (quoting *Roman*, 377 U.S. at 710).

was not sure what data were ultimately used to draw the Plan and could not confirm whether ACS estimates were in fact used, did not participate in drawing the Plan, and had not analyzed the Plan. The legislative sponsors' explanation for the use of ACS estimates was that the Illinois Constitution's redistricting schedule necessitated the enactment of a plan prior to June 30th.

10.     Second, use of ACS estimates for population data is also discriminatory. It results in the overestimation of some sub-populations and geographic areas and the underestimation of others. In particular, the differential undercounts have a greater effect on minority voters. Indeed, computer-generated plans drawn using the 2005-2009 ACS estimates generally resulted in two fewer majority-Latino districts than plans drawn using the official 2010 census counts, when controlling for the number of majority-Black districts and certain other traditional redistricting criteria, including compactness.[13] The Plan ensures that historically undercounted minority communities will continue to be underrepresented and lose their right to an equal vote in the legislature by foregoing the official census counts in favor of the ACS estimates. Thus, it is no surprise that more than 50 good government groups and community advocates have publicly opposed the General Assembly's reliance on ACS estimates for the Redistricting Plan.[14]

11.     The General Assembly ostensibly tried to mitigate the foregoing problems by supplementing the ACS estimates with certain unspecified "election data." However, the legislative leaders who sponsored and pushed the Plan through the General Assembly were

---

[13] When compared to the 2010 census count, the 2005-2009 5-Year ACS estimates for Illinois underestimated the entire Illinois population by 45,589 people, but the impact on specific sub-populations was even more significant. The Latino, Asian, and Native American populations were underestimated by 154,959 (7.6%), 48,206 (8.2%), and 20,755 (47.2%) persons, respectively. In contrast, the white population was over-estimated.

[14] *See* Statement of Appropriate Data for Redistricting (https://advancingjustice-aajc.org/sites/default/files/2021-04/Statement%20on%20Appropriate%20Data%20for%20Redistricting%20FINAL%204.27.2021.pdf).

unable to articulate during legislative proceedings precisely what "election data" were used or how the data were used in combination with the ACS estimates. Regardless, election data, whether consisting of the number of ballots cast or voter registration records, suffer from many of the same defects as the ACS estimates, including the fact that the use of such data results in a plan that disproportionately impacts minority communities. Thus, the use of election data only exacerbates the many problems inherent in the Plan.

12. Because the legislative districts in the Plan were drawn using ACS estimates and unspecified "election data," the districts cannot and do not satisfy the constitutional requirement of substantial population equality. The use of ACS estimates for the Redistricting Plan, among other issues, also renders the Plan arbitrary and discriminatory. For these reasons, the Court should declare the Redistricting Plan unconstitutional, invalid, and thus void *ab initio* and order Defendants to cooperate with the creation of a bipartisan legislative redistricting Commission.

## II.
## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1357. Plaintiffs bring claims arising under the U.S. Constitution and 42 U.S.C. § 1983 for violations of their civil rights and the elective franchise, a claim under the federal Declaratory Judgment Act (28 U.S.C. §§ 2201, 2202), and a claim for a writ of mandamus pursuant to the All Writs Act (28 U.S.C. § 1651(a)).

14. Venue is proper pursuant to 28 U.S.C. § 1391(b) because all Defendants reside in Illinois and because some Defendants reside in the Northern District of Illinois. By Illinois law, Defendant Illinois State Board of Elections is required to maintain an office in the City of Chicago.[15] Pursuant to that requirement, the Board of Elections maintains an office at 100 West

---

[15] 10 ILCS § 5/1A-11.

Randolph Street, Suite 14-100, Chicago, Illinois. Illinois law also requires four members of the Board of Elections to be residents of Cook County.[16] Defendants Emanuel Christopher Welch and Don Harmon both reside in and maintain offices in the Northern District of Illinois.

**III.**
**PARTIES**

**A.    Plaintiffs**

15.    Plaintiff DAN MCCONCHIE is a state senator from the 26th Senate District, a citizen of the United States and the State of Illinois, and a duly registered voter residing in Lake County, Illinois. Mr. McConchie is also the Minority Leader of the Illinois Senate, vested by Article IV, Section 6(c) of the Illinois Constitution with the duty to promote and express the views, ideas, and principles of the Senate Republican caucus in the 102nd General Assembly and of Republicans in every Senate District throughout the State of Illinois. Mr. McConchie is named as a Plaintiff in his official capacity as Minority Leader of the Illinois Senate and individually as a registered voter.

16.    Plaintiff JIM DURKIN is a state representative from the 82nd Representative District, a citizen of the United States and the State of Illinois, and a duly registered voter residing in Cook County, Illinois. Mr. Durkin is also the Minority Leader of the Illinois House of Representatives, vested by Article IV, Section 6(c) of the Illinois Constitution with the duty to promote and express the views, ideas, and principles of the House Minority Republican caucus in the 102nd General Assembly and of Republicans in every Representative District throughout Illinois. Mr. Durkin is named as a Plaintiff in his official capacity as Minority Leader of the Illinois House of Representatives and individually as a registered voter.

---

[16] 10 ILCS § 5/1A-2.

**B.      Defendants**

17.      Defendant ILLINOIS STATE BOARD OF ELECTIONS (the "Board") is the entity responsible for overseeing and regulating public elections in Illinois as provided by Article III, Section 5 of the Illinois Constitution and 10 ILCS 5/1A-1, *et seq*. The Board undertakes those acts and conducts its business under color of state law. The Board has eight members, who are named as Defendants below (collectively the "Individual Board Member Defendants").

18.      Defendant CHARLES W. SCHOLZ is the Chairman of the Illinois State Board of Elections. He is sued in his official capacity.

19.      Defendant IAN K. LINNABARY is the Vice Chairman of the Illinois State Board of Elections. He is sued in his official capacity.

20.      Defendant WILLIAM M. MCGUFFAGE is a member of the Illinois State Board of Elections. He is sued in his official capacity.

21.      Defendant WILLIAM J. CADIGAN is a member of the Illinois State Board of Elections. He is sued in his official capacity.

22.      Defendant KATHERINE S. O'BRIEN is a member of the Illinois State Board of Elections. She is sued in her official capacity.

23.      Defendant LAURA K. DONAHUE is a member of the Illinois State Board of Elections. She is sued in her official capacity.

24.      Defendant CASANDRA B. WATSON is a member of the Illinois State Board of Elections. She is sued in her official capacity.

25.      Defendant WILLIAM R. HAINE is a member of the Illinois State Board of Elections. He is sued in his official capacity.

26.     Defendant EMANUEL CHRISTOPHER WELCH is a state representative from the 7th Representative District. He is sued in his official capacity as Speaker of the Illinois House of Representatives.

27.     Defendant the OFFICE OF THE SPEAKER OF THE ILLINOIS HOUSE OF REPRESENTATIVES is the office of the presiding officer of the Illinois House of Representatives, as designated by Article IV, Section 6(b) of the Illinois Constitution.

28.     Defendant DON HARMON is a state senator from the 39th Senate District. He is sued in his official capacity as President of the Illinois Senate.

29.     Defendant OFFICE OF THE PRESIDENT OF THE ILLINOIS SENATE is the office of the presiding officer of the Illinois Senate, as designated by Article IV, Section 6(b) of the Illinois Constitution.

## IV.
## REQUEST FOR A THREE-JUDGE COURT

30.     Plaintiffs request a three-judge trial court pursuant to 28 U.S.C. § 2284(a) and Rule 9.1 of the Local Rules for the Northern District of Illinois because this action challenges the constitutionality of the apportionment of a statewide legislative body.

## V.
## BACKGROUND

**A.      The Illinois Constitution Requires that Redistricting Occur Every Ten Years Pursuant to a Specific Timeline and Procedure**

31.     The Illinois Constitution states that one Illinois state senator is elected from each of the 59 Senate Districts.[17] Each Senate District is divided into two Representative Districts, and one Illinois state representative is elected from each of the 118 Representative Districts.[18]

---

[17] Ill Const. 1970, art. IV, §§ 1, 2(a).

[18] Ill Const. 1970, art. IV, § 2(b).

32.     Article IV, Section 3 of the Illinois Constitution requires that redistricting of the Senate and Representative Districts occur in the year after each decennial census.[19] The decennial census was conducted last year, in 2020, so legislative redistricting must occur this year, in 2021.

33.     The Illinois Constitution entrusts the General Assembly to pass a redistricting plan in the first instance.[20] However, if a valid redistricting plan does not become effective with the full force and effect of law by June 30, 2021, regardless of the reason for that failure, the Illinois Constitution shifts the responsibility for drafting a redistricting plan from the General Assembly to a bipartisan redistricting Commission, which must be constituted by July 10, 2021. The Illinois Constitution does not shift redistricting responsibility back to the General Assembly for any reason; rather, if the General Assembly fails to enact a valid redistricting plan by June 30, 2021, then a bipartisan Commission has the sole authority, duty, and responsibility to enact a valid legislative redistricting plan based on the 2020 decennial census.

34.     The Commission consists of eight members, no more than four of whom are members of the same political party. The Speaker and Minority Leader of the House of Representatives and the President and Minority Leader of the Senate are each required to appoint one member of the General Assembly and one person who is not a member of the General Assembly. The members of the Commission shall be certified to the Secretary of State by the appointing authorities.[21]

35.     The Commission is required to file with the Secretary of State a redistricting plan approved by at least five members by August 10th. If it fails to file an approved redistricting plan

---

[19] Ill Const. 1970, art. IV, § 3(b).

[20] *Id.*

[21] *Id.*

by August 10, 2021, the Supreme Court of Illinois must submit the names of two persons, not of the same political party, to the Secretary of State by September 1st. By September 5th, the Secretary of State must draw the name of one of the two persons to serve as the ninth member of the Commission. After the ninth member is appointed, by October 5th, the Commission must file with the Secretary of State a redistricting plan approved by at least five members.[22]

36.     A redistricting plan that is approved by at least five members of the Commission and filed with the Secretary of State shall be presumed valid, shall have the force and effect of law, and shall be published promptly by the Secretary of State.[23]

**B.     Illinois Has Historically Used a Commission in the Legislative Redistricting Process**

37.     The use of a Commission in the legislative redistricting process is not unusual under the latest version of the Illinois Constitution, adopted in 1970. To the contrary, it has been the norm. Since 1970, five legislative redistricting plans have been enacted, but the General Assembly has directly approved a new plan only once—in 2011. Following each of the four decennial censuses before 2010 (i.e., 1970, 1980, 1990, and 2000), a Commission was constituted to enact a plan.[24]

38.     A three-judge panel of this Court upheld the constitutionality of this legislative redistricting process after the adoption of a legislative redistricting plan in 2001, including the use of a Commission and the selection of a ninth member of the Commission to break any ties.[25] That ruling was affirmed by the U.S. Supreme Court without a written opinion.[26]

---

[22] *Id.*

[23] *Id.*

[24] *See Hooker v. Illinois State Bd. of Elections*, 2016 IL 121007, ¶ 5 63 N.E.3d 824 (describing historical use of Commission in legislative redistricting in Illinois).

[25] *Winters v. Illinois State Bd. of Elections*, 197 F. Supp. 2d 1110 (N.D. Ill. 2001).

[26] *Winters v. Illinois State Bd. of Elections*, 535 U.S. 967 (2002).

C. **The Equal Protection Clause of the U.S. Constitution Requires Senate and Representative Districts of Substantially Equal Population**

39. States are subject to limitations arising from the protections guaranteed by the U.S. Constitution in conducting state legislative redistricting, including limitations stemming from the Equal Protection Clause of the Fourteenth Amendment.[27] Among the most fundamental of these limitations is the well-established "one person, one vote" principle that requires states to design legislative districts that contain substantially equal populations and regularly reapportion districts to prevent malapportionment.[28]

40. The U.S. Supreme Court has held that a legislative redistricting plan in which the maximum population deviation between the largest and smallest districts is greater than 10% is "presumptively impermissible."[29]

41. Even if a redistricting plan results in a maximum population deviation of less than 10%, the plan nonetheless violates the Equal Protection Clause of the Fourteenth Amendment if the redistricting process contains the "taint of arbitrariness or discrimination."[30] If the redistricting process was either arbitrary or discriminatory, then the resulting redistricting plan is unconstitutional and therefore void *ab initio*.

D. **Like All Other States, Illinois Uses the Census Counts for Legislative Redistricting Because They Are the Best Measure of Population**

42. The official census counts have long been recognized as the best and most accurate source of population data for redistricting purposes, and the use of the census

---

[27] *See Evenwel*, 136 S. Ct. at 1123 (citing *Baker v. Carr*, 369 U.S. 186, 191-92 (1962)).

[28] *Id.* at 1124 (citing *Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964); *Reynolds v. Sims*, 377 U.S. 533, 568 (1964)).

[29] *Id.* (citing *Brown v. Thomson*, 462 U.S. 835, 842-43 (1983)).

[30] *Roman*, 377 U.S. at 710.

population counts as the main source of population data in a legislative redistricting plan is presumptively valid.[31]

43.     As the Supreme Court recognized in 2016, "[t]oday, all States use total-population numbers from the census when designing congressional and state-legislative districts, and only seven States adjust those census numbers in any meaningful way."[32] Specifically, three states (Hawaii, Kansas and Washington) exclude certain non-permanent residents, including nonresident members of the military, from the total-population apportionment base, and four other states (California, Delaware, Maryland, and New York) exclude inmates who were domiciled out-of-state prior to incarceration.[33] Even in these seven states, however, the total population numbers are still based on the official counts from the census.

44.     Thus, in Illinois, the appropriate redistricting authorities (either a Commission or, in 2011, the General Assembly) have used the official census counts as the base population data when enacting a redistricting plan in connection with every legislative redistricting since at least the adoption of the 1970 Illinois Constitution.

**E.     The Census Bureau Has Delayed Providing Official Census Counts to the States**

45.     To enable state officials to draw districts of substantially equal population, the Census Bureau is tasked with providing the states with the official census counts to be used for legislative redistricting within one year after the April 1st census date.[34]

46.     In November 2015, the Census Bureau issued its first 2020 Census Operational Plan. The plan set a date of March 31, 2021 for the Bureau to release the official 2020 census

---

[31] *See Karcher*, 462 U.S. at 738; *Kirkpatrick*, 394 U.S. at 528.

[32] *Evenwel*, 136 S. Ct. at 1124.

[33] *Id.* at 1124, n.3.

[34] 13 U.S.C. § 141(c).

counts to the states for redistricting purposes.[35] However, the Bureau subsequently revised and delayed a number of its data collection and processing operations in connection with the 2020 census.[36]

47.     In March 2021, the Bureau announced that it would provide the untabulated census counts in a summary redistricting data file to all of the states by August 16, 2021, and explained that each state would have the opportunity to use an outside vendor to process the legacy format data file in August if the state does not have the capacity to tabulate the data on its own.[37] The legacy format data file is all that is necessary for redistricting and what the General Assembly has utilized in the past redistricting cycles to draw valid redistricting plans for legislative districts.

**F.     The Redistricting Plan Passed by the General Assembly Uses Population Estimates from the ACS and Certain Unspecified "Election Data"**

48.     Despite lacking the official population counts from the 2020 census, the General Assembly passed the Plan on May 28, 2021, on a purely partisan roll call, and Governor Pritzker signed it into law on June 4, 2021.

49.     The legislation passed by the General Assembly acknowledges that the Census Bureau has been delayed in providing the 2020 decennial census counts to the states for redistricting purposes.[38] Instead of the official census population counts, the legislation states that the Plan uses population estimates derived from the 2015-2019 ACS responses as the base

---

[35] 2020 Census Operational Plan, A New Design for the 21st Century, Version 1.1 (Nov. 2015), p. 9, ¶ 2.5 (https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/2020-oper-plan.pdf).

[36] 2020 Census Operational Adjustments Due to COVID-19, 2020Census.gov (https://2020census.gov/en/news-events/operational-adjustments-covid-19.html).

[37] Bureau March 2021 Statement.

[38] Pub. Act 102-0010 § 5(b).

population data.[39] Both the Illinois Senate and House of Representatives stated that the Plan uses estimates derived from the 2015-2019 ACS responses, along with "election data" and "public input" to "establish the boundaries" in the Plan.[40]

**G.    The Decennial Census and the ACS Are Different Data Collection Projects that Use Different Methodologies and Have Different Purposes**

50.    The decennial census is conducted every 10 years.[41] The goal of the census is to count every person in America to determine the total population count and location of each person as of April 1st, which in this case is April 1, 2020.[42] The census is conducted according to a detailed Operational Plan that outlines and defines specific timelines and milestones.[43] Among other things, the Census Bureau takes the following steps to complete the census:

a.    Establish where to count by: (1) identifying all addresses where people could live; (2) conducting a 100-percent review and update of the nation's address list; (3) using multiple data sources to identify areas with address changes; and (4) getting input from local governments.

b.    Motivate people to respond by: (1) conducting a nationwide communications and partnership campaign; (2) working with trusted sources to increase participation; (3) maximizing outreach using traditional and new media; and (4) targeting advertisements to specific audiences.

c.    Count the population by: (1) collecting data from all households, including group quarters and unique living arrangements; (2) making it easy for people to respond anytime, anywhere; (3) encouraging people to use the online response option, but also offering other modes such as traditional paper forms sent by mail and telephone data collection; (4) using the most

---

[39] Pub. Act 102-0010 § 5(d).

[40] House Resolution 359 (https://www.ilga.gov/legislation/102/HR/PDF/10200HR0359lv.pdf) ("HR0359"), at p. 5; Senate Resolution No. 326 (https://www.ilga.gov/legislation/102/SR/PDF/10200SR0326enr.pdf) ("SR326"), at p. 5.

[41] 13 U.S.C. § 141(a).

[42] 13 U.S.C. § 141(b).

[43] 2020 Census Operational Plan, A New Design for the 21st Century, Version 4.0 (Dec. 2018) ("Census Operational Plan V 4.0") (https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/2020-oper-plan4.pdf).

cost-effective strategy to contact and count nonresponding housing units; (5) streamlining in-field census taking; (6) in-person follow-up for nonresponding housing units, including the collection of data from knowledgeable proxy informants; and (7) utilizing administrative records to supplement field data and enhance data quality.

d. Release the census results by: (1) processing and providing census data; (2) releasing apportionment counts to the President; (3) releasing counts for redistricting to the states; and (4) releasing results to the public.[44]

51. The decennial census is supported by billions of dollars of federal spending. In total, Congress appropriated approximately $7.9 billion in federal funds to the Census Bureau to support the 2020 census operations.[45]

52. In addition to federal funding, in 2019, Governor Pritzker and the General Assembly allocated $29 million in state funds to encourage Illinoisans to participate and be counted in the 2020 census. When the Bureau's operational deadlines were extended, Governor Pritzker and the General Assembly appropriated an additional $14.5 million to extend the census outreach and educational efforts, for a total of $43.5 million in state funds allocated towards improving participation in the census.[46]

53. Local governments and municipalities also contributed to the census efforts, with Chicago Mayor Lori Lightfoot pledging $2.7 million in funding to encourage Chicagoans to participate and be counted in the 2020 census.[47] Thus, the State of Illinois and the City of

---

[44] *Id.* at p. 9.

[45] U.S. Census Bureau's Budget, Fiscal Year 2021, Department of Commerce, U.S. Census Bureau, Periodic Censuses and Programs, PROGRAM AND PERFORMANCE: DIRECT OBLIGATIONS, at Exhibit 10, CEN-87, n.1 (Feb. 2021) (FY 2021 Census Budget) (https://www2.census.gov/about/budget/census-fiscal-year-21-presidents-budget.pdf).

[46] 2020 Census: A Final Report on Illinois 2020 Census Self Response Rates (https://www.dhs.state.il.us/OneNetLibrary/117935/documents/Census-2020-Final-Report-on-Illinois-Self-Response-Rate-12-30-2020.pdf), at 2 ("2020 Illinois Census Report").

[47] Mayor Lightfoot Announces $2.7 Million Investment To Prepare For Full, Accurate Count Of Chicagoans In The 2020 U.S. Census, City of Chicago (Oct. 1, 2019)

Chicago together contributed over $45 million in combined funding to encourage full participation in the 2020 census.

54.     In June 2019, Governor Pritzker signed Executive Order 19-10, which established the Census Office within the Illinois Department of Human Services and established a Census Advisory Panel to coordinate the state's census efforts and encourage full participation.[48] The Executive Order defined "hard to count" areas as locations in which the self-response rate to the 2010 decennial census was 73% or less and explained that 16% of Illinois' population live in "hard to count" communities, which include racial and ethnic minorities, foreign-born individuals, renters, people with disabilities, those living close to or below the poverty line, homeless persons, undocumented immigrants, young mobile persons, LGBTQ persons, persons who live in rural areas, children younger than five years old, and individuals living in homes without a broadband internet subscription.[49] The Executive Order directed the Census Advisory Panel to focus on ensuring that "hard to count" communities throughout Illinois receive specialized outreach and assistance to ensure participation in the 2020 census.[50]

55.     Among other things, the Executive Order emphasized the importance of the census count by explaining that the count is used for Congressional reapportionment and budgeting and also used to provide the base population for "the redistricting of the State legislature."[51] Thus, in 2019, the Governor clearly envisioned and understood that the efforts to

---

[48] Executive Order Cementing Illinois' Comprehensive 2020 Census Effort, Executive Order 2019-10 (https://www2.illinois.gov/Documents/ExecOrders/2019/ExecutiveOrder-10-2019.pdf).

[49] *Id.* at p. 1.

[50] *Id.* at p. 3.

[51] *Id.* at p. 1.

increase participation in the 2020 census would help ensure appropriate redistricting because the census counts would provide the base population data for the redistricting process, as they had done with every prior legislative redistricting in Illinois and in every other state in the nation.

56.     In contrast to the census, the ACS is a rolling sample survey of households. The ACS is not intended to, and does not, provide a complete population count. Instead, the ACS collects and produces information on social, economic, housing, and demographic characteristics to assist lawmakers and others in setting policies, distributing funds, and assessing programs.[52]

57.     The decennial census asks respondents about the number of people in a household, their ages, sex, ethnicity, and owner or renter status. The ACS asks about a wide variety of other topics, including citizenship, education, employment, and transportation. This is because the ACS is not intended to provide a precise total population, but is instead intended to produce information on social, economic, housing, and demographic characteristics.[53]

58.     In addition, the ACS and decennial census use different rules to establish residency. The decennial census asks about a respondent's usual residency (such that migrants are captured in their home state, for example), whereas the ACS asks respondents where they intend to live for the two months following the survey. Thus, if a person receives the survey at somewhere other than his or her permanent home and intends to stay there for the next two months, that person will be determined to reside at the location of the place where the survey was received, even if the person's permanent residence is elsewhere. This distinction in residency rules potentially affects migrants, laborers, college students, and others who may stay away from their permanent homes for extended periods throughout the year.

---

[52] American Community Survey Information Guide, Census.gov, at p. 4 (https://www.census.gov/content/dam/Census/programs-surveys/acs/about/ACS_Information_Guide.pdf) ("ACS Info Guide").

[53] *Id.* at p. 1.

59.     Another difference between the ACS and the decennial census is language availability. The 2020 decennial census was available in 12 non-English languages, while the ACS generally is available in only English and Spanish.[54]

60.     Unlike the decennial census, which receives billions of dollars of federal funding and is supported by additional state funding and programs, only between approximately $210 and $230 million in federal funding was apportioned for the ACS in each year between 2015 and 2019 (when the responses used in the estimates reflected in the Plan were gathered), which combined is approximately 13% of the total federal funding allocated to the decennial census.[55] The State of Illinois and local governments in Illinois did not spend any funds to encourage Illinoisans to respond to the ACS during the past decade, nor did they conduct an extensive public outreach campaign, in contrast to the census.

**H.     ACS Estimates Cannot be Used as the Base Population Data in Place of the Official Census Count for Purposes of Legislative Redistricting**

61.     Because the decennial census and the ACS use different methodologies and have different purposes, the Bureau, which conducts both the decennial census and the ACS, is careful

---

[54]    The 2020 Census Speaks More Languages, Census.gov (Mar. 9, 2020) (https://www.census.gov/newsroom/press-releases/2020/languages.html).

[55]    *See* FY2017 Budget at Exhibit 10, CEN-87 (https://www.osec.doc.gov/bmi/budget/FY17CBJ/Census%20FY%202017%20CBJ%20final%20not508.pdf) (2015 ACS budget of approximately $230M); FY2018 Budget at Exhibit 10, CEN-77 (https://www.osec.doc.gov/bmi/budget/FY18CBJ/Census_FY_2018_Congressional_Budget_Submission_508_Compliant.pdf) (2016 ACS budget of approximately $225M); FY2019 Budget at Exhibit 10, CEN-71 (https://www.osec.doc.gov/bmi/budget/FY19CBJ/Census_FY19_President's_Budget_Final.pdf) (2017 ACS budget of approximately $220M); FY2020 Budget at Exhibit 10, CEN-87 (https://www.osec.doc.gov/bmi/budget/FY20CBJ/fy2020_census_congressional_budget_justification.pdf) (2018 ACS budget of approximately $210M); FY2021 Budget at Exhibit 10 CEN-87 (https://www2.census.gov/about/budget/census-fiscal-year-21-presidents-budget.pdf) (2019 ACS budget of approximately $210M).

to warn users that the ACS "is not the official source of population counts."[56] Instead, "the official population count—including population by age, sex, race and Hispanic origin—comes from the once-a-decade census, supplemented by annual population estimates (the Population Estimates Program)."[57] Therefore, the Bureau warns that, although ACS population estimates may be useful in understanding the characteristics of persons or populations within a legislative district or other area, the ACS estimates "**should not be used as actual population counts or housing totals for the nation, states or counties.**"[58]

62.     The use of ACS estimates as the base population data for the Plan creates a number of problems and inaccuracies, including but not limited to the following five broad categories of issues:

> a.    First, unlike the decennial census, which represents a complete count of the population, the ACS estimates represent a small sampling of addresses and are therefore subject to sampling errors and imprecision, which can be considerable for small geographic areas and population groups.
>
> > (1)    The Bureau selects a random sample of addresses to be included in the ACS. The Bureau then sends the surveys to approximately 295,000 addresses each month across the United States (or about 3.5 million addresses each year). This is a small sample of roughly 2.5 percent out of more than 140 million eligible addresses.[59]
> >
> > (2)    ACS estimates can differ significantly from the official census count because the ACS is only a sample, not a specific population count. As an example, a comparison of the population estimates from the 2005-2009 ACS (the most current at the time of the last Illinois legislative redistricting in 2011) to the population count from the 2010 census show significant differences, such as county total populations varying from +36.6% to -51.5%.

---

[56] ACS Key Facts, at p. 1.

[57] *Id.*

[58] *Id.*

[59] ACS Info Guide, at p. 9.

(3)     ACS estimates are reported with a margin of error (e.g., +/- 1,000 people). That margin reflects a 90% confidence interval, meaning that there is a 90% likelihood that the true number lies within that margin and a 10% chance it does not.

(4)     Each ACS estimate is reported by geographic unit. As the unit shrinks, the margin of error (as a percentage of the estimate) increases dramatically. This disproportionately affects the reliability of ACS estimates with respect to both smaller geographic units, like Blocks and Block Groups, and minority populations.

(5)     For illustration, consider Census Tract 8212 in Cook County and, within that tract, Block Group 4, both of which are split in the Redistricting Plan between proposed Representative Districts 27 and 28.[60] Both of those districts are intended to be majority-Black districts (54.0% and 50.0% Black citizen voting age population, respectively, according to the General Assembly).[61] The reported margin of error (at a 90% confidence interval) for the total population of Census Tract 8212 is *14.6%* (925 people out of 6,327 estimated total); the reported margin of error for the total population of Block Group 4 within that Tract is *35.9%* (725 people out of 2,020 estimated total); the reported margin of error for the Black population (one race) within that Tract is *30.9%* (942 people out of 3,049 estimated total); and the reported margin of error for the Black population (one race) of Block Group 4 within that Tract is *57.4%* (591 people out of 1,029 estimated total).[62]

(6)     These margins of error for small units of geography and minority populations demonstrate the uncertainty and imprecision inherent in using ACS estimates for redistricting. Moreover, there are *no* reported estimates for specific blocks used to draw the boundary between the two districts.

b.     Second, the five-year ACS estimates are based on outdated survey responses dating back more than five years before the census date and fail to fully represent population changes that have occurred since that time.

(1)     ACS estimates are not reported for all geographic areas every year. Instead, reporting varies based on the estimated population of the

---

[60] American Community Survey, 2019 5-Year Estimate, Table IDs DP05 and B01003, Census.gov (https://www.census.gov/programs-surveys/acs/data.html) ("ACS Table IDs DP05, B01003").

[61] House Res. 539.

[62] ACS Table IDs DP05, B01003, B02001.

geographic area. Single-year estimates are made available only for areas with a population of 65,000 or more. Estimates for sparsely-populated areas, referred to as "small area estimates," are available only using five-year averages.

(2)     Only 23 of the 102 counties in Illinois and only 19 out of the 1,298 municipalities in Illinois are large enough to have single-year ACS estimates.

(3)     Because one-year estimates are not available for the entire state, the Redistricting Plan passed by the General Assembly uses five-year estimates from the 2015-2019 ACS responses for complete statewide coverage. The five-year estimates reflect ACS responses from January 1, 2015 through December 31, 2019. Effectively, the average response reflected in the ACS estimates is from 2017.

(4)     By contrast, the census date is April 1, 2020. Therefore, the five-year ACS estimates are, on average, three years older than the 2020 census count.

(5)     The five-year ACS estimates do not reflect a single point in time. This creates inaccuracies and fails to reflect the most recent population status. For example, a growing area would be under-reported because the five-year estimates would fail to capture all growth in the most recent years of the estimates. The example of Kendall County, Illinois below reflects this fact:

**One-Year Estimates**

| Geographic Area Name | Date Description | Population |
|---|---|---|
| Kendall County, Illinois | 7/1/2015 population estimate | 122,878 |
| Kendall County, Illinois | 7/1/2016 population estimate | 124,535 |
| Kendall County, Illinois | 7/1/2017 population estimate | 126,152 |
| Kendall County, Illinois | 7/1/2018 population estimate | 127,717 |
| Kendall County, Illinois | 7/1/2019 population estimate | 128,990 |

**Five-Year Estimate**

| **ACS DEMOGRAPHIC AND HOUSING ESTIMATES** | |
|---|---|
| Survey/Program: American Community Survey  TableID: DP05  Product: 2019: ACS 5-Year Estimates Data Profiles ▾ | |
| ⌄ Total population | 126,054 |

24

(6)     In this example, the five-year estimate for the 2019 population of Kendall County would be 2,936 people lower than the one-year estimate, which further demonstrates the errors inherent in using five-year ACS estimates as the base population data for redistricting.

c.     Third, unlike the decennial census, which is supported by substantial federal, state, and local funding for public outreach campaigns, the ACS receives far less funding and has a lower response rate, which creates further imprecision.

(1)     As explained in detail in paragraphs 52 through 54 above, billions of dollars from the federal budget are allocated to increasing participation in the decennial census, and Illinois and Chicago have additionally dedicated over $45 million in total to support census efforts.

(2)     Utilizing these funds, the census is conducted using a detailed operations plan that includes specific milestones and timelines.[63] At a high level, the Bureau must: (i) make a list of every address in the 50 states, District of Columbia, and five U.S. territories—include houses, apartments, dormitories, military barracks, and more, (ii) ask a member of every occupied address to complete the census online, by phone, or by mail, and (iii) follow up with addresses that did not respond on their own, including through door-to-door visits and inquiries.[64]

(3)     In contrast, only between approximately $210 and $230 million in federal funding was apportioned for the ACS in each year between 2015 and 2019, which combined is approximately 13% of the total federal funding allocated to the decennial census. The State of Illinois and local governments in the state did not spend any funds to encourage Illinoisans to respond to the ACS during the past decade, nor did they conduct an extensive public outreach campaign, in contrast to the census.

(4)     As expected given the higher level of funding and emphasis, the completion rate for the 2020 decennial census in Illinois was approximately 99.9% (including enumerated and proxy data),

---

[63] Census Operational Plan V 4.0.

[64] Conducting the Census, 2020Census.gov (https://2020census.gov/en/conducting-the-count.html).

while the completion rate for the ACS in 2019 was only approximately 85.3%.[65]

d. Fourth, ACS estimates are not available for individual Census Block units but are instead reported in larger "Block Group" units. Thus, the ACS estimates must be manipulated to fit the Census Blocks used in redistricting.

   (1) In addition to states, counties, and other large areas, the decennial census reports population count by:

      (i) Census Tracts (targeted to be 4,000 inhabitants and 1,600 housing units)

      (ii) Census Block Groups (targeted to be 600 to 3,000 inhabitants and 240 to 1,200 housing units)

      (iii) Census Blocks (in Illinois, there are approximately 450,000 Blocks, or more than 40 Blocks for every Block Group)

   (2) In contrast, ACS total population estimates are reported only down to the Block Group unit, not the Block unit. ACS racial and ethnic estimates by age group, which are important for determining voting age population by race and ethnicity, are reported down to the Tract unit, not the Block Group or Block units.[66]

   (3) The Redistricting Plan's Senate and Representative Districts were drawn using Blocks, not exclusively Block Groups or Tracts. The absence of Block-level estimates means that the Redistricting Plan passed by the General Assembly required manipulating the estimates by using certain assumptions about how a Tract or Block Group population should be allocated among Block units, which enhanced error rates in the plan. The General Assembly has not publicly stated what assumptions were used for this manipulation or how the manipulation was conducted.

e. Fifth, the ACS estimates are based on outdated geographic boundaries. Thus, the ACS estimates must be manipulated to fit the current geographic boundaries.

---

[65] American Community Survey, Response Rates, Census.gov (https://www.census.gov/acs/www/methodology/sample-size-and-data-quality/response-rates/).

[66] American Community Survey 5-Year Data (2009-2019), Census.gov (https://www.census.gov/data/developers/data-sets/acs-5year.html).

(1)      The Bureau adjusts Tracts, Block Groups, and Blocks every 10 years. The 2020 census count will be based on new geographic boundaries, which have already been released to the public.[67] It is apparent that the Plan was drawn using the 2020 geographic boundaries.

(2)      However, the 2015-2019 ACS population estimates are based on the prior geographic boundaries from the 2010 census.

(3)      Using the 2015-2019 ACS estimates to draw legislative districts thus requires further manipulation of the estimates to match the geographic boundaries from the 2020 census. That manipulation requires additional assumptions that enhance the errors inherent in the use of the ACS estimates. The General Assembly has not publicly stated what assumptions were used for this manipulation or how the manipulation was conducted.

63.      Comparisons using historical data also demonstrate the problems inherent in using ACS estimates for redistricting. Experts have run comparisons of computer-generated plans drawn using the 2005-2009 ACS estimates, which show that the use of ACS estimates inevitably results in population disparities well in excess of 10%. Among a *thousand* computer-generated plans drawn using the 2005-2009 ACS estimates, while controlling for compactness and majority-minority districts, not a single plan had a maximum population deviation within 10% when subsequently analyzed against the 2010 census counts. Instead, the plans based on ACS estimates showed maximum population deviations that were generally between 23% and 55%, far beyond the constitutional limits.

64.      Even recent ACS estimates of the statewide Illinois total population—the largest sample, which should suffer the least error—show the inaccuracies from using ACS estimates. The ACS had predicted a steady decline in population between 2013 and 2019, with a total loss

---

[67] Census Bureau to Release 2020 Census Geographic Products, 2020Census.gov (Jan. 14, 2021) (https://2020census.gov/en/news-events/press-releases/2020-census-geographic-products.html).

of 210,000 residents statewide.[68] Yet when the 2020 apportionment count, which is from the decennial census, was released earlier this year, Illinois's population was roughly flat over the decade; the predicted loss didn't materialize.



65. In addition, courts have consistently recognized the distinctions between ACS estimates and the official decennial census counts and explained that ACS estimates are not sufficient for determining population or apportioning residents between districts.[69]

---

[68] American Community Survey, 1-Year Estimates (2011-2019), Table ID B01003, Census.gov (https://www.census.gov/programs-surveys/acs/data.html).

[69] *See Missouri State Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1022 (E.D. Mo. 2016), *aff'd*, 894 F.3d 924 (8th Cir. 2018) (ACS estimates are subject to sampling bias and margins of error, and the Census Bureau warns users to use the official census for population counts); *Pope*, 2014 WL 316703, at *13 n.22 (Census Bureau acknowledged that estimates provided by the ACS are not intended to be used in redistricting); *Benavidez v. Irving Indep. Sch. Dist., Tex.*, 690 F. Supp. 2d 451, 458 (N.D. Tex. 2010) (ACS estimates have higher margins of error compared to traditional census data).

66.     In sum, it is improper to use ACS estimates as the population data for redistricting purposes. The use of the ACS estimates creates numerous errors and makes it impossible to determine with any accuracy the population in any Senate or Representative District.

**I.      The Use of ACS Estimates as the Base Population in the Redistricting Plan Is Arbitrary.**

67.     In addition to the fact that the Redistricting Plan violates the "one person, one vote" principle, the Plan also violates the Equal Protection Clause because it is arbitrary.

68.     The General Assembly did not establish a sufficient legislative record to support the use of ACS estimates. In fact, in committee hearings and floor debates, the Plan's legislative sponsors professed to have *no* knowledge of precisely what data were used, how the data were manipulated to work for redistricting purposes, or even who drew the maps.

69.     During a legislative hearing on May 25, 2021, after the Plan was publicly unveiled and shortly before its passage, Dr. Allan Lichtman, an expert retained by the House and Senate Democratic Caucuses, stated that he was not sure what data were ultimately used to draw the Plan and could not confirm whether ACS estimates were in fact used, did not participate in drawing the Plan, and had not analyzed the Plan. The legislative sponsors' explanation for the use of ACS estimates was that the Illinois Constitution's redistricting schedule necessitated the enactment of a plan prior to June 30th.

70.     Also, despite professing to use "election data" and "public input" in creating the Plan, Democratic legislative leaders who sponsored and pushed the Redistricting Plan through the General Assembly were unable to articulate during legislative proceedings precisely what "election data" were used or how they were used in combination with the ACS estimates.

71.     Moreover, the General Assembly has not provided any explanation for why the five-year 2015-2019 ACS estimates were determined to be the best available population data or

why the General Assembly chose to pass a map using those ACS estimates instead of the actual census counts, which will be available not later than August 16, 2020.

72.     The taint of arbitrariness in the Redistricting Plan is illustrated by the oddly shaped boundaries for some of the proposed Representative Districts. There are many instances where presumably unpopulated blocks along road and highway medians are assigned to a Representative District without apparent reason—like superfluous appendages. Examples are illustrated immediately below.[70]



Rep. District 28 (shown in green), Block 170318245093007



Rep. District 59 (shown in tan), Blocks 170978645111032 and 170978645111038



Rep. District 87 (shown in green), Blocks 171130052022093, 171130052022094, and 171130052022099



Rep. District 101 (shown in blue), Block 170190009022009

---

[70] Pub. Act 102-0010 and Google map representation of the Plan released by the House Democratic Caucus, available at https://www.google.com/maps/d/u/2/viewer?mid=1Rs-85ic7W0nBZ2QPiXsGIazZicynzIco&ll=39.79510521942542%2C-89.50414500000001&z=7.

73. The official decennial census counts are presumed to be accurate, valid, and the best data available to determine populations for redistricting purposes. The General Assembly has failed to rebut the presumption that the decennial census counts are the best population data for redistricting. Nor has the General Assembly shown that the ACS estimates are appropriate to use as the main source of population data in the Redistricting Plan. The Redistricting Plan is plainly arbitrary and capricious.

**J.    The Use of ACS Estimates as the Base Population in the Redistricting Plan Is Discriminatory**

74. In addition to the fact that the Redistricting Plan violates the "one person, one vote" principle and the fact that the redistricting process was arbitrary, the Plan also violates the Equal Protection Clause because it is discriminatory. The use of ACS estimates results in a differential undercount that has a greater effect on racial and ethnic minorities and other minority groups that have historically been undercounted and thus underrepresented and underfunded.

75. Comparisons based on historical data confirm that ACS estimates undercount minority populations. When compared to the 2010 census count, the 2005-2009 5-Year ACS estimates for Illinois underestimated the entire Illinois population by 45,589 people, but the impact on specific sub-populations was even more significant. The Latino, Asian, and Native American populations were underestimated by 154,959 (7.6%), 48,206 (8.2%), and 20,755 (47.2%) persons, respectively. In contrast, the white population was over-estimated.

76. Also, computer-generated plans drawn using the 2005-2009 ACS estimates generally resulted in two fewer majority-Latino districts than plans drawn using the official 2010 census counts, even when controlling for compactness, the number of majority-Black districts, and certain other districting criteria. The Plan ensures that historically undercounted minority

communities will continue to be underrepresented and lose their right to an equal vote in the legislature by foregoing the official census counts in favor of the ACS estimates.

77.     Thus, it is no surprise that more than 50 good government groups and community advocates have publicly opposed the use of ACS estimates for the Plan, including the American Federation of Teachers, Asian American Legal Defense and Education Fund, CHANGE Illinois, Common Cause, Fair Elections Center, Georgetown Center on Poverty and Inequality, Lawyers for Good Government, League of Women Voters of the United States, MALDEF (Mexican American Legal Defense and Educational Fund), NAACP (National Association for the Advancement of Colored People), National Urban League, and SPLC Action Fund.[71]

78.     These organizations have correctly warned that the decision to use ACS estimates as the base for the Plan will disenfranchise at least tens of thousands of Illinoisans by creating representative maps that do not include them. Thus, the Plan is discriminatory and improper.

**K.     The Use of Unspecified Election Data Only Exacerbates the Problems Caused by the Use of ACS Estimates**

79.     The Redistricting Plan attempts to mitigate the problems caused by the use of ACS population estimates by supplementing the ACS estimates with additional unspecified "election data." However, the legislative leaders who sponsored and pushed the Plan through the General Assembly were unable to articulate during legislative proceedings precisely what "election data" were used or how the data were used in combination with the ACS estimates.

80.     Regardless, election data, whether consisting of the number of ballots cast or voter registration records, suffers from many of the same defects as the ACS estimates, including

---

[71] Statement on Appropriate Data for Redistricting (https://advancingjustice-aajc.org/sites/default/files/2021-04/Statement%20on%20Appropriate%20Data%20for%20Redistricting%20FINAL%204.27.2021.pdf).

the fact that the use of that data results in a plan that disproportionately impacts minority communities. Thus, the use of election data only exacerbates the problems inherent in the Plan.

# VI.
## CAUSES OF ACTION

### COUNT I
**(Violation of the Equal Protection Clause, Actionable under 42 U.S.C. § 1983)**

81.     Plaintiffs re-allege the facts set forth in the paragraphs above as if set forth herein.

82.     The Equal Protection Clause in the Fourteenth Amendment to the U.S. Constitution requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis and that states must draw Senate and Representative Districts with substantially equal populations.

83.     Under this requirement, any plan that results in a greater-than-10% population deviation between the largest and smallest legislative districts is "presumptively impermissible."[72] Even if the plan results in a smaller maximum population deviation, the plan will still be held invalid if the districts are drawn using arbitrary or discriminatory criteria.[73]

84.     The official population counts from the decennial census have long been recognized as the best source of population data to achieve such equality and are presumptively valid for redistricting purposes.[74]

85.     Despite lacking the official population counts from the census, the General Assembly passed the Redistricting Plan on May 28, 2021, and Governor Pritzker signed it into law on June 4, 2021. Instead of the official census counts, the Redistricting Plan passed by the

---

[72] *Evenwel*, 136 S. Ct. at 1124.

[73] *Roman*, 377 U.S. at 710.

[74] *See, e.g.*, *Karcher*, 462 U.S. at 738; *Kirkpatrick*, 394 U.S. at 528.

General Assembly uses ACS five-year population estimates from 2015-2019 as the main source of population data.[75]

86. The attempts to pass and enact the Plan deprive Plaintiffs and other Illinois voters of their rights to vote in Senate and Representative Districts with substantially equal populations. The deprivation of these rights occurred under the color of state law. Plaintiffs are therefore entitled to relief for violation of their rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution pursuant to 42 U.S.C. § 1983.

87. As explained in detail above, because it uses ACS estimates for population data, the Plan does not ensure that the Senate and Representative Districts satisfy the constitutional mandate of substantially equal populations. The Plan fails to ensure substantial population equality for a number of key reasons:

a. Unlike the decennial census, which represents a complete count of the population, the ACS estimates represent a small sampling of addresses and are therefore subject to considerable sampling errors and imprecision;

b. The ACS single-year estimates are available only for geographic areas with populations of 65,000 or more and the five-year ACS estimates, which are the only available estimates for smaller geographic areas (e.g., Block Groups and Census Tracts), are based on outdated survey responses dating back more than five years before the census date and fail to fully represent population changes that have occurred since that time;

c. Unlike the decennial census, which is supported by substantial federal, state, and local funding for public outreach campaigns, the ACS receives far less funding and has a lower response rate, which creates further imprecision;

d. The ACS estimates are not available for each individual "Census Block" but are instead reported in larger "Census Tracts" or "Block Groups" (depending on the particular estimates) and must be manipulated to attempt to fit the applicable Census Blocks; and

e. The ACS estimates are based on the 2010 census geographic boundaries and must be manipulated to fit the updated 2020 census boundaries.

---

[75] Pub. Act 102-0010 at § 5(d) (explaining that Plan is based on 2015-2019 ACS estimates).

88.     For these reasons, any redistricting plan based on ACS estimates *cannot* create substantially equal legislative districts, as shown by comparisons of historical data which confirm that plans drawn using ACS estimates inevitably result in population disparities well in excess of 10%.

89.     In addition to the failure of the Redistricting Plan to draw substantially equal districts, the Redistricting Plan also violates the Equal Protection Clause of the Fourteenth Amendment because the choice to use ACS estimates as the base population data is both arbitrary and discriminatory.

90.     First, the Redistricting Plan is arbitrary because, among other things, the General Assembly has not provided any explanation for why the five-year 2015-2019 ACS estimates were determined to be the best available population data or why it chose to pass a map using the ACS estimates instead of the actual census counts, which will be available in a few short months.

91.     Second, the Redistricting Plan is discriminatory because the use of ACS estimates results in greater undercounts of minority populations, and thereby ensures that historically undercounted minority communities will continue to be underrepresented and lose their right to an equal vote in the legislature.

92.     Also, the use of unspecified "election data" only exacerbates the many problems inherent in the Plan. Election data, whether consisting of the number of ballots cast or voter registration records, suffers from many of the same defects as the ACS estimates, including that the use of such data results in a plan that disproportionately impacts minority communities.

93.     Based on the foregoing, the Redistricting Plan fails to draw legislative districts of substantially equal populations and thus violates the well-established "one person, one vote"

guarantee embodied in the Equal Protection Clause of the U.S. Constitution. Thus, the Redistricting Plan is unconstitutional, invalid, and void *ab initio*.

## COUNT II
**(Federal Declaratory Judgment Claim, 28 U.S.C. §§ 2201, 2202)**

94.     Plaintiffs re-allege the facts set forth in the paragraphs above as if set forth herein.

95.     For the reasons explained above, an actual controversy exists between Plaintiffs and Defendants regarding whether the Plan is unconstitutional, invalid, and void *ab initio*.

96.     Despite lacking the official population counts from the census, the General Assembly passed the Redistricting Plan on May 28, 2021, and Governor Pritzker signed it into law on June 4, 2021.

97.     Accordingly, Plaintiffs respectfully request that the Court grant declaratory relief under the Declaratory Judgment Act and declare that the Plan is unconstitutional, invalid, and void *ab initio*.

## COUNT III
**(Claim for a Writ of Mandamus, 28 U.S.C. § 1651(a))**

98.     Federal courts have authority to issue writs of mandamus pursuant to the All Writs Act, 28 U.S.C. § 1651(a).[76] Mandamus is appropriate when the plaintiff has a clear, affirmative right to relief and when the defendant has a clear duty to act and authority to comply with the writ.

99.     Under Article IV, Section 3 of the Illinois Constitution, in the event that a valid legislative redistricting plan does not become effective with the full force and effect of law by June 30, 2021, regardless of the reason for that failure, then the sole authority, duty, and

---

[76] *See Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 380 (2004).

responsibility to enact a valid legislative redistricting plan based on the 2020 decennial census shifts to a bipartisan Commission.

100.    Because the Redistricting Plan is unconstitutional, invalid, and void *ab initio*, no valid legislative redistricting plan has become effective or can become effective prior to June 30, 2021. The Speaker of the House of Representatives and the President of the Senate therefore have a clear duty to appoint members to a bipartisan Commission and have the authority to comply with a writ ordering them to appoint such members. Plaintiffs have a clear, affirmative right to having a bipartisan Commission constituted to enact a valid and constitutional redistricting plan.

101.    By enacting an unconstitutional and invalid Redistricting Plan and refusing to appoint members to a bipartisan Commission, Defendants have violated federal law, including the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. Plaintiffs have no adequate remedy other than mandamus with which to require Defendants to comply with their duties and obligations under federal law.

102.    Therefore, the Court should grant a writ of mandamus ordering Defendants EMANUEL CHRISTOPHER WELCH, in his official capacity as Speaker of the Illinois House of Representatives, the OFFICE OF SPEAKER OF THE ILLINOIS HOUSE OF REPRESENTATIVES, DON HARMON, in his official capacity as President of the Illinois Senate, and the OFFICE OF THE PRESIDENT OF THE ILLINOIS SENATE to appoint members to a bipartisan Commission.

## VII.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

1.      Assume jurisdiction over this action and designate a three-judge panel pursuant to 28 U.S.C. § 2284.

2.      Issue an order pursuant to 42 U.S.C. § 1983 holding that Defendants violated Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

3.      Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57, declaring that the Redistricting Plan violates the Equal Protection Clause of the Fourteenth Amendment and is therefore unconstitutional, invalid, and void *ab initio*.

4.      Issue a permanent injunction enjoining the appropriate Defendants, their agents, employees, and those persons acting in concert with them, from enforcing or giving any effect to the Plan, including enjoining the appropriate Defendants from conducting any elections based on the Redistricting Plan.

5.      Grant a writ of mandamus requiring Defendants EMANUEL CHRISTOPHER WELCH, in his official capacity as Speaker of the Illinois House of Representatives, the OFFICE OF SPEAKER OF THE ILLINOIS HOUSE OF REPRESENTATIVES, DON HARMON, in his official capacity as President of the Illinois Senate, and the OFFICE OF THE PRESIDENT OF THE ILLINOIS SENATE to appoint members to a bipartisan Commission with the responsibility for enacting a redistricting plan pursuant to the procedures set forth in Article IV, Section 3 of the Illinois Constitution.

6.      In the alternative to granting a writ of mandamus requiring the appropriate Defendants to appoint members to a bipartisan Commission, appoint a Special Master to draft a valid and lawful redistricting plan based on the official 2020 decennial census counts or,

alternatively, grant such other appropriate relief that allows for the drafting and implementation of a redistricting plan based on the official 2020 decennial census counts.

7.      Make all further orders as are just, necessary, and proper to ensure complete fulfillment of this Court's declaratory and injunctive orders in this case.

8.      Issue an order requiring Defendants to pay Plaintiffs' costs, expenses, and reasonable attorneys' fees incurred in the prosecution of this action, as authorized by the Civil Rights Attorneys' Fees Awards Act of 1976, 42 U.S.C. § 1988 and as authorized by 42 U.S.C. § 1973l(e).

9.      Grant such other and further relief as it deems is proper and just.

Dated: June 9, 2021

/s/ Phillip A. Luetkehans
Phillip A. Luetkehans
Brian J. Armstrong
LUETKEHANS, BRADY, GARNER &
ARMSTRONG, LLC
105 E. Irving Park Road
Itasca, Illinois 60143
Tel: (630) 760-4601
Fax: (630) 773-1006
pal@lbgalaw.com
bja@lbgalaw.com

*Counsel for Plaintiffs*

Respectfully submitted,

/s/ Charles E. Harris, II
Charles E. Harris, II
Mitchell D. Holzrichter
Thomas V. Panoff
Christopher S. Comstock
Heather A. Weiner
Christopher A. Knight
Joseph D. Blackhurst
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 782-0600
Fax: (312) 701-7711
charris@mayerbrown.com
mholzrichter@mayerbrown.com
tpanoff@mayerbrown.com
ccomstock@mayerbrown.com
hweiner@mayerbrown.com
cknight@mayerbrown.com
jblackhurst@mayerbrown.com

*Counsel for Plaintiffs*