# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

DAN MCCONCHIE, in his official capacity as
Minority Leader of the Illinois Senate and individually
as a registered voter, JIM DURKIN, in his official
capacity as Minority Leader of the Illinois House of
Representatives and individually as a registered voter,
the REPUBLICAN CAUCUS OF THE ILLINOIS
SENATE, the REPUBLICAN CAUCUS OF THE
ILLINOIS HOUSE OF REPRESENTATIVES, and
the ILLINOIS REPUBLICAN PARTY,

              Plaintiffs,

    vs.

CHARLES W. SCHOLZ, IAN K. LINNABARY,
WILLIAM M. MCGUFFAGE, WILLIAM J.
CADIGAN, KATHERINE S. O'BRIEN, LAURA K.
DONAHUE, CASANDRA B. WATSON, and
WILLIAM R. HAINE, in their official capacities as
members of the Illinois State Board of Elections,
EMANUEL CHRISTOPHER WELCH, in his official
capacity as Speaker of the Illinois House of
Representatives, the OFFICE OF SPEAKER OF THE
ILLINOIS HOUSE OF REPRESENTATIVES, DON
HARMON, in his official capacity as President of the
Illinois Senate, and the OFFICE OF THE
PRESIDENT OF THE ILLINOIS SENATE,

              Defendants.

Case No. 1:21-cv-03091

Circuit Judge Michael B. Brennan
Chief District Judge Jon E. DeGuilio
District Judge Robert M. Dow, Jr.

Three-Judge Court
Pursuant to 28 U.S.C. § 2284(a)

## PLAINTIFFS' STATUS REPORT

Plaintiffs DAN MCCONCHIE, in his official capacity as Minority Leader of the Illinois

Senate and individually as a registered voter, JIM DURKIN, in his official capacity as Minority

Leader of the Illinois House of Representatives and individually as a registered voter, the

REPUBLICAN CAUCUS OF THE ILLINOIS SENATE, the REPUBLICAN CAUCUS OF THE

ILLINOIS HOUSE OF REPRESENTATIVES, and the ILLINOIS REPUBLICAN PARTY

(collectively, "Plaintiffs") respectfully submit this status report to the Court in light of the General Assembly's passage, by a straight party-line vote, of a new legislative redistricting plan.

The General Assembly passed Senate Bill 927 last night at 10:15 PM. Senate Bill 927 purports to amend The General Assembly Redistricting Act of 2021 (as passed by House Bill 2777), which passed on May 28, 2021 and was approved by the Governor on June 4, 2021.[1] House Bill 2777 defined 118 Representative Districts by Census block in Section 10 of that bill.[2] Senate Bill 927 would enact a new Section 11 to define a new set of 118 Representative Districts.[3]

In the Court's August 23, 2021 Minute Order (Dkt. 88), the Court "reiterate[d] the comments made on the record urging the General Assembly to take into account the views of the Plaintiffs in crafting any amended plan with the objective of presenting for the Court's consideration a plan that satisfies all constitutional and statutory obligations, not just those raised in the existing pleadings and motions." Despite this clear admonition from the Court—which the Court emphasized during the August 23, 2021 hearing—the General Assembly chose a different path. In particular, the General Assembly repeatedly excluded Plaintiffs and numerous community groups in its rush to pass the new maps, and therefore chose speed and secrecy at the expense of transparency and deliberation, as shown below:

- The House and Senate Redistricting Committees organized public "subject matter" hearings between Thursday and Sunday on a few days' notice, before unveiling their

---

[1]     S.B. 927, 102nd Ill. Gen'l Assem., available at https://www.ilga.gov/legislation/BillStatus.asp?DocNum=0927&GAID=16&DocTypeID=SB&LegID=133554&SessionID=111&SpecSess=1&Session=0&GA=102 ("S.B. 927").

[2]     H.B. 2777, 102nd Ill. Gen'l Assem., available at https://www.ilga.gov/legislation/billstatus.asp?DocNum=2777&GAID=16&GA=102&DocTypeID=HB&LegID=131631&SessionID=110

[3]     S.B. 927, beginning at p. 5, line 9.

2

proposed amended map.[4] Organizations and advocates that testified at those hearings pleaded for more time—up to 30 days—to develop proposals for the committees' consideration based on the PL 94-171 decennial census data released on August 12, 2021 and to evaluate any proposal by the majority caucuses. Those pleas were ignored.

- Despite House Redistricting Committee Chair Lisa Hernandez having repeatedly stated at those public hearings that a new map had not yet been completed, House Redistricting Committee Minority Spokesman Tim Butler personally witnessed members of the Democratic caucus viewing their newly revised districts on Wednesday, August 26, 2021, the day before those hearings began. Representative Butler stated so much in the subsequent hearings, and his statements were not refuted. Independent media reports subsequently confirmed the same. Republican members were never invited to review changes to map.

- A first amended map was finally made publicly available at approximately 12:00 PM on Monday, August 30, 2021, in the form of a Google map (which is not itself capable of being quickly analyzed, except visually). Despite promises made by the Leadership Defendants' counsel, the majority caucuses did not provide a block equivalency file or shapefile for that map until approximately three hours after the map was unveiled.

- Democrats made further changes to the map overnight in secret. A second amended map, which was the first to be put into legislative form (House Floor Amendment 1 to Senate

---

[4]     https://www.ilsenateredistricting.com/hearings. A "subject matter hearing" is a hearing about a topic in general, rather than specific legislation. Because the majority caucuses were not yet willing to unveil their proposed amended map, these hearings were only subject matter hearings.

Bill 927), was made publicly available at approximately 9:35 AM on Tuesday, August 31, 2021. After the House Rules Committee waived usual posting and notice requirements, a hearing of the House Redistricting Committee was convened to approve that legislation within an hour after the map was unveiled (and approximately the same time that the Leadership Defendants made a block equivalency or shapefile available to the Plaintiffs). The bill reflected only a long list of Census blocks by number, but lacked any narrative description of the districts. The legislative sponsor, Representative Hernandez, asserted that the districts would be described in House Resolution 443. That resolution, however, was not available at the time of the committee hearing and only became available at 5:30 PM. The committee passed the amendment on a party-line vote, despite the unavailability of House Resolution 443.

- A third amended map was introduced as House Floor Amendment 2 to Senate Bill 927 at approximately 5:45 PM. No hearing was held; instead, it was approved for consideration by the Rules Committee without a hearing before the House Redistricting Committee. An updated Google map was released at approximately the same time, but no explanation of the differences was offered, and a basic chart describing the demographic characteristics of the districts was not updated; it continued to reflect the characteristics of the first map unveiled the day prior. Only at this time, too, was House Resolution 443 made available.

- The House of Representatives immediately proceeded to vote on both House Resolution 443 and Senate Bill 927, as amended by House Floor Amendment 2. Republican members of the House of Representatives were forced to vote on this map without the block equivalency or shapefiles necessary to analyze what was actually being passed and

4

repeatedly protested the falsehoods stated in House Resolution 443. Both House Resolution 443 and Senate Bill 927 passed the House of Representatives on party-line votes.

- The Senate held no hearing on August 31, 2021. Instead, the Senate Assignments Committee voted to send House Floor Amendment 2 to Senate Bill 927 to the Senate floor for consideration without a hearing or vote before the Senate Redistricting Committee, which in the practice of the Senate is a rare maneuver. As such, there was no opportunity to provide input on the final bill before the Senate.

- Like the House of Representatives debate, the Senate debate occurred without an opportunity for the Plaintiffs to view a block equivalency or shapefile for the map.[5] Further, Senate Special Session Resolution 3, which provided the narrative description of the districts and the alleged reasoning for the shape of the districts, was not made public until 20 minutes before the floor debate began. Both Senate Special Session Resolution 3 and Senate Bill 927 passed the Senate on a party-line vote.

- Numerous organizations have spoken out strongly to lament the undemocratic, rushed, and secretive process by which Senate Bill 927 was passed. A sampling of those statements is attached as Exhibit A hereto. As Common Cause Illinois succinctly stated, the process was "yet another example of how mishandled and undemocratic the redistricting process has been in Illinois," and "this latest, last minute hearing provides almost no notice to the public." Common Cause Illinois Executive Director Jay Young stated, "At each opportunity in this redistricting process, it's as if lawmakers went out of their way to ensure

---

[5]     As of 8:00 AM this morning (September 1, 2021), the Plaintiffs had still not been provided a shapefile for the Senate portion of the map.

the creation of these maps *had as little public input as possible.*" (emphasis added) The Chicago Lawyers' Committee for Civil Rights and United Congress and Community and Religious Organizations stated that "the General Assembly has still refused to provide meaningful opportunities for community input, to the detriment of the very communities that voting rights laws were enacted to protect," that "[c]ommunities of color have said loud and clear throughout these hearings that we are uncomfortable with this year's redistricting process, and we do not feel reassured that our rights are being respected," and that "there is no way to confirm that there is compliance with the federal Voting Rights Act."

- The Plaintiffs' and Leadership Defendants' counsel were in contact throughout this process. Mike Kasper, counsel to the Leadership Defendants, invited Plaintiffs' counsel to meet and confer at 11:24 AM on August 30, 2021. After Plaintiffs' counsel had an opportunity to review the map that was unveiled that day, we responded to Mr. Kasper at 9:37 AM on August 31, 2021. Having just heard (but not yet confirmed) that another new map was being unveiled, we advised at that time that we would like to meet once the new map was released and could be analyzed. We did not know at that time that, in fact, the new map had just been released and was being sent for a vote before the House Redistricting Committee. We reiterated our requests for block equivalency and shapefiles throughout the day of August 31st. Mr. Kasper finally responded at 7:55 PM, after the House floor proceedings had begun, saying that he never received our suggestion to meet earlier that morning.

*       *       *

6

Plaintiffs respectfully submit this status report for the Court's consideration and to assist in the Court's discussion with the parties at today's upcoming status conference.

Dated: September 1, 2021

Respectfully submitted,

/s/ Phillip A. Luetkehans
Phillip A. Luetkehans
Brian J. Armstrong
LUETKEHANS, BRADY, GARNER &
ARMSTRONG, LLC
105 E. Irving Park Road
Itasca, Illinois 60143
Tel: (630) 760-4601
Fax: (630) 773-1006
pal@lbglaw.com
bja@lbglaw.com

*Counsel for Plaintiffs Dan McConchie, in his official capacity as Minority Leader of the Illinois Senate and individually as a registered voter, Jim Durkin, in his official capacity as Minority Leader of the Illinois House of Representatives and individually as a registered voter, the Republican Caucus of the Illinois Senate, and the Republican Caucus of the Illinois House of Representatives*

/s/ Ricardo Meza
Ricardo Meza
Meza Law
161 N. Clark Street, Suite 1600
Tel: (312) 802-0336
rmeza@meza.law

*Counsel for Plaintiffs Dan McConchie, in his official capacity as Minority Leader of the Illinois Senate and individually as a registered voter, Jim Durkin, in his official capacity as Minority Leader of the Illinois House of Representatives and individually as a registered voter, the Republican Caucus of the Illinois Senate, and the Republican Caucus of the Illinois House of Representatives*

/s/ Charles E. Harris, II
Charles E. Harris, II
Mitchell D. Holzrichter
Thomas V. Panoff
Christopher S. Comstock
Heather A. Weiner
Christopher A. Knight
Joseph D. Blackhurst
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 782-0600
Fax: (312) 701-7711
charris@mayerbrown.com
mholzrichter@mayerbrown.com
tpanoff@mayerbrown.com
ccomstock@mayerbrown.com
hweiner@mayerbrown.com
cknight@mayerbrown.com
jblackhurst@mayerbrown.com

*Counsel for Plaintiffs Dan McConchie, in his official capacity as Minority Leader of the Illinois Senate and individually as a registered voter, Jim Durkin, in his official capacity as Minority Leader of the Illinois House of Representatives and individually as a registered voter, the Republican Caucus of the Illinois Senate, and the Republican Caucus of the Illinois House of Representatives*

/s/ John G. Fogarty
John G. Fogarty
Clark Hill PLC
130 E. Randolph St., Suite 3900
Chicago, Illinois 60601
Tel: (312) 985-5900
Fax: (312) 985-5999
jfogarty@clarkhill.com

*Counsel for Plaintiff the Illinois Republican Party*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on September 1, 2021, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will provide notice to all counsel of record in this matter.

/s/ Charles E. Harris, II
Charles E. Harris, II

# EXHIBIT A



# COMMON CAUSE ILLINOIS BOYCOTTS JOINT REDISTRICTING HEARING IN PROTEST OF UNDEMOCRATIC MAPMAKING PROCESS

08.30.2021 / 2:50 PM

**Media Contact**

---

CHICAGO — Common Cause Illinois announced today that it is boycotting the hastily scheduled Joint Redistricting Committee hearing, scheduled for this Monday evening, in protest of yet another example of how mishandled and undemocratic the redistricting process has been in Illinois.

The organization, which has repeatedly testified at previous hearings and has mobilized its over 30,000 supporters to participate in the process, will not be engaging its network as lawmakers rush to revise maps in the shadows. The General Assembly is set to vote on revised maps on Tuesday, August 31st.

"Since the beginning, we've pleaded with lawmakers to keep the redistricting process open, transparent, and accessible to no avail," said Jay Young, Executive Director of Common Cause Illinois. "This latest, last-minute hearing provides almost no notice to the public. The new maps have been released less than a day before lawmakers vote on them. It's shameful, and our organization refuses to add any legitimacy to such an undemocratic process."

"At each opportunity in this redistricting process, it's as if lawmakers went out of their way to ensure the creation of these maps had as little public input as possible. Rejecting an independent bipartisan redistricting commission, politicians chose to draw maps themselves. They did so behind closed doors, with a series of hearings attempting to add a veneer of public access. Yet, these hearings were consistently hastily scheduled, poorly noticed to the general public, and sparsely attended. As a result, the maps to be voted on tomorrow will not be crafted of public input, but of pure politics."

Common Cause Illinois will be continuing its work on the creation of an independent redistricting commission in Illinois to give residents a voice in future mapmaking.

###

See More:   **GERRYMANDERING/REDISTRICTING**      **REDISTRICTING & GERRYMANDERING**

## About Us

Staff Directory

What We Do

Careers & Opportunities

National Governing Board

National Staff Directory

## Democracy Wire

## Financials

## Facebook

## Twitter

Common Cause Illinois
205 W. Randolph St, Suite 1220
Chicago, Illinois 60606
(312) 372-2422



CONTACT US

WEBSITE POLICIES

 

**TESTIMONY BY UNITED CONGRESS OF COMMUNITY AND RELIGIOUS
ORGANIZATIONS AND CHICAGO LAWYERS' COMMITTEE FOR CIVIL RIGHTS
BEFORE THE ILLINOIS HOUSE REDISTRICTING COMMITTEE &
ILLINOIS SENATE REDISTRICTING COMMITTEE
AUGUST 28, 2021**

Submitted By:

Rod Wilson, Executive Director
Rev. Robin Hood, Community Organizer
United Congress of Community and Religious Organizations
2532 W. Warren Blvd.
Chicago, IL 60612
E-mail: rwilson@unitedcongress.org

Ami Gandhi, Senior Counsel
Clifford Helm, Program Counsel
Erica Knox, Policy Advocate
Aneel Chablani, Chief Counsel
Chicago Lawyers' Committee for Civil Rights
100 N. LaSalle St., Suite 600
Chicago, Illinois 60602
Phone: (312) 888-4193 | E-mail: agandhi@clccrul.org

## 1. Introduction

### a. United Congress of Community and Religious Organizations (UCCRO)

The United Congress of Community and Religious Organizations (UCCRO) is a non-partisan grassroots-led multiethnic and multi-faith human rights alliance mobilizing people, policy and ideals to drive societal transformation and forge unity for the equitable advancement of marginalized communities. UCCRO believes that all Illinoisans have the right to be healthy, wealthy, safe, educated and employed regardless of race, ethnicity, religion, age, income or citizenship status. UCCRO's coalition includes Coalition for a Better Chinese American Community, Communities United, Enlace Chicago, HANA Center, Illinois Muslim Civic Coalition, Inner City Muslim Action Network, Kenwood-Oakland Community Organization, Latino Policy Forum, Lugenia Burns Hope Center, Target Area Development Corporation, and a number of other grassroot organizations.




b. <u>**Chicago Lawyers' Committee for Civil Rights**</u>

Chicago Lawyers' Committee for Civil Rights is a non-profit, non-partisan organization that has been working for the past 50 years to advance racial equity and economic opportunity for all. We provide legal representation through partnerships with our 40 member law firms. We collaborate with grassroots organizations to implement community-based solutions that advance civil rights.

Our organization protects voting rights in Illinois and Indiana. We work to reduce barriers to voting and civic participation, especially in communities of color and low-income communities. We aim to ensure that all eligible voters are able to cast ballots, that their votes are not diluted, and that the system does not undermine their fundamental right to vote and right to choose their elected officials.

Chicago Lawyers' Committee has a history of representing Black community organizations in redistricting advocacy and litigation under the federal Voting Rights Act and the Constitution. We regularly partner with national Lawyers' Committee for Civil Rights Under Law on civil rights cases. Even aside from litigation, we are proud to work with Black voters and other voters of color in collaborating with our government leaders to strengthen voters' rights and our ability to elect the candidates of our choice. Through our non-partisan Election Protection program, we answer voters' questions in person and over our 866-OUR-VOTE hotline, especially focused on outreach to Black voters and voters of color who are facing unfair barriers to voting.

## 2. <u>UCCRO Unity Map Process</u>

Despite numerous barriers to access, community members have persevered to give input during this year's redistricting cycle. However, many have expressed distress and frustration that this input is not being meaningfully considered by lawmakers. Ultimately community members will have the most relevant insights about their neighborhoods and about whether specific proposed lines dilute their voting rights.

In the spring of 2021, UCCRO filed a redistricting proposal for Illinois House and Senate districts that accomplished the following:

1. Optimized opportunities for Black, Latino, Asian American, and Muslim community members in the State of Illinois to elect candidates of their choice;
2. Was designed with input from leaders within the Black, Latino, Asian American, and Muslim communities around the State; and
3. Is the most comprehensive proposal put forth by any community group in the State of Illinois.

UCCRO is currently in the process of updating its Unity Map to incorporate recently released Census data. However, the Illinois General Assembly's rushed and exclusionary process – once again with hearings *before* the release of proposed maps – imposes significant challenges to Black and Brown communities who are trying to work together toward win-win outcomes.




### 3. Communities Need More Time

In community forums and during a press conference on August 26, 2021, UCCRO, Latino Policy Forum, Enlace, Inner City Muslim Action Network, and others pointed to the need for *at least 30 days* to provide input on the proposed state districts before they are finalized, in order to ensure compliance with state and federal voting rights laws and the ability of communities of color to elect candidates of their choice.

This is not UCCRO's first time seeking equitable outcomes for Black and Brown communities. UCCRO's 2011 Unity Map included input from organizations that engaged Black, Latino, Asian American, and Arab American communities. Not all the coalition's requests were granted, but there were some important signs of progress. Communities stood in solidarity and worked hard to avoid being pitted against each other.

2011 redistricting was challenging for communities of color, but this year's process has been much worse. The legislature has utterly failed to be transparent about what data they have used and how they have used it, hiding the ball from communities most directly impacted by disenfranchisement and then putting the onus on the very same communities to provide sophisticated proposals in ridiculously short time frames. For those communities who have put significant time and resources into articulating their concerns regarding specific neighborhood boundaries, they have been ignored time and time again. Even after the filing of a lawsuit and involvement by a federal court, the Illinois General Assembly has still refused to provide meaningful opportunities for community input, to the detriment of the very communities that voting rights laws were enacted to protect.

### 4. Our Civil Rights and Voting Rights Must Not Be Ignored

The General Assembly must comply with the United States Constitution and federal and state law when redrawing state legislative districts. These bedrock legal requirements provide an important safeguard to ensure a bare minimum of fair representation. But if the General Assembly is to live up to its public commitment to "ensure that the people of Illinois have fair and equal representation," it must do more than just claim that it has complied with the law. Rather, the General Assembly must keep communities of interest together and ensure communities of color are able to participate equally in the political process and elect candidates of choice.

The Equal Protection Clause of the United States Constitution requires state legislative districts to be roughly equal in total population.[1] This principle—known as "one person, one vote"—ensures that at a basic level, each resident of each district is afforded substantially the same representational

---

[1] *See Reynolds v. Sims*, 377 U.S. 533, 569 (1964) ("We hold that, as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis. Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the state.").





power and influence in the General Assembly.[2] In practice, this means that there can be a maximum population deviation of 10% between the most and least populous district, or in other words at most plus 5% or minus 5% between the most or least populous district and the ideal population size (total population divided by the total number of districts).

The Illinois House and Senate district maps enacted on June 4, 2021, fail to meet this basic constitutional threshold, with multiple districts containing either too many or two few residents. Most concerningly, several of the districts that are most overpopulated—and therefore most dilutive of each individual resident's representational power and influence—are districts in which Black Illinoisans constitute a majority or near-majority. Black communities and other communities of color, having been marginalized and excluded from our political process for so long, in 2021 now face further marginalization through malapportionment.

In addition to constitutional requirements, the federal Voting Rights Act requires that district lines be drawn in a way that does not dilute the vote of Black and other communities of color. Specifically, Section 2 of the Voting Rights Act prohibits voting practices—including districting schemes—that result in members of a racial minority group having "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."[3] Since 1965, this provision has prevented the enactment of districting schemes that "pack" minority voters into fewer districts or "crack" them across many districts, both of which have the effect of diluting and reducing overall minority voting power and representational influence in the elected body.

In 2021, and in particular in areas with large and politically diverse communities of color—such as Chicago and Cook County—it is not enough to point to electoral successes by candidates of color as evidence that voters of color are able to elect "representatives of their choice."

Finally, the Illinois Voting Rights Act of 2011 provides that state legislative districts "shall be drawn" so as to create districts wherein voters in a racial minority group can combine with white voters or voters in another racial minority group to elect candidates of choice, or can influence the outcome of an election even short of electing their candidate of choice.[4] This provision explicitly

---

[2] *Id*. at 566-67 ("Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race or economic status.").

[3] 52 U.S.C. § 10301.

[4] 10 ILCS 120 (a) ("In any redistricting plan pursuant to Article IV, Section 3 of the Illinois Constitution, Legislative Districts and Representative Districts shall be drawn… to create crossover districts, coalition districts, or influence districts."). *See also id*. at (b) ("The phrase "crossover district" means a district where a racial minority or language minority constitutes less than a majority of the voting-age population but where this minority, at least potentially, is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate. The phrase "coalition district" means a district where more than one group of racial minorities or language minorities may form a coalition to elect the candidate of the coalition's choice. The phrase "influence district" means a district where a racial minority or language minority can influence the outcome of an election even if its preferred candidate cannot be elected.")




requires the General Assembly to go *beyond* what is required by federal law to create district maps that afford communities of color representational power and influence wherever possible.[5] The enacted maps patently fail to do this.

There is no indication of whether the General Assembly's redrawn maps will protect the voting rights of communities of color. Communities of color have said loud and clear throughout these hearings that we are uncomfortable with this year's redistricting process, and we do not feel reassured that our rights are being respected.

### 5. Problems With Current Adopted Maps Must Be Fixed

We are concerned that the map enacted earlier this year did not go far enough in maximizing opportunities for majority-minority districts – and even weakened many existing majority-minority districts. Merely fixing the current "one person one vote" problem would be insufficient here. When the legislature adjusts the population numbers in each district, as it has announced that it plans to do, we urge the legislature to more robustly protect minority voting rights than it did in the map enacted in June. UCCRO has affirmed its commitment to finding win-win solutions for Black and Brown communities and insists upon at least 30 days to revise its Unity Map to incorporate Census data.

Below are just a few examples of problems in the June 2021 enacted maps that must be fixed when the General Assembly amends the map:

    **a.** **Regarding the North Lawndale area and House District 9**, the Illinois General Assembly originally proposed boundaries for House District 9 that excluded the Southwest corner of North Lawndale and also drew the district in a way where it was unclear if it would remain majority Black. The corner of North Lawndale in question is the triangle is bounded by Cermak Rd to the north, Springfield Ave to the east, Ogden Ave/BNSF railroad to the south, and Canadian National/Chicago & Illinois Western railroad to the west. After testimony from North Lawndale community members, the adopted 2021 map included this triangle region in House District 9. However, North Lawndale community members' concerns have still not yet sufficiently been addressed. We are still concerned that the district can be drawn to have stronger Black voting power than what was reflected in the June 2021 adopted map.

    **b.** We remain concerned that other lines should similarly be revised to strengthen the Black voting power of districts, including **Senate District 5**. UCCRO's Unity Map

---

[5] *Id*. at (a) ("The requirements imposed by this Article are *in addition* and subordinate to any requirements or obligations imposed by the United States Constitution, any federal law regarding redistricting Legislative Districts or Representative Districts, including but not limited to the federal Voting Rights Act, and the Illinois Constitution" (emphasis added)).

 

demonstrated that it is possible to increase the percentage of Black voters in Senate District 5, while also honoring preferences of Latino, Asian American, and Arab American stakeholders. Again, UCCRO requires additional time to engage these respective communities and revise its Unity Map to incorporate recently released Census data.

c. Regarding **House District 26**, the General Assembly should consider increasing the percentage of Black voters in this district and moving the northern boundary of the district farther south, as compared to the June 2021 enacted map. We appreciate the complexities and ripple effects with making such adjustments, which is once again why communities need more time to talk through with each other the repercussions of such a boundary change and discuss workable solutions for our communities.

d. Given the overpopulation of **House Districts 5 and 6**, it is clear that the boundaries of these districts must be modified. However, in revising these districts, the General Assembly must robustly solicit community input, given the important issues at stake for Black and Brown communities whose lives will be impacted by alterations to our voting power. Changing the lines in a rush unnecessarily pits our communities against each other, instead of providing UCCRO a reasonable opportunity to revise its Unity Map proposal.

### 6. <u>Conclusion</u>

Organizations like UCCRO and its coalition members have been speaking out time and time again. We are the experts on our neighborhood boundaries, changes, and preferences. But it is unreasonable to ask communities to give input in a vacuum without the General Assembly sharing proposed maps and accompanying data. Furthermore, it needlessly pits our communities of color against each other when instead we could achieve solutions together. If there are decisions to be made about the interplay between Black-majority districts and Latino-majority districts, Black communities and Latino communities must be a part of those conversations.

Without proposed maps and accompanying data, there is no way to confirm that there is compliance with the federal Voting Rights Act. Merely pointing to current incumbents of color is not enough reassurance that our communities' civil rights have been respected. Legislators have not indicated whether specific input about places like North Lawndale, Chinatown, Little Village, Southwest Suburban Cook County, and other areas of concern will be incorporated into the maps being redrawn now. Without basic information about majority-minority districts that are being drawn, we do not know if communities of color will be able to elect the candidates of their choice in accordance with the law.

We know that the State of Illinois is capable of doing better to protect voting rights of people of color. And Illinois must do better. Thank you for your consideration.



8/28/21
CHANGE Illinois Testimony
To: House and Senate Redistricting Committees
From: CHANGE Illinois

Thank you Chairs Sims, Hernandez and committee members for providing our organization with the opportunity to come before you to weigh in on the state legislative and representative maps that have been signed into law by Governor Pritzker and any potential changes to those maps. My name is Ryan Tolley and I am the Policy Director for CHANGE Illinois Action Fund and CHANGE Illinois.

I would like to raise a few of our concerns, many of which remain unchanged since we last testified during a May redistricting hearing and were shared by our colleagues, friends and partners at hearings earlier this week. We would also like to provide a few suggestions to the committee as you consider making changes to the legislative and representative maps.

Our organization raised many concerns about the redistricting process during the Spring, most notably around the lack of meaningful public participation and transparency as well as the use of American Community Survey data without the 2020 Census data. During those hearings, it was repeated over and over again by lawmakers that the Illinois constitution demanded that a map be finished by June 30, 2021, despite many objections from members of the public and advocacy organizations about the use of ACS data and not having enough time to provide any meaningful input on the map proposals released in late May.

Again, we find ourselves in a similar situation, involved in hearings about changes to the maps that are not available to the public, with the majority of participating community members requesting more time to see, review, analyze, and provide feedback. Only this time there are no state laws requiring a map to be completed by August 31 and there is no constitutional deadline imposing a timeline on changes to the maps.

We recommend that this committee give ample time for the public to review and provide input on any new maps or proposed changes to existing maps before a vote is taken. We recommend that at minimum, the public is given two weeks to review as was called for by and not afforded to community members for the current maps.

www.changeil.org      @changeil

Organizations, who historically have been involved in redistricting, have said that the current timeline isn't nearly enough time for them to provide meaningful feedback. If these organizations need more time, it is unreasonable to expect members of the public to be informed, understand changes to the maps, and reschedule their lives on such short notice to provide input on new maps that will affect the communities they live and work in a matter of days. Much less a matter of hours if no additional time is provided for the public to weigh in after changes to the map are drafted and made public. In reality, the process so far has robbed everyday voters of their ability to participate in a way that lives up to the rhetoric and ideals of the inclusive process.

Our organization continues to have many of the same concerns about the lack of meaningful public participation in these hearings. As you repeatedly heard in the hearings over the past few days, advocates and community organizations don't feel as though they had a voice in how maps were drawn during the Spring. And unless there's a significant change in the way their input is incorporated into the final product from then to now, those feelings persist.

At a stakeholder meeting with the Illinois Redistricting Collaborative, a coalition of over 30 diverse organizations, earlier this week, we encouraged people to attend these hearings. We were met with concerns from organizations and individuals, who participated in one or more of the previous 50 redistricting hearings, that their input would not seriously be considered by this committee based on their experience with prior hearings.

In reviewing the two resolutions that accompanied the maps voted on by the General Assembly, Senate Resolution 326 and House Resolution 359, it is concerning to note that very little public input is referenced in either.

The Senate resolution only mentions five instances of testimony or public feedback that guided map drawers' hands. The House resolution only took public input and testimony into account in 15 of the 118 districts. It's not clear to me how to reconcile the rhetoric that the public has so many opportunities to participate and that they are being listened to if out of the hundreds of people that submitted input and hundreds of hours of hearing time that Senate and House members only felt that so few testimonies were worthy of consideration for the maps that are currently law.

This fact further elevates our concerns that the process this week and next, that so closely mirrors the rushed process in the Spring, will not provide a different result and that any additional testimony received over the past few days will be ignored.

The voices and concerns of those who have already testified this year including Illinois Muslim Civic Coalition, UCCRO, League of Women Voters of Illinois, Latino Policy Forum, Common Cause Illinois, Indivisible Naperville, Better Government Association, Coalition for a Better Chinese American Community, Black Roots Alliance, MALDEF, Chicago Lawyers' Committee for Civil Rights, Mujeras Latinas en Accion, Nonprofit Utopia, Faith Coalition for the Common

 

www.changeil.org | @changeil

Good, Mano a Mano Family Resource Center, and many more organizations need to be heard and reflected in any changes to this map.

Many more individual community members provided testimony that is also not reflected in the current maps. I would strongly urge committee members and members of the General Assembly to go back and review the testimony from the Spring that largely seemed to be ignored and draw maps that prioritize that testimony over any political or self-interest.

Additionally, our concerns over the use of American Community Survey data came to bear after the 2020 Census data was released. We now know that districts are malapportioned with a population deviation three times higher than the 10% deviation standard. Previously, we asked these committees, well in advance of any constitutional deadlines, to appeal to the courts in order to seek relief and use the 2020 census data. But, we were met with silence and an apparent refusal from the General Assembly to even consider seeking relief that has now been provided to other states through their courts. Instead, after passing the maps, lawmakers issued assurances that the current map met all legal requirements and claimed the population deviations to be nonconsequential.

There is little doubt that these districts will have to be fixed given they are likely unconstitutional, but we would recommend that the committee does not do the bare minimum and fix a few select districts. The 2020 Census data did not just reveal that a few districts were malapportioned, it shows that many of the projections in the ACS data were inaccurate, some of which are highlighted in the Democrats' staff presentation. We strongly believe that a thorough review of the entire map is needed and, again, that changes are made prioritizing community members testimony and input that was largely ignored during the Spring.

Once again, it is the people of this state and the communities across the state that are left voiceless in the redistricting process. The proceeding today and over the past year reinforces the dire need to reform the redistricting process. We hope, for the sake of future generations of Illinoisans, that members of this committee choose to prioritize and listen to voices of community members moving forward.  To continue down the current path that fails to include voices of the communities confirms that this process is broken. Redistricting should truly focus on how to involve, prioritize, and ultimately lift up communities across Illinois for the decade ahead.

Thank you, again, for the opportunity and I am happy to answer any questions from committee members.


Ryan Tolley
Policy Director
CHANGE Illinois

 

www.changeil.org     @changeil