**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

DAN MCCONCHIE, in his official capacity as
Minority Leader of the Illinois Senate and individually
as a registered voter, JIM DURKIN, in his official
capacity as Minority Leader of the Illinois House of
Representatives and individually as a registered voter,
JAMES RIVERA, ANNA DE LA TORRE,
DOLORES DIAZ, FELIPE LUNA JR., SALVADOR
TREMILLO, CHRISTOPHER ROMERO, the
REPUBLICAN CAUCUS OF THE ILLINOIS
SENATE, the REPUBLICAN CAUCUS OF THE
ILLINOIS HOUSE OF REPRESENTATIVES, and
the ILLINOIS REPUBLICAN PARTY,

        Plaintiffs,

    vs.

IAN K. LINNABARY, CASANDRA B. WATSON,
WILLIAM J. CADIGAN, LAURA K. DONAHUE,
CATHERINE S. MCCRORY, WILLIAM M.
MCGUFFAGE, and RICK S. TERVEN, SR., in their
official capacities as members of the Illinois State
Board of Elections, EMANUEL CHRISTOPHER
WELCH, in his official capacity as Speaker of the
Illinois House of Representatives, the OFFICE OF
SPEAKER OF THE ILLINOIS HOUSE OF
REPRESENTATIVES, DON HARMON, in his
official capacity as President of the Illinois Senate, and
the OFFICE OF THE PRESIDENT OF THE
ILLINOIS SENATE,

        Defendants.

Case No. 1:21-cv-03091

Circuit Judge Michael B. Brennan
Chief District Judge Jon E. DeGuilio
District Judge Robert M. Dow, Jr.

Three-Judge Court
Pursuant to 28 U.S.C. § 2284(a)

**SECOND AMENDED COMPLAINT FOR
DECLARATORY, INJUNCTIVE, AND EQUITABLE RELIEF**

Plaintiffs DAN MCCONCHIE, in his official capacity as Minority Leader of the Illinois

Senate and individually as a registered voter, JIM DURKIN, in his official capacity as Minority

Leader of the Illinois House of Representatives and individually as a registered voter, JAMES

RIVERA, ANNA DE LA TORRE, DOLORES DIAZ, FELIPE LUNA JR., SALVADOR TREMILLO, CHRISTOPHER ROMERO, the REPUBLICAN CAUCUS OF THE ILLINOIS SENATE, the REPUBLICAN CAUCUS OF THE ILLINOIS HOUSE OF REPRESENTATIVES, and the ILLINOIS REPUBLICAN PARTY bring this action against Defendants IAN K. LINNABARY, CASANDRA B. WATSON, WILLIAM J. CADIGAN, LAURA K. DONAHUE, CATHERINE S. MCCRORY, WILLIAM M. MCGUFFAGE, and RICK S. TERVEN, SR., in their official capacities as members of the Illinois State Board of Elections, EMANUEL CHRISTOPHER WELCH, in his official capacity as Speaker of the Illinois House of Representatives, the OFFICE OF SPEAKER OF THE ILLINOIS HOUSE OF REPRESENTATIVES, DON HARMON, in his official capacity as President of the Illinois Senate, and the OFFICE OF THE PRESIDENT OF THE ILLINOIS SENATE.

Plaintiffs allege and aver as follows:

## I.
## INTRODUCTION

1.      Plaintiffs filed this lawsuit in June 2021 to protect the fundamental rights of Illinois voters and to invalidate the map of Illinois Senate and House Districts in the legislative redistricting plan passed by the Illinois General Assembly on May 28, 2021 and signed by Governor Pritzker on June 4, 2021 (the "June Map").[1] Plaintiffs challenged the June Map on the grounds that the map was drafted and passed before the Census Bureau released the official

---

[1] *See* Public Act 102-0010 (https://www.ilga.gov/legislation/publicacts/102/PDF/102-0010.pdf). The Illinois Constitution defines the districts from which state senators are elected as "Legislative Districts" and defines the districts from which state representatives are elected as "Representative Districts." Ill Const. 1970, art. IV, § 1. For clarity, Plaintiffs use the phrase "Senate Districts" to describe districts from which state senators are elected and use the phrase "House Districts" to describe the districts from which state representatives are elected.

population counts from the 2020 census and the map is therefore malapportioned and fails to comply with the "one person, one vote" principle derived from the Equal Protection Clause.

2.      On August 12, 2021, the Census Bureau released the official 2020 census population counts, which prove the June Map is unconstitutionally malapportioned. The maximum population deviations in the June Map are nearly ***three times*** the 10% limit set by the Supreme Court and well outside the 16.4% level the Court has said "may well approach tolerable limits."[2]

3.      On August 19, 2021, Plaintiffs filed a Motion for Summary Judgment and supporting materials, which demonstrate that the June Map is invalid, unconstitutional, and void *ab initio* and establish that the Court should grant Plaintiffs' requested declaratory, injunctive, and prospective equitable relief.[3]

4.      Because the June Map is invalid and void *ab initio*, no redistricting map became "effective" as of June 30, 2021. Therefore, under the Illinois Constitution, the authority for drawing a new legislative map shifted for the remainder of this redistricting cycle from the General Assembly to a redistricting commission.[4] The Speaker of the Illinois House and President of the Illinois Senate are required to appoint members to the commission. Plaintiffs Dan McConchie, the Minority Leader of the Senate, and Jim Durkin, the Minority Leader of the House, have appointed members to serve on the commission. However, Defendants Don Harmon, the President of the Senate, and Emanuel Christopher Welch, the Speaker of the House (collectively, the "Leadership Defendants"), have refused to appoint members to serve on the commission.

---

[2] *Mahan v. Howell*, 410 U.S. 315, 329 (1973).

[3] Plaintiffs' Motion for Summary Judgment ("MSJ") [Dkt. No. 76]; Memorandum of Law ("MSJ Memo") [Dkt. No. 78], Plaintiffs' Rule 56.1 Statement of Fact ("SOF") [Dkt. No. 79].

[4] *See* Ill Const. 1970, art. IV, § 3(b).

5.     None of the Defendants contest the amount of population deviation in the June Map. Instead of attempting to defend the June Map, the Leadership Defendants reconvened the General Assembly for a special session on August 31, 2021. At that session, the General Assembly purported to pass, on a party-line vote, an additional redistricting plan with a new map of Senate and House Districts, which was later signed by Governor Pritzker on September 24, 2021 (the "September Map").[5] The General Assembly purported to pass the September Map despite the provision in the Illinois Constitution requiring that redistricting authority shift to a commission after June 30th.

6.     The process used to pass the September Map was even more rushed and exclusionary than the process used to pass the June Map. Drafts of the September Map were only made public on August 30, 2021 and a final version was not made public until just before it was passed by the General Assembly on the evening of August 31, 2021. Contrary to this Court's direction to the Leadership Defendants to "take into account the views of the Plaintiffs,"[6] the General Assembly failed to work with Plaintiffs or community groups to draft the September Map, failed to take input and comment from Plaintiffs regarding the September Map, and held hearings before releasing any proposed maps, which prevented Plaintiffs and other interested parties from meaningfully reviewing and commenting on the September Map prior to its passage.

7.     Like the June Map, the September Map is also invalid, unconstitutional, and void *ab initio*. The September Map violates Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301 (the "VRA"), and the Equal Protection Clause of the Fourteenth Amendment by

---

[5] *See* Public Act 102-0663 (https://www.ilga.gov/legislation/publicacts/102/PDF/102-0663.pdf); *see also* Bill Status for Senate Bill SB0927 (https://www.ilga.gov/legislation/billstatus.asp?DocNum=927&GAID=16&GA=102&DocTypeID=SB&LegID=133554&SessionID=111&SpecSess=1).

[6] Aug. 23, 2021 Minute Entry [Dkt. No. 88].

discriminating against and diluting the votes of Latino voters. Specifically, the September Map "packs" Latino voters into a particular House District and "cracks" other Latino communities to artificially limit the number of districts with an effective majority of Latino voters.

8. Illinois added approximately 309,832 Latinos in the 2020 census, which is the largest population increase among racial or ethnic groups statewide.[7] Latinos now comprise approximately 11.2% of the citizen voting age population ("CVAP") in Illinois. This percentage (11.2%) would equate to 13 of the state's 118 House Districts.[8] Under the September Map, however, there are only four House Districts with a 50%+ Latino CVAP. In contrast, as shown in the tables and map excerpts in the text below, a map could be drawn that includes at least nine compact House Districts with a 50%+ Latino CVAP while still providing for at least as many majority-Black districts as were included in the September Map.

9. Latinos are entitled to protection under Section 2 of the VRA. Latino voters historically and consistently vote cohesively in the State of Illinois. Historically, elections in Illinois have been racially and ethnically polarized. The majority racial and ethnic population in Illinois, white non-Latinos, often vote sufficiently as a bloc that, in the absence of special

---

[7] The Latino Policy Forum Urges Governor Pritzker to Veto Inequitable Legislative Maps, Latino Policy Forum (Sept. 2, 2021) (https://www.latinopolicyforum.org/news/press-releases/document/The-Latino-Policy-Forum-Urges-Governor-Pritzker-to-Veto-Inequitable-Legislative-Maps-1.pdf).

[8] In Illinois, each Senate District made up of two House Districts. Ill Const. 1970, art. IV, § 2(b). Therefore, to the extent the boundaries of a House District violate Section 2 of the VRA or the Equal Protection Clause, such problems also extend to the Senate District encompassing such House District. For ease of reference in this Second Amended Complaint, Plaintiffs focus their arguments on the relevant House Districts.

circumstances or a large Latino voter population, the preferred candidates of Latino voters have been defeated.[9]

10.     The discrimination and dilution of voting power for Latino voters in the September Map is most evident in three specific geographic areas:

a.     **Southwest Chicago** – Across the entire state of Illinois, the September Map creates just four House Districts with a 50%+ Latino CVAP, which are House Districts 1, 2, 22, and 23, all located in Southwest Chicago and the adjoining southwest suburbs. However, the General Assembly could have drawn at least six compact majority Latino CVAP districts in Southwest Chicago.

Specifically, House District 23 is "packed" and gerrymandered to capture an excessive supermajority of Latino voters. House District 23 has a Latino CVAP of 71.05%. In addition, the Latino community is also "cracked" and separated among four additional House Districts in Southwest Chicago: 21 (areas of Berwyn, Cicero, North Riverside, Summit, Hodgkins, and McCook), 24 (parts of Chicago in the McKinley Park, Mount Pleasant, Lower West Side, and Bridgeport neighborhoods), and 6 and 32 (parts of the Back of the Yards, Ashburn, and Clarksdale neighborhoods).

Thus, many Latino voters in House District 23 will see their votes wasted because the September Map makes those votes unnecessary to elect a candidate of their choice. At the same time, Latino voters in House Districts 21, 24, 6, and 32 will be prevented by their diminished numbers from having significant influence in choosing primary and general election candidates.

In contrast, as shown herein, a map could be naturally drawn with at least two additional Latino CVAP districts in Southwest Chicago, which combine excess Latino voters from the "packed" district with Latino voters from the "cracked" districts to better represent Latino voters in this area.

b.     **Northwest Chicago** – The September Map does not create any House Districts with a 50%+ Latino CVAP—or any other effective majority-Latino district—on Chicago's northwest side. Instead, Latino voters are "cracked" and separated into five separate House Districts, including House Districts 3, 4, 19, 39, and 40 (which include Latino communities in the Chicago neighborhoods of Avondale, Albany Park, Irving Park, Humboldt, Garfield Park, Hermosa, Belmont Park, and Portage Park, and Latino

---

[9] *See, e.g.*, *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 427 (2006) (Latinos satisfied requirements of cohesion among the minority group and bloc voting among majority population in challenged district).

communities in the near-northwest suburbs of Elmwood Park, Franklin Park, Melrose Park, Northlake, Bensenville, and Addison).

Under the September Map, Latino voters in these House Districts will be prevented by their diminished numbers from having significant influence in choosing primary and general election candidates. Instead of separating Latino voters in these districts, a map could be naturally drawn with three compact majority Latino CVAP districts in Northwest Chicago, as compared to the zero majority Latino CVAP House Districts actually drawn in the area in the September Map.

c.  **Aurora** – The September Map also "cracks" and separates a large Latino community in the west suburbs of Chicago, concentrated in Aurora and West Chicago, among four separate House Districts, including House Districts 49, 50, 83, and 84.

Instead of separating Latino voters in this community, a map could be naturally drawn with a compact House District with approximately 48% Latino CVAP in this area, which would be far more effective at providing Latino voters an opportunity to elect a candidate of their choice in both primary and general elections.

11.  A number of good government groups and community advocates have denounced the September Map for its discrimination against Latino voters and the dilution of their voting power. On September 2, 2021, after the General Assembly passed the September Map, the Latino Policy Forum issued a press release urging Governor Pritzker to veto the map, which does "not equitably reflect the state's Latino community."[10] As explained in the press release:

Despite recent 2020 census data indicating that Illinois added 309,832 Latinos (the largest population increase among racial/ethnic groups statewide), no Latino-majority districts were added in the maps passed by the general assembly. In fact, preliminary analysis and reports show that some Latino-majority districts are diluted even more, further hindering the community's ability to elect the representatives of their choice.

---

[10] The Latino Policy Forum Urges Governor Pritzker to Veto Inequitable Legislative Maps, Latino Policy Forum (Sept. 2, 2021) (https://www.latinopolicyforum.org/news/press-releases/document/The-Latino-Policy-Forum-Urges-Governor-Pritzker-to-Veto-Inequitable-Legislative-Maps-1.pdf).

Furthermore, as with the maps from the spring, the Illinois legislature did not provide advocates with a reasonable timeline that would enable community input.[11]

12.     In addition to the problems with Latino districts, the September Map also discriminates against and dilutes the votes of Black voters. Black voters are entitled to protection under Section 2 of the VRA. Black voters historically and consistently vote cohesively in the State of Illinois. Historically, elections in Illinois have been racially and ethnically polarized. The majority racial and ethnic population in Illinois, white non-Latinos, often vote sufficiently as a bloc that, in the absence of special circumstances or a large Black voter population, the preferred candidates of Black voters have been defeated.

13.     There is a substantial, compact Black community in the East St. Louis area. The September Map "cracks" and separates this community into two districts: House Districts 113 and 114. Thus, Black voters in these two districts will be prevented by their diminished numbers from having significant influence in choosing primary and general election candidates. Instead of separating Black voters in this area, a compact map naturally could be drawn with a 50%+ Black CVAP House District in this area.

14.     The General Assembly has now twice attempted to rush through a redistricting plan without providing opportunities for Plaintiffs and other interested parties to review or provide meaningful input. In both attempts, the General Assembly drew maps that are invalid, unconstitutional, and void *ab initio*. In the second attempt, the General Assembly also acted *ultra vires* given that the redistricting authority had shifted to a commission after June 30th.

15.     Plaintiffs respectfully request that the Court grant the relief requested herein, including: (1) declaring that the June Map and September Map are invalid, unconstitutional, and

---

[11] *Id.*

8

void *ab initio*; (2) enjoining Defendants, including the members of the Illinois State Board of Elections, from enforcing or giving any effect to the June Map or the September Map, and enjoining any elections based on such maps, and (3) issuing prospective equitable relief, including ordering the Leadership Defendants to appoint members to a redistricting commission with authority to draft a valid legislative map, appointing a Special Master to draft a valid legislative map, or issuing any other appropriate relief that allows for the drafting of a valid legislative map.

## II.
## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1357. Plaintiffs bring claims arising under the U.S. Constitution, 42 U.S.C. § 1983, and 52 U.S.C. § 10301 for violations of their civil rights and the elective franchise and claims under the federal Declaratory Judgment Act (28 U.S.C. §§ 2201, 2202).

17.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because all Defendants reside in Illinois and because some Defendants reside in the Northern District of Illinois. By Illinois law, the Illinois State Board of Elections is required to maintain an office in the City of Chicago.[12] Pursuant to that requirement, the Board of Elections maintains an office at 100 West Randolph Street, Suite 14-100, Chicago, Illinois, at which the members of the Board of Elections meet and conduct business. Illinois law also requires four members of the Board of Elections to be residents of Cook County.[13] In addition, Defendants Emanuel Christopher Welch and Don Harmon both reside in and maintain offices in the Northern District of Illinois.

---

[12] 10 ILCS § 5/1A-11.

[13] 10 ILCS § 5/1A-2.

# III.
# PARTIES

**A.    Plaintiffs**

18.    Plaintiff DAN MCCONCHIE is a state senator from the 26th Senate District, a citizen of the United States and the State of Illinois, and a duly registered voter residing in Lake County, Illinois. Mr. McConchie is also the Minority Leader of the Illinois Senate, vested by Article IV, Section 6(c) of the Illinois Constitution with the duty to promote and express the views, ideas, and principles of the Senate Republican caucus in the 102nd General Assembly and of Republicans in every Senate District throughout the State of Illinois. Leader McConchie is also the leader of the Plaintiff Republican Caucus of the Illinois Senate, having been elected its leader pursuant to Article IV, Section 6(c) of the Illinois Constitution and Rule 2-3 of the Illinois Senate. Under the rules of the Illinois Senate and the customs and practices of the Plaintiff Republican Caucus of the Illinois Senate, Leader McConchie is charged with leading and representing the Plaintiff Republican Caucus of the Illinois Senate.[14] Leader McConchie is named as a Plaintiff in his official capacity as Minority Leader of the Illinois Senate and individually as a registered voter. Under the June Map, Leader McConchie would vote in and represent the 26th Senate District, which contains 2,733 persons more than the ideal district and 19,982 persons more (9.99% more) than the least-populated Senate District in the June Map. Accordingly, under the June Map, Leader McConchie has suffered and is suffering concrete and particularized injuries through the dilution of his voting power.

---

[14] Such rules confer broad authority on the Minority Leader of the Illinois Senate, including appointing assistant leaders (Senate Rule 2-4), appointing Republican members to Senate committees and designating spokespersons (ranking members) (Senate Rule 2-6), and having general supervision of the caucus staff (Senate Rule 2-6).

19.     Plaintiff JIM DURKIN is a state representative from the 82nd House District, a citizen of the United States and the State of Illinois, and a duly registered voter residing in Cook County, Illinois. Mr. Durkin is also the Minority Leader of the Illinois House of Representatives, vested by Article IV, Section 6(c) of the Illinois Constitution with the duty to promote and express the views, ideas, and principles of the House Minority Republican caucus in the 102nd General Assembly and of Republicans in every House District throughout Illinois. Leader Durkin is also the leader of the Plaintiff Republican Caucus of the Illinois House of Representatives, having been elected its leader pursuant to Article IV, Section 6(c) of the Illinois Constitution and Rule 2 of the Illinois House of Representatives. Under the rules of the Illinois House of Representatives and the rules of the Plaintiff Republican Caucus of the Illinois House of Representatives, Leader Durkin is charged with leading and representing the Plaintiff Republican Caucus of the Illinois House of Representatives.[15] Leader Durkin is named as a Plaintiff in his official capacity as Minority Leader of the Illinois House of Representatives and individually as a registered voter. Under the June Map, Leader Durkin would vote in and represent the 82nd House District, which contains 1,210 persons more than the ideal district and 17,401 persons more (18.8% more) than the least-populated House District in the June Map. Accordingly, under the June Map, Leader Durkin has suffered and is suffering concrete and particularized injuries through the dilution of his voting power.

20.     Plaintiff JAMES RIVERA is a Latino, a citizen, and a registered voter whose residence is located in House District 21 in the September Map. He is part of a Latino community that is "cracked" and separated among several House Districts, including House District 21, and

---

[15] Such rules confer broad authority on the Minority Leader of the Illinois House of Representatives, including appointing assistant leaders (House Rule 3), appointing Republican members to House committees and designating spokespersons (ranking members) (House Rule 5), and having general supervision of the caucus staff (House Rule 5).

he is therefore injured by being prevented from having significant influence in choosing primary and general election candidates.

21.     Plaintiff ANNA DE LA TORRE is a Latina, a citizen, and a registered voter whose residence is located in House District 21 in the September Map. She is part of a Latino community that is "cracked" and separated among several House Districts, including House District 21, and she is therefore injured by being prevented from having significant influence in choosing primary and general election candidates.

22.     Plaintiff DOLORES DIAZ is a Latina, a citizen, and a registered voter whose residence is located in House District 23 in the September Map. She is part of a Latino community that is "packed" into House District 23, and she is therefore injured by having her vote wasted because the September Map makes that vote unnecessary to elect a candidate of her choice.

23.     Plaintiff FELIPE LUNA JR. is a Latino, a citizen, and a registered voter whose residence is located in House District 24 in the September Map. He is part of a Latino community that is "cracked" and separated among several House Districts, including House District 24, and he is therefore injured by being prevented from having significant influence in choosing primary and general election candidates.

24.     Plaintiff SALVADOR TREMILLO is a Latino, a citizen, and a registered voter whose residence is located in House District 39 in the September Map. He is part of a Latino community that is "cracked" and separated among several House Districts, including House District 39, and he is therefore injured by being prevented from having significant influence in choosing primary and general election candidates.

25.     Plaintiff CHRISTOPHER ROMERO is a Latino, a citizen, and a registered voter whose residence is located in House District 50 in the September Map. He is part of a Latino

community that is "cracked" and separated among several House Districts, including House District 50, and he is therefore injured by being prevented from having significant influence in choosing primary and general election candidates.

26. Plaintiff REPUBLICAN CAUCUS OF THE ILLINOIS SENATE is an association consisting of 18 elected members of the Illinois Senate belonging to the Republican Party. The Republican Caucus of the Illinois Senate is comprised of members who reside and vote in various Senate Districts throughout the State of Illinois and represent their respective Senate Districts and constituent voters in the General Assembly. The Republican Caucus of the Illinois Senate operates pursuant to Illinois law and the Rules of the Illinois Senate, as well as its own adopted rules.[16] The Republican Caucus of the Illinois Senate has an interest in fair and legal elections in Illinois and in ensuring the State of Illinois' compliance with all statutory and constitutional requirements for redrawing the Senate Districts in Illinois. The Republican Caucus of the Illinois Senate's interests include protecting the constitutional and other rights of its members and of the electorate of the State of Illinois by ensuring compliance with statutory and constitutional requirements in redrawing the Senate Districts. Under the June Map, eight members of the Republican Caucus of the Illinois Senate would vote in and represent Senate Districts that are overpopulated as compared to the ideal districts. In addition, under the June Map, each member of the Republican Caucus of the Illinois Senate would vote in and represent a Senate District that is more populated than the

---

[16] *See, e.g.*, Ill. Const. (1970) art. IV sec. 6(c); 30 ILCS 605/7.7(b) (designating space for the "four caucuses of the General Assembly" within the Michael A. Bilandic Building); Rules of the Illinois Senate, One Hundred Second General Assembly (https://www.ilga.gov/senate/102ndSenateRules.pdf). In particular, Senate Rule 1-16 defines the minority caucus, which is the Republican Caucus, as "that group of Senators from other than the majority caucus." The Republican Caucus of the Illinois Senate also adopts and conducts itself by its own rules.

least-populated Senate District. Thus, each member of the Republican Caucus of the Illinois Senate is suffering and will continue to suffer injury as a result of the June Map.

27.     Plaintiff REPUBLICAN CAUCUS OF THE ILLINOIS HOUSE OF REPRESENTATIVES is an association consisting of 45 elected members of the Illinois House of Representatives belonging to the Republican Party. The Republican Caucus of the Illinois House of Representatives is comprised of members who reside and vote in various House Districts throughout the State of Illinois and represent their respective House Districts and constituent voters in the General Assembly. The Republican Caucus of the Illinois House of Representatives operates pursuant to Illinois law and the Rules of the Illinois House of Representatives, as well as its own adopted rules.[17] The Republican Caucus of the Illinois House of Representatives has an interest in fair and legal elections in Illinois and in ensuring the State of Illinois' compliance with all statutory and constitutional requirements for redrawing the House Districts in Illinois. The Republican Caucus of the Illinois House of Representatives' interests include protecting the constitutional and other rights of its members and of the electorate of the State of Illinois by ensuring compliance with statutory and constitutional requirements in redrawing the House Districts. Under the June Map, 22 members of the Republican Caucus of the Illinois House of Representatives would vote in and represent House Districts that are overpopulated as compared to the ideal districts. In addition, under the June Map, each member of the Republican Caucus of the Illinois House of Representatives would vote in and represent a House District that is more populated than the least-

---

[17] *See, e.g.*, Ill. Const. (1970) art. IV sec. 6(c); 30 ILCS 605/7.7(b) (designating space for the "four caucuses of the General Assembly" within the Michael A. Bilandic Building); Rules of the Illinois House of Representatives, One Hundred Second General Assembly (https://www.ilga.gov/house/102_House_Rules.pdf). The Republican Caucus of the Illinois House of Representatives also adopts and conducts itself by its own rules.

populated House District. Thus, each member of the Republican Caucus of the Illinois House of Representatives is suffering and will continue to suffer injury as a result of the June Map.

28.     Plaintiff ILLINOIS REPUBLICAN PARTY is an established political party in the State of Illinois, organized and existing under the election laws of the State of Illinois, 10 ILCS 5/1-1, *et seq.* The Illinois Republican Party is comprised of hundreds of thousands of members and voters who reside in every Senate District and House District in the State of Illinois. In accordance with such election laws, the Illinois Republican Party has party officials in every Illinois county, including committeemen elected or designated from counties, townships, wards, and precincts throughout Illinois.[18] The Illinois Republican Party has an interest in fair and legal elections in Illinois and in ensuring the State of Illinois' compliance with all statutory and constitutional requirements for redrawing the Senate and House Districts in Illinois. The Illinois Republican Party's interests include protecting the constitutional and other rights of its members and of the electorate of the State of Illinois by ensuring compliance with statutory and constitutional requirements in redrawing the Senate and House Districts. The Illinois Republican Party has associational standing to represent its members in this lawsuit.[19] The Illinois Republican Party's

---

[18] *See* list of county chairmen (https://ilsos.gov/publications/illinois_bluebook/chairman.pdf). In addition, committeemen are elected by local units of geography, including wards, precincts, and townships, depending on the size of the county. For example, within the largest county, Cook County, there are township committeemen in almost every township of the county (https://www.cookrepublicanparty.com/leadership/township-committeemen/); and in the largest municipality, the City of Chicago, there are ward committeemen in 34 of 50 wards (https://www.cookrepublicanparty.com/leadership/ward-committeemen/).

[19] *See, e.g.*, *Smith v. Boyle*, 959 F. Supp. 982, 986 (C.D. Ill. 1997) (Illinois Republican Party had associational standing to sue on behalf of members), *aff'd by* 144 F.3d 1060 (7th Cir. 1998); *see also Texas Democratic Party v. Benkiser*, 459 F.3d 582, 587-88 (5th Cir. 2006) (political party had standing on behalf of member); *Nelson v. Warner*, 472 F. Supp. 3d 297, 309-10 (S.D. W.Va. 2020) (same).

2020 Platform emphasizes support for civil rights "for all people—regardless of race, color or creed into the future."[20] The claims in this lawsuit are germane to this purpose.

**B.    Defendants**

29.    The Illinois State Board of Elections is the entity responsible for overseeing and regulating public elections in Illinois as provided by Article III, Section 5 of the Illinois Constitution and 10 ILCS 5/1A-1, *et seq*. The members of the Board undertake those acts and conduct business under color of state law. The Board consists of eight members.[21] However, one of the members of the Board, William R. Haine, passed away on August 16, 2021 and, upon information and belief, his seat on the Board has yet to be filled. The remaining seven members of the Board are named as Defendants in this action (collectively the "Board Members").

30.    Defendant IAN K. LINNABARY is the Chairman of the Illinois State Board of Elections. He is sued in his official capacity.

31.    Defendant CASANDRA B. WATSON is the Vice Chairman of the Illinois State Board of Elections. She is sued in her official capacity.

32.    Defendant WILLIAM J. CADIGAN is a member of the Illinois State Board of Elections. He is sued in his official capacity.

33.    Defendant LAURA K. DONAHUE is a member of the Illinois State Board of Elections. She is sued in her official capacity.

34.    Defendant CATHERINE S. MCCRORY is a member of the Illinois State Board of Elections. She is sued in her official capacity.

---

[20]    Illinois Republican Party Platform (Oct. 3, 2020), at 2-3 (https://illinois.gop/wp-content/uploads/2021/02/2020PlatformoftheIllinoisRepublicanParty.pdf).

[21]    10 ILCS 5/1A-2.

35.     Defendant WILLIAM M. MCGUFFAGE is a member of the Illinois State Board of Elections. He is sued in his official capacity.

36.     Defendant RICK S. TERVEN, SR. is a member of the Illinois State Board of Elections. He is sued in his official capacity.

37.     Defendant EMANUEL CHRISTOPHER WELCH is a state representative from the 7th House District. He is sued in his official capacity as Speaker of the Illinois House of Representatives.

38.     Defendant the OFFICE OF THE SPEAKER OF THE ILLINOIS HOUSE OF REPRESENTATIVES is the office of the presiding officer of the Illinois House of Representatives, as designated by Article IV, Section 6(b) of the Illinois Constitution.

39.     Defendant DON HARMON is a state senator from the 39th Senate District. He is sued in his official capacity as President of the Illinois Senate.

40.     Defendant OFFICE OF THE PRESIDENT OF THE ILLINOIS SENATE is the office of the presiding officer of the Illinois Senate, as designated by Article IV, Section 6(b) of the Illinois Constitution.

## IV.
## REQUEST FOR A THREE-JUDGE COURT

41.     Plaintiffs request a three-judge trial court pursuant to 28 U.S.C. § 2284(a) and Rule 9.1 of the Local Rules for the Northern District of Illinois because this action challenges the constitutionality of the apportionment of a statewide legislative body.

**V.**

**BACKGROUND**

A.     **Legal Requirements for State Legislative Redistricting in Illinois and the Role of the State Board of Elections**

42.     The Illinois Constitution requires that Illinois Senate and House Districts be redrawn in each year following a year in which the decennial census is conducted.[22] Because the decennial census was conducted in 2020, legislative redistricting must occur in 2021.

43.     The Illinois Constitution entrusts the General Assembly to pass a redistricting plan in the first instance.[23] However, if a valid plan does not "become[] effective" by June 30, 2021, responsibility for drafting a plan shifts from the General Assembly to a commission, which then has the sole authority to enact a plan for the current redistricting cycle.[24] The President of the Senate, the Speaker of the House, and the Senate and House leaders of the minority party each must appoint two members to the commission, with a ninth member to be added if the commission is unable to agree on a redistricting plan.[25]

44.     The use of a commission in the legislative redistricting process has been the norm in Illinois. Since the latest version of the Illinois Constitution was adopted in 1970, five legislative redistricting plans have been enacted, but the General Assembly has directly approved a new plan only once—in 2011. Following each of the four decennial censuses before 2010 (i.e., 1970, 1980, 1990, and 2000), a commission was constituted to enact a plan.[26]

---

[22] Ill Const. 1970, art. IV, § 3(b).

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *See Hooker v. Illinois State Bd. of Elections*, 2016 IL 121007, ¶ 5 63 N.E.3d 824 (describing historical use of Commission in legislative redistricting in Illinois).

45. The Illinois State Board of Elections, acting through its individual Board Members, has "general supervision over the administration of the registration and election laws throughout the State."[27] In accordance with that mandate, the Board of Elections is required to, among other things, "[d]isseminate information to and consult with election authorities concerning the conduct of elections and registration,"[28] furnish "a manual of uniform instructions . . . which shall be used by election authorities" throughout the state,[29] prescribe "uniform forms, notices, and other supplies" to be used "in the conduct of elections and registrations,"[30] and "[r]eview and inspect procedures and records relating to conduct of elections and registration . . . and to report violations of election laws" to appropriate authorities.[31]

46. Under Illinois Public Act 102-15, effective as of June 17, 2021, established party candidates for the 2022 Illinois Senate and House elections will begin circulating petitions for nominations for the general primary election on January 13, 2022 and will file their nomination papers with the Board of Elections between March 7, 2022 and March 14, 2022.[32] The Board of Elections will be required to certify the names of eligible candidates for the general primary election ballot by April 21, 2022.[33] The general primary election will be held on June 28, 2022, and the general election will be held on November 8, 2022.[34]

---

[27] Ill. Const. 1970, art. III § 5; 10 ILCS 5/1A-1.

[28] 10 ILCS § 5/1A-8(2).

[29] 10 ILCS § 5/1A-8(3).

[30] 10 ILCS § 5/1A-8(4).

[31] 10 ILCS § 5/1A-8(7).

[32] 10 ILCS 5/2A-1.1b(b), (c).

[33] 10 ILCS 5/2A-1.1b(g).

[34] 10 ILCS 5/2A-1.1b(k); 10 ILCS 5/2A-1.1c.

**B.** **The Passage of the June Legislative Redistricting Map**

47.     Any state legislative redistricting plan must comply with the requirements of the U.S. Constitution, including the requirement that state legislative districts be drawn to include substantially equal populations, which is known as the "one person, one vote" principle deriving from the Equal Protection Clause of the Fourteenth Amendment.[35]

48.     To assist state officials in drawing legislative districts of substantially equal population, the U.S. Census Bureau is tasked with providing the states with the official census population counts within one year after the April 1st census date.[36] This year, that date was April 1, 2021. However, the Census Bureau was delayed and did not release the official census counts to the states until August 12, 2021.[37]

49.     Despite lacking the official population counts from the 2020 census, on May 28, 2021, the General Assembly passed, on a purely partisan roll call, a redistricting plan including the June Map of Senate and House Districts, which Governor Pritzker approved on June 4, 2021.[38]

50.     The legislation passed by the General Assembly acknowledges that the Census Bureau was delayed in providing the official population counts to the states for redistricting purposes.[39] Instead of the official population counts, the General Assembly used population estimates derived from responses to the American Community Survey ("ACS") from 2015-2019 as the base population data for the June Map.[40] Both the Illinois Senate and House resolutions state

---

[35] *See, e.g.*, *Evenwel v. Abbott*, 577 U.S. 937, ---, 136 S. Ct. 1120, 1124 (2016).

[36] 13 U.S.C. § 141(c).

[37] *See* 2020 Census Redistricting Data Files Press Kit, U.S. Census Bureau (https://www.census.gov/newsroom/press-kits/2021/2020-census-redistricting.html).

[38] Pub. Act 102-0010 (https://www.ilga.gov/legislation/publicacts/102/PDF/102-0010.pdf).

[39] Pub. Act 102-0010 § 5(b).

[40] Pub. Act 102-0010 § 5(d).

that the General Assembly used ACS population estimates, along with "election data" and "public input" to "establish the boundaries" in the June Map.[41]

51.     While the Census Bureau conducts the ACS, the estimates from that survey are not intended to be, and are not, a proper substitute for the official census counts. Nor is it proper to use ACS estimates for redistricting. Indeed, the Census Bureau itself expressly warns that ACS estimates are not a viable alternative to the official census population counts and "should not be used as actual population counts or housing totals for the nation, states or counties."[42]

52.     The General Assembly did not establish any substantive legislative record to support the use of ACS estimates as the base population data for the June Map. In fact, in committee hearings and floor debates, the sponsors of the June Map professed to have *no* knowledge of precisely what data were used, how the data were manipulated to work for redistricting purposes, or even who drew the maps. During a legislative hearing on May 25, 2021, after the June Map was publicly unveiled but before its passage, Dr. Allan Lichtman, an expert retained by the Senate and House Democratic Caucuses, stated that he was not sure what data were used to draw the June Map and could not confirm whether ACS estimates were used. Dr. Lichtman stated that he did not participate in drawing the June Map and had not analyzed the June Map.

---

[41]  House Resolution 359 (https://www.ilga.gov/legislation/102/HR/PDF/10200HR0359lv.pdf) ("HR0359"), at p. 5; Senate Resolution No. 326 (https://www.ilga.gov/legislation/102/SR/PDF/10200SR0326enr.pdf) ("SR326"), at p. 5.

[42]  ACS Key Facts, Census.gov (https://www.census.gov/content/dam/Census/programs-surveys/acs/news/10ACS_keyfacts.pdf) ("ACS Key Facts"), at p. 1; *see also Pope v. Cty. of Albany*, No. 1:11-CV-0736-LEK/CFH, 2014 WL 316703, at *13, n.22 (N.D.N.Y. Jan. 28, 2014) (noting warnings from Census Bureau that ACS estimates are "less reliable than [decennial] Census data and not intended to be used for redistricting").

C.      **Plaintiffs File this Lawsuit Challenging the June Map**

53.     On June 9, 2021, days after Governor Pritzker signed the legislation including the June Map, Leaders McConchie and Durkin filed the initial Complaint in this lawsuit.[43] In the Complaint, Plaintiffs explained that the Senate and House Districts in the June Map are malapportioned and do not have substantially equal populations, as required under the Equal Protection Clause of the Fourteenth Amendment.[44] Plaintiffs also explained that the passage of the June Map was both arbitrary and discriminatory in violation of the Equal Protection Clause.[45]

54.     On July 29, 2021, Plaintiffs filed their First Amended Complaint ("FAC") in this lawsuit, which added the Republican Caucuses of the Illinois Senate and House of Representatives and the Illinois Republican Party (collectively, the "Associational Plaintiffs") as Plaintiffs in this case.[46] In the FAC, Plaintiffs challenged the June Map on the same grounds raised in the initial Complaint, asserted claims for violation of the Equal Protection Clause and for declaratory judgment, and asked the Court to award declaratory, injunctive, and prospective equitable relief.[47]

55.     On August 12, 2021, the Census Bureau released the official 2020 census population counts.[48] Within an hour of the release of this data, Plaintiffs' expert, Dr. Jowei Chen, was able to analyze the data and calculate the populations of the Senate and House Districts in the June Map.[49] Dr. Chen determined that the maximum population deviation of the House Districts

---

[43] Complaint [Dkt. No. 1].

[44] *Id.* ¶¶ 1-8; 48-66.

[45] *Id.* ¶¶ 9-10; 67-78.

[46] First Amended Complaint ("FAC") [Dkt. No. 51].

[47] *Id.* ¶¶ 90-111.

[48] *See* 2020 Census Redistricting Data Files Press Kit, U.S. Census Bureau (https://www.census.gov/newsroom/press-kits/2021/2020-census-redistricting.html).

[49] Plaintiffs' Local Rule 56.1 Statement of Material Facts ("SOF") [Dkt. No. 79] ¶ 31; Affidavit of Dr. Jowei Chen, attached as Exhibit A to SOF ("Chen Aff.") [Dkt. No. 79-1] ¶¶ 13-14.

in the June Map is **29.88%**.[50] In addition, Dr. Chen determined that the maximum population

deviation of the Senate Districts in the June Map is **20.25%**.[51] The Leadership Defendants do not

contest these numbers and concede that the June Map is "malapportioned" and thus "presumptively

unconstitutional."[52]

56.     On August 19, 2021, Plaintiffs filed a Motion for Summary Judgment ("MSJ"),

Memorandum of Law ("MSJ Memo"), and Statement of Material Facts ("SOF"), which attached

an affidavit from Dr. Chen ("Chen Aff.").[53] In these filings, Plaintiffs explained that the maximum

population deviations in the June Map far exceed the 10% threshold established by the Supreme

Court and therefore the June Map is "presumptively impermissible," unconstitutional, and void *ab*

*initio*.[54] Plaintiffs asked the Court to enter judgment in their favor with respect to the two claims

in the FAC and to award Plaintiffs their requested declaratory, injunctive, and equitable relief.[55]

**D.      The Passage of the September Redistricting Map**

57.     On August 23, 2021, the Court held a hearing on several pending motions. At the

hearing, counsel for the Leadership Defendants stated that, rather than attempting to defend the

population deviations in the June Map, the General Assembly would instead be reconvened for a

special session at which it would attempt to pass a new redistricting map. The Court "urg[ed] the

General Assembly to take into account the views of the Plaintiffs in crafting any amended plan

---

[50] SOF ¶ 34; Chen Aff. ¶ 16.

[51] SOF ¶ 36; Chen Aff. ¶ 18.

[52] Sept. 1, 2021 Tr. at 18:7-8 (Ex. A to Plaintiffs' Memorandum of Law in Opposition to the Leadership Defendants' Motion to Dismiss) [Dkt. No. 102-1].

[53] Motion for Summary Judgment ("MSJ") [Dkt. No. 76]; Memorandum of Law ("MSJ Memo") [Dkt. No. 78]; SOF; Chen Aff.

[54] *See* MSJ Memo at 6-7.

[55] *Id.* at 8-10.

with the objective of presenting for the Court's consideration a plan that satisfies all constitutional and statutory obligations, not just those raised in the existing pleadings and motions."[56] The Court reiterated these comments in a Minute Entry issued on the same day.[57]

58.     Because the June Map was invalid, unconstitutional, and void *ab initio*, there was no redistricting plan that became "effective" by June 30, 2021.[58] Therefore, under the Illinois Constitution, after June 30, 2021, the authority for drafting a valid redistricting plan shifted from the General Assembly to a commission.[59] Leaders McConchie and Durkin have both appointed members to serve on the commission. However, the Leadership Defendants have refused to appoint their members so that the commission can begin the process of drafting a valid plan.

59.     Instead of appointing members to a commission, on August 31, 2021, the Leadership Defendants reconvened a special session of the General Assembly, which purported to pass legislation that includes the September Map of Senate and House Districts.[60]

60.     Contrary to the Court's instructions at the August 23, 2021 hearing and in the Minute Entry issued on the same date, the General Assembly did not "take into account the views of the Plaintiffs" in crafting the September Map. Instead, the General Assembly purported to pass the September Map through an even more rushed and exclusionary process than the passage of the June Map. Drafts of the September Map were only made public on August 30, 2021 and a final

---

[56] Aug. 23, 2021 Minute Entry [Dkt. No. 88].

[57] *Id.*

[58] *See People v. Blair*, 986 N.E.2d 75, 82 (Ill. App. Ct. 2013) ("[W]hen we declare a statute unconstitutional and void ab initio, we mean only that the statute was constitutionally infirm from the moment of its enactment and is, therefore, unenforceable. As a consequence*, we will give no effect to the unconstitutional statute*." (emphasis added)).

[59] Ill Const. 1970, art. IV, § 3(b).

[60] *See* Public Act 102-0663 (https://www.ilga.gov/legislation/publicacts/102/PDF/102-0663.pdf).

version was not made public until just before it was passed by the General Assembly on the evening of August 31, 2021. In fact, the General Assembly failed to even produce the actual data for the September Map to anyone, including Republican legislators, until after the Illinois House of Representatives voted on and passed the September Map. The General Assembly failed to work with Plaintiffs, failed to take input and comment from Plaintiffs regarding the September Map, and held hearings before releasing any proposed maps, which prevented Plaintiffs and other interested parties, especially minorities, from reviewing and commenting on the September Map prior to its passage.

61.    A number of good government groups, minority organizations, and community advocates have criticized this "rushed and exclusionary" redistricting process. The United Congress of Community and Religious Organizations ("UCCRO") and the Chicago Lawyers' Committee for Civil Rights jointly testified before the Illinois Senate and House Redistricting Committees on August 28, 2021, and expressed a number of serious concerns regarding the redistricting process, including:

    a.    "There is no indication of whether the General Assembly's redrawn maps will protect the voting rights of communities of color. Communities of color have said loud and clear throughout these hearings that we are uncomfortable with this year's redistricting process, and we do not feel reassured that our rights are being respected."

    b.    "[I]t is unreasonable to ask communities to give input in a vacuum without the General Assembly sharing proposed maps and accompanying data. Furthermore, it needlessly pits our communities of color against each other when instead we could achieve solutions together."

    c.    "Merely pointing to current incumbents of color is not enough reassurance that our communities' civil rights have been respected. . . . Without basic information about majority-minority districts that are being drawn, we do

not know if communities of color will be able to elect the candidates of their choice in accordance with the law."[61]

62.     Likewise, the Latino Policy Forum issued a press release on September 2, 2021 urging Governor Pritzker "to veto the Illinois legislative maps passed by legislators this week, which do not equitably reflect the state's Latino community."[62] As explained in the press release, "[d]espite recent 2020 census data indicating that Illinois added 309,832 Latinos (the largest population increase among racial/ethnic groups statewide), no Latino-majority districts were added in the maps passed by the [G]eneral [A]ssembly. In fact, preliminary analysis and reports show that some Latino-majority districts are diluted even more, further hindering the community's ability to elect the representatives of their choice."[63]

63.     The legislation containing the September Map did not purport to repeal the June Map, but instead included a paragraph stating that the boundaries in the September Map "shall be construed to take precedence over any conflict of law in accordance with the Statute on Statutes."[64] Thus, if this Court finds that the September Map is invalid, as Plaintiffs contend, then the June

---

[61] Testimony by United Congress of Community and Religious Organizations and Chicago Lawyers' Committee for Civil Rights Before the Illinois House Redistricting Committee & Illinois Senate Redistricting Committee (Aug. 28, 2021), at 5-6 (https://static1.squarespace.com/static/5871061e6b8f5b2a8ede8ff5/t/612a7342cf943846959b9964/1630171970872/2021-08-28+UCCRO+Chicago+Lawyers%27+Committee+testimony.pdf).

[62] The Latino Policy Forum Urges Governor Pritzker to Veto Inequitable Legislative Maps, Latino Policy Forum (Sept. 2, 2021) (https://www.latinopolicyforum.org/news/press-releases/document/The-Latino-Policy-Forum-Urges-Governor-Pritzker-to-Veto-Inequitable-Legislative-Maps-1.pdf).

[63] *Id.*

[64] *See* Public Act 102-0663 § 5(h) (10 ILCS 92/5(h)). The Illinois Statute on Statutes provides that two or more statutes relating to the same subject matter will be construed together except in the case of an "irreconcilable conflict." 5 ILCS 70/6. If such a conflict exists, then the "Act last acted upon by the General Assembly is controlling to the extent of such conflict." *Id.*

Map will not be superseded, and the Board Members will have a statutory duty to conduct elections using the malapportioned districts in the June Map.[65]

64.     Governor Pritzker signed the legislation containing the September Map on September 24, 2021.[66]

## E.     The September Map Disenfranchises Latino Voters by "Packing" Such Voters into A Particular House District and "Cracking" and Separating Voters in Other Districts

65.     Illinois added approximately 309,832 Latinos in the 2020 census, which is the largest population increase among racial or ethnic groups statewide.[67] Latino voters comprise approximately 11.2% of the CVAP in Illinois.[68] Proportionally, this percentage (11.2%) equates to 13 of the state's 118 House Districts.

66.     The September Map passed by the General Assembly purports to create a number of Latino "influence" districts. There are 13 total House Districts in the September Map with a total Latino population of more than 50%, but only four of those districts have a 50%+ Latino CVAP.[69] The other Latino "influence" districts do not provide Latino voters with an effective opportunity to elect the candidates of their choice. In contrast, the General Assembly could have

---

[65] 10 ILCS 5/1A-1, *et seq.* (requiring Board Members to oversee elections pursuant to Illinois law).

[66]     *See* Bill Status of Senate Bill SB0927 (https://www.ilga.gov/legislation/BillStatus.asp?DocNum=927&GAID=16&DocTypeID=SB&LegId=133554&SessionID=110&GA=102).

[67] The Latino Policy Forum Urges Governor Pritzker to Veto Inequitable Legislative Maps, Latino Policy Forum (Sept. 2, 2021) (https://www.latinopolicyforum.org/news/press-releases/document/The-Latino-Policy-Forum-Urges-Governor-Pritzker-to-Veto-Inequitable-Legislative-Maps-1.pdf).

[68]     *See* Citizen Voting Age Population by Race and Ethnicity, Census.gov (Feb. 19, 2021) (https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.2019.html).

[69] *Id.*

drawn a map that includes at least nine compact House Districts with a 50%+ Latino CVAP while still providing for at least as many majority-Black districts as the September Map.

67.     The September Map "packs" Latino voters into a particular House District and "cracks" other Latino communities to artificially limit the number of districts with a majority of Latino voters.

68.     Latino voters historically and consistently vote cohesively in the State of Illinois. Historically, elections in Illinois have been racially and ethnically polarized.

69.     The majority racial and ethnic population in Illinois, white non-Latinos, often vote sufficiently as a bloc that, in the absence of special circumstances or a large Latino voter population, the preferred candidates of Latino voters have been defeated.

70.     The discrimination against Latino voters and dilution of their voting power in the September Map is most evident in three specific geographic areas: (1) Southwest Chicago, (2) Northwest Chicago, and (3) Aurora. Each area is discussed in turn below.

**1.      Southwest Chicago**

71.     The September Map creates just four House Districts with a 50%+ Latino CVAP. Those four districts are House Districts 1, 2, 22, and 23, all located in Southwest Chicago. The percentages of total Latino population, Latino voting population, and Latino CVAP in these four districts are reflected in the table below.

**Table 1** (House Districts in Southwest Chicago with 50%+ Latino CVAP in the September Map)

| District | Total Latino Population | Latino Voting Age Population[70] | Latino CVAP[71] |
|---|---|---|---|
| House District 1 | 78.90% | 75.95% | 64.63% |
| House District 2 | 68.34% | 64.57% | 55.20% |
| House District 22 | 67.15% | 62.79% | 52.62% |
| House District 23 | 86.58% | 84.44% | 71.05% |

72.    House District 23 is "packed" and gerrymandered to capture an unnecessarily excessive supermajority of Latino voters. The Latino CVAP is 71.05% in House District 23. By packing Latino voters into this district, the September Map unnecessarily "wastes" the votes of many Latino voters.

73.    Instead of "packing" Latino voters into House District 23, a map could be drawn with at least two additional compact majority Latino CVAP districts by rejoining areas with Latino voters from the "packed" House District 23 with voters from the Latino communities into non-Latino majority CVAP House Districts 21 (including areas of Berwyn, Cicero, North Riverside, Summit, Hodgkins, and McCook), 24 (including parts of Chicago in the McKinley Park, Mount Pleasant, Lower West Side, and Bridgeport neighborhoods), and 6 and 32 (including parts of the Back of the Yards, Ashburn, and Clarksdale neighborhoods). The percentages of total Latino population, Latino voting population, and Latino CVAP in these four districts are reflected in the table below.

---

[70]    *See* Illinois House Democratic Data (https://ilhousedems.com/redistricting/wp-content/uploads/2021/08/House-data.pdf) ("House Data").

[71]    *See* Citizen Voting Age Population by Race and Ethnicity, Census.gov (Feb. 19, 2021) (https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.2019.html).

**Table 2** **(Certain House Districts in Southwest Chicago with Under 50% Latino CVAP in the September Map)**

| District | Total Latino Population | Latino Voting Age Population[72] | Latino CVAP[73] |
|---|---|---|---|
| House District 6 | 30.01% | 26.19% | 13.81% |
| House District 21 | 55.72% | 51.85% | 42.58% |
| House District 24 | 51.41% | 48.50% | 43.68% |
| House District 32 | 34.44% | 31.17% | 19.18.0% |

74.     Latino voters in these four House Districts are being deprived of their rights and having their voting power diluted because they live outside of effective majority-Latino House Districts but could live within a compact majority-Latino House District.

75.     The boundaries of these House Districts in the September Map looks like the following (Map 1), which includes only four 50%+ Latino CVAP House Districts (1, 2, 22, and 23). For all maps included in this filing, green shading reflects areas of Latino population and blue shading reflects areas of Black population.

---

[72] *See* Illinois House Democratic Data (https://ilhousedems.com/redistricting/wp-content/uploads/2021/08/House-data.pdf) ("House Data").

[73] *See* Citizen Voting Age Population by Race and Ethnicity, Census.gov (Feb. 19, 2021) (https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.2019.html).

**Map 1 (Southwest Chicago House Districts in the September Map)**



76.     In contrast to the September Map, a map could be drawn with at least six compact

majority Latino CVAP districts in the Southwest Chicago area, such as the proposed alternative

map excerpt of the area shown below (Map 2):

**Map 2** (**Alternative Map of Southwest Chicago House Districts with 50%+ Latino CVAP**)[74]



77. Indeed, the six majority Latino CVAP districts in the map excerpt above (Map 2)

are actually ***more compact*** than the four districts in the September Map (Map 1), which further

---

[74] This proposed alternative map excerpt is not the only valid alternative map that could be used in place of the September Map. The proposed alternative map excerpts included in this Second Amended Complaint are merely examples of different valid and constitutionally compliant maps that could be used in place of the invalid September Map. Plaintiffs believe that a redistricting commission, Special Master, or other potential expert could draw a variety of alternative maps that are valid and constitutionally acceptable.

demonstrates that the September Map intentionally and unreasonably discriminates against and dilutes the votes of Latino voters.

78.    Because the September Map "packs" Latino voters into House District 23 and "cracks" and separates Latino voters in House Districts 6, 21, 24, and 32, the September Map violates the Equal Protection Clause and Section 2 of the VRA. Thus, Latino voters who live and vote in these House Districts are injured by the September Map, including Plaintiffs James Rivera, Anna De La Torre, Dolores Diaz, and Felipe Luna Jr.

**2.    Northwest Chicago**

79.    The September Map does not create any House Districts with a 50%+ Latino CVAP on Chicago's northwest side. Instead, Latino voters are "cracked" and separated into a number of non-Latino majority CVAP districts in this area, including House Districts 3, 4, 19, 39, and 40 (which include Latino communities in the Chicago neighborhoods of Avondale, Albany Park, Irving Park, Humboldt, Garfield Park, Hermosa, Belmont Park, and Portage Park, and Latino communities in the near-northwest suburbs of Elmwood Park, Franklin Park, Melrose Park, Northlake, Bensenville, and Addison).

80.    None of these five House Districts have a 50%+ Latino CVAP. The percentages of total Latino population, Latino voting population, and Latino CVAP in these five districts are reflected in the table below.

**Table 3** (**Certain House Districts in Northwest Chicago with Under 50% Latino CVAP in the September Map**)

| District | Total Latino Population | Latino Voting Age Population[75] | Latino CVAP[76] |
|---|---|---|---|
| House District 3 | 58.78% | 54.98% | 47.54% |
| House District 4 | 56.06% | 52.65% | 45.19% |
| House District 19 | 29.85% | 27.32% | 23.93% |
| House District 39 | 54.50% | 50.78% | 45.61% |
| House District 40 | 45.63% | 42.76% | 34.54% |

81.     In the June Map, House District 3 actually had a Latino CVAP of 54.3%.[77] However, in the September Map, the Latino CVAP was reduced to under 50%, which further demonstrates that the September Map intentionally and unreasonably discriminates against and dilutes the votes of Latino voters.[78]

82.     The boundaries of these five House Districts in the September Map are reflected in the map excerpt below (Map 3):

---

[75]  *See* Illinois House Democratic Data (https://ilhousedems.com/redistricting/wp-content/uploads/2021/08/House-data.pdf) ("House Data").

[76]  *See* Citizen Voting Age Population by Race and Ethnicity, Census.gov (Feb. 19, 2021) (https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.2019.html).

[77]  *See* Illinois House Democratic Proposed District Data (https://ilhousedems.com/redistricting/wp-content/uploads/2021/05/2021-Proposed-District-Data.pdf) ("Proposed Data").

[78]  *See* Citizen Voting Age Population by Race and Ethnicity, Census.gov (Feb. 19, 2021) (https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.2019.html).

**Map 3** (**Northwest Chicago House Districts in the September Map**)



83. Instead of separating Latino voters in these districts, a map could be drawn with three compact majority Latino CVAP districts by rejoining Latino communities from these districts. A proposed alternative map of this area is shown below (Map 4):

**Map 4 (Alternative Map of Northwest Chicago House Districts with 50%+ Latino CVAP)**



84. House District 39 is a particularly notable example of the discriminatory effects of the September Map. That district has a total Latino population of 54.50%, but a Latino CVAP of only 45.61%. The House Resolution regarding the June Map stated, with respect to House District 39, that "[t]he residence of the incumbent was a factor in adjustments to this district, as well as the ability to increase the partisan advantage."[79]

---

[79] HR0359 at p. 20. The incumbent-protection language was removed from the comparable paragraph of the legislation describing the September Map. However, the geographic and

85.     The incumbent representative for House District 39 is non-Latino white: Will Guzzardi, who lives in and represents the Logan Square neighborhood of Chicago. The area is overwhelmingly Democratic, so there is no need to "increase the partisan advantage." Indeed, Representative Guzzardi has run unopposed in both the primary and general elections since he was first elected in 2014. Representative Guzzardi first ran for election in 2012 and narrowly lost by 125 votes in the Democratic primary to a Latina incumbent, Maria Antonia Berrios. Guzzardi ran again and defeated Representative Berrios in the 2014 Democratic primary.

86.     In 2011, the General Assembly claimed that House District 39 had a Latino voting age population of 55.06%.[80] According to the data released by the House Democrats in August 2021, the new House District 39 in the September Map has a Latino voting age population of only 50.78%.[81] Thus, the adjustments to House District 39 have the effect of protecting a non-Latino incumbent and depriving Latino voters in the area of the ability to elect a Latino representative.

87.     Because the September Map "cracks" and separates Latino voters into non-Latino majority CVAP House Districts 3, 4, 19, 39, and 40, the September Map violates the Equal Protection Clause and Section 2 of the VRA. Thus, Latino voters who live and vote in these House Districts are injured by the September Map, including Plaintiff Salvador Tremillo.

---

demographic composition of House District 39 is substantially similar in both the June Map and the September Map. The Latino voting age population and CVAP are nearly identical in both maps even though the boundaries were adjusted in the September Map to account for malapportionment.

[80] House Resolution 0385 (https://www.ilga.gov/legislation/97/HR/PDF/09700HR0385lv.pdf) at 111.

[81] *See* Illinois House Democratic Data (https://ilhousedems.com/redistricting/wp-content/uploads/2021/08/House-data.pdf) ("House Data").

### 3. Aurora

88.     The September Map also "cracks" and separates a large Latino community in the west suburbs of Chicago, concentrated in Aurora and West Chicago, among House Districts 49, 50, 83, and 84. The percentages of total Latino population, Latino voting population, and Latino CVAP in these four districts are reflected in the table below.

**Table 4 (Certain House Districts in Aurora area with Under 50% Latino CVAP in the September Map)**

| District | Total Latino Population | Latino Voting Age Population[82] | Latino CVAP[83] |
|---|---|---|---|
| House District 49 | 27.03% | 23.85% | 16.26% |
| House District 50 | 53.20% | 48.78% | 36.74% |
| House District 83 | 23.54% | 20.63% | 14.20% |
| House District 84 | 20.68% | 18.69% | 15.31% |

89.     The boundaries of these four House Districts in the September Map are reflected in the map excerpt below (Map 5):

---

[82]     *See* Illinois House Democratic Data (https://ilhousedems.com/redistricting/wp-content/uploads/2021/08/House-data.pdf) ("House Data").

[83]     *See* Citizen Voting Age Population by Race and Ethnicity, Census.gov (Feb. 19, 2021) (https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.2019.html).

**Map 5** (Aurora Area House Districts in the September Map)



90.     Instead of separating Latino voters in these districts, a map could naturally be drawn with a compact district with approximately 48% Latino CVAP by rejoining the Latino communities from this area, which would be far more effective at providing Latino voters an opportunity to elect a candidate of their choice in both primary and general elections. A proposed alternative map of this area is shown below (Map 6):

**Map 6** (**Alternative Map of Aurora Area House District with Effective Latino District**)



91.    Because the September Map "cracks" and separates Latino voters in House Districts 49, 50, 83, and 84, the September Map violates the Equal Protection Clause and Section 2 of the VRA. Thus, Latino voters who live and vote in these House Districts are injured by the September Map, including Plaintiff Christopher Romero.

**F.    The September Map Disenfranchises Black Voters by "Cracking" and Separating Voters Certain House Districts**

92.    In addition to the problems with Latino districts, the September Map also discriminates against and dilutes the votes of Black voters. Specifically, there is a substantial, compact Black community in the East St. Louis area, which could form a compact 50%+ Black CVAP House District. Instead, the September Map "cracks" and separates this community into two non-Black majority CVAP districts: House Districts 113 and 114. The percentages of total Black population, Black voting population, and Black CVAP in these two districts are reflected in the table below.

**Table 5 (Certain House Districts in the East St. Louis area with Under 50% Black CVAP in the September Map)**

| District | Total Black Population | Black Voting Age Population[84] | Black CVAP[85] |
|---|---|---|---|
| House District 113 | 31.50% | 29.56% | 26.17% |
| House District 114 | 34.65% | 33.41% | 38.19% |

93.    The boundaries of these two House Districts in the September Map are reflected in the map excerpt below (Map 7):

---

[84]    *See* Illinois House Democratic Data (https://ilhousedems.com/redistricting/wp-content/uploads/2021/08/House-data.pdf) ("House Data").

[85]    *See* Illinois House Democratic Proposed District Data (https://ilhousedems.com/redistricting/wp-content/uploads/2021/05/2021-Proposed-District-Data.pdf) ("Proposed Data").

**Map 7** **(East St. Louis Area House Districts in the September Map)**



94.     Instead of separating Black voters in these districts, a map could be drawn with an additional majority Black CVAP district by combining areas with Black communities from these two districts. A proposed alternative map of this area is shown below (Map 8):

**Map 8** **(Alternative Map of East St. Louis Area House District with 50%+ Black CVAP)**



95.     Because the September Map "cracks" and separates Black voters in House Districts

113 and 114, the September Map violates the Equal Protection Clause and Section 2 of the VRA.

**VI.**
**CAUSES OF ACTION**

**COUNT I**
**(Violation of the Equal Protection Clause, actionable under 42 U.S.C. § 1983,**
**with respect to the June Map)**

96.     Plaintiffs re-allege the facts set forth in the paragraphs above as if set forth herein.

97.     The Equal Protection Clause in the Fourteenth Amendment to the U.S. Constitution requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis and that states must draw legislative districts with substantially equal populations.

98.     Under this requirement, any plan that results in a greater-than-10% population deviation between the largest and smallest legislative districts is "presumptively impermissible."[86] Even if the plan results in a smaller maximum population deviation, the plan will still be held invalid if the districts are drawn using arbitrary or discriminatory criteria.[87]

99.     The maximum population deviation of the House Districts in the June Map is **29.88%**, and the maximum population deviation of the Senate Districts in the June Map is **20.25%**.[88] Therefore, the maximum population deviations in the June Map are far above the 10% threshold set by the U.S. Supreme Court. Accordingly, the June Map is therefore "presumptively impermissible" and violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. The June Map is therefore invalid, unconstitutional, and void *ab initio*.

100.     In addition, the June Map also violates the Equal Protection Clause of the Fourteenth Amendment because the choice to use ACS estimates as the base population data is both arbitrary and discriminatory. *First*, the June Map is arbitrary because, among other things,

---

[86] *Evenwel*, 136 S. Ct. at 1124.

[87] *See Roman v. Sincock*, 377 U.S. 369, 710 (1964).

[88] SOF ¶¶ 34, 36; Chen Aff. ¶¶ 16, 18.

the General Assembly did not provide any explanation for why the five-year 2015-2019 ACS estimates were determined to be the best available population data or why the General Assembly chose to pass an invalid redistricting map rather than deferring to a commission to pass a map using the official census population counts, as required under the Illinois Constitution. **Second**, the June Map is discriminatory because the use of ACS estimates results in greater undercounts of minority populations, and thereby ensures that historically undercounted minority communities will continue to be underrepresented and lose their right to an equal vote in the legislature.

101.    The dispute regarding the June Map is not moot because the legislation that contained the September Map did not purport to repeal the June Map. Instead, the legislation included a paragraph stating that the boundaries in the September Map "shall be construed to take precedence over any conflict of law in accordance with the Statute on Statutes."[89] Thus, if this Court finds that the September Map is invalid, as Plaintiffs contend, then the June Map will not be superseded, and the Board Members will have a statutory duty to conduct elections using the malapportioned districts in the June Map.[90]

## COUNT II
### (Federal Declaratory Judgment Claim, 28 U.S.C. §§ 2201, 2202, with respect to the June Map)

102.    Plaintiffs re-allege the facts set forth in the paragraphs above as if set forth herein.

103.    Despite lacking the official population counts from the census, the General Assembly passed the June Map on May 28, 2021, and Governor Pritzker signed the legislation containing the June Map on June 4, 2021.

---

[89] *See* Public Act 102-0663 § 5(h) (10 ILCS 92/5(h)).

[90] 10 ILCS 5/1A-1, *et seq.* (requiring Board Members to oversee elections pursuant to Illinois law).

104.    An actual controversy exists between Plaintiffs and Defendants regarding whether the June Map is invalid, unconstitutional, and void *ab initio* and whether the June Map complies with the "one person, one vote" principle derived from the Equal Protection Clause in the Fourteenth Amendment to the U.S. Constitution.

105.    An actual controversy exists between Plaintiffs and the Leadership Defendants regarding whether the Leadership Defendants should be required to appoint members to a legislative commission with the responsibility for enacting a redistricting plan pursuant to the procedures set forth in Article IV, Section 3 of the Illinois Constitution.

106.    An actual controversy exists between Plaintiffs and the Board Members regarding whether the Board Members may enforce the June Map or conduct any elections based on the June Map. Under Illinois law, the Board Members are required to conduct elections pursuant to the Illinois statutes during the upcoming election cycle, which begins in January 2022, only four months from now.

107.    Accordingly, Plaintiffs respectfully request that the Court grant declaratory relief under the Declaratory Judgment Act and declare the June Map invalid, unconstitutional, and void *ab initio* and that Defendants may not enforce or give any effect to the June Map, including conducting any elections with respect to the districts contained in the June Map.

108.    The dispute regarding the June Map is not moot because the legislation that contained the September Map did not purport to repeal the June Map. Instead, the legislation included a paragraph stating that the boundaries in the September Map "shall be construed to take precedence over any conflict of law in accordance with the Statute on Statutes."[91] Thus, if this Court finds that the September Map is invalid, as Plaintiffs contend, then the June Map will not be

---

[91] *See* Public Act 102-0663 § 5(h) (10 ILCS 92/5(h)).

superseded, and the Board Members will have a statutory duty to conduct elections using the malapportioned districts in the June Map.[92]

### COUNT III
### (Federal Declaratory Judgment Claim, 28 U.S.C. §§ 2201, 2202, with respect to the September Map)

109.    Plaintiffs re-allege the facts set forth in the paragraphs above as if set forth herein.

110.    The Illinois Constitution entrusts the General Assembly to pass a redistricting plan in the first instance.[93] However, if a valid plan does not "become[] effective" by June 30th of the year following each year in which the decennial census is conducted (in this instance, June 30, 2021), then responsibility for drafting a plan shifts for the remainder of the current redistricting cycle from the General Assembly to a commission.[94] The President of the Senate, the Speaker of the House, and the Senate and House leaders of the minority party each must appoint two members to the commission, with a ninth member to be added if the commission is unable to agree on a redistricting plan.[95]

111.    The use of a commission in the legislative redistricting process has been the norm in Illinois. Since the latest version of the Illinois Constitution was adopted in 1970, five legislative redistricting plans have been enacted, but the General Assembly has directly approved a new plan only once—in 2011. Following each of the four decennial censuses before 2010 (i.e., 1970, 1980, 1990, and 2000), a commission was constituted to enact a plan.[96]

---

[92] 10 ILCS 5/1A-1, *et seq.* (requiring Board Members to oversee elections pursuant to Illinois law).

[93] Ill Const. 1970, art. IV, § 3(b).

[94] *Id.*

[95] *Id.*

[96] *See Hooker*, 2016 IL 121007, ¶ 5 (describing historical use of Commission in legislative redistricting in Illinois).

112. Because the June Map is invalid and void *ab initio*, no redistricting map became "effective" as of June 30, 2021. Therefore, under the Illinois Constitution, the authority for drawing a new legislative map shifted for the remainder of this redistricting cycle from the General Assembly to a redistricting commission.[97]

113. Leaders McConchie and Durkin have appointed members to serve on the commission. However, the Leadership Defendants have refused to make their selections of members to serve on the commission. Instead of appointing members to a commission, as required by the Illinois Constitution, on August 31, 2021, the Leadership Defendants reconvened the General Assembly for a special session, at which the General Assembly purported to pass legislation that includes the September Map of Senate and House Districts.

114. Because the General Assembly did not have authority to pass a redistricting plan after June 30, 2021, the September Map is invalid and void *ab initio*.

115. An actual controversy exists between Plaintiffs and the Leadership Defendants regarding whether the September Map is invalid and void *ab initio* and whether the Leadership Defendants should be required to appoint members to a commission with the responsibility for enacting a valid redistricting plan pursuant to the procedures set forth in Article IV, Section 3 of the Illinois Constitution.

116. Accordingly, Plaintiffs respectfully request that the Court grant declaratory relief under the Declaratory Judgment Act and declare that the September Map is invalid and void *ab initio* and that the Leadership Defendants should be required to appoint members to a commission with the responsibility for enacting a valid redistricting plan.

---

[97] *Id.*

## COUNT IV
### (Violation of Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, with respect to the September Map)

117.    Plaintiffs re-allege the facts set forth in the paragraphs above as if set forth herein.

118.    The September Map denies and abridges the rights of Latino voters to vote on the basis of their race. The September Map intentionally dilutes the votes of Latino voters by "packing" an excessive supermajority of Latino voters in a particular House District and "cracking" or separating other Latino communities to artificially limit the number of districts with a majority of Latino voters.

119.    Latino voters historically and consistently vote cohesively in the State of Illinois. Historically, elections in Illinois have been racially and ethnically polarized.

120.    The majority racial and ethnic population in Illinois, white non-Latinos, often vote sufficiently as a bloc that, in the absence of special circumstances or a large Latino voter population, the preferred candidates of Latino voters have been defeated.

121.    The discrimination against Latino voters and dilution of their voting power in the September Map is most evident in three specific geographic areas:

a.    **Southwest Chicago** – The September Map "packs" a Latino supermajority in House District 23 and "cracks" and separates Latino communities into non-Latino majority CVAP House Districts 21, 24, 6, and 32. Thus, many Latino voters in House District 23, including Plaintiff Dolores Diaz, will see their votes "wasted" because the September Map intentionally makes those votes unnecessary to elect a candidate of their choice. At the same time, Latino voters in House Districts 21, 24, 6, and 32, including Plaintiffs James Rivera, Anna De La Torre, and Felipe Luna Jr., will be prevented by their intentionally diminished numbers from having any significant influence in choosing primary and general election candidates.

b.    **Northwest Chicago** – The September Map "cracks" and separates Latino communities into non-Latino majority CVAP House Districts 3, 4, 19, 39, and 40. Latino voters in these House Districts, including Plaintiff Salvador Tremillo, will be prevented by their intentionally diminished numbers from having any significant influence in choosing primary and general election candidates.

      c.     **Aurora** – The September Map "cracks" and separates Latino communities into House Districts 49, 50, 83, and 84. Latino voters in these House Districts, including Plaintiff Christopher Romero, will be prevented by their intentionally diminished numbers from having any significant influence in choosing primary and general election candidates.

122.    As shown in the tables and map excerpts in the text above, a map could be drawn that includes at least nine compact House Districts with a 50%+ Latino CVAP while still providing for at least as many majority-Black districts as the September Map.

123.    As a result, the September Map denies or abridges the right of Latino voters in the above-referenced House Districts to vote, on account of their race or color, and affords such voters less opportunities than other members of the electorate to participate in the political process and to elect representatives of their choice.

124.    Accordingly, the September Map violates Section 2 of the VRA, 52 U.S.C. § 10301.

## COUNT V
### (Violation of Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, with respect to the September Map)

125.    Plaintiffs re-allege the facts set forth in the paragraphs above as if set forth herein.

126.    In addition to the problems with Latino districts, the September Map also discriminates and dilutes the votes of Black voters. Specifically, there is a substantial, compact Black community in the East St. Louis area, which could form a compact 50%+ Black CVAP House District. Instead, the September Map "cracks" and separates this community into two non-Black majority districts: House Districts 113 and 114.

127.    Under the September Map, Black voters in House Districts 113 and 114 will be prevented by their intentionally diminished numbers from having any significant influence in choosing primary and general election candidates of their choice.

128.    Black voters historically and consistently vote cohesively in the State of Illinois. Historically, elections in Illinois have been racially and ethnically polarized.

129.     The majority racial and ethnic population in Illinois, white non-Latinos, often vote sufficiently as a bloc that, in the absence of special circumstances or a large Black voter population, the preferred candidates of Black voters have been defeated.

130.     As a result, the September Map denies or abridges the right of Black voters in House Districts 113 and 114 to vote, on account of their race or color, and affords such voters less opportunities than other members of the electorate to participate in the political process and to elect representatives of their choice.

131.     Accordingly, the September Map violates Section 2 of the VRA, 52 U.S.C. § 10301.

**COUNT VI**
**(Violation of the Equal Protection Clause, actionable under 42 U.S.C. § 1983,**
**with respect to the September Map)**

132.     Plaintiffs re-allege the facts set forth in the paragraphs above as if set forth herein.

133.     The September Map intentionally discriminates against Latino voters on the basis of their race. The September Map intentionally dilutes the votes of Latino voters by: (1) "packing" an excessive supermajority of Latino voters into House District 23, and (2) "cracking" and separating Latino communities into non-Latino majority CVAP House Districts 3, 4, 6, 19, 21, 24, 32, 39, 40, 49, 50, 83, and 84.

134.     Thus, many Latino voters in House District 23 will see their votes wasted because the September Map intentionally makes those votes unnecessary to elect a candidate of their choice. At the same time, many Latino voters into non-Latino majority CVAP House Districts 3, 4, 6, 19, 21, 24, 32, 39, 40, 49, 50, 83, and 84 will be prevented by their intentionally diminished numbers from having any significant influence in choosing primary and general election candidates.

135.     As a result, the September Map intentionally treats Latino voters in these House Districts differently and worse than it treats similarly situated voters who are not Latino, based upon the race of the affected voters.

136.     Accordingly, the September Map violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, made actionable in this suit by 42 U.S.C. § 1983.

### COUNT VII
### (Violation of the Equal Protection Clause, actionable under 42 U.S.C. § 1983, with respect to the September Map)

137.     Plaintiffs re-allege the facts set forth in the paragraphs above as if set forth herein.

138.     The September Map intentionally discriminates against Black voters on the basis of their race. The September Map intentionally dilutes the votes of Black voters by "cracking" and separating Black communities in House Districts 113 and 114.

139.     Thus, many Black voters in non-Black majority House Districts 113 and 114 will be prevented by their intentionally diminished numbers from having any significant influence in choosing primary and general election candidates.

140.     As a result, the September Map intentionally treats Black voters in these House Districts differently and worse than it treats similarly situated voters who are not Black, based upon the race of the affected voters.

141.     Accordingly, the September Map violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, made actionable in this suit by 42 U.S.C. § 1983.

### VII.
### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

1.      Assume jurisdiction over this action and designate a three-judge panel pursuant to 28 U.S.C. § 2284.

2.      Issue an order pursuant to 42 U.S.C. § 1983 holding that the June Map violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and is therefore invalid, unconstitutional, and void *ab initio*.

3.      Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57, declaring that the June Map violates the Equal Protection Clause of the Fourteenth Amendment and is therefore invalid, unconstitutional, and void *ab initio*.

4.      Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57, declaring that the September Map is invalid and void *ab initio* because the General Assembly lacked authority to pass the September Map.

5.      Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57, declaring that the September Map dilutes the voting strength of Latino voters in violation of Section 2 of the VRA, 52 U.S.C. § 10301.

6.      Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57, declaring that the September Map dilutes the voting strength of Black voters in violation of Section 2 of the VRA, 52 U.S.C. § 10301.

7.      Issue an order pursuant to 42 U.S.C. § 1983 holding that the September Map violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and is therefore invalid and unconstitutional.

8.      Issue a permanent injunction enjoining Defendants, their agents, employees, and those persons acting in concert with them, from enforcing or giving any effect to the June Map or

the September Map, including enjoining the Board Members from conducting any elections based on the June Map or the September Map.

9.     Grant prospective equitable relief requiring the Leadership Defendants to appoint members to a redistricting commission with the responsibility for enacting a redistricting plan pursuant to the procedures set forth in Article IV, Section 3 of the Illinois Constitution. Alternatively, appoint a Special Master to draft a valid and constitutionally acceptable redistricting plan or grant such other appropriate relief that allows for the drafting and implementation of a valid and constitutionally acceptable redistricting plan.

10.     Make all further orders as are just, necessary, and proper to ensure complete fulfillment of this Court's declaratory, injunctive, and equitable orders in this case.

11.     Issue an order requiring Defendants to pay Plaintiffs' costs, expenses, and reasonable attorneys' fees incurred in the prosecution of this action, as authorized by the Civil Rights Attorneys' Fees Awards Act of 1976, 42 U.S.C. § 1988 and as authorized by 42 U.S.C. § 1973l(e).

12.     Grant such other and further relief as it deems is proper and just.

Dated: October 1, 2021

Respectfully submitted,

/s/ Phillip A. Luetkehans
Phillip A. Luetkehans
Brian J. Armstrong
LUETKEHANS, BRADY, GARNER &
ARMSTRONG, LLC
105 E. Irving Park Road
Itasca, Illinois 60143
Tel: (630) 760-4601
pal@lbgalaw.com
bja@lbgalaw.com

*Counsel for Plaintiffs Dan McConchie, in his official capacity as Minority Leader of the Illinois Senate and individually as a registered voter, Jim Durkin, in his official capacity as Minority Leader of the Illinois House of Representatives and individually as a registered voter, James Rivera, Anna De La Torre, Dolores Diaz, Felipe Luna Jr., Salvador Tremillo, Christopher Romero, the Republican Caucus of the Illinois Senate, and the Republican Caucus of the Illinois House of Representatives*

/s/ Ricardo Meza
Ricardo Meza
Meza Law
161 N. Clark Street, Suite 1600
Tel: (312) 802-0336
rmeza@meza.law

*Counsel for Plaintiffs Dan McConchie, in his official capacity as Minority Leader of the Illinois Senate and individually as a registered voter, Jim Durkin, in his official capacity as Minority Leader of the Illinois House of Representatives and individually as a registered voter, James Rivera, Anna De La Torre, Dolores Diaz, Felipe Luna Jr., Salvador Tremillo, Christopher Romero, the Republican Caucus of the Illinois Senate, and the Republican Caucus of the Illinois House of Representatives*

/s/ Charles E. Harris, II
Charles E. Harris, II
Mitchell D. Holzrichter
Thomas V. Panoff
Christopher S. Comstock
Heather A. Weiner
Christopher A. Knight
Joseph D. Blackhurst
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 782-0600
charris@mayerbrown.com
mholzrichter@mayerbrown.com
tpanoff@mayerbrown.com
ccomstock@mayerbrown.com
hweiner@mayerbrown.com
cknight@mayerbrown.com
jblackhurst@mayerbrown.com

*Counsel for Plaintiffs Dan McConchie, in his official capacity as Minority Leader of the Illinois Senate and individually as a registered voter, Jim Durkin, in his official capacity as Minority Leader of the Illinois House of Representatives and individually as a registered voter, James Rivera, Anna De La Torre, Dolores Diaz, Felipe Luna Jr., Salvador Tremillo, Christopher Romero, the Republican Caucus of the Illinois Senate, and the Republican Caucus of the Illinois House of Representatives*

/s/ John G. Fogarty
John G. Fogarty
Clark Hill PLC
130 E. Randolph St., Suite 3900
Chicago, Illinois 60601
Tel: (312) 985-5900
jfogarty@clarkhill.com

*Counsel for Plaintiff the Illinois Republican Party*