**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DAN MCCONCHIE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 21-cv-3091 |
| | ) | |
| v. | ) | Circuit Judge Michael B. Brennan |
| | ) | Chief District Judge Jon E. DeGuilio |
| CHARLES W. SCHOLZ, *et al.*, | ) | District Judge Robert M. Dow, Jr. |
| | ) | |
| Defendants. | ) | Three-Judge Court – 28 U.S.C. § 2284(a) |

_____

| | | |
|---|---|---|
| JULIE CONTRERAS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 21-cv-3139 |
| | ) | |
| v. | ) | Circuit Judge Michael B. Brennan |
| | ) | Chief District Judge Jon E. DeGuilio |
| ILLINOIS STATE BOARD OF | ) | District Judge Robert M. Dow, Jr. |
| ELECTIONS, *et al.*, | ) | |
| | ) | Three-Judge Court – 28 U.S.C. § 2284(a) |
| Defendants. | ) | |

_____

**MEMORANDUM OPINION AND ORDER**

PER CURIAM. On May 28, 2021, the Illinois General Assembly approved a state legislative redistricting plan before the release of the official population totals from the 2020 United States decennial census. The pandemic delayed release of the official population totals, although the United States Census Bureau ("the Census Bureau") had announced previously that those totals would be available by mid-August 2021. The Illinois General Assembly elected not to wait, and instead relied primarily on data from the American Community Survey ("ACS"), a population estimate previously published by the Census Bureau, to determine the boundaries of Illinois

legislative districts. With Governor Pritzker's signature, the General Assembly-approved redistricting plan ("the June Redistricting Plan") became effective as of June 4, 2021.

Two sets of Plaintiffs filed lawsuits contending that use of the ACS data resulted in the drawing of constitutionally-flawed legislative district boundaries. Those cases have been consolidated before this three-judge court ("Court") convened under 28 U.S.C. § 2284(a). In both cases, Plaintiffs allege that the June Redistricting Plan impermissibly violated their right to Equal Protection under the Fourteenth Amendment to the United States Constitution. Defendants in both cases have moved to dismiss [*McConchie*, 66, 80], [*Contreras*, 40, 55] Plaintiffs' first amended complaints[1] [*McConchie*, 51], [*Contreras*, 37]. Following the release of the official Census data, Plaintiffs in each case moved for summary judgment [*McConchie*, 76], [*Contreras*, 63].

For the reasons stated below, the Court denies the motions to dismiss [*McConchie*, 66, 80], [*Contreras*, 40, 55] in full, except to the extent that Plaintiff Martinez is dismissed from the first amended complaint in *Contreras*, see [37]. The Court also grants the Plaintiffs' motions for summary judgment in full [*Contreras*, 63] and in part [*McConchie*, 76]. The Court declares that the June Redistricting Plan, Public Act 102-0010, violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, and enjoins the Defendant State Board of Elections and Defendant Members, Charles W. Scholz, Ian K. Linabarry, William M. McGuffage, William J. Cadigan, Katherine S. O'Brien, Laura K. Donahue, Casandra B. Watson, and William R. Haine, in their official capacities as members of the Illinois State Board of Elections, from enforcing Public Act 102-0010.

---

[1] Pursuant to a schedule set by this Court, both sets of Plaintiffs filed second amended complaints on October 1, 2021. In substance, the second amended complaints reiterate the claims targeting the June redistricting plan in the first amended complaint, in addition to adding new claims regarding a second redistricting plan passed in September, discussed below.

Finally, the Court will not require formal dispositive motion practice (*e.g.*, motions under Federal Rules of Civil Procedure 12(b) and 56) on the second amended complaints and sets the schedule for the selection of a court-approved state redistricting map as follows: (1) Plaintiffs' submissions for proposed revisions to the September Redistricting Plan, Public Act 102-0663, accompanied by a statement explaining how those revisions cure any constitutional or statutory defects in the September Redistricting Plan, are to be filed on the docket no later than November 8, 2021; (2) Defendants' responses and objections to the submissions are to be submitted no later than November 18, 2021. This case is set for further status on November 5, 2021, at 11:00 a.m.

## I.    Background

### A.    Enactment of Public Act 102-0010 ("The June Redistricting Plan")

Article IV, § 3(b) of the Illinois Constitution authorizes the Illinois General Assembly to adopt legislative districts for the Illinois House of Representatives and Illinois Senate in the year following each Federal decennial census year.  Under the State Constitution, legislative districts must be "compact, contiguous, and substantially equal in population."  Ill. Const. art. IV, § 3(a). But if "no redistricting plan becomes effective by June 30," control over redistricting shifts from the General Assembly to a bipartisan "Legislative Redistricting Commission," which must be "constituted not later than July 10."  Ill. Const. art. IV, § 3(b) (requiring the speaker and minority leaders of the House and Senate to appoint members to the Commission, consisting "of eight members, no more than four of whom shall be members of the same political party" together with a ninth member).

The Census Bureau generally provides states with the official census population counts within one year of the April 1 census date.  [*McConchie*, 79 (Pls.' Statement of Facts ("Pls.' SOF")) at ¶ 19] (citing 13 U.S.C. § 141(c)).  The most recent census date was April 1, 2020, so the deadline

for the Census Bureau's data release under Public Law 94–171 (the "PL 94–171 Data") was March 31, 2021. [*Id.* at ¶ 20.] In a traditional year, the March 31 release date enables state officials to draw legislative districts of substantially equal population. [*Id.* at ¶ 19.]

As a result of the global pandemic, this year was anything but traditional. In February 2021, the Census Bureau announced that it would not release the PL 94–171 Data until approximately September 30, 2021.[2] In March 2021, the Census Bureau updated its prior guidance. The Census Bureau confirmed that it would not release state-by-state, summary PL 94–171 Data until September 30, 2021, but advised that it would provide "legacy format redistricting data file(s) to all states by mid-to-late August 2021." [*McConchie*, 79 (Pls.' SOF) at ¶ 20.][3] In other words, the Census Bureau would release raw data that outside vendors could use to process a state's population data by August 2021. See [*id.*]

Although the PL 94–171 Data was not available as of May 2021, the Illinois General Assembly elected to pass a redistricting plan using an alternative data source. In particular, the General Assembly drew on population *estimates* derived from the 2015–2019 five-year responses to the ACS, "election data," and "public input." [*McConchie*, 79 (Pls.' SOF) at ¶ 24.] The plan approved on May 28, 2021, included a legislative map setting forth districts for the Illinois House of Representatives ("House Districts") and the Illinois Senate ("Senate Districts"). [*Id.* at ¶ 21.] The Governor of Illinois signed the legislature's plan into law on June 4, 2021. [*Id.* at ¶ 22]; see Public Act 102-0010.

---

[2] U.S. Census Bureau, *Statement on Redistricting Data Timeline* (Feb. 12, 2021), https://www.census.gov/newsroom/press-releases/2021/statement-redistricting-data-timeline.html.

[3] U.S. Census Bureau, *Statement on Release of Legacy Format Summary Redistricting Data File* (Mar. 15, 2021), https://www.census.gov/newsroom/press-releases/2021/statement-legacy-format-redistricting.html.

**B.       The Lawsuits and the September Redistricting Plan (Public Act 102-0663)**

In the wake of the June Redistricting Plan's enactment, these two lawsuits followed.  In June 2021, the Minority Leaders of the Illinois Senate and House of Representatives (Dan McConchie and Jim Durkin, respectively), the Republican Caucuses of the Illinois Senate and House of Representatives, and the Illinois Republican Party (collectively, "*McConchie* Plaintiffs") filed suit alleging that the June Redistricting Plan violated their rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and seeking a three-judge court pursuant to 28 U.S.C. § 2284(a).[4]   In their first amended complaint [*McConchie*, 51], the *McConchie* Plaintiffs alleged that the June Redistricting Plan was malapportioned in violation of their right to "one-person, one-vote," as articulated by the Supreme Court's decisions in *Baker v. Carr*, 369 U.S. 186 (1962), and *Reynolds v. Sims*, 377 U.S. 533 (1964).  The *McConchie* Plaintiffs sought injunctive and declaratory relief against two sets of Defendants: (1) Charles W. Scholz, Ian K. Linnabary, William M. McGuffage, William J. Cadigan, Katherine S. O'Brien, Laura K. Donahue, Casandra B. Watson, and William R. Haine, in their official capacities as members of the Illinois State Board of Elections (collectively, the "SBE Defendants"); and (2) the Speaker of the Illinois House of Representatives (Emanuel Chris Welch), Office of the Speaker of the Illinois House of Representatives, President of the Illinois Senate (Don Harmon), and Office of the President of the Illinois Senate (collectively, the "Legislative Defendants").

Days later, a separate group filed suit alleging nearly identical constitutional violations but seeking different remedies.  In June 2021, Plaintiffs Julie Contreras, Irvin Fuentes, Abraham

---

[4] Dan McConchie, the Minority Leader of the Illinois Senate, is a state senator from Illinois' 26th Senate District.  [*McConchie*, 79 (Pls.' SOF) at ¶ 1.]  Jim Durkin, the Minority Leader of the Illinois House of Representatives, is a state representative from Illinois' 82nd Representative District.  [*McConchie*, *Id.* at ¶ 2.]

Martinez, and Irene Padilla (collectively, "the *Contreras* Plaintiffs")[5] alleged that the June Redistricting Plan violated their right to one-person, one-vote in violation of the Equal Protection Clause and sought a three-judge panel pursuant to 28 U.S.C. § 2284(a) [*Contreras*, 1]. In their first amended complaint [*Contreras*, 37], the *Contreras* Plaintiffs sought injunctive and declaratory relief against the substantively same sets of Defendants: (1) the Illinois State Board of Elections ("SBE") and its individual members, Charles Scholz, Ian Linnabary, William Cadigan, Laura Donahue, William Haine, William McGuffage, Katherine O'Brien, and Casandra Watson, and (2) the President of the Illinois Senate (Don Harmon), the Office of the President of the Illinois Senate, the Speaker of the Illinois House of Representatives (Emanuel Chris Welch), and the Office of the Speaker of the Illinois House of Representatives. The *Contreras* Plaintiffs sought a declaration that the June Redistricting Plan was malapportioned and an injunction against the SBE from enforcing the June Redistricting Plan or its predecessors in the upcoming election.

The SBE Defendants and Legislative Defendants moved to dismiss the first amended complaints in their entirety in both suits [*McConchie*, 66 (SBE Defs.' Mot. to Dismiss ("SBE MTD")), 80 (Leg. Defs.' Mot. to Dismiss ("Leg. MTD"))], [*Contreras*, 40 (SBE MTD), 55 (Leg. MTD)] under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

On August 12, 2021, the Census Bureau released the PL 94–171 Data. Shortly thereafter, both the *McConchie* and *Contreras* Plaintiffs moved for summary judgment [*McConchie*, 76], [*Contreras*, 63]. Analysis by experts for both sets of Plaintiffs revealed apportionment problems

---

[5] Plaintiffs Contreras, Fuentes, Martinez, Padilla, and Torres reside in the following Districts:
- Contreras lives in Representative District 60. [*Contreras*, 37 (1st Am. Compl.) at ¶ 10; 66 (Pls.' SOF) at ¶1.]
- Fuentes lives in Representative District 1. [*Contreras*, 37 at ¶ 11; 66 at ¶ 2.]
- Martinez lives in Representative District 86. [*Contreras*, 37 at ¶ 12; 66 at ¶ 3.]
- Padilla and Torres live in Representative District 6 (which forms part of Senate District 3, see Public Act 102-0010). [*Contreras*, 37 at ¶¶ 13–14; 66 at ¶¶ 4–5.]

with the June Redistricting Plan. See [*McConchie*, 79 (Pls.' SOF) at ¶¶ 28–36]; [*Contreras*, 66 (Pls.' SOF) at ¶¶ 33–39.] For example, upon release of the PL 94–171 Data, Plaintiffs' expert, Dr. Jowei Chen[6] calculated the populations in each House and Senate District in the June Plan. [*McConchie*, 79 at ¶ 29.][7] Based on the total Illinois population of 12,812,508, Dr. Chen calculated that the ideal population of each House District is 108,580.6 and each Senate District is 217,161.2. [*Id.* at ¶¶ 33, 35; 79-1 (Chen. Aff.) at ¶¶ 15, 17.] As for the House Districts, Dr. Chen calculated that the lowest-populated district, House District 83, is 14.91% below the ideal population, and the highest-populated district, House District 5, is 14.97% above the ideal population. [79 at ¶ 34; 79-1 at ¶ 16.] Put another way, the maximum population deviation of the House Districts in the June Plan is 29.88%. [79 at ¶ 34; 79-1 at ¶ 16.] As to the Senate Districts, the lowest-populated district, Senate District 42, is 7.94% below the ideal population, and the highest-populated district, Senate District 3, is 12.31% above the ideal population. [79 at ¶ 36; 79-1 at ¶ 18.] Thus, the maximum population deviation of the Senate Districts in the June Plan is 20.25%. [79 at ¶ 36; 79-1 at ¶ 18.] The *Contreras* Plaintiffs' expert's analysis revealed substantively similar maximum population deviations. See [*Contreras*, 66 (Pls.' SOF) at ¶¶ 32–39; 66-1 (Ely Aff.) at ¶¶ 21–28.][8]

---

[6] Dr. Chen is an associate professor at the University of Michigan. [*McConchie*, 79 (Pls.' SOF) at ¶ 30.] Dr. Chen has academic publications regarding legislative districting and political geography and has testified at deposition or trial in a number of redistricting cases. [*Id.* at ¶ 30.]

[7] To calculate the populations of the House and Senate Districts, Dr. Chen identified the districts to which each 2020 Census block is assigned and overlaid the appropriate Census block shapefiles provided by the Speaker of the Illinois House of Representatives, the Officer of the Speaker of the Illinois House of Representatives, the President of the Illinois Senate, and the Office of the President of the Illinois Senate. [*McConchie*, 79 (Pls.' SOF) at ¶ 32.]

[8] The *Contreras* Plaintiffs' expert, Mr. David R. Ely, is the manager and founder of Compass Demographics, a consulting and database management firm. His analysis revealed maximum deviations of 20.3% and 29.9% in the Senate and House Districts, respectively, as compared to the ideal districts. See [*Contreras*, 66 (Pls.' SOF) at ¶¶ 32–39; 66-1 (Ely Aff.) at ¶¶ 21–28.]

The release of the PL 94–171 Data prompted a second attempt by the General Assembly to formulate redistricting maps. In a special session, the General Assembly passed another state legislative redistricting plan on August 31, 2021. See [*McConchie*, 116 (2d Am. Compl.) at ¶ 59.] The Governor subsequently signed that plan into law on September 24, 2021. See [*id.* at ¶ 64]; Public Act 102-0663 ("the September Redistricting Plan"). The September Redistricting Plan provides that the State Boundaries therein "shall be construed to take precedence over any conflict of law in accordance with the Statute on Statutes." See Public Act 102-0663. However, the June Redistricting Plan was not repealed. See *id.*; Public Act 102-0010.

In a hearing held on August 23, 2021, all Plaintiffs reiterated their intention to seek summary judgment and relief in connection with the June Redistricting Plan, and no Defendant gave any indication of abandoning the defense of that Plan. See [*McConchie*, 92 (Hr'g Tr.) at 20, 24.] The Court therefore ordered (1) the litigants to brief the Defendants' motions to dismiss and Plaintiffs' motions for summary judgment in each case by September 17, 2021, and (2) the Plaintiffs to file amendments, if any, to their prior complaints no later than October 1, 2021. See [*McConchie*, 94.] The *McConchie* and *Contreras* Plaintiffs both filed second amended complaints [*McConchie*, 116], [*Contreras*, 98]. In those complaints, Plaintiffs continue to seek injunctive and declaratory relief in connection with the June Redistricting Plan and allege that the September Redistricting Plan also violates their constitutional and statutory rights, including under the Fourteenth Amendment and the Voting Rights Act of 1965, see 52 U.S.C. § 10301.

Now before this Court are two sets of motions: (1) the Legislative and SBE Defendants' motions to dismiss, [*McConchie*, 66, 80], [*Contreras*, 40, 55], the first amended complaints, [*McConchie*, 51], [*Contreras*, 37], in both cases; and (2) the *McConchie* and *Contreras* Plaintiffs' motions for summary judgment, [*McConchie*, 76], [*Contreras*, 63].

## II.     Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b), the complaint typically must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).  In determining whether the complaint meets this standard, the Court accepts as true all of Plaintiffs' well-pleaded factual allegations and draws all reasonable inferences in Plaintiffs' favor.  *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute as to any material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "On a motion for summary judgment, the moving party has the burden of demonstrating that there are no genuine questions of material fact and that he is entitled to judgment as a matter of law."  *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 (7th Cir. 1994).  "Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'"  *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (quoting Fed. R. Civ. P. 56(c)).  In

evaluating a motion for summary judgment, the Court will construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016).

## III. Analysis

We have consolidated the *McConchie* and *Contreras* cases and streamlined the pending motions and issues before us to address the overlapping facts and issues in both cases and sets of motions in a single opinion. We do so not only for efficiency, but also in recognition that time is of the essence because candidates for office in next year's Illinois primaries will need to begin gathering signatures in a few months and the State Board of Elections must accomplish several tasks even sooner. See [*McConchie*, 122 (Status Report of SBE Defs.) at 1–3]; [*Contreras*, 107 (Status Report of SBE Defs.)] (identifying those tasks).

In their motions to dismiss under Federal Rule of Civil Procedure 12(b), the Legislative Defendants primarily argue that the Individual Plaintiffs in each case lack individual standing to sue, see [*McConchie*, 80 (Leg. MTD) at 3], [*Contreras*, 55 (Leg. MTD) at 2], and that the Illinois Senate and House Republican Caucuses and Illinois Republican Party lack associational standing, see [*McConchie*, 80 at 7]. The SBE Defendants likewise attack the Individual and Organizational Plaintiffs' standing collectively, contending that Plaintiffs' claims were not caused by and are not redressable by the SBE, and that the claims were otherwise too speculative to warrant the exercise of Article III jurisdiction, see [*McConchie*, 67 (SBE MTD) at 3], [*Contreras*, 41 (SBE MTD) at 4].

In their motions for summary judgment, the *McConchie* and *Contreras* Plaintiffs both argue that the June Redistricting Plan violates the Equal Protection Clause of the Fourteenth Amendment. See [*McConchie*, 78 (Pls.' Memo. in Support of Mot. for Summ. J. ("Pls.' MSJ"))

10

at 5], [*Contreras*, 65 (Pls.' MSJ) at 7.] They principally contend that there is no genuine issue of material fact that the total maximum deviations in that plan are *prima facie* constitutionally infirm and advance an arbitrary and capricious state policy. In opposition, the Legislative and/or SBE Defendants advance three points. First, they submit that the enactment of the September Redistricting Plan moots the constitutional question regarding the June Redistricting Plan. See [*McConchie*, 104 (Leg Defs.' Opp'n to MSJ) at 6]; [*Contreras*, 82 (Leg Defs.' Opp'n to MSJ) at 6.] Second, they renew their arguments that Plaintiffs lack individual and associational standing. See [*McConchie*, 104 at 7; 99 (SBE Defs.' Opp'n to MSJ) at 3]; [*Contreras*, 82 at 7.] Third, they maintain that summary judgment in Plaintiffs' favor is improper. See [*McConchie*, 104 at 9]; [*Contreras*, 82 at 8.]

We begin with the Defendants' challenges to the justiciability of Plaintiffs' lawsuits. This discussion will address the combined standing and mootness issues raised by both sets of Defendants in their motions to dismiss and in opposition to summary judgment. Then, we move to the merits of Plaintiffs' claims. Finally, we will conclude by discussing the commencement of a remedial phase.

### A. Justiciability

The Legislative Defendants and SBE Defendants devote the bulk of their briefing to two, alleged overarching obstacles to the justiciability of both suits. First, the Legislative and SBE Defendants assert that all Plaintiffs lack Article III standing to confer jurisdiction. Second, the Legislative Defendants argue that the September Redistricting Plan moots the first amended complaints in their entirety. We conclude that both the Individual Plaintiffs and the Organizational Plaintiffs have Article III standing, and that the challenges to the June Redistricting Plan still present a live controversy.

11

1.    **Standing**

To establish Article III standing, a plaintiff must show (1) an "injury in fact," (2) a sufficient "causal connection between the injury and the conduct complained of," that is "fairly traceable to the challenged action of the defendants," and (3) a likelihood, as opposed to mere speculation, that the injury "will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks omitted) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 38, 41–43 (1976)). As to the first requirement, the injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 560 (internal quotation marks omitted) (quoting *Whitmore v. Arkansas*, 495 U.S. 149 (1990)). A plaintiff's injury must be particularized because "[a] federal court is not 'a forum for generalized grievances[]'" and must "exercise power that is judicial in nature." *Gill v. Whitford*, 138 S. Ct. 1916, 1929–30 (2018) (quoting *Lance v. Coffman*, 549 U.S. 437, 439 (2007)).

In the context of challenges to a redistricting plan, the Supreme Court has held that plaintiffs living in malapportioned districts who can show the districts "disfavor[ed] the voters in the counties in which they reside[d], placing them in a position of constitutionally unjustifiable inequality vis-a -vis voters in irrationally favored counties" have standing to advance a Fourteenth Amendment challenge. *Baker v. Carr*, 369 U.S. 186, 206–08 (1962). As the Court later elaborated in other contexts, "the holdings in *Baker* and *Reynolds* were expressly premised on the understanding that the injuries giving rise to those claims were 'individual and personal in nature,' because the claims were brought by voters who alleged 'facts showing disadvantage to themselves as individuals.'" *Gill*, 138 S. Ct. at 1929 (citations omitted) (quoting *Baker*, 369 U.S. at 206). The law provides, unequivocally, that plaintiffs in overpopulated districts have standing to bring a claim. See *Baker*, 369 U.S. at 206; *Fairley v. Patterson*, 493 F.2d 598, 603 (5th Cir. 1974) ("[T]he

12

Supreme Court has conclusively established * * * that sufficient damage through underrepresentation to obtain standing will be inflicted if population equality among voting units is not present.").

As for imminence, in the context of pre-enforcement challenges for certain statutes, "[a] probability of future injury counts as 'injury' for the purpose of standing.'" *Am. C.L. Union of Ill. v. Alvarez*, 679 F.3d 583, 591 (7th Cir. 2012) (quoting *Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010)). The Supreme Court's "cases have consistently spoken of the need to assert an injury that is the result of a statute's actual or threatened enforcement, whether today or in the future." *California v. Texas*, 141 S. Ct. 2104, 2114 (2021) (emphasis omitted).

Before turning to the specifics of this case, we recognize some additional general principles that guide our standing inquiry. The Seventh Circuit recently observed that "[a]s the litigation progresses, the way in which the plaintiff demonstrates standing changes." *Spuhler v. State Collection Serv., Inc.*, 983 F.3d 282, 285 (7th Cir. 2020). As the court of appeals further explained:

> Initially, a plaintiff may demonstrate standing by clearly pleading allegations that "plausibly suggest" each element of standing when all reasonable inferences are drawn in the plaintiff's favor. But if a plaintiff's standing is questioned as a factual matter—for example, in a motion to dismiss under Rule 12(b)(1)—the plaintiff must supply proof, by a preponderance of the evidence or to a reasonable probability, that standing exists. Once the action reaches the summary-judgment stage, the plaintiff must demonstrate standing by "set[ting] forth by affidavit or other evidence specific facts" that, taken as true, support each element of standing.

*Id.* (internal quotation marks and citations omitted) (alteration in original) (first quoting *Silha v. ACT, Inc.*, 807 F.3d 169, 173–74 (7th Cir. 2015); and then quoting *Lujan*, 504 U.S. at 561).

In their motions to dismiss and briefs in opposition to the Plaintiffs' motions for summary judgment, the SBE and Legislative Defendants argue that neither the Individual Plaintiffs (McConchie, Durkin, Contreras, Fuentes, Martinez, Padilla, and Torres) nor the Organizational Plaintiffs (the Republican Caucuses of the Illinois Senate and House of Representatives and Illinois

Republican Party) have standing. Together, Defendants insist that jurisdiction is improper because none of the Individual Plaintiffs can satisfy the Article III standing requirements—an injury-in-fact that is traceable to and redressable by Defendants. The Legislative Defendants further argue that the Organizational Plaintiffs have not established associational standing. We now address each argument in turn.

### a. Individual Plaintiffs

The Legislative and SBE Defendants raise four separate arguments that the *McConchie* Individual Plaintiffs (McConchie and Durkin) and all of the *Contreras* Plaintiffs lack standing. First, they contend that Plaintiffs cannot satisfy *Lujan*'s "injury-in-fact" requirement because their injuries are too generalized. Specifically, they maintain that Plaintiffs have failed to plausibly allege at the motion to dismiss stage, or prove at summary judgment, that they live in districts that violate their one-person, one-vote rights. Second, in a separate-but-related argument, the SBE Defendants contend that Plaintiffs cannot show that any such injury is imminent and that their allegations are too speculative.[9] Third, the SBE Defendants argue that they did not cause any prospective injuries to Plaintiffs. Fourth, the SBE Defendants submit that any injuries sustained by Plaintiffs are not redressable by the SBE.

We disagree with each argument. Plaintiffs have satisfied the first Article III standing requirement because they alleged and showed that there are no genuine issues of fact that they will suffer particularized, imminent injuries if the June Redistricting Plan is enforced. In addition, the Plaintiffs' injuries are traceable to and redressable by the SBE Defendants.

---

[9] The SBE Defendants frame this argument as an issue of "ripeness." However, they specifically argue that the Plaintiffs' allegations are too speculative, which we take to raise an issue with respect to injury-in-fact.

### i. Particularity

Both the *McConchie* and *Contreras* Plaintiffs allege and show there is no genuine dispute that they may incur concrete, particularized injuries because their voting power is being diluted. As a preliminary matter, though, the *Contreras* Plaintiffs do not allege, nor prove, that Plaintiff Abraham Martinez resides in an overpopulated district, so we will dismiss him from the case for lack of standing. See *Skolnick v. Bd. of Comm'rs*, 435 F.2d 361, 364 (7th Cir. 1970).

Regarding the *McConchie* Plaintiffs, McConchie and Durkin both reside in districts that are overrepresented. McConchie votes in the 26th District, which is overpopulated by 9.9%. See [*McConchie*, 110 (Pls.' Reply in Support of MSJ) at 4] (citing Chen Aff.). Durkin resides in the 82nd District, which is overpopulated by 18.8%. *Id.* Among the *Contreras* Plaintiffs, Padilla and Torres allege that they reside in a district that is overpopulated by 12.3%.[10] Contreras and Fuentes live in Representative Districts 60 and 1, respectively, which are also overpopulated (albeit to a lesser degree).[11] Defendants do not challenge Dr. Chen's calculations as to the overpopulation in these districts, nor do they dispute that McConchie and Durkin, as well as Padilla, Torres, Fuentes, and Contreras, reside in the affected districts.[12] Nor do Defendants introduce any evidence to demonstrate factual dispute concerning those allegations, such as evidence to rebut Dr. Chen's or

---

[10] Padilla and Torres indicate they live in Representative District 6 (which forms part of Senate District 3, see Public Act 102-0010, § 15). See [*Contreras*, 86 (Pls.' Reply in Support of MSJ) at 9–10; 37 (1st Am. Compl.) at ¶¶13–14; 66 (Pls.' SOF) at ¶ 35; 66-1 (Lily Aff.) at 10, T. 2.]

[11] Contreras lives in Representative District 60, which is overpopulated by .1%, and Fuentes lives in Representative District 1, which is overpopulated by 4.3%. [*Contreras*, 86 (Pls.' Reply in Support of MSJ) at 10; 37 (1st Am. Compl.) at ¶¶10–11; 66 (Pls.' SOF) at ¶¶ 1–2; 66-1 (Lily Aff.) at 7–8, T. 1.]

[12] Defendants admit that Plaintiff McConchie resides and votes in Lake County. [*McConchie*, 105 (Leg. Defs.' Resp. to Pls.' SOF) at ¶ 1; 100 (SBE Defs.' Resp. to Pls.' SOF) at ¶ 1.] They also admit that Plaintiff Durkin resides and lives in Cook County. [105 at ¶ 2; 100 at ¶ 2.] Furthermore, Defendants admit the relevant facts as they relate to Dr. Chen's expert testimony regarding the population deviations. [105 at ¶¶ 33–36; 100 at ¶¶ 33–34.] Defendants also admit the relevant facts of the *Contreras* Plaintiffs' residences and Mr. Ely's expert testimony. [*Contreras*, 83 (Leg. Defs.' Resp. to Pls.' SOF) at ¶¶1–5, 35–39; 79 (SBE Defs.' Resp. to Pls.' SOF) at ¶¶ 1–5, 34–39.]

Mr. Ely's expert analyses. See generally [*Contreras*, 84 (Leg. Defs.' Additional Statement of Facts ("Leg. Defs.' SOF")]; [*McConchie*, 106 (Leg. Defs.' SOF).] Accordingly, there is no issue of material fact to preclude summary judgment that McConchie, Durkin, Contreras, Fuentes, Padilla, and Torres reside in overpopulated districts and thus have shown "disadvantage to [themselves] as individual[s]" sufficient to qualify as a particularized injury-in-fact. See *Baker*, 369 U.S. at 206.[13]

As a backstop, the SBE Defendants contend that the Plaintiffs' claims are not ripe, but their argument actually appears to be that the Plaintiffs' allegations are too speculative. In particular, although the SBE Defendants refer to ripeness, they argue that the Plaintiffs' allegations "rely on the assumption that if this Court finds that the Redistricting Plan is deemed unconstitutional, the Board Members will still conduct an election in approximately ten months based on the Redistricting Plan in violation of this Court's holding." See [*McConchie*, 67 (SBE MTD), at 5–6.] This assertion misses the mark because we presume the SBE will take steps to enforce a

---

[13] None of the Defendants' arguments regarding these Individual Plaintiffs undermine our conclusion that the first Article III jurisdictional prong has been satisfied. In their replies in support of their motions to dismiss, the Legislative Defendants resort to technicalities, insisting that the pleadings are not sufficient, on their own, to show standing. Specifically, the Legislative Defendants suggest that Plaintiffs have not cured the standing deficiencies because they rely on an affidavit by their expert, rather than allegations in the first amended complaint. We disagree.

Defendants do not cite a single case for the proposition that we cannot rely on the expert report as a supplement to the pleadings at this juncture. Even if they had developed the argument, it would not rescue their position. As an initial matter, Plaintiffs allege "upon information and belief" in the first amended complaint that they reside in underrepresented districts, which is sufficient and permissible under the applicable federal rules. See *Trs. of the Auto. Mechs.' Indus. Welfare and Pension Funds Loc. 701 v. Elmhurst Lincoln Mercury*, 677 F. Supp. 2d 1053, 1054–55 (N.D. Ill. 2010) (collecting cases). Those allegations aside, Plaintiffs were well within their right to "add [facts] by affidavit or brief in order to defeat a motion to dismiss if the facts are consistent with the allegations of the complaint." See *Hrubec v. Nat'l R.R. Passenger Corp.*, 981 F.2d 962, 963–64 (7th Cir. 1992). Furthermore, the Court acts well within its considerable discretion in considering Dr. Chow's and Mr. Ely's testimony. See *Int'l Union of Operating Eng'rs, Loc. 139, AFL-CIO v. Daley*, 983 F.3d 287, 294 (7th Cir. 2020) (concluding that the district court acted within its discretion in fulfilling its independent obligation to evaluate standing by considering allegations furnished in supplemental pleadings). And, of course, at the summary judgment stage, we are entitled to rely on the expert reports. See *Spuhler*, 983 F.3d at 285.

redistricting plan in a matter of months, and for the reasons explained below, the June Redistricting Plan remains on the statute books and thus viable to enforce should Plaintiffs be correct that the September Plan is invalid. Plaintiffs allege that they reside, represent, and vote in overpopulated districts under the June Redistricting Plan. So the Plan, if enforced, would reduce their voting power, in violation of their established constitutional rights. The Plaintiffs' "prospective injury * * * can indeed present a cognizable injury-in-fact." See *Milwaukee Police Ass'n v. Bd. of Police Cmm'rs of City of Milwaukee*, 708 F.3d 921, 928 (7th Cir. 2013).

As the *McConchie* Plaintiffs point out, "there are no further matters standing between the Board of Elections and the implementation of the Redistricting Plan in the 2022 primary and general elections." [*McConchie*, 103 (Pls.' Resp. to SBE MTD) at 3.] See *Wis. Right to Life State Pol. Action Comm. v. Barland*, 664 F.3d 139, 149 (7th Cir. 2011) (claims related to upcoming election "a scant few months away"). The SBE is required by statute to enforce the law. See ILCS § 5/1A-8(12) (Board Members have a duty to "supervise the administration of the registration and election laws throughout the state"). So long as the June Redistricting Plan remains on the proverbial books and the September Redistricting Plan is subject to ongoing constitutional challenge, we must presume that the SBE would uphold its obligation to enforce the June Redistricting Plan if it were the only plan that had not been invalidated in the courts. See *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) ("For purposes of standing to seek injunctive relief against future harm, courts generally assume that litigants 'will conduct their activities within the law * * *.'" (quoting *O'Shea v. Littleton*, 414 U.S. 488, 497 (1974))). And as the SBE Defendants' recent status report [*McConchie*, 122] makes clear, the "administrative processes" that take place in advance of candidates even circulating petitions, much less the actual conduct of primary elections, must begin in earnest even prior to the end of this calendar year.

In sum, all the Individual Plaintiffs, with the exception of Martinez, have adequately pleaded and proved that dilution of their votes constitutes a particularized, concrete injury in fact.

### ii. Causation and redressability

Given that the *McConchie* and *Contreras* Individual Plaintiffs have satisfied the first requirement for Article III standing, we turn to the second and third prongs: causation and redressability. The SBE Defendants argue that there is no "nexus" between the SBE's conduct that can be traced to the Plaintiffs' injuries and that, in any event, the asserted injuries are not redressable by the SBE. We are not persuaded by either argument.

The Plaintiffs' injuries are fairly traceable to the State Board of Elections because, as Plaintiffs point out, the SBE Defendants "are the sole authority tasked with implementing and enforcing" the June Redistricting Plan (or any other Plan). See [*McConchie*, 103 (Pls.' Resp. to SBE MTD) at 9] (emphasis omitted). The first amended complaint alleges that absent this Court's intervention, in their official capacities as members of the Illinois State Board of Elections, the SBE will "enforce an unconstitutional state legislative redistricting plan" through their role in the general election process. Namely, as required under Illinois law, the SBE will receive petitions filed by established party candidates for nominations in the general primary election, see 10 ILCS § 5/2A-1.1b(b), (c), use those filings to publish a candidate guide, map, and petition, and later certify the names of eligible candidates for the general primary, 10 ILCS § 5/2A-1.1b (g). See *Libertarian Party of Ill. v. Ill. State Bd. of Elections*, 2012 WL 3880124, at *3 (N.D. Ill. Sept. 5, 2012) (denying Illinois SBE's motion to dismiss suit for injunctive relief arising from injuries stemming from implementation of election laws against the SBE because the SBE "has general supervision over the administration of the registration and election laws throughout the State of Illinois.")

As the *McConchie* Plaintiffs point out, "[p]re-enforcement actions against the Board of Elections Members *** are not only proper, they are routine." [*McConchie*, 103 (Pls.' Resp. to SBE MTD) at 10.] See, *e.g.*, *Stevenson v. State Bd. of Elections*, 638 F. Supp. 547, 549 (N.D. Ill.), *aff'd*, 794 F.2d 1176 (7th Cir. 1986); *Gould v. Schneider*, 448 F. App'x 615, 618 (7th Cir. 2011); *Winters v. Ill. State Bd. of Elections*, 197 F. Supp. 2d 1110, 1112 (N.D. Ill. 2001). These authorities all support the proposition that the Plaintiffs' injuries are "fairly traceable to the challenged action of" the SBE. See *Lujan*, 504 U.S. at 560.

For that same reason, the Plaintiffs' prospective injuries are redressable by a favorable decision. A declaration that the June Redistricting Plan is unconstitutional and an injunction against its enforcement would prevent the SBE from using the Plan in the upcoming election, so it directly follows that it would prevent the dilution of the Plaintiffs' votes. The Plaintiffs' injuries therefore are both caused and redressable by the SBE in satisfaction of the second and third requirements for Article III jurisdiction.

In sum, the Individual Plaintiffs, with the exception of Plaintiff Martinez, have satisfied all three requirements for Article III standing.

#### b. Organizational Plaintiffs

We turn next to associational standing. As a general proposition, "an association may have standing solely as the representative of its members." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). To establish associational standing, an entity must satisfy the three following prongs: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). "Associational standing * * * is derivative

of—and not independent from—individual standing." *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1008 (7th Cir. 2021).

On the second prong, a suit that "do[es] not reflect and [is] actually at odds with the interests of some of its members * * * cannot be said to be 'germane' to [the association's] overriding purposes." *Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Plan. Ass'n*, 830 F.2d 1374, 1381 (7th Cir. 1987). That said, a conflict of interest will defeat associational standing only if litigation risks a "profound" conflict. *Retired Chi. Police Ass'n v. City of Chicago* ("*Chi. Police I*"), 76 F.3d 856, 864 (7th Cir. 1996). Among other scenarios not relevant here, "a profound conflict arises where the association's suit, if successful, would cause a direct detriment to the interests of some of its members." *Id.* at 865. That said, "a plaintiff can defeat a direct-detriment conflict challenge by showing that the litigation, if successful, will not cause a direct detriment to any of its members *or* that the litigation was properly authorized." *Id.* (emphasis added). Proper authorization defeats the conflict of interest because it "affirm[s] that the detriment to some members' interests does not render the litigation outside the germane interest." *Id.* at 865.

As to the third prong, individual participation of the organization's members "is * * * plausibly read as dealing with situations in which it is necessary to establish 'individualized proof,' for litigants not before the court in order to support the cause of action." *Retired Chi. Police Ass'n v. City of Chicago* ("*Chi. Police II*"), 7 F.3d 584, 602 (7th Cir. 1993) (citation omitted) (quoting *Hunt*, 432 U.S. at 344). Thus, "while the third prong of the *Hunt* test requires that we conclude that 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit,'" our inquiry is remedy-dependent. *Id.* at 602–03 (quoting *Hunt*, 432 U.S. at 343). "Declaratory, injunctive, or other prospective relief will usually inure to the benefit of the members actually injured and thus individualized proof of damages is often unnecessary." *Id.*

(citing *Warth*, 422 U.S. at 515).  See, *e.g.*, *Shakman v. Clerk of Cook Cnty.*, 994 F.3d 832, 840 (7th Cir. 2021) (applying the *Hunt* test to affirm district court's conclusions that plaintiffs alleged sufficient, particularized harm to warrant jurisdiction and individual participation not necessary to warrant relief).

The Legislative Defendants present three arguments in support of their contention that the Organizational Plaintiffs—the Republican Caucus of the Illinois Senate, the Republican Caucus of the Illinois House of Representatives, and the Illinois Republican Party—cannot satisfy the requirements for associational standing.  First, they argue that none of the organizations have a member with individual standing.  Second, they assert that the *McConchie* suit implicates a conflict of interest for each organization.  Third, they insist that the suits require individual participation of the organizations' members.  We address each argument below.

### i.      Prong 1, Individual Standing

First, all three Organizational Plaintiffs' individual members have standing.  Several current members of the Republican Senate Caucus live in districts that are more populated than the least-populated district under the June Redistricting Plan.[14]  The same is true for the Republican House Caucus.[15]  The Republican Party has members in every Senate and House District in the

---

[14] Specifically, members live in overpopulated districts 26, 32, 33, 35, 38, 41, and 45.  See [*McConchie*, 79 (Pls.' SOF) at ¶ 3] (enumerating membership of Senate Caucus members); [*McConchie*, 79-1 (Chen Aff.) at 13–14, T. 3] (enumerating percentage deviation over the ideal population in Senate Districts (*e.g.*, 26 (+1.26%), 32 (+1.85%), 35 (+.65%), 41 (+.98%), 45 (+1.15%)).

[15] Specifically, districts 20, 37, 42, 47, 50, 51, 52, 54, 63, 64, 65, 70, 73, 75, 82, 87, 89, 90, 93, 95, 97, and 109.  See [*McConchie*, 79 (Pls.' SOF) at ¶ 4] (enumerating membership of House Caucus members); [*McConchie*, 79-1 (Chen Aff.) at 9–11, T. 2] (enumerating percentage deviation over the ideal population in House Districts (*e.g.*, 20 (+2.69%), 42 (+2.16%), 63 (+3.26%), 97 (+4.51%), 109 (+2.36%)).

State, so it follows that individual members live in the most populated House and Senate Districts, respectively.[16]

### ii. Prong 2, Germaneness /Conflict of Interest

The right to equal representation is germane to the purposes of all three organizations as well. For decades, courts in this circuit have recognized that political parties have associational standing in one-person, one-vote cases. See *Smith v. Boyle*, 959 F. Supp. 982, 986 (C.D. Ill. 1997). Reinforcing that view, albeit in different circumstances, the Seventh Circuit has explicitly held that political parties have associational standing to challenge other kinds of state voting laws. See *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007), *aff'd on other grounds*, 553 U.S. 181 (2008) (holding a political party had standing to challenge an Indiana voting law because the law likely discouraged some of the party's supporters from voting); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189 n.7 (2008) ("agree[ing] with the unanimous view of [the Seventh Circuit] that the Democrats have standing to challenge the validity of [the law]").

The Legislative Defendants' contention that the Illinois Republican Party and Caucus have not satisfied the second prong—germaneness—presents a closer question but does not alter our analysis. They argue that a successful suit would redound to the detriment of some of the Organizational Plaintiffs' members because some members live in underpopulated districts and would lose benefits under the June Redistricting Plan. To be sure, plaintiffs in overrepresented districts do not have individual standing. See *Skolnick*, 435 F.2d at 364; *Tisza v. Commc'ns Workers of Am.*, 953 F.2d 298, 300 (7th Cir. 1992). Nevertheless, even if some members receive a "boon" under the June Redistricting Plan, see *Tisza*, 953 F.2d at 300, the organizations' suit to protect their right to one-person, one-vote would at most indirectly, not directly, harm them. The

---

[16] Specifically, Districts 5 (+14.97%) and District 3 (+12.31%). See [*McConchie*, 79 (Pls.' SOF) at ¶ 5; 79-1 (Chen Aff.) at 9, T. 2; *Id.* at 11, T. 3.]

only "harm" is that their members would have to play on a (more) even playing field. *Compare Chi. Police I*, 76 F.3d at 865–66 (holding that association did not have standing to intervene because some members of the association would have lost health insurance subsidies and faced increased premiums if the association prevailed in the litigation). As the *McConchie* Plaintiffs point out, even members living in underrepresented districts "have a unified interest in being able to vote in districts with substantially equal populations." [*McConchie*, 102 (Pls.' Resp. to Leg. MTD) at 11.]

Even if losing the "boon" were a direct detriment, dismissal of neither party is appropriate because, in light of the injunctive and declaratory relief sought, their participation does not raise any real danger that "the association will not be fully committed to the litigation." Nor would these cases cause Plaintiffs not to "pursue the litigation with the strong advocacy and persistence necessary to be an effective representative." See *Chi. Police I,* 76 F.3d at 865–66. As such, associational standing here would not undermine the twin purposes of *Hunt*'s second prong.

### iii.        Prong 3, Individual Participation

Finally, individual participation of each member is not necessary because we agree with the *McConchie* Plaintiffs that "the Court can review the population numbers and calculations performed by Dr. Chen to determine that the Map is invalid and malapportioned. There is no need for individualized testimony or evidence from any particular individual members." [*McConchie*, 102 (Pls.' Resp. to Leg. MTD) at 12.] What's more, the organizations here have sought declaratory and injunctive relief, neither of which requires the participation of their members. See *Shakman*, 994 F.3d at 841 (complaint seeking injunctive relief did not require proof of individual damages or otherwise demand participation of the organizational-plaintiff's members); *Chi. Police II*,

7 F.3d at 590, 601–03 (concluding association had standing to seek declaratory relief where suit did not require individual participation of each member of organization for suit).

In sum, the Organizational Plaintiffs have come forward with sufficient facts to satisfy the requirements for associational standing.

### 2. Mootness

We shift now to another justiciability concern, mootness. As a preliminary matter, Defendants argue that the dispute over the June Redistricting Plan ended when the General Assembly passed the September Redistricting Plan. "A claim becomes moot, and thus strips a court of jurisdiction under Article III, '[w]hen a party with standing at the inception of the litigation loses it due to intervening events.'" *Freedom from Religion Found., Inc. v. Concord Cmty. Sch.* ("*FRF*"), 885 F.3d 1038, 1050 (7th Cir. 2018) (quoting *Parvati Corp. v. City of Oak Forest*, 630 F.3d 512, 516 (7th Cir. 2010)). A case becomes moot, though, only "if events make it 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id.* (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)).

As the Seventh Circuit has explained, the "mere cessation of the conduct sought to be enjoined does not moot a suit to enjoin the conduct, lest dismissal of the suit leave the defendant free to resume the conduct the next day." *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 724 F.3d 854, 864–66 (7th Cir. 2013) (quoting *Chi. United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 947 (7th Cir. 2006)). Even a "complete repeal" of a law does not moot a case if "there is evidence creating a reasonable expectation that the [defendant] will reenact the ordinance or one substantially similar." *Id.* (quoting *Fed'n of Adver. Indus. Representatives, Inc. v. City of Chicago*, 326 F.3d 924, 930 (7th Cir. 2003)). "The party asserting mootness bears the 'heavy'

burden of proof on this 'stringent' standard." *FRF*, 885 F.3d at 1051 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167 (2000)).

Two cases are instructive on this point. In *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982), and *Northeastern Florida Chapter of the Associate General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993), the Supreme Court held that constitutional challenges to two statutes were not mooted by amendments to each of the laws at issue during the pendency of the cases. In *City of Mesquite*, the Court held that revisions to the challenged statutory language did not moot the plaintiff's claims to the original statute. 455 U.S. at 288. "[R]epeal of the objectionable language would not preclude [the defendant] from reenacting precisely the same provision if the district Court's judgment were vacated." 455 U.S. at 289. In *Northeastern Florida*, the Court again held that defendant's revision to the challenged language did not moot the case because the new ordinance continued to disadvantage the plaintiffs. 508 U.S. at 663. The new ordinance presented "no mere risk that [the defendant] w[ould] repeat its allegedly wrongful conduct; it ha[d] already done so." *Id.* at 662. Nor did it matter that the ordinance "differ[ed] in certain respects from the old one" or "disadvantage[d] them to a lesser degree" because the new statutory text "disadvantage[d] [the plaintiffs] in the same fundamental way." *Id.* See, *e.g.*, *FRF*, 885 F.3d at 1050–53 (affirming district court's conclusion that defendant's corrective actions— replacing prior, unconstitutional plan and informally assuring court that it would not rescind the plan—during the course of a lawsuit do not moot a plaintiff's claims).

Here, Defendants have not met the "'stringent' standard" to show that the case has been mooted. See *FRF*, 885 F.3d. at 1050. Defendants argue, without citing a single case or developing their argument in their briefs, that the enactment of the September Redistricting Plan mooted this case. We disagree.

25

The June Redistricting Plan presents a live controversy because no court has ruled that that map is unconstitutional, and upon inquiry from this Court, no assurances have been provided that the SBE would not enforce the June Redistricting Plan if the September Plan were invalidated. To be sure, the September Redistricting Plan was enacted into law on September 24, 2021. But, importantly, the General Assembly did not repeal the June Plan. Instead, Public Act 102-0663 dictates that the September Plan "shall be construed to take precedence over any conflict of law in accordance with the Statute on Statutes," which in turn provides that when two or more statutes present an "irreconcilable conflict," the "Act last acted upon by the General Assembly is controlling to the extent of such conflict." 5 ILCS § 70/6. The Court has been given no assurances that if the September Redistricting Plan is invalidated, Defendants would not simply revert to the June Redistricting Plan. Both sets of plaintiffs have amended their pleadings to raise constitutional and statutory challenges to the September Redistricting Plan. See [*McConchie*, 116 (2d Am. Compl.]; [*Contreras*, 98 (2d Am. Compl.).] The "gravamen" of those complaints is that the Plaintiffs' members are disadvantaged in the same "fundamental way" as the June Redistricting Plan—that the Redistricting Plan impermissibly dilutes votes. See *Northeastern Florida*, 508 U.S. at 662 ("*City of Mesquite* does not stand for the proposition that it is only the possibility that the *selfsame* statute will be enacted that prevents a case from being moot; if that were the rule, a defendant could moot a case by repealing the challenged statute and replacing it with one that differs only in some insignificant respect."). Through these pleadings, Plaintiffs continue to allege that Defendants have not ceased their wrongful conduct.

The mootness argument also fails because Defendants continue to *defend* the constitutionality of the June Redistricting Plan even in the wake of the enactment of the September Redistricting Plan. Specifically, during a hearing held August 23, 2021, in the lead-up to the

enactment of the replacement redistricting maps, the Court asked Defendants multiple times about the June map. The Court asked, point blank, "I know the plan is still on the books, but are you lawyers planning to defend this plan in any way?" [*McConchie*, 92 (Hr'g Tr.) at 8:23–8:25.] The Legislative Defendants affirmed, "To the extent that the Court believes that the issue of whether the present map is constitutional is relevant after the amended map is drawn, I would say that we would plan to defend it from a presumptive – or from a per se standpoint." [*Id.* at 9: 7–9:10.] In a follow-on, the Court reframed the question: "Are you going to defend it, is the question, and that's the clearest way I can put it. I will just ask you one more time. If that helps to clarify where we are, that would be helpful if you can address that." [*McConchie*, 92 (Hr'g Tr.) at 14:18–14:22.] The Legislative Defendants again affirmed: "Yes. * * * To the extent that you, as a Tribunal, believe that having a valid existing constitutional plan in place as of June 30th is prerequisite, I think that we would want additional discovery to defend the purposes and so forth to do that." [*Id.* at 14:23, 15:3–15:7.] They continued, "[T]he short answer * * * is we don't believe that it's relevant to have to explore this issue[,]" and then stated, "I am not going to say, because we haven't analyzed it fully, that I'm prepared to suggest that we would never under any set of circumstances defend the map." [*Id.* at 15:11–15:13, 15:20–15:24.]

The Legislative Defendants have also continued to defend the constitutionality of the June Redistricting Plan in their briefs following the General Assembly's passage of the September Redistricting Plan. See [*McConchie*, 104 (Leg. Defs.' Opp'n to MSJ)], [*Contreras*, 82 (Leg. Defs.' Opp'n to MSJ).] For example, the Legislative Defendants assert that: "If the June Plan were still current, and if Defendants were seeking to defend its use in the upcoming elections, Defendants would be entitled to rebut the presumption created by the June Plan's over-10% population deviations. And on that step in the analysis, a question of fact exists over whether the General

27

Assembly's June Plan 'may be reasonably said to advance a rational state policy.'" [*McConchie*, 104 at 10] (citation omitted); [*Contreras*, 82 at 9] (advancing identical argument). Similarly, they argue that "far from being undisputed in Plaintiffs' favor, the undisputed facts establish that the General Assembly's use of ACS data was 'necessary to achieve [a] legitimate state objective[]'" because "Plaintiffs do not dispute that (i) the General Assembly had a constitutional mandate to ensure a plan 'became effective' by June 30; (ii) the 2020 census data was unavailable to the General Assembly before that constitutional deadline; and (iii) the ACS data used by the General Assembly was the best-available data at the time the General Assembly had to act." [*McConchie*, 104 at 10–11] (citations omitted); [*Contreras*, 82 at 9–10] (advancing identical argument).

In sum, the Defendants' public actions in and out of the courtroom provide no assurance that the June Redistricting Plan is a dead letter. In fact, the argument against mootness here is stronger than in *Freedom from Religion Foundation*—the Court has not ruled on the June Plan's validity; Defendants continue to defend its constitutionality; and neither Defendants nor their lawyers have provided *any* assurances that the June Plan is out of play. See 885 F.3d at 1051–53 (holding that there was a live dispute even when the district court already *had* made a preliminary ruling of unconstitutionality, the school had stopped defending the plan, and the school had provided "informal" assurance that it had abandoned the unconstitutional plan). Nor is this a situation where the legislature left on the books a moribund statute that a court already has declared unconstitutional. *Compare Wis. Right to Life, Inc. v. Schober*, 366 F.3d 485, 490–91 (7th Cir. 2004) (observing that plaintiffs were not entitled to injunction even though statute had not been removed or amended because a court had already held the statute unconstitutional and state officials had given public and private assurances that the statute would not be enforced).

Without a declaration of unconstitutionality, repeal, or public assurances to the contrary, the June Redistricting Plan remains enforceable. Accordingly, the Plaintiffs' challenge to the constitutionality of the June Redistricting Plan is not moot.

### B. Malapportionment

We turn now to the merits of these two lawsuits.

The *McConchie* and *Contreras* Plaintiffs assert that they are entitled to summary judgment on their claims that the June Redistricting Plan violates the Fourteenth Amendment to the United States Constitution. We agree. "[T]he Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis." *Reynolds v. Sims*, 377 U.S. 533, 568 (1964). "This holding requires only 'that a State make an honest and good faith effort to construct districts * * * as nearly of equal population as is practicable,' for 'it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters.'" *Brown v. Thomson*, 462 U.S. 835, 842 (1983) (quoting *Reynolds*, 377 U.S. at 577). Courts assess the gap between the "ideal" population of each district, on the one hand, and the districts drawn by the legislature. The so-called "maximum population deviation" is the sum of the percentage deviations from perfect population equality of the most- and least-populated districts.

*Reynolds* and its progeny teach that courts may tolerate *de minimis* variances. "[A]s a general matter * * * an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations." *Brown*, 462 U.S. at 842. At the other end of the spectrum, "[a] plan with larger disparities in population * * * creates a *prima facie* case of discrimination and therefore must be justified by the State." *Id.* at 842–43. In fact, the Court has stated explicitly that "variations of 30% among senate districts and 40% among house districts can

29

hardly be deemed *de minimis* and * * * differences of this magnitude [could not] be approved" absent strong justification. *Swann v. Adams*, 385 U.S. 440, 444 (1967).

These cases establish that raw numbers do not represent the end of our inquiry. We may permit departures from precise population equality to accommodate "traditional districting objectives," including preserving integrity of political subdivisions or historical boundary lines, maintaining communities of interest, and creating geographic compactness. See *Evenwel v. Abott*, 136 S. Ct. 1120, 1124 (2016) (citing *Brown*, 462 U.S. at 842–43). For example, in *Mahan v. Howell*, 410 U.S. 315 (1971), the Supreme Court held "that the legislature's plan for apportionment * * * may reasonably be said to advance the rational state policy of respecting the boundaries of political subdivisions[,]" *id.* at 328, which justified an approximately 16% maximum population deviation, see *id.* at 328–29; *Abate v. Mundt*, 403 U.S. 182 (1971) (similar).

Nevertheless, even states that can articulate a legitimate policy rationale do not receive a blank check to dilute votes. "The inquiry * * * becomes whether it can reasonably be said that the state policy urged * * * to justify the divergences * * * is, indeed, furthered by the plan adopted by the legislature, and whether, if so justified, the divergences are also within tolerable limits." *Mahan*, 410 U.S. at 326. As the Supreme Court explained in *Connor v. Finch*, 431 U.S. 407 (1977), "[r]ecognition that a State may properly seek to protect the integrity of political subdivisions or historical boundary lines permits no more than 'minor deviations' from the basic requirement that legislative districts must be 'as nearly of equal population as is practicable.'" *Id.* at 419 (quoting *Roman v. Sincock*, 377 U.S. 695, 710 (1974)). Once the state has advanced a valid justification, "[t]he question is one of degree." *Id.*

For that reason, *Finch* is illustrative. In *Finch*, the Court overturned a plan with maximum population deviations of 16.5% in the Senate districts and 19.3% in the House districts. 431 U.S.

at 418. Even a 19.3% deviation "substantially exceed[ed] the 'under-10%' deviations the Court ha[d] previously considered to be of *prima facie* constitutional validity." *Id.* at 418. The state's rationale, adherence to political subdivisions, "permit[ted] no more than minor deviations." *Id.* at 419. The Court emphasized that the numbers could not be justified when the legislature had formulated alternative, "less statistically offensive" plans. *Id.* at 420. To be sure, the Court was referring to a court-formulated plan, but the Court indicated that "even a legislatively crafted apportionment with deviations of this magnitude could be justified only if it were 'based on legitimate considerations incident to the effectuation of a rational state policy.'" *Id.* at 418 (quoting *Reynolds*, 377 U.S. at 579).

Here, the maximum population deviations in the June Redistricting Plan do not even approach a passing grade under *Reynolds*' one-person, one-vote principle. The *McConchie* Plaintiffs' expert, Dr. Chow, calculated that the maximum population deviations in the House Districts are 29.88% and in the Senate Districts are 20.25%. See [*McConchie*, 79 (Pls.' SOF) at ¶¶ 34, 36.] The *Contreras* Plaintiffs' expert reached essentially the same conclusion. See [*Contreras*, 66 (Pls.' SOF) at ¶¶ 34–39] (concluding that the June Redistricting Plan included maximum population deviations in the House Districts of 29.9% and in the Senate Districts of 20.3%). These deviations demonstrate that Plaintiffs have presented a *prima facie* case that the June Redistricting Plan violates the Equal Protection Clause. No party has cited—nor can we find—a single case upholding a maximum deviation of 20.25%, to say nothing of a 29.88% deviation. See *Swann*, 385 U.S. at 444 (holding 26% variation violated the Fourteenth Amendment); *Kilgarlin v. Hill*, 386 U.S. 120, 123–24 (1967) (rejecting variations of approximately 26.48%). Such deviations are particularly large, a half-century after *Finch*, given the technological advances available to the General Assembly to enable it with greater precision

31

to set the population per district.  The maximum deviations in the June Redistricting Plan exceed any limit tolerated by any case law.  Even if, in theory, population deviations as extreme as these might be constitutionally tolerable if they advanced a compelling districting objective, see *Mahan*, 410 U.S. at 328, no such objective has been advanced here.

In assessing the Defendants' rationale, we begin with the text of Public Act 102-0010 and the circumstances leading to its enactment.  Nothing in the statute nor either houses' resolution refers to the global pandemic or the looming general and primary elections.  Rather, the House Resolution simply states: "under the Illinois Constitution * * * the General Assembly by law shall redistrict the Legislative Districts and the Representative Districts by June 30" and later, that the Census Bureau "announced it would not release the 2020 Census * * * population data * * * until approximately September 30, 2021."  See H.R. 359, 102 Leg. (Ill. 2021); S.R. 326, 102 Leg. (Ill. 2021).

In addition, alternative paths were available to the General Assembly to approach this circumstance.  First, the Census Bureau publicly announced its plans to release raw data by mid-August, well in advance of the State Constitution's final redistricting deadline of October 5, 2021.  House Resolution 359 glosses over that fact by referring to the date the Census Bureau anticipated releasing summarized data, rather than the raw data.  See *id.*  Second, redistricting plans with smaller deviations were readily available by August 2021.  Once the Census Bureau released the raw data, the General Assembly redrew and enacted a new map within days.  Both houses approved the map on August 31, 2021, and the Governor signed off within one month.  In other words, a new map could have been (and was) readily available even with the belated August 2021 data.  See *Kilgarlin*, 386 U.S. at 123–24 (holding apportionments of 14.84% overrepresented to 11.64% underrepresented ran afoul of the Fourteenth Amendment absent explanation that adherence to

32

political subdivisions "necessitated the range of deviations" or that alternative plans submitted were deficient).

Defendants point us to two additional rational or legitimate justifications, neither of which rescues the 20.25% and 29.88% deviations in the June Redistricting Plan.  First, they focus on expert testimony that the ACS data was the best alternative data source.  But even accepting that the pandemic has upended the world and caused delays in the data release, Defendants focus on the means, not the ends.  Indeed, the Census Bureau itself states that ACS data should not be used for redistricting.  See [*McConchie*, 78 (Pls.' MSJ) at 10.][17]  See also *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 853–54 (5th Cir. 1999) (presuming census data valid and requiring "high degree of accuracy *** clear, cogent and convincing to override the presumptive correctness of the prior decennial census"); *Pope v. Cnty. of Albany*, 2014 WL 316703 (N.D.N.Y. Jan. 28, 2014) (describing ACS data as "less reliable"); *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1022 (E.D. Mo. 2016), *aff'd*, 894 F.3d 924 (8th Cir. 2018) ("Because ACS population estimates are based on a sample, they are subject to sampling bias, i.e., error margins or confidence intervals.").  Had the ACS data fortuitously led to the drawing of constitutionally-acceptable districts, the use of that data alone likely would not have led to the invalidation of the June Plan.  But the Census Bureau's own warnings placed the General Assembly on notice of the risk it was taking, and the actual data released in August revealed an

---

[17]    See,  *e.g.*,  U.S.  Census  Bureau,  *American  Community  Survey  Key  Facts*, https://www.census.gov/content/dam/Census/programs-surveys/acs/news/10ACS_keyfacts.pdf#:~:text=WHAT%20IT%20IS.%20The%20American%20Community%20Survey%20is,distributed%20to%20state%20and%20local%20areas%20each%20year (last visited Oct. 7, 2021); U.S. Census Bureau, *Understanding and Using American Community Survey (ACS) Data* at 15 https://www.census.gov/content/dam/Census/library/publications/2020/acs/acs_researchers_handbook_2020.pdf (last visited Oct. 12, 2021).

unacceptably large gap between the ACS estimates and the population realities in the district boundaries reflected in the map enacted by Public Act 102-0010.

Defendants' second argument—that they faced a Constitutional mandate to enact a plan—fares no better. Neither the text nor the structure of the Illinois Constitution mandates that the redistricting process be completed by June 30. Article IV, § 3(b) of the Illinois Constitution states that "in the year following each Federal decennial census year, the General Assembly by law shall redistrict." The only reference to June 30 is by way of a contingency plan: Section 3(b) continues, "[i]f no redistricting plan becomes effective by June 30 of that year, a Legislative Redistricting Commission shall be constituted not later than July 10." *Id.* In other words, there is no June 30 mandate; in fact, the Constitution contemplates that in some circumstances, the General Assembly will not enact a plan by June 30, and in such cases provides the Commission as a back-up. See *id.* Four of the last five Illinois redistricting maps—all but the 2010 map—were drawn by a Commission, not by the General Assembly. See [*McConchie*, 51 (1st Am. Compl.) at ¶ 41] (citing *Hooker v. Ill. State Bd. of Elections*, 2016 IL 121077, ¶ 5). Here, the census numbers were due in August 2021, [*McConchie*, 79 (Pls.' SOF) at ¶ 20], well before the October 5 final deadline, see §3(b) ("Not later than October 5, the Commission shall file with the Secretary of State a redistricting plan approved by at least five members.").

All this leads to the conclusion that Defendants have not advanced a compelling districting objective. The reasons offered by Defendants show that they could have waited for the census data in August 2021 before producing the maps. The absence of such a compelling reason suggests that Defendants were motivated by a desire to avoid a Commission. To be sure, political considerations are not unconstitutional and courts are reluctant to wade into, much less to reverse, partisan maps, including those that amount to political gerrymanders. See *Rucho v. Common*

*Cause*, 139 S. Ct. 2484, 2502–03 (2019) (explaining that a determination "that lines were drawn on the basis of partisanship does not indicate that the districting was improper. A permissible intent—securing partisan advantage—does not become constitutionally impermissible, like racial discrimination, when that permissible intent 'predominates.'")  And we are not so naïve as to imagine that any party in power would decline to exercise levers available to it to maximize its opportunity to retain seats in the General Assembly.  While there is nothing legally wrong with this approach, it is not a proper rationale for violating constitutionally-required mandates, including the drawing of districts of approximately equal population.  In other words, the General Assembly may not dilute a large percentage of votes to advance a preferred political outcome.

Here, the General Assembly well understood that if it waited for the official census data, it would be unable to draw a map until mid-August.  Under the deadlines set in Article IV of the State Constitution, that delay would have shifted control of the map from the House and Senate— both of which are comprised of a super-majority of Democrats—to a bi-partisan Commission, which must be formed if no state redistricting plan is in place by June 30.  See Ill. Const. art. IV, § 3(b) (requiring the speaker and minority leaders of the House and Senate to appoint members to the Commission, consisting "of eight members, no more than four of whom shall be members of the same political party" together with a ninth member).  Once the Census Bureau announced in early 2021 that the raw data would not be available until after the June 30th deadline, but rather anticipated a mid-August 2021 release, the General Assembly comprehended the consequences of waiting and chose to proceed.

So, the record reveals that, unlike the geographical and historical state policies advanced in the cases cited by Defendants, the General Assembly risked running afoul of the one-person, one-vote principle to avoid ceding political control of the legislative redistricting process.

35

Compare *Brown*, 462 U.S. at 846 (holding that state's "policy of preserving county boundaries justifie[d] the additional deviations resulting from" guaranteeing representation to each county); *Mahan*, 410 U.S. at 325–26 (recognizing that adhering to boundary lines qualifies as a legitimate state policy). Certainly, a preferred political outcome is more than *no* rationale at all for Defendants' decision to proceed on the basis of the ACS data. Compare *Swann*, 385 U.S. at 444 (no state rationale advanced on the record to support 26% maximum deviation). Nevertheless, a "patchwork of political maneuvering and manipulation, to perpetuate * * * invidious apportionment is not a legitimate reason" to tolerate maximum population deviations of the June Redistricting Plan's magnitude. See *Moss v. Burkhart*, 220 F. Supp. 149, 154 (W.D. Okla. 1963), *aff'd sub nom. Williams v. Moss*, 378 U.S. 558 (1964). Put slightly differently, maintaining political control over the redistricting process is not the kind of state policy that can justify the kind of radical departure from the "one-person, one-vote" principle reflected in the June Redistricting Plan.

In disapproving the June Redistricting Plan on constitutional grounds, we recognize that Illinois lawmakers faced unprecedented circumstances. The final census data was delayed on account of the pandemic. That circumstance weighs in favor of allowing the General Assembly the first opportunity to remedy the problem in the map that resulted from its first, failed effort, an opportunity the General Assembly took with its passage of the September Redistricting Plan. But the General Assembly's interest in enacting a partisan map to avoid a bipartisan Commission is not sufficiently compelling to justify legislative districts with the 20.25% and 29.88% deviations in the June Redistricting Plan. Accordingly, the June Redistricting Plan is unconstitutional as a matter of law.

IV.     **Remedy**

Having determined that the June Redistricting Plan presents a justiciable controversy and violates the Equal Protection Clause of the Fourteenth Amendment, we turn finally to the issue of remedies.  "Relief in redistricting cases is 'fashioned in the light of well-known principles of equity.'"  *North Carolina v. Covington*, 137 S. Ct. 1624, 1625 (2017).  In recognition of the need to attend to "the circumstances of the challenged apportionment and a variety of local conditions," the Supreme Court affords courts wide latitude.  *Reynolds*, 377 U.S. at 585.  "In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles."  *Id.*

In selecting an appropriate remedy, *Reynolds* and its progeny teach us to "undertake an 'equitable weighing process' to select a fitting remedy for the legal violations [we] have identified" and "tak[e] account of 'what is necessary, what is fair, and what is workable.'"  *Covington*, 137 S. Ct. at 1625 (first quoting *NAACP v. Hampton Cnty. Election Comm'n*, 470 U.S. 166, 183 n.36 (1985), and then quoting *New York v. Cathedral Acad.*, 434 U.S. 125, 129 (1977)).  There is no precise formula for selecting a remedy, but rather we consider the following non-exhaustive factors: "the severity and nature of the particular constitutional violation, the extent of the likely disruption to the ordinary processes of governance * * * and the need to act with proper judicial restraint when intruding on state sovereignty."  *Id.* at 1626.  We are particularly mindful of the Court's repeated admonition that "reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court."  *Chapman v. Meier*, 420 U.S. 1, 27 (1975).

The *McConchie* Plaintiffs request multiple forms of prospective, declaratory, and injunctive relief. Chief among them, they ask this Court (1) to declare the Plan invalid, (2) to enjoin the enforcement of the June Redistricting Plan, and (3) to order that a legislative redistricting Commission draft a new plan that creates substantially equal districts. See [*McConchie*, 78 (Pls.' MSJ) at 8.] The *Contreras* Plaintiffs request that the Court (1) declare the Illinois House and Senate districts unconstitutionally malapportioned, (2) enjoin the State Board of Elections Defendants from holding elections under the June Redistricting Plan or its predecessor, and (3) schedule the creation of a court-approved plan. [*Contreras*, 65 (Pls.' MSJ) at 12.]

Guided by these principles, we will award the relief requested by the *Contreras* Plaintiffs in full and *McConchie* Plaintiffs in part. First, we declare the Illinois House and Senate districts in the June Redistricting Plan unconstitutionally malapportioned. Second, we enjoin the State Board of Elections Defendants from holding elections under the June Redistricting Plan or its predecessors. Third, in selecting a new plan going forward, we will consider in the first instance the revised September Redistricting Plan submitted by the state through Public Act 102-0663.

It is appropriate to consider the September Redistricting Plan as a starting point for a few reasons. To begin, the Supreme Court repeatedly has stressed, that "reapportionment is primarily the duty and responsibility of the State * * * rather than of a federal court." *Chapman*, 420 U.S. at 27; see also *Scott v. Germano*, 381 U.S. 407, 409 (1965) ("The power of the judiciary of a State to require valid reapportionment or to formulate a valid redistricting plan has not only been recognized by this Court but appropriate action by the States in such cases has been specifically encouraged."). In addition, the pandemic delayed the Census Bureau's efforts to meet its customary deadlines. True, the General Assembly could have waited until the final numbers were released—as many other states did—but the deadlines in Article IV of the Illinois Constitution

were not written with the pandemic in mind. And absent the pandemic, a partisan plan could have been enacted without resort to the ACS data. These circumstances warrant giving the General Assembly a second bite at the apple. See, *e.g.*, *Reynolds*, 377 U.S. at 586 (approving the district court's decision to decline to stay impending primary election, affording the state legislature an opportunity to remedy the admitted discrepancies in the plan, and ordering its own temporary apportionment plan after the legislature failed to "act effectively in remedy[ing] the constitutional deficiencies in the State's legislative apportionment scheme").

Given the timing of next year's primary election cycle, it is fortunate that the General Assembly has already taken that bite. The General Assembly must have been well aware of the infirmities in the prior map at the time that it met to draw a new version; indeed, the one likely was the impetus for the other. Mindful of the relatively rare opportunity for a "do-over," the Court urged the General Assembly to consider the Plaintiffs' input. See [*McConchie*, 88 (Aug. 23, 2021 Order)] ("The [Court] also reiterates the comments made on the record urging the General Assembly to take into account the views of the Plaintiffs in crafting any amended plan with the objective of presenting for the Court's consideration a plan that satisfies all constitutional and statutory obligations, not just those raised in the existing pleadings and motions."). Yet, according to Plaintiffs, the General Assembly excluded Plaintiffs and numerous community groups from the process. Instead, the General Assembly held subject matter hearings with little notice and *before* releasing the first amended map to the public. See [*McConchie*, 93 (Status Report of Leg. Defs.) at 2–3] (describing subject matter hearing timeline). Further, Plaintiffs claim that despite pleas from organizations and public advocates alike for additional time to assess the plan and provide input, the majority caucuses then held hearings and voted on the various iterations of that map within hours of its public release and without releasing data that could have facilitated public

feedback. See [*McConchie*, 93 at 2–4] (describing advocates' "plea[s] for more time * * * to develop proposals for the committees' consideration based on the PL 94–171 decennial census data * * * and to evaluate any proposal by the majority caucuses"); [*id.* at 13–21, Ex. A] (testimony before the Illinois House and Senate Redistricting Committees of (1) United Congress of Community and Religious Organizations and Chicago Lawyers' Committee for Civil Rights, and (2) CHANGE Illinois); [*id.* at 3–5] (explaining that majority caucuses neither released block equivalency nor shapefiles for the maps until during or after House of Representative Redistricting Committee debate or Senate debate and vote on drafts). Ultimately, Plaintiffs say, the General Assembly approved a new map a single day after publicly releasing *any* version of its amended map and within hours of releasing the version that it enacted into law. See *id.* Defendants may well disagree with those characterizations, and we need not (and do not) do more than to note them at this time.

Taking into account the totality of the circumstances—both agreed and disputed—we will proceed therefore toward the approval of a map for Illinois legislative districts for the next decade using the September Redistricting Plan as a starting point, but also carefully considering the legal challenges raised in the operative second amended complaints. Having found the June Redistricting Plan unconstitutional and therefore reached the remedial phase of proceedings, the Court will not require formal dispositive motion practice (*e.g.*, under Federal Rules of Civil Procedure 12(b) and 56) on the seconded amended complaints [*McConchie*, 116], [*Contreras*, 98]. To the extent that the September Redistricting Plan does not pass muster, Plaintiffs are invited to submit proposed alternative maps for the Court's consideration accompanied by a statement explaining (1) the constitutional or statutory defects in the September Redistricting Plan and, (2) how the revisions or alternatives cure such defects. Defendants will likewise receive an

40

opportunity to respond to the proposed alternative maps and accompanying assessment according to the schedule set out at the conclusion of this opinion.

The final matter that we address today is the *McConchie* Plaintiffs' request that we order a legislative redistricting Commission to draft a replacement plan. In support of that request, the *McConchie* Plaintiffs direct us to Article IV, § 3 of the Illinois Constitution. They insist that "if the General Assembly does not enact a valid redistricting plan with the full force and effect of law by June 30, 2021, regardless of the reason for that failure, the Illinois Constitution shifts the responsibility for drafting a plan from the General Assembly to a redistricting commission." [*McConchie*, 78 (Pls.' MSJ) at 9–10.]

If the *McConchie* Plaintiffs' proposed reading of the Illinois Constitution raised a close question under state law, we would be inclined to defer that question to the Illinois Supreme Court, which is an available forum in which to raise such a question under the State Constitution. See Ill. Const. art. IV, § 3(b) (vesting Illinois Supreme Court with "original and exclusive jurisdiction over actions concerning redistricting the House and Senate"). But the notion that a successful court challenge to an Illinois redistricting plan requires the formation of a Commission is too far-fetched to require presentation of the issue to another tribunal. Challenges to redistricting maps are routine. They occur every ten years, like clockwork, during each census cycle. As this case and countless before it illustrate, parties need time to compile a record; courts need time to issue a ruling; and on occasion one or another aspect of a redistricting plan needs revision to comply with the law. Sometimes the revisions are minor. See *Baldus v. Members of Wis. Gov't Accountability Bd.*, 849 F. Supp. 2d 840, 859–60 (E.D. Wis. 2012) (concluding Wisconsin's legislative redistricting plan violated § 2 of the Voting Rights Act and rejecting eight other challenges to the plan); *Baldus v. Members of Wis. Gov't Accountability Bd.*, 862 F. Supp. 860, 863 (E.D. Wis. 2012) (revising

two assembly districts to cure § 2 violation). The process for drawing legislative districts with a Commission, as Illinois has done after four of the last five decennial censuses, is itself time-consuming and takes place pursuant to a tight schedule imposed by the State Constitution. The Plaintiffs' suggestion that the General Assembly intended that cycle to commence at the end of often lengthy court proceedings seems very implausible.

In our view, the far more reasonable construction of the text and structure of Article IV of the Illinois Constitution sets up two methods for arriving at the boundaries of state legislative districts. So long as a redistricting plan "becomes effective" by June 30, the General Assembly controls the process. A redistricting plan is embodied in a Public Law, which "becomes effective" if it is passed by both legislative houses and is signed by the Governor. All redistricting maps, in Illinois and elsewhere, are subject to judicial review, as they must comply with (at a minimum) the Constitution and the Voting Rights Act. But the law becomes effective with the Governor's signature and remains so unless and until it is repealed or invalidated. The Commission does not come into play upon the striking down of a legislature-enacted plan any more than the General Assembly takes over if a Commission-enacted plan fails to satisfy the courts. Instead, the Commission amounts to an alternative process for producing an "effective" map in the first instance if the political branches are unable to do so by the deadline.

## V. Conclusion

For the reasons stated above, the Court denies the motions to dismiss [*McConchie*, 66, 80], [*Contreras*, 40, 55] the first amended complaints [*McConchie*, 51], [*Contreras*, 37] in full, except to the extent that Plaintiff Martinez is dismissed from the first amended complaint [*Contreras*, 37].

Further, the Court grants the Plaintiffs' motions for summary judgment in full [*Contreras*, 63], and in part, [*McConchie*, 76].

The Court declares that the June Redistricting Plan, Public Act 102-0010, violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, and enjoins the Defendant State Board of Elections and Members, Charles W. Scholz, Ian K. Linabarry, William M. McGuffage, William J. Cadigan, Katherine S. O'Brien, Laura K. Donahue, Casandra B. Watson, and William R. Haine, in their official capacities as members of the Illinois State Board of Elections, from enforcing Public Act 102-0010. Finally, the Court will not require formal dispositive motion practice (*e.g.*, motions under Federal Rules of Civil Procedure 12(b) and 56) on the second amended complaints and sets the schedule for the selection of a court-approved state redistricting map as follows: (1) Plaintiffs' submissions for proposed revisions to the September Redistricting Plan, Public Act 102-0663, accompanied by a statement explaining how those revisions cure any constitutional or statutory defects in the September Redistricting Plan, are to be filed on the docket no later than November 8, 2021; (2) Defendants' responses and objections to the submissions are to be submitted no later than November 18, 2021. This case is set for further status on November 5, 2021, at 11:00 a.m.