## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DAN MCCONCHIE, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 21 CV 3091 |
| | ) | |
| CHARLES W. SCHOLZ, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and, | ) | |
| | ) | |
| ANGELICA GUERRERO-CUELLAR, | ) | |
| in her official capacity as Illinois State | ) | |
| Representative for the 22nd District and | ) | |
| Individually, | ) | |
| | ) | |
| Petitioner/Defendant-Intervenor) | | |

| | | |
|---|---|---|
| JULIE CONTRERAS, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 21 CV 3139 |
| | ) | |
| ILLINOIS STATE BOARD OF | ) | |
| ELECTIONS, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and, | ) | |
| | ) | |
| ANGELICA GUERRERO-CUELLAR, | ) | |
| in her official capacity as Illinois State | ) | |
| Representative for the 22nd District and | ) | |
| Individually, | ) | |
| | ) | |
| Petitioner/Defendant-Intervenor) | | |

1

## PETITIONER/DEFENDANT-INTERVENOR'S MOTION AND MEMORANDUM OF LAW TO INTERVENE PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 24

NOW COMES Petitioner/Defendant-Intervenor, Angelica Guerrero-Cuellar (the "Representative") by and through her attorney Veronica Bonilla-Lopez of Del Galdo Law Group, LLC., and moves to intervene as a Defendant pursuant to Federal Rule of Civil Procedure 24 in the actions filed by Dan McConchie, et al. and Julie Contreras, et al. (Respectively hereinafter "*McConchie*" and "*Contreras*") and in support thereof states as follows:

### INTRODUCTION

The Representative is an Illinois State Representative for the 22nd District of Illinois which is home to a large Latino/a/x population and includes neighborhoods that surround Midway Airport. She also is a Latina who is a registered voter in her District. She seeks to intervene as a Defendant in this matter as of right for the following reasons: 1) the motion is timely; 2) the Representative has a significant interest both in her official and individual capacity; 3) the disposition of this matter impairs or impedes the Representative's ability to protect her interest in this matter; and, 4) the existing parties fail to adequately represent the unique and specific interests of the Representative. The Representative otherwise moves to intervene by permission where: 1) the motion is timely; 2) the Representative raises a defense that shares common questions of law and fact to the main action; and 3) if the motion were to be denied, the Representative would be prejudiced. Alternatively, the Representative seeks to permissibly intervene for a limited purpose.

ARGUMENT

I.    <u>The Representative Should be Granted Leave to Intervene as of Right</u>

Federal Rule of Civil Procedure 24(a)(2) provides in relevant part that on timely motion, the court must permit anyone to intervene who: claims an interest relating to the … transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest. Accordingly, there is a four-part test to intervention as of right: 1) timely application; (2) an interest relating to the subject matter of the action; (3) potential impairment, as a practical matter, of that interest by the disposition of the action; and, (4) lack of adequate representation of the interest by the existing parties to the action. *PAC for Middle America v. State Bd. of Elections*, 1995 WL 571893, *2, Case no. 95 C 827 (N.D. Ill. 1995) citing *Shea v. Angulo,* 19 F.3d 343, 346 (7th Cir.1994). A motion to intervene as a matter of right should not be dismissed unless it appears with certainty that the intervenor is not entitled to relief under any set of facts. *Lake Investors Development Group, Inc. v. Egidi Development Group*, 715 F.2d 1256, 1258 (7th Cir. 1983).

    a.   <u>The Motion is Timely</u>

Timeliness involves examining all of the circumstances of a case and is to be determined by the court in the exercise of its discretion. *Smith v. Board of Election Com'rs for City of Chgo.*, 103 F.R.D. 161, 163 (N.D. Ill. 1984) citing *NAACP v. New York,* 413 U.S. 345, 365–66, (1973). Four factors are considered to determine whether

a motion to intervene is timely: (1) the length of time the intervenor knew or should have known of his or her interest in this case, (2) the prejudice to the original party caused by the delay, (3) the resulting prejudice to intervenor if the motion is denied, and (4) any unusual circumstances. It is a reasonableness standard: "potential intervenors need to be reasonably diligent in learning of a suit that might affect their rights, and upon so learning they need to act reasonably promptly." *PAC*, 1995 WL 571893 *3 citing *Nissei Sangyo Am., Ltd. v. United States,* 31 F.3d 435, 438 (7th Cir.1994).

The Representative's motion to intervene is timely. Plaintiffs have filed amended complaints on October 1, 2021. (*McConchie* Dkt. #116 & *Contreras* Dkt. #98). In the Complaints, as discussed in more detail below, the Plaintiffs challenge the 22nd District in seeking to change its boundaries to create additional "Latino" House Districts. (*McConchie* Dkt. #116, ¶¶ 8, 10a & *Contreras* Dkt. #98, ¶¶ 74, 76-88). The *McConchie* Complaint proposes a revised September map that cuts through the 22nd District and the *Contreras* Plaintiffs assert that "district elections in the areas in and around" House District 21, which is west of the 22nd District, are racially polarized. (*McConchie*, Dkt. #116, ¶¶ 75-76, *Contreras* #98, ¶ 99). On October 19, 2021, the three-judge panel (the "Panel") granted summary judgment in favor of the Plaintiffs and ruled among other things that the Plaintiffs shall submit proposed revisions to the September Redistricting Plan. (*McConchie* Dkt #131, *Contreras* Dkt #117). As such, the Representative hereby having notice that her direct interests are at stake, files this motion reasonably promptly. Next, no prejudice to the original

parties will occur by permitting the Representative to intervene. The Representative attaches to her motion, an answer to each Complaint and agrees to abide by any current schedules. See *PAC*, 1995 WL 571893 *4 (finding a motion to intervene filed three months after the Plaintiff's complaint to be timely). In fact, prejudice will result to the Representative should her motion to intervene be denied as she would be left without any recourse to protect her interests. See *Smith*, 103 F.R.D. at 163 (motion to intervene by registered voters not untimely where intervenors would be prejudiced if denied and parties were briefing summary judgment motions). The Representative has met all the factors to demonstrate her motion is timely.

b. The Representative has a Substantial Legal Interest in the Case

What constitutes an "interest" is defined broadly and is described as one which is "significantly protectable." *Lake Investors*, 715 F.2d at 1259. The Complaints in the captioned consolidated matters seek declaratory judgments declaring the September and June maps invalid and unconstitutional. (*McConchie* Dkt. #116, ¶15 & *Contreras* Dkt. #98, ¶¶ 2-3).

The *McConchie* Complaint explicitly proposes a revised September map that cuts through the 22nd District. (*McConchie* Dkt. #116, ¶¶ 75-76). In their Complaint, *Contreras* Plaintiffs contend that by moving "Latinos into other districts and out of House District 21," which is located directly west of the 22nd District, the September Plan uses race as a predominant factor. (*Contreras* Dkt #98, ¶ 83). The *Contreras* Complaint further attacks the change of "nested house district" compositions of Senate District 11 which includes the 22nd District. (*Contreras* Dkt #98, ¶¶ 94-95).

In the Complaint, the *Contreras* Plaintiffs assert that "district elections in the areas in and around House Districts 3, 4, 21, 24 and 39, and Senate Districts 2 and 11, are characterized by racially polarized voting." (*Id.* at ¶ 99). The 22nd District is "in and around" the districts enumerated. In other words, the respective Complaints challenge the 22nd District.

The Representative has a valid and substantial interest in her official capacity as the Illinois State Representative of the 22nd District and in her individual capacity to protect her right to re-election. See *PAC for Middle America v. State Bd. of Elections*, 1995 WL 571893, *2, Case no. 95 C 827 (N.D. Ill. 1995)(concession by plaintiffs that congressman who may lose his base electorate as a result of an adverse ruling, may intervene as of right); *Johnson v. Mortham*, 915 F. Supp. 1529, 1538 (N.D. Fla. 1995)(congresswoman whose district is being challenged granted leave to intervene as of right where she has a direct, substantial, and legally protectable interest); *Williams v. State Board of* Elections, 696 F. Supp. 1563, 1571-72 (N.D. Ill. 1988)(elected officials whose electoral districts are challenged as unlawful have "personal interests in their office," "equitable interests" in the timing and form of relief, and interests in their continued incumbency); *Texas Democratic Party v. Benkiser*, 459 F. 3d 582, 586-588 (5th Cir. 2006)(an injury in fact exists when a candidate's election prospects and campaign coffers are threatened); *League of Woman Voters of Mich. v. Johnson,* 902 F. 3d 572, 579 (6th Cir. 2018)(congressmen interests in intervening in a suit included the relationship between constituent and representative).

Additionally, the Representative as a registered Latina voter within the 22nd District has a personal interest in the causes of action. "[V]oting implicates fundamental rights which are integral to a democratic society. These include the right to associate with others for the common advancement of political beliefs and ideas. The right of qualified voters to associate with the political party of their choice through voting is central to our basic constitutional freedoms." *Smith*, 103 F.R.D. at 163 citing *Smith v. Board of Election Commissioners*, 587 F.Supp. 1136, 1146 (N.D. Ill. 1984); and see *Johnson*, 915 F.Supp. at 1536 (registered voters have standing, and a sufficiently substantial interest to intervene, in an action challenging the voting district in which the voters are registered). The Representative has accordingly established a significant interest in the consolidated cases.

c. Impairment of the Legal Interest is Possible if Intervention is Denied

An interest is considered "impaired when the decision of a legal question ... would, as a practical matter, foreclose the rights of the proposed intervenor in a subsequent proceeding." *PAC*, 1995 WL 571893 *2. The burden is minimal and can be satisfied if a determination in the action may result in potential stare decisis. *Id*. Here, a disposition that changes the configuration of the 22nd District is imminent. The consolidated cases have entered the remedial phase where the Panel has instructed the Plaintiffs to submit their proposed revisions to the September Redistricting Plan "accompanied by a statement explaining how those revisions cure any constitutional or statutory defects in the September Redistricting Plan… no later than November 8, 2021." As detailed above, the proposals will unequivocally contain

revisions to the 22nd District. Should the Representative be denied opportunity to intervene, it would impair the Representative's ability to protect her significant interest in her continued incumbency, her relationship with her constituents, and her voting rights. Therefore, the Representative has demonstrated an impairment to her legal interests if the motion to intervene were to be denied.

### d. The Parties do not Adequately Represent the same Interests

This requirement is satisfied, "if the applicant shows that representation of [her] interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *Lake Investors*, 715 F.2d at 1261 citing *Trbovich v. United Mine Workers of America,* 404 U.S. 528, 538 n. 10 (1972). The existing parties to the action do not adequately represent the same interests as that of the elected State Representative for the 22nd District. The Representative has a particular and unique interest to protect her incumbency, the relationship with her constituents of the 22nd District and her voting rights. While the current defendants are opposing the litigation and reconfiguration of the map as a whole, their interests are not specific to the 22nd District or sufficiently protect the Representative's interests. In other words, any disposition or negotiated settlement that implicates the 22nd District will not be of any consequence to the current parties. See *Johnson*, 915 F.Supp. at 1538 (congresswoman has a personal interest in her office that goes beyond more general interest that she and the government have in keeping her district intact). The parties, accordingly, fail to adequately represent the same interests as that of the Representative.

II.    <u>The Representative should be Permitted to Intervene</u>

The Court has broad discretion in granting a motion to intervene under Rule 24(b)(1). *PAC* 1995 WL 571893 *3. In deciding whether to grant permissive intervention, the court must consider: (1) whether the petition was timely; (2) whether a common question of law or fact exists; and (3) whether granting the petition to intervene will unduly delay or prejudice the adjudication of the rights of the original parties. *Id.* citing *Southmark Corp.,* 950 F.2d 416, 419 (7th Cir. 1991); *HHB Ltd. Partnership v. Ford Motor Co.,* Case No. 92 C 3287, 1992 WL 348870, *1 (N.D.Ill.1992).

Timeliness has already been addressed and established as stated in (I.)(a.) of the argument section above. The remaining criteria are also met. The Representative has a "defense that shares with the main action a common question of law and fact." Fed.R.Civ.Pro. 24(b)(1)(B). The Representative seeks to defend the 22nd District against the constitutional attacks. The common questions are the constitutionality of the June and September Plan. Further, the Representative seeks to protect the right to vote, rights to a fair and reasonable opportunity to elect candidates of choice and avoid dilution of Latino/a/x votes which are common questions in the consolidated cases. Additionally, should the Representative be permitted to intervene, it would not prejudice the adjudication of the rights of the parties to this action or unduly delay the proceedings. The Representative's defenses overlap with the defenses put forth by the current Defendants. <u>See</u> *League of Women Voters of Mich*, 902 F. 3d at 578 (where many of the Congressmen's defenses overlapped with the defendant's, adding

the Congressmen would not have placed any unnecessary or unexpected burden upon the district court)*.* Moreover, as mentioned above the Representative would abide by all current schedules. The progression of the case will not be affected. The motion to permissively intervene should be granted.

### III. Alternatively, Intervention Should be Granted for a Limited Purpose

Alternatively, the Representative requests to permissibly intervene for a limited purpose and scope. Permissive intervention "leaves the district court with ample authority to manage the litigation before it. The court can even place conditions on the scope of permissive intervention, allowing more voices to be heard without overcomplicating the case with additional claims, defenses, discovery, and conflicting positions." *Planned Parenthood of Wisconsin, Inc. v. Kaul*, 942 F.3d 793 (7th Cir. 2019). The Representative's interests as expressed herein are not adequately represented by any of the parties currently in these cases. In order to protect her interests, the Representative seeks leave to intervene for the limited purpose of submitting her responses and objections, in regard to the 22nd District, to Plaintiffs' proposed revisions to the September Redistricting Plan as Defendants have been granted per the Memorandum Opinion and Order of October 19, 2021. (*McConchie*, Dkt. # 131 & *Contreras* Dkt. 117). See *Reynolds v. LaSalle County*, 607 F.Supp. 482, 483 (N.D. Ill. 1985)(Fraternal Order of Police allowed to intervene by permission under Rule 24(b) for limited purpose of objecting to the promotion of two individuals to deputy sheriff contained in a consent decree); *U.S. v. Navistar International Corp.*, 2016 WL 6948378, Case No. 15 cv 6143, \*2 (N.D. Ill. 2016)(granting permissive

intervention for limited purpose of protecting sensitive confidential business information); *SEC v. Heartland Group, Inc.*, 2003 WL 1089366, Case No. 01 C 1984, *6 (N.D. Ill. 2003)(granted motion to intervene for limited purpose of contesting motion); *Kerasotes Michigan Theatres, Inc. v. National Amusements, Inc.*, 139 F.R.D. 102, 103 (limited intervention permitted to challenge a protective order); and *Driftless Area Land Conservancy v. Public Service Commission of Wisconsin*, 2020 WL 7186150, Case No. 19-CV-1007-wmc, *3 (W.D. Wis. 2020)(motion to intervene granted for limited purpose of protecting interests during discovery).

## CONCLUSION

The Illinois State Representative should be granted leave to intervene in this matter as of right. She has met all the factors for intervention under Federal Rule of Civil Procedure 24(a)(2). The Panel should otherwise allow permissive intervention under 24(b). Alternatively, the Representative should be granted leave to intervene for a limited purpose.

WHEREFORE, the Representative prays this Panel enter an order granting leave to intervene as of right or as permitted and further grant any and all such other relief this Panel deems just and equitable.

Respectfully Submitted,

ANGELICA GUERRERO-CUELLAR

By: */s/ Veronica Bonilla-Lopez*
  Veronica Bonilla-Lopez
  *One of the Petitioner- Defendant's Attorneys*

11

Veronica Bonilla-Lopez (ARDC# 6281050)
Tiffany Nelson-Jaworski (ARDC #6278126)
DEL GALDO LAW GROUP, LLC
(708) 222-7000 (t)/ (708) 222-7001 (f)
1441 S. Harlem Avenue
Berwyn, Illinois 60402
vblopez@dlglawgroup.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

DAN MCCONCHIE, et al.,       )
                             )
       Plaintiff,        )
v.                          )    Case No. 21 CV 3091
                             )
CHARLES W. SCHOLZ, et al.,  )
                             )
       Defendants,     )
                             )
and,                         )
                             )
ANGELICA GUERRERO-CUELLAR, )
in her official capacity as Illinois State )
Representative for the 22nd District and )
Individually,               )
                             )
    Petitioner/Defendant-Intervenor )

**DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS'
SECOND AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND
EQUITABLE RELIEF**

NOW COMES the Defendant-Intervenor, Illinois State Representative Angelica Guerrero-Cuellar ("The Representative"), by and through her counsel, Veronica Bonilla-Lopez of Del Galdo Law Group, LLC., and for her Answer and Affirmative Defenses to Plaintiffs' Second Amended Complaint, states as follows:

**I.
INTRODUCTION**

1.    Plaintiffs filed this lawsuit in June 2021 to protect the fundamental rights of Illinois voters and to invalidate the map of Illinois Senate and House Districts in the legislative redistricting plan passed by the Illinois General Assembly on May 28, 2021 and signed by Governor Pritzker on June 4, 2021 (the "June Map"). Plaintiffs challenged the June Map on the

1

grounds that the map was drafted and passed before the Census Bureau released the official population counts from the 2020 census and the map is therefore malapportioned and fails to comply with the "one person, one vote" principle derived from the Equal Protection Clause.

**ANSWER: The Representative acknowledges that the General Assembly passed Illinois Public Act 102-0010 (the "June Map") and that the June Map was drafted and passed before the Census Bureau released the official population counts for the 2020 Census. Representative denies the remaining allegations in this Paragraph.**

2.      On August 12, 2021, the Census Bureau released the official 2020 census population counts, which prove the June Map is unconstitutionally malapportioned. The maximum population deviations in the June Map are nearly *three times* the 10% limit set by the Supreme Court and well outside the 16.4% level the Court has said "may well approach tolerable limits.

**ANSWER: The Representative admits the Census Bureau released the official 2020 census population counts on August 12, 2021. The Representative denies the remaining allegations in Paragraph 2 of the Complaint.**

3.      On August 19, 2021, Plaintiffs filed a Motion for Summary Judgment and supporting materials, which demonstrate that the June Map is invalid, unconstitutional, and void *ab initio* and establish that the Court should grant Plaintiffs' requested declaratory, injunctive, and prospective equitable relief.

**ANSWER: The Representative admits that Plaintiffs filed a Motion for Summary Judgment on August 19, 2021. Respondent denies the remaining allegations in this Paragraph 3 of the Complaint.**

4.      Because the June Map is invalid and void *ab initio*, no redistricting map became "effective" as of June 30, 2021. Therefore, under the Illinois Constitution, the authority for

drawing a new legislative map shifted for the remainder of this redistricting cycle from the General Assembly to a redistricting commission. The Speaker of the Illinois House and President of the Illinois Senate are required to appoint members to the commission. Plaintiffs Dan McConchie, the Minority Leader of the Senate, and Jim Durkin, the Minority Leader of the House, have appointed members to serve on the commission. However, Defendants Don Harmon, the President of the Senate, and Emanuel Christopher Welch, the Speaker of the House (collectively, the "Leadership Defendants"), have refused to appoint members to serve on the commission.

**ANSWER: The Representative denies the allegations, and the implications from such allegations, in Paragraph 4.**

5.      None of the Defendants contest the amount of population deviation in the June Map. Instead of attempting to defend the June Map, the Leadership Defendants reconvened the General Assembly for a special session on August 31, 2021. At that session, the General Assembly purported to pass, on a party-line vote, an additional redistricting plan with a new map of Senate and House Districts, which was later signed by Governor Pritzker on September 24, 2021 (the "September Map"). The General Assembly purported to pass the September Map despite the provision in the Illinois Constitution requiring that redistricting authority shift to a commission after June 30th.

**ANSWER: The Representative admits the General Assembly reconvened for a special session on August 31, 2021, passed Senate Bill 927 (the "September Map"), and Senate Bill 927 was signed by Governor Pritzker on September 24, 2021. The Representative denies the remaining allegations in Paragraph 5.**

6.      The process used to pass the September Map was even more rushed and exclusionary than the process used to pass the June Map. Drafts of the September Map were only made public on August 30, 2021 and a final version was not made public until just before it was passed by the General Assembly on the evening of August 31, 2021. Contrary to this Court's direction to the Leadership Defendants to "take into account the views of the Plaintiffs,"6 the General Assembly failed to work with Plaintiffs or community groups to draft the September Map, failed to take input and comment from Plaintiffs regarding the September Map, and held hearings before releasing any proposed maps, which prevented Plaintiffs and other interested parties from meaningfully reviewing and commenting on the September Map prior to its passage.

**ANSWER: The Representative admits that drafts of the September Map were made public on August 30, 2021, and August 31, 2021 and denies the remaining allegations in Paragraph 6.**

7.      Like the June Map, the September Map is also invalid, unconstitutional, and void *ab initio*. The September Map violates Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301 (the "VRA"), and the Equal Protection Clause of the Fourteenth Amendment by discriminating against and diluting the votes of Latino voters. Specifically, the September Map "packs" Latino voters into a particular House District and "cracks" other Latino communities to artificially limit the number of districts with an effective majority of Latino voters.

**ANSWER: The Representative denies the allegations, and the implications from such allegations, in Paragraph 7 of the Complaint.**

8.      Illinois added approximately 309,832 Latinos in the 2020 census, which is the largest population increase among racial or ethnic groups statewide. Latinos now comprise approximately 11.2% of the citizen voting age population ("CVAP") in Illinois. This percentage

(11.2%) would equate to 13 of the state's 118 House Districts.8 Under the September Map, however, there are only four House Districts with a 50%+ Latino CVAP. In contrast, as shown in the tables and map excerpts in the text below, a map could be drawn that includes at least nine compact House Districts with a 50%+ Latino CVAP while still providing for at least as many majority-Black districts as were included in the September Map.

**ANSWER: The Representative denies the allegations contained in Paragraph 8.**

9.      Latinos are entitled to protection under Section 2 of the VRA. Latino voters historically and consistently vote cohesively in the State of Illinois. Historically, elections in Illinois have been racially and ethnically polarized. The majority racial and ethnic population in Illinois, white non-Latinos, often vote sufficiently as a bloc that, in the absence of special circumstances or a large Latino voter population, the preferred candidates of Latino voters have been defeated.

**ANSWER: The Representative admits Latino voters vote cohesively in the State of Illinois, in that they are able to elect the Latino or non-Latino candidate of their choice. Representative denies the remaining allegations in Paragraph 9 of the Complaint.**

10.      The discrimination and dilution of voting power for Latino voters in the September Map is most evident in three specific geographic areas:

a.      **Southwest Chicago** – Across the entire state of Illinois, the September Map creates just four House Districts with a 50%+ Latino CVAP, which are House Districts 1, 2, 22, and 23, all located in Southwest Chicago and the adjoining southwest suburbs. However, the General Assembly could have drawn at least six compact majority Latino CVAP districts in Southwest Chicago.

Specifically, House District 23 is "packed" and gerrymandered to capture an excessive supermajority of Latino voters. House District 23 has a Latino CVAP of 71.05%. In addition, the Latino community is also "cracked" and separated among four additional House Districts in Southwest Chicago: 21 (areas of Berwyn, Cicero, North Riverside, Summit, Hodgkins, and McCook), 24 (parts of Chicago in the McKinley Park, Mount

Pleasant, Lower West Side, and Bridgeport neighborhoods), and 6 and 32 (parts of the Back of the Yards, Ashburn, and Clarksdale neighborhoods).

Thus, many Latino voters in House District 23 will see their votes wasted because the September Map makes those votes unnecessary to elect a candidate of their choice. At the same time, Latino voters in House Districts 21, 24, 6, and 32 will be prevented by their diminished numbers from having significant influence in choosing primary and general election candidates.

In contrast, as shown herein, a map could be naturally drawn with at least two additional Latino CVAP districts in Southwest Chicago, which combine excess Latino voters from the "packed" district with Latino voters from the "cracked" districts to better represent Latino voters in this area.

b.     **Northwest Chicago** – The September Map does not create any House Districts with a 50%+ Latino CVAP—or any other effective majority- Latino district—on Chicago's northwest side. Instead, Latino voters are "cracked" and separated into five separate House Districts, including House Districts 3, 4, 19, 39, and 40 (which include Latino communities in the Chicago neighborhoods of Avondale, Albany Park, Irving Park, Humboldt, Garfield Park, Hermosa, Belmont Park, and Portage Park, and Latino communities in the near-northwest suburbs of Elmwood Park, Franklin Park, Melrose Park, Northlake, Bensenville, and Addison).

Under the September Map, Latino voters in these House Districts will be prevented by their diminished numbers from having significant influence in choosing primary and general election candidates. Instead of separating Latino voters in these districts, a map could be naturally drawn with three compact majority Latino CVAP districts in Northwest Chicago, as compared to the zero majority Latino CVAP House Districts actually drawn in the area in the September Map.

c.     **Aurora** – The September Map also "cracks" and separates a large Latino community in the west suburbs of Chicago, concentrated in Aurora and West Chicago, among four separate House Districts, including House Districts 49, 50, 83, and 84. Instead of separating Latino voters in this community, a map could be naturally drawn with a compact House District with approximately 48% Latino CVAP in this area, which would be far more effective at providing Latino voters an opportunity to elect a candidate of their choice in both primary and general elections.

**ANSWER: The Representative denies the allegations contained in Paragraph 10 a-c of the Complaint.**

11.     A number of good government groups and community advocates have denounced the September Map for its discrimination against Latino voters and the dilution of their voting

power. On September 2, 2021, after the General Assembly passed the September Map, the Latino Policy Forum issued a press release urging Governor Pritzker to veto the map, which does "not equitably reflect the state's Latino community." As explained in the press release: Despite recent 2020 census data indicating that Illinois added 309,832 Latinos (the largest population increase among racial/ethnic groups statewide), no Latino majority districts were added in the maps passed by the general assembly. In fact, preliminary analysis and reports show that some Latino-majority districts are diluted even more, further hindering the community's ability to elect the representatives of their choice.

**ANSWER: The Representative admits that the Latino Policy Forum issued a press release on September 2, 2021, which speaks for itself. The Representative lacks information and belief to respond to and on that basis denies, the remaining allegations in Paragraph 11.**

12.    In addition to the problems with Latino districts, the September Map also discriminates against and dilutes the votes of Black voters. Black voters are entitled to protection under Section 2 of the VRA. Black voters historically and consistently vote cohesively in the State of Illinois. Historically, elections in Illinois have been racially and ethnically polarized. The majority racial and ethnic population in Illinois, white non-Latinos, often vote sufficiently as a bloc that, in the absence of special circumstances or a large Black voter population, the preferred candidates of Black voters have been defeated.

**ANSWER: The Representative admits Black voters historically and consistently vote cohesively in the State of Illinois, in that they are able to elect the Black or non-Black candidate of their choice. The Representative denies the remaining allegations in Paragraph 12.**

13.    There is a substantial, compact Black community in the East St. Louis area. The

September Map "cracks" and separates this community into two districts: House Districts 113 and 114. Thus, Black voters in these two districts will be prevented by their diminished numbers from having significant influence in choosing primary and general election candidates. Instead of separating Black voters in this area, a compact map naturally could be drawn with a 50%+ Black CVAP House District in this area.

**ANSWER: The Representative admits there is a Black community in the East St. Louis area. The Representative denies the remaining allegations in Paragraph 13.**

14.     The General Assembly has now twice attempted to rush through a redistricting plan without providing opportunities for Plaintiffs and other interested parties to review or provide meaningful input. In both attempts, the General Assembly drew maps that are invalid, unconstitutional, and void *ab initio*. In the second attempt, the General Assembly also acted *ultra vires* given that the redistricting authority had shifted to a commission after June 30th.

**ANSWER: The Representative denies the allegation, and implications from such allegations, in Paragraph 14.**

15.     Plaintiffs respectfully request that the Court grant the relief requested herein, including: (1) declaring that the June Map and September Map are invalid, unconstitutional, and void *ab initio*; (2) enjoining Defendants, including the members of the Illinois State Board of Elections, from enforcing or giving any effect to the June Map or the September Map, and enjoining any elections based on such maps, and (3) issuing prospective equitable relief, including ordering the Leadership Defendants to appoint members to a redistricting commission with authority to draft a valid legislative map, appointing a Special Master to draft a valid legislative map, or issuing any other appropriate relief that allows for the drafting of a valid legislative map.

**ANSWER: The allegations in Paragraph 15 are legal conclusions to which no response is required. To the extent that a response is required, the Representative denies the allegations, and implications from such allegations, in this Paragraph 15.**

## II.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1357.  Plaintiffs bring claims arising under the U.S. Constitution, 42 U.S.C. § 1983, and 52 U.S.C. § 10301 for violations of their civil rights and the elective franchise and claims under the federal Declaratory Judgment Act (28 U.S.C. §§ 2201, 2202).

**ANSWER: The Representative admits jurisdiction is proper but denies a violation of the U.S Constitution or of any violation of law.**

17.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because all Defendants reside in Illinois and because some Defendants reside in the Northern District of Illinois. By Illinois law, the Illinois State Board of Elections is required to maintain an office in the City of Chicago. Pursuant to that requirement, the Board of Elections maintains an office at 100 West Randolph Street, Suite 14-100, Chicago, Illinois, at which the members of the Board of Elections meet and conduct business. Illinois law also requires four members of the Board of Elections to be residents of Cook County.  In addition, Defendants Emanuel Christopher Welch and Don Harmon both reside in and maintain offices in the Northern District of Illinois.

**ANSWER: The Representative admits venue is proper.**

### III.
### PARTIES

A.      **Plaintiffs**

18.     Plaintiff DAN MCCONCHIE is a state senator from the 26th Senate District, a citizen of the United States and the State of Illinois, and a duly registered voter residing in Lake County, Illinois. Mr. McConchie is also the Minority Leader of the Illinois Senate, vested by Article IV, Section 6(c) of the Illinois Constitution with the duty to promote and express the views, ideas, and principles of the Senate Republican caucus in the 102nd General Assembly and of Republicans in every Senate District throughout the State of Illinois. Leader McConchie is also the leader of the Plaintiff Republican Caucus of the Illinois Senate, having been elected its leader pursuant to Article IV, Section 6(c) of the Illinois Constitution and Rule 2-3 of the Illinois Senate. Under the rules of the Illinois Senate and the customs and practices of the Plaintiff Republican Caucus of the Illinois Senate, Leader McConchie is charged with leading and representing the Plaintiff Republican Caucus of the Illinois Senate. Leader McConchie is named as a Plaintiff in his official capacity as Minority Leader of the Illinois Senate and individually as a registered voter. Under the June Map, Leader McConchie would vote in and represent the 26th Senate District, which contains 2,733 persons more than the ideal district and 19,982 persons more (9.99% more) than the least-populated Senate District in the June Map. Accordingly, under the June Map, Leader McConchie has suffered and is suffering concrete and particularized injuries through the dilution of his voting power.

**ANSWER: The Representative admits Plaintiff McConchie is a State Senator from the 26th Senate District and is the Minority Leader of the Illinois Senate. The Representative lacks knowledge or information to form a belief about the truth of the remaining allegations regarding Plaintiff McConchie. The Representative denies the remaining allegations in Paragraph 18.**

19.     Plaintiff JIM DURKIN is a state representative from the 82nd House District, a

citizen of the United States and the State of Illinois, and a duly registered voter residing in Cook County, Illinois. Mr. Durkin is also the Minority Leader of the Illinois House of Representatives, vested by Article IV, Section 6(c) of the Illinois Constitution with the duty to promote and express the views, ideas, and principles of the House Minority Republican caucus in the 102nd General Assembly and of Republicans in every House District throughout Illinois. Leader Durkin is also the leader of the Plaintiff Republican Caucus of the Illinois House of Representatives, having been elected its leader pursuant to Article IV, Section 6(c) of the Illinois Constitution and Rule 2 of the Illinois House of Representatives. Under the rules of the Illinois House of Representatives and the rules of the Plaintiff Republican Caucus of the Illinois House of Representatives, Leader Durkin is charged with leading and representing the Plaintiff Republican Caucus of the Illinois House of Representatives. Leader Durkin is named as a Plaintiff in his official capacity as Minority Leader of the Illinois House of Representatives and individually as a registered voter. Under the June Map, Leader Durkin would vote in and represent the 82nd House District, which contains 1,210 persons more than the ideal district and 17,401 persons more (18.8% more) than the least-populated House District in the June Map. Accordingly, under the June Map, Leader Durkin has suffered and is suffering concrete and particularized injuries through the dilution of his voting power.

**ANSWER: The Representative acknowledges that Plaintiff Durkin is a state representative from the 82nd House District and the Minority Leader of the Illinois House of Representatives. The Representative lacks knowledge or information to form a belief about the truth of the remaining allegations regarding Plaintiff Durkin. The Representative denies the remaining allegations in Paragraph 19.**

20.     Plaintiff JAMES RIVERA is a Latino, a citizen, and a registered voter whose residence is located in House District 21 in the September Map. He is part of a Latino community

that is "cracked" and separated among several House Districts, including House District 21, and he is therefore injured by being prevented from having significant influence in choosing primary and general election candidates.

**ANSWER: The Representative lacks knowledge or information to form a belief about the truth of the allegations regarding Plaintiff Rivera. The Representative denies the remaining allegations in Paragraph 20.**

21.     Plaintiff ANNA DE LA TORRE is a Latina, a citizen, and a registered voter whose residence is located in House District 21 in the September Map. She is part of a Latino community that is "cracked" and separated among several House Districts, including House District 21, and she is therefore injured by being prevented from having significant influence in choosing primary and general election candidates.

**ANSWER: The Representative lacks knowledge or information to form a belief about the truth of the allegations regarding Plaintiff De La Torre. The Representative denies the remaining allegations in Paragraph 21.**

22.     Plaintiff DOLORES DIAZ is a Latina, a citizen, and a registered voter whose residence is located in House District 23 in the September Map. She is part of a Latino community that is "packed" into House District 23, and she is therefore injured by having her vote wasted because the September Map makes that vote unnecessary to elect a candidate of her choice.

**ANSWER: The Representative lacks knowledge or information to form a belief about the truth of the allegations regarding Plaintiff Diaz. The Representative denies the remaining allegations in Paragraph 22.**

23.     Plaintiff FELIPE LUNA JR. is a Latino, a citizen, and a registered voter whose residence is located in House District 24 in the September Map. He is part of a Latino community

that is "cracked" and separated among several House Districts, including House District 24, and he is therefore injured by being prevented from having significant influence in choosing primary and general election candidates.

**ANSWER: The Representative lacks knowledge or information to form a belief about the truth of the allegations regarding Plaintiff Luna. The Representative denies the remaining allegations in Paragraph 23.**

24.     Plaintiff SALVADOR TREMILLO is a Latino, a citizen, and a registered voter whose residence is located in House District 39 in the September Map. He is part of a Latino community that is "cracked" and separated among several House Districts, including House District 39, and he is therefore injured by being prevented from having significant influence in choosing primary and general election candidates.

**ANSWER: The Representative lacks knowledge or information to form a belief about the truth of the allegations regarding Plaintiff Tremillo. The Representative denies the remaining allegations in Paragraph 24.**

25.     Plaintiff CHRISTOPHER ROMERO is a Latino, a citizen, and a registered voter whose residence is located in House District 50 in the September Map. He is part of a Latino community that is "cracked" and separated among several House Districts, including House District 50, and he is therefore injured by being prevented from having significant influence in choosing primary and general election candidates.

**ANSWER: The Representative lacks knowledge or information to form a belief about the truth of the allegations regarding Plaintiff Romero. The Representative denies the remaining allegations in Paragraph 25.**

26.     Plaintiff REPUBLICAN CAUCUS OF THE ILLINOIS SENATE is an association consisting of 18 elected members of the Illinois Senate belonging to the Republican Party. The Republican Caucus of the Illinois Senate is comprised of members who reside and vote in various Senate Districts throughout the State of Illinois and represent their respective Senate Districts and constituent voters in the General Assembly. The Republican Caucus of the Illinois Senate operates pursuant to Illinois law and the Rules of the Illinois Senate, as well as its own adopted rules. The Republican Caucus of the Illinois Senate has an interest in fair and legal elections in Illinois and in ensuring the State of Illinois' compliance with all statutory and constitutional requirements for redrawing the Senate Districts in Illinois. The Republican Caucus of the Illinois Senate's interests include protecting the constitutional and other rights of its members and of the electorate of the State of Illinois by ensuring compliance with statutory and constitutional requirements in redrawing the Senate Districts. Under the June Map, eight members of the Republican Caucus of the Illinois Senate would vote in and represent Senate Districts that are overpopulated as compared to the ideal districts. In addition, under the June Map, each member of the Republican Caucus of the Illinois Senate would vote in and represent a Senate District that is more populated than the least-populated Senate District. Thus, each member of the Republican Caucus of the Illinois Senate is suffering and will continue to suffer injury as a result of the June Map.

**ANSWER: The Representative denies that each member of the Republican Caucus of the Illinois Senate would vote in and represent a Senate District that is more populated than the least-populated Senate District, and thus, each member of the Republican Caucus of the Illinois Senate is suffering and will continue to suffer injury as a result of the June Map. The Representative lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 26.**

14

27. Plaintiff REPUBLICAN CAUCUS OF THE ILLINOIS HOUSE OF REPRESENTATIVES is an association consisting of 45 elected members of the Illinois House of Representatives belonging to the Republican Party. The Republican Caucus of the Illinois House of Representatives is comprised of members who reside and vote in various House Districts throughout the State of Illinois and represent their respective House Districts and constituent voters in the General Assembly. The Republican Caucus of the Illinois House of Representatives operates pursuant to Illinois law and the Rules of the Illinois House of Representatives, as well as its own adopted rules. The Republican Caucus of the Illinois House of Representatives has an interest in fair and legal elections in Illinois and in ensuring the State of Illinois' compliance with all statutory and constitutional requirements for redrawing the House Districts in Illinois. The Republican Caucus of the Illinois House of Representatives' interests include protecting the constitutional and other rights of its members and of the electorate of the State of Illinois by ensuring compliance with statutory and constitutional requirements in redrawing the House Districts. Under the June Map, 22 members of the Republican Caucus of the Illinois House of Representatives would vote in and represent House Districts that are overpopulated as compared to the ideal districts. In addition, under the June Map, each member of the Republican Caucus of the Illinois House of Representatives would vote in and represent a House District that is more populated than the least-populated House District. Thus, each member of the Republican Caucus of the Illinois House of Representatives is suffering and will continue to suffer injury as a result of the June Map.

**ANSWER: The Representative denies Plaintiffs' allegations related to the June Map. The Representative lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 27.**

28. Plaintiff ILLINOIS REPUBLICAN PARTY is an established political party in the

State of Illinois, organized and existing under the election laws of the State of Illinois, 10 ILCS 5/1-1, *et seq.* The Illinois Republican Party is comprised of hundreds of thousands of members and voters who reside in every Senate District and House District in the State of Illinois. In accordance with such election laws, the Illinois Republican Party has party officials in every Illinois county, including committeemen elected or designated from counties, townships, wards, and precincts throughout Illinois. The Illinois Republican Party has an interest in fair and legal elections in Illinois and in ensuring the State of Illinois' compliance with all statutory and constitutional requirements for redrawing the Senate and House Districts in Illinois. The Illinois Republican Party's interests include protecting the constitutional and other rights of its members and of the electorate of the State of Illinois by ensuring compliance with statutory and constitutional requirements in redrawing the Senate and House Districts. The Illinois Republican Party has associational standing to represent its members in this lawsuit. The Illinois Republican Party's 2020 Platform emphasizes support for civil rights "for all people—regardless of race, color or creed into the future." The claims in this lawsuit are germane to this purpose.

**ANSWER:  The Representative acknowledges that Plaintiff Illinois Republican Party is an established pollical party in the State of Illinois. The Representative lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations, and therefore, denies the remaining allegations contained in Paragraph 28.**

**B.    Defendants**

29.    The Illinois State Board of Elections is the entity responsible for overseeing and regulating public elections in Illinois as provided by Article III, Section 5 of the Illinois Constitution and 10 ILCS 5/1A-1, *et seq.* The members of the Board undertake those acts and conduct business under color of state law. The Board consists of eight members. However, one of

the members of the Board, William R. Haine, passed away on August 16, 2021 and, upon information and belief, his seat on the Board has yet to be filled. The remaining seven members of the Board are named as Defendants in this action (collectively the "Board Members").

**ANSWER: The Representative admits the allegations contained in Paragraph 29.**

30.     Defendant IAN K. LINNABARY is the Chairman of the Illinois State Board of Elections. He is sued in his official capacity.

**ANSWER: The Representative admits the allegations contained in Paragraph 30.**

31.     Defendant CASANDRA B. WATSON is the Vice Chairman of the Illinois State Board of Elections. She is sued in her official capacity.

**ANSWER: The Representative admits the allegations contained in Paragraph 31.**

32.     Defendant WILLIAM J. CADIGAN is a member of the Illinois State Board of Elections. He is sued in his official capacity.

**ANSWER: The Representative admits the allegations contained in Paragraph 32.**

33.     Defendant LAURA K. DONAHUE is a member of the Illinois State Board of Elections. She is sued in her official capacity.

**ANSWER: The Representative admits the allegations contained in Paragraph 33.**

34.     Defendant CATHERINE S. MCCRORY is a member of the Illinois State Board of Elections. She is sued in her official capacity.

**ANSWER: The Representative admits the allegations contained in Paragraph 34.**

35.     Defendant WILLIAM M. MCGUFFAGE is a member of the Illinois State Board of Elections. He is sued in his official capacity.

**ANSWER: The Representative admits the allegations contained in Paragraph 35.**

36.     Defendant RICK S. TERVEN, SR. is a member of the Illinois State Board of Elections. He is sued in his official capacity.

**ANSWER: The Representative admits the allegations contained in Paragraph 36.**

37.     Defendant EMANUEL CHRISTOPHER WELCH is a state representative from the 7th House District. He is sued in his official capacity as Speaker of the Illinois House of Representatives.

**ANSWER: The Representative admits the allegations contained in Paragraph 37.**

38.     Defendant the OFFICE OF THE SPEAKER OF THE ILLINOIS HOUSE OF REPRESENTATIVES is the office of the presiding officer of the Illinois House of Representatives, as designated by Article IV, Section 6(b) of the Illinois Constitution.

**ANSWER: The Representative admits the allegations contained in Paragraph 38.**

39.     Defendant DON HARMON is a state senator from the 39th Senate District. He is sued in his official capacity as President of the Illinois Senate.

**ANSWER: The Representative admits the allegations contained in Paragraph 39.**

40.     Defendant OFFICE OF THE PRESIDENT OF THE ILLINOIS SENATE is the office of the presiding officer of the Illinois Senate, as designated by Article IV, Section 6(b) of the Illinois Constitution.

**ANSWER: The Representative admits the allegations contained in Paragraph 40.**

## IV.
## REQUEST FOR A THREE-JUDGE COURT

41.     Plaintiffs request a three-judge trial court pursuant to 28 U.S.C. § 2284(a) and Rule 9.1 of the Local Rules for the Northern District of Illinois because this action challenges the constitutionality of the apportionment of a statewide legislative body.

**ANSWER: The Representative does not contest a three-judge trial court.**

## V.
## BACKGROUND
### A. Legal Requirements for State Legislative Redistricting in Illinois and the Role of the State Board of Elections

42.     The Illinois Constitution requires that Illinois Senate and House Districts be redrawn in each year following a year in which the decennial census is conducted. Because the decennial census was conducted in 2020, legislative redistricting must occur in 2021.

**ANSWER: The Representative admits the allegations contained in Paragraph 42.**

43.     The Illinois Constitution entrusts the General Assembly to pass a redistricting plan in the first instance. However, if a valid plan does not "become[] effective" by June 30, 2021, responsibility for drafting a plan shifts from the General Assembly to a commission, which then has the sole authority to enact a plan for the current redistricting cycle. The President of the Senate, the Speaker of the House, and the Senate and House leaders of the minority party each must appoint two members to the commission, with a ninth member to be added if the commission is unable to agree on a redistricting plan.

**ANSWER: The Representative denies that the General Assembly has the sole authority to enact a plan for the current redistricting cycle, but otherwise admits the allegations in Paragraph 43.**

44.     The use of a commission in the legislative redistricting process has been the norm in Illinois. Since the latest version of the Illinois Constitution was adopted in 1970, five legislative redistricting plans have been enacted, but the General Assembly has directly approved a new plan only once—in 2011. Following each of the four decennial censuses before 2010 (i.e., 1970, 1980, 1990, and 2000), a commission was constituted to enact a plan.

**ANSWER: The Representative acknowledges that the latest version of the Illinois Constitution was adopted in 1970, that five legislative redistricting plans have been enacted, and the General Assembly approved a redistricting plan in 2011. The Representative denies the remaining allegations in this paragraph 44.**

45.     The Illinois State Board of Elections, acting through its individual Board Members, has "general supervision over the administration of the registration and election laws throughout the State." In accordance with that mandate, the Board of Elections is required to, among other things, "[d]isseminate information to and consult with election authorities concerning the conduct of elections and registration," furnish "a manual of uniform instructions . . . which shall be used by election authorities" throughout the state, prescribe "uniform forms, notices, and other supplies" to be used "in the conduct of elections and registrations," and "[r]eview and inspect procedures and records relating to conduct of elections and registration . . . and to report violations of election laws" to appropriate authorities.

**ANSWER: The Representative admits the allegations contained in Paragraph 45.**

46.     Under Illinois Public Act 102-15, effective as of June 17, 2021, established party candidates for the 2022 Illinois Senate and House elections will begin circulating petitions for nominations for the general primary election on January 13, 2022 and will file their nomination papers with the Board of Elections between March 7, 2022 and March 14, 2022. The Board of Elections will be required to certify the names of eligible candidates for the general primary election ballot by April 21, 2022. The general primary election will be held on June 28, 2022, and the general election will be held on November 8, 2022.

**ANSWER: The Representative admits the allegations contained in Paragraph 46.**

**B.     The Passage of the June Legislative Redistricting Map**

47.    Any state legislative redistricting plan must comply with the requirements of the U.S. Constitution, including the requirement that state legislative districts be drawn to include substantially equal populations, which is known as the "one person, one vote" principle deriving from the Equal Protection Clause of the Fourteenth Amendment.

**ANSWER: The allegations in Paragraph 47 are legal conclusions to which no response is required. To the extent that a response is required, the Representative denies the allegations, and implications from such allegations, in this paragraph 47.**

48.    To assist state officials in drawing legislative districts of substantially equal population, the U.S. Census Bureau is tasked with providing the states with the official census population counts within one year after the April 1st census date. This year, that date was April 1, 2021. However, the Census Bureau was delayed and did not release the official census counts to the states until August 12, 2021.

**ANSWER: The Representative admits the allegations contained in Paragraph 48.**

49.    Despite lacking the official population counts from the 2020 census, on May 28, 2021, the General Assembly passed, on a purely partisan roll call, a redistricting plan including the June Map of Senate and House Districts, which Governor Pritzker approved on June 4, 2021.

**ANSWER: The Representative acknowledges that the General Assembly passed a redistricting plan on May 28, 2021, which Governor Pritzker approved on June 4, 2021. The Representative denies the remaining allegations contained in this paragraph.**

50.    The legislation passed by the General Assembly acknowledges that the Census Bureau was delayed in providing the official population counts to the states for redistricting purposes. Instead of the official population counts, the General Assembly used population estimates derived from responses to the American Community Survey ("ACS") from 2015-2019

as the base population data for the June Map. Both the Illinois Senate and House resolutions state that the General Assembly used ACS population estimates, along with "election data" and "public input" to "establish the boundaries" in the June Map.

**ANSWER: The Representative admits the allegations contained in Paragraph 50.**

51.     While the Census Bureau conducts the ACS, the estimates from that survey are not intended to be, and are not, a proper substitute for the official census counts. Nor is it proper to use ACS estimates for redistricting. Indeed, the Census Bureau itself expressly warns that ACS estimates are not a viable alternative to the official census population counts and "should not be used as actual population counts or housing totals for the nation, states or counties."

**ANSWER:   The Representative denies the allegations, and implications from such allegations, in Paragraph 51.**

52.     The General Assembly did not establish any substantive legislative record to support the use of ACS estimates as the base population data for the June Map. In fact, in committee hearings and floor debates, the sponsors of the June Map professed to have *no* knowledge of precisely what data were used, how the data were manipulated to work for redistricting purposes, or even who drew the maps. During a legislative hearing on May 25, 2021, after the June Map was publicly unveiled but before its passage, Dr. Allan Lichtman, an expert retained by the Senate and House Democratic Caucuses, stated that he was not sure what data were used to draw the June Map and could not confirm whether ACS estimates were used. Dr. Lichtman stated that he did not participate in drawing the June Map and had not analyzed the June Map.

**ANSWER: The Representative acknowledges that Dr. Lichtman's testimony speaks for itself. Representative denies the remaining allegations in Paragraph 52.**

**C.     Plaintiffs File this Lawsuit Challenging the June Map**

53.    On June 9, 2021, days after Governor Pritzker signed the legislation including the June Map, Leaders McConchie and Durkin filed the initial Complaint in this lawsuit. In the Complaint, Plaintiffs explained that the Senate and House Districts in the June Map are malapportioned and do not have substantially equal populations, as required under the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs also explained that the passage of the June Map was both arbitrary and discriminatory in violation of the Equal Protection Clause.

**ANSWER: The Representative acknowledges that Plaintiffs filed the initial Complaint in this lawsuit on June 9, 2021. The Representative denies the remaining allegations in Paragraph 53.**

54.    On July 29, 2021, Plaintiffs filed their First Amended Complaint ("FAC") in this lawsuit, which added the Republican Caucuses of the Illinois Senate and House of Representatives and the Illinois Republican Party (collectively, the "Associational Plaintiffs") as Plaintiffs in this case. In the FAC, Plaintiffs challenged the June Map on the same grounds raised in the initial Complaint, asserted claims for violation of the Equal Protection Clause and for declaratory judgment, and asked the Court to award declaratory, injunctive, and prospective equitable relief.

**ANSWER: The Representative admits the allegations contains in Paragraph 54.**

55.    On August 12, 2021, the Census Bureau released the official 2020 census population counts.[48] Within an hour of the release of this data, Plaintiffs' expert, Dr. Jowei Chen, was able to analyze the data and calculate the populations of the Senate and House Districts in the in the June Map is **29.88%**. In addition, Dr. Chen determined that the maximum population deviation of the Senate Districts in the June Map is **20.25%**. The Leadership Defendants do not contest these numbers and concede that the June Map is "malapportioned" and thus "presumptively unconstitutional.

**ANSWER: The Representative acknowledges that the Census Bureau released the official 2020 census population counts on August 12, 2021. The Representative denies the remaining allegations contained in this paragraph.**

56.     On August 19, 2021, Plaintiffs filed a Motion for Summary Judgment ("MSJ"), Memorandum of Law ("MSJ Memo"), and Statement of Material Facts ("SOF"), which attached an affidavit from Dr. Chen ("Chen Aff."). In these filings, Plaintiffs explained that the maximum population deviations in the June Map far exceed the 10% threshold established by the Supreme Court and therefore the June Map is "presumptively impermissible," unconstitutional, and void *ab initio*. Plaintiffs asked the Court to enter judgment in their favor with respect to the two claims in the FAC and to award Plaintiffs their requested declaratory, injunctive, and equitable relief.

**ANSWER: The Representative acknowledges that Plaintiffs filed a Motion for Summary Judgment on August 19, 2021. The Representative denies the remaining allegations contained in this paragraph.**

**D.      The Passage of the September Redistricting Map**

57. On August 23, 2021, the Court held a hearing on several pending motions. At the hearing, counsel for the Leadership Defendants stated that, rather than attempting to defend the population deviations in the June Map, the General Assembly would instead be reconvened for a special session at which it would attempt to pass a new redistricting map. The Court "urg[ed] the General Assembly to take into account the views of the Plaintiffs in crafting any amended plan with the objective of presenting for the Court's consideration a plan that satisfies all constitutional and statutory obligations, not just those raised in the existing pleadings and motions. The Court reiterated these comments in a Minute Entry issued on the same day.

**ANSWER: The Representative acknowledges that the Court held a hearing on August 23, 2021, and the transcript of proceedings speaks for itself. The Representative denies the remaining allegations contained in this paragraph.**

58.     Because the June Map was invalid, unconstitutional, and void *ab initio*, there was no redistricting plan that became "effective" by June 30, 2021. Therefore, under the Illinois Constitution, after June 30, 2021, the authority for drafting a valid redistricting plan shifted from the General Assembly to a commission.  Leaders McConchie and Durkin have both appointed members to serve on the commission. However, the Leadership Defendants have refused to appoint their members so that the commission can begin the process of drafting a valid plan.

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 58.**

59.    Instead of appointing members to a commission, on August 31, 2021, the Leadership Defendants reconvened a special session of the General Assembly, which purported to pass legislation that includes the September Map of Senate and House Districts.

**ANSWER: The Representative acknowledges that a special session of the General Assembly was convened on August 31, 2021, and that legislation containing a redistricting plan was passed by the General Assembly. Representative denies the remaining allegations, and implications from such allegations, in Paragraph 59.**

60.    Contrary to the Court's instructions at the August 23, 2021 hearing and in the Minute Entry issued on the same date, the General Assembly did not "take into account the views of the Plaintiffs" in crafting the September Map. Instead, the General Assembly purported to pass the September Map through an even more rushed and exclusionary process than the passage of the

June Map. Drafts of the September Map were only made public on August 30, 2021 and a final version was not made public until just before it was passed by the General Assembly on the evening of August 31, 2021. In fact, the General Assembly failed to even produce the actual data for the September Map to anyone, including Republican legislators, until after the Illinois House of Representatives voted on and passed the September Map. The General Assembly failed to work with Plaintiffs, failed to take input and comment from Plaintiffs regarding the September Map, and held hearings before releasing any proposed maps, which prevented Plaintiffs and other interested parties, especially minorities, from reviewing and commenting on the September Map prior to its passage.

**ANSWER: The Representative admits drafts of the September Map were made public on August 30, 2021, and August 31, 2021. Representative denies the remaining allegations in Paragraph 60.**

61.     A number of good government groups, minority organizations, and community advocates have criticized this "rushed and exclusionary" redistricting process. The United Congress of Community and Religious Organizations ("UCCRO") and the Chicago Lawyers' Committee for Civil Rights jointly testified before the Illinois Senate and House Redistricting Committees on August 28, 2021, and expressed a number of serious concerns regarding the redistricting process, including:

a.     "There is no indication of whether the General Assembly's redrawn maps will protect the voting rights of communities of color. Communities of color have said loud and clear throughout these hearings that we are uncomfortable with this year's redistricting process, and we do not feel

reassured that our rights are being respected."

b.     "[I]t is unreasonable to ask communities to give input in a vacuum without the General Assembly sharing proposed maps and accompanying data. Furthermore, it needlessly pits our communities of color against each other when instead we could achieve solutions together."

c.    "Merely pointing to current incumbents of color is not enough reassurance that our communities' civil rights have been respected. . . .Without basic information about majority-minority districts        that are being drawn, we do not know if communities of color will be able to elect the candidates           of their choice in accordance with the law."

**ANSWER: The Representative admits the United Congress of Community and Religious Organizations ("UCCRO") and the Chicago Lawyers' Committee for Civil Rights jointly testified before the Illinois Senate and House Redistricting Committees on August 28, 2021, and the testimony speaks for itself.**

62.    Likewise, the Latino Policy Forum issued a press release on September 2, 2021 urging Governor Pritzker "to veto the Illinois legislative maps passed by legislators this week, which do not equitably reflect the state's Latino community. As explained in the press release, "[d]espite recent 2020 census data indicating that Illinois added 309,832 Latinos (the largest population increase among racial/ethnic groups statewide), no Latino-majority districts were added in the maps passed by the [G]eneral [A]ssembly. In fact, preliminary analysis and reports show that some Latino-majority districts are diluted even more, further hindering the community's ability to elect the representatives of their choice.

**ANSWER: The Representative admits that the Latino Policy Forum issued a press release on September 2, 2021, the content of which speaks for itself. The Representative denies or lacks information and belief to respond to and on that basis denies, the remaining allegations in Paragraph 62.**

63.    The legislation containing the September Map did not purport to repeal the June Map, but instead included a paragraph stating that the boundaries in the September Map "shall be construed to take precedence over any conflict of law in accordance with the Statute on Statutes.

Thus, if this Court finds that the September Map is invalid, as Plaintiffs contend, then the June Map will not be superseded, and the Board Members will have a statutory duty to conduct elections using the malapportioned districts in the June Map.

**ANSWER: The allegations in Paragraph 63 assert a legal conclusion for which no answer is required. To the extent that a response is required, the Representative denies the allegations, and implications from such allegations, in this paragraph.**

64.     Governor Pritzker signed the legislation containing the September Map on September 24, 2021.

**ANSWER: The Representative admits the allegations in Paragraph 64.**

E.     **The September Map Disenfranchises Latino Voters by "Packing" Such Voters into A Particular House District and "Cracking" and Separating Voters in Other Districts**

65.     Illinois added approximately 309,832 Latinos in the 2020 census, which is the largest population increase among racial or ethnic groups statewide. Latino voters comprise approximately 11.2% of the CVAP in Illinois. Proportionally, this percentage (11.2%) equates to 13 of the state's 118 House Districts.

**ANSWER: Representative admits that Illinois added approximately 309,823 Latinos according to the 2020 Census, and denies the remaining allegations in Paragraph 65.**

66.     The September Map passed by the General Assembly purports to create a number of Latino "influence" districts. There are 13 total House Districts in the September Map with a total Latino population of more than 50%, but only four of those districts have a 50%+ Latino CVAP. The other Latino "influence" districts do not provide Latino voters with an effective opportunity to elect the candidates of their choice. In contrast, the General Assembly could have

28

drawn a map that includes at least nine compact House Districts with a 50%+ Latino CVAP while still providing for at least as many majority-Black districts as the September Map.

**ANSWER: Representative admits that the September Map includes 13 House Districts in the September Map with a total Latino population of more than 50%. The Representative denies the remaining allegations in Paragraph 66.**

67.     The September Map "packs" Latino voters into a particular House District and "cracks" other Latino communities to artificially limit the number of districts with a majority of Latino voters.

**ANSWER: The Representative denies the allegations contained in Paragraph 67.**

68.     Latino voters historically and consistently vote cohesively in the State of Illinois. Historically, elections in Illinois have been racially and ethnically polarized.

**ANSWER: The Representative admits Latino voters historically and consistently vote cohesively in the State of Illinois, in that they are able to elect the Latino or non-Latino candidate of their choice. Representative denies the remaining allegations in Paragraph 68.**

69.     The majority racial and ethnic population in Illinois, white non-Latinos, often vote sufficiently as a bloc that, in the absence of special circumstances or a large Latino voter population, the preferred candidates of Latino voters have been defeated.

**ANSWER: The Representative denies the allegations contained in Paragraph 69.**

70.     The discrimination against Latino voters and dilution of their voting power in the September Map is most evident in three specific geographic areas: (1) Southwest Chicago, (2) Northwest Chicago, and (3) Aurora. Each area is discussed in turn below.

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 70.**

1.      **Southwest Chicago**

71.      The September Map creates just four House Districts with a 50%+ Latino CVAP. Those four districts are House Districts 1, 2, 22, and 23, all located in Southwest Chicago. The percentages of total Latino population, Latino voting population, and Latino CVAP in these four districts are reflected in the table below.

**Table 1 (House Districts in Southwest Chicago with 50%+ Latino CVAP in the September Map)**

| District | Total Latino Population | Latino Voting Age Population | Latino CVAP |
|---|---|---|---|
| House District 1 | 78.90% | 75.95% | 64.63% |
| House District 2 | 68.34% | 64.57% | 55.20% |
| House District 22 | 67.15% | 62.79% | 52.62% |
| House District 23 | 86.58% | 84.44% | 71.05% |

**ANSWER: The Representative denies the allegations contained in Paragraph 71 and Table 1.**

72.      House District 23 is "packed" and gerrymandered to capture an unnecessarily excessive supermajority of Latino voters. The Latino CVAP is 71.05% in House District 23. By packing Latino voters into this district, the September Map unnecessarily "wastes" the votes of many Latino voters.

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 72.**

73.      Instead of "packing" Latino voters into House District 23, a map could be drawn with at least two additional compact majority Latino CVAP districts by rejoining areas with Latino

voters from the "packed" House District 23 with voters from the Latino communities into non-Latino majority CVAP House Districts 21 (including areas of Berwyn, Cicero, North Riverside, Summit, Hodgkins, and McCook), 24 (including parts of Chicago in the McKinley Park, Mount Pleasant, Lower West Side, and Bridgeport neighborhoods), and 6 and 32 (including parts of the Back of the Yards, Ashburn, and Clarksdale neighborhoods). The percentages of total Latino population, Latino voting population, and Latino CVAP in these four districts are reflected in the table below.

**Table 2 (Certain House Districts in Southwest Chicago with Under 50% Latino CVAP in the September Map)**

| District | Total Latino Population | Latino Voting Age Population | Latino CVAP |
|---|---|---|---|
| House District 6 | 30.01% | 26.19% | 13.81% |
| House District 21 | 55.72% | 51.85% | 42.58% |
| House District 24 | 51.41% | 48.50% | 43.68% |
| House District 32 | 34.44% | 31.17% | 19.18% |

**ANSWER: The Representative denies the allegations in Paragraph 73 and Table 2.**

74.      Latino voters in these four House Districts are being deprived of their rights and having their voting power diluted because they live outside of effective majority-Latino House Districts but could live within a compact majority-Latino House District.

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 74.**

75.      The boundaries of these House Districts in the September Map looks like the following (Map 1), which includes only four 50%+ Latino CVAP House Districts (1, 2, 22, and 23). For all maps included in this filing, green shading reflects areas of Latino population and blue shading reflects areas of Black population.

(Map 1 Omitted)

**ANSWER: The Representative lacks knowledge or information sufficient to form a belief about the truth of the allegations and, therefore, denies the allegations contained in Paragraph 75.**

76.     In contrast to the September Map, a map could be drawn with at least six compact majority Latino CVAP districts in the Southwest Chicago area, such as the proposed alternative map excerpt of the area shown below (Map 2):

(Map 2 Omitted)

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 76.**

77.     Indeed, the six majority Latino CVAP districts in the map excerpt above (Map 2) are actually ***more compact*** than the four districts in the September Map (Map 1), which further

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 77.**

78.     Because the September Map "packs" Latino voters into House District 23 and "cracks" and separates Latino voters in House Districts 6, 21, 24, and 32, the September Map violates the Equal Protection Clause and Section 2 of the VRA. Thus, Latino voters who live and vote in these House Districts are injured by the September Map, including Plaintiffs James Rivera, Anna De La Torre, Dolores Diaz, and Felipe Luna Jr.

**ANSWER: The allegations in Paragraph 78 are legal conclusions to which no response is required. To the extent that a response is required, the Representative denies the allegations, and implications from such allegations, in this paragraph.**

    **2.     Northwest Chicago**

79.     The September Map does not create any House Districts with a 50%+ Latino CVAP

on Chicago's northwest side. Instead, Latino voters are "cracked" and separated into a number of non-Latino majority CVAP districts in this area, including House Districts 3, 4, 19, 39, and 40 (which include Latino communities in the Chicago neighborhoods of Avondale, Albany Park, Irving Park, Humboldt, Garfield Park, Hermosa, Belmont Park, and Portage Park, and Latino communities in the near-northwest suburbs of Elmwood Park, Franklin Park, Melrose Park, Northlake, Bensenville, and Addison).

**ANSWER: The Representative denies the allegations contained in Paragraph 79.**

80.     None of these five House Districts have a 50%+ Latino CVAP. The percentages of\ total Latino population, Latino voting population, and Latino CVAP in these five districts are reflected in the table below.

**Table 3 (Certain House Districts in Northwest Chicago with Under 50% Latino CVAP in the September Map)**

| District | Total Latino Population | Latino Voting Age Population | Latino CVAP |
|---|---|---|---|
| House District 3 | 58.78% | 54.98% | 47.54% |
| House District 4 | 56.06% | 52.65% | 45.19% |
| House District 19 | 29.85% | 27.32% | 23.93% |
| House District 39 | 54.50% | 50.78% | 45.61% |
| House District 40 | 45.63% | 42.76% | 34.54% |

**ANSWER: The Representative denies the allegations contained in Paragraph 80 and Table 3.**

81.     In the June Map, House District 3 actually had a Latino CVAP of 54.3%.[77] However, in the September Map, the Latino CVAP was reduced to under 50%, which further demonstrates that the September Map intentionally and unreasonably discriminates against and dilutes the votes of Latino voters.

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 81.**

82.     The boundaries of these five House Districts in the September Map are reflected in the map excerpt below (Map 3):

(Map 3 Omitted)

**ANSWER: The Representative lacks knowledge or information sufficient to form a belief about the truth of the allegations and, therefore, denies the allegations contained in Paragraph 82.**

83.     Instead of separating Latino voters in these districts, a map could be drawn with three compact majority Latino CVAP districts by rejoining Latino communities from these districts. A proposed alternative map of this area is shown below (Map 4):

(Map 4 Omitted)

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 83.**

84.     House District 39 is a particularly notable example of the discriminatory effects of the September Map. That district has a total Latino population of 54.50%, but a Latino CVAP of only 45.61%. The House Resolution regarding the June Map stated, with respect to House District 39, that "[t]he residence of the incumbent was a factor in adjustments to this district, as well as the ability to increase the partisan advantage.

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 84.**

85.     The incumbent representative for House District 39 is non-Latino white: Will Guzzardi, who lives in and represents the Logan Square neighborhood of Chicago. The area is

overwhelmingly Democratic, so there is no need to "increase the partisan advantage." Indeed, Representative Guzzardi has run unopposed in both the primary and general elections since he was first elected in 2014. Representative Guzzardi first ran for election in 2012 and narrowly lost by 125 votes in the Democratic primary to a Latina incumbent, Maria Antonia Berrios. Guzzardi ran again and defeated Representative Berrios in the 2014 Democratic primary.

**ANSWER: The Representative admits the allegations regarding Representative Will Guzzardi. The Representative denies the remaining allegations in Paragraph 85.**

86.     In 2011, the General Assembly claimed that House District 39 had a Latino voting age population of 55.06%. According to the data released by the House Democrats in August 2021, the new House District 39 in the September Map has a Latino voting age population of only 50.78%. Thus, the adjustments to House District 39 have the effect of protecting a non-Latino incumbent and depriving Latino voters in the area of the ability to elect a Latino representative.

**ANSWER: The Representative admits that House Resolution 385 of the 97th General Assembly claimed that House District 39 had a Latino voting age population of 55.06%. Representative denies the remaining allegations in Paragraph 86.**

87.     Because the September Map "cracks" and separates Latino voters into non-Latino majority CVAP House Districts 3, 4, 19, 39, and 40, the September Map violates the Equal Protection Clause and Section 2 of the VRA. Thus, Latino voters who live and vote in these House Districts are injured by the September Map, including Plaintiff Salvador Tremillo.

**ANSWER: The allegations in Paragraph 87 are legal conclusions to which no response is required. To the extent that a response is required, the Representative denies the allegations, and implications from such allegations, in this paragraph.**

### 3. Aurora

88.     The September Map also "cracks" and separates a large Latino community in the west suburbs of Chicago, concentrated in Aurora and West Chicago, among House Districts 49, 50, 83, and 84. The percentages of total Latino population, Latino voting population, and Latino CVAP in these four districts are reflected in the table below.

**Table 4 (Certain House Districts in Aurora area with Under 50% Latino CVAP in the September Map)**

| District | Total Latino Population | Latino Voting Age Polpulation | Latino CVAP |
|---|---|---|---|
| House District 49 | 27.03% | 23.85% | 16.26% |
| Houser District 50 | 53.20% | 48.78% | 36.74 |
| House District 83 | 23.54% | 20.63% | 14.20% |
| House District 84 | 20.68% | 18.69% | 15.31% |

**ANSWER: The Representative denies the allegations in Paragraph 88 and Table 4.**

89.     The boundaries of these four House Districts in the September Map are reflected in the map excerpt below (Map 5):

(Map 5 Omitted)

**ANSWER: The Representative lacks knowledge or information sufficient to form a belief about the truth of the allegations and, therefore, denies the allegations contained in Paragraph 89.**

90.     Instead of separating Latino voters in these districts, a map could naturally be drawn with a compact district with approximately 48% Latino CVAP by rejoining the Latino communities from this area, which would be far more effective at providing Latino voters an opportunity to elect a candidate of their choice in both primary and general elections. A proposed alternative map of this area is shown below (Map 6):

(Map 6 Omitted)

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 90.**

91.     Because the September Map "cracks" and separates Latino voters in House Districts 49, 50, 83, and 84, the September Map violates the Equal Protection Clause and Section 2 of the VRA. Thus, Latino voters who live and vote in these House Districts are injured by the September Map, including Plaintiff Christopher Romero.

**ANSWER: The allegations in Paragraph 91 are legal conclusions to which no response is required. To the extent that a response is required, the Representative denies the allegations, and implications from such allegations, in this paragraph.**

**F.    The September Map Disenfranchises Black Voters by "Cracking" and Separating Voters Certain House Districts**

92.     In addition to the problems with Latino districts, the September Map also discriminates against and dilutes the votes of Black voters. Specifically, there is a substantial, compact Black community in the East St. Louis area, which could form a compact 50%+ Black CVAP House District. Instead, the September Map "cracks" and separates this community into two non-Black majority CVAP districts: House Districts 113 and 114. The percentages of total Black population, Black voting population, and Black CVAP in these two districts are reflected in the table below.

**Table 5 (Certain House Districts in the East St. Louis area with Under 50% Black CVAP in the September Map)**

| District | Total Black Population | Black Voting Age Population | Black CVAP |
|---|---|---|---|
| House District 113 | 31.50% | 29.56% | 26.17% |
| House District 114 | 34.65% | 33.41% | 38.19% |

**ANSWER: The Representative denies the allegations in Paragraph 92 and Table 5.**

93.     The boundaries of these two House Districts in the September Map are reflected in the map excerpt below (Map 7):

(Map 7 Omitted)

**ANSWER: The Representative lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations and, therefore, denies the allegations contained in Paragraph 93.**

94.     Instead of separating Black voters in these districts, a map could be drawn with an additional majority Black CVAP district by combining areas with Black communities from these two districts. A proposed alternative map of this area is shown below (Map 8):

(Map 8 Omitted)

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 94.**

95.     Because the September Map "cracks" and separates Black voters in House Districts 113 and 114, the September Map violates the Equal Protection Clause and Section 2 of the VRA.

**ANSWER: The allegations in Paragraph 95 are legal conclusions to which no response is required. To the extent that a response is required, the Representative denies the allegations, and implications from such allegations, in this paragraph 95.**

## VI.
## CAUSES OF ACTION

### COUNT I
### (Violation of the Equal Protection Clause, actionable under 42 U.S.C. § 1983, with respect to the June Map)

96.     Plaintiffs re-allege the facts set forth in the paragraphs above as if set forth herein.

**ANSWER: The Representative repeats and re-alleges her answers to Paragraphs 1 through 95 as if fully set forth herein as her answer to Paragraph 96.**

97.     The Equal Protection Clause in the Fourteenth Amendment to the U.S. Constitution requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis and that states must draw legislative districts with substantially equal populations.

**ANSWER: The allegations in Paragraph 97 comprise legal conclusions to which no response is required. To the extent that a response is required, the Representative denies the allegations, and implications from such allegations, in this paragraph.**

98.     Under this requirement, any plan that results in a greater-than-10% population deviation between the largest and smallest legislative districts is "presumptively impermissible. Even if the plan results in a smaller maximum population deviation, the plan will still be held invalid if the districts are drawn using arbitrary or discriminatory criteria.

**ANSWER: The allegations in Paragraph 98 comprise legal conclusions to which no response is required. To the extent that a response is required, the Representative denies the allegations, and implications from such allegations, in this paragraph.**

99.      The maximum population deviation of the House Districts in the June Map is 29.88%, and the maximum population deviation of the Senate Districts in the June Map is 20.25%. Therefore, the maximum population deviations in the June Map are far above the 10% threshold set by the U.S. Supreme Court. Accordingly, the June Map is therefore "presumptively impermissible" and violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. The June Map is therefore invalid, unconstitutional, and void *ab initio*.

**ANSWER: The allegations in Paragraph 99 comprise legal conclusions to which no response is required. To the extent that a response is required, the Representative denies the allegations, and implications from such allegations, in this paragraph.**

100.    In addition, the June Map also violates the Equal Protection Clause of the Fourteenth Amendment because the choice to use ACS estimates as the base population data is both arbitrary and discriminatory. ***First***, the June Map is arbitrary because, among other things, the General Assembly did not provide any explanation for why the five-year 2015-2019 ACS estimates were determined to be the best available population data or why the General Assembly chose to pass an invalid redistricting map rather than deferring to a commission to pass a map using the official census population counts, as required under the Illinois Constitution. ***Second***, the June Map is discriminatory because the use of ACS estimates results in greater undercounts of minority populations, and thereby ensures that historically undercounted minority communities will continue to be underrepresented and lose their right to an equal vote in the legislature.

**ANSWER: The allegations in Paragraph 100 comprise legal conclusions to which no response is required. To the extent that a response is required, the Representative denies the allegations, and implications from such allegations, in this paragraph.**

101.    The dispute regarding the June Map is not moot because the legislation that\ contained the September Map did not purport to repeal the June Map. Instead, the legislation included a paragraph stating that the boundaries in the September Map "shall be construed to take precedence over any conflict of law in accordance with the Statute on Statutes." Thus, if this Court finds that the September Map is invalid, as Plaintiffs contend, then the June Map will not be superseded, and the Board Members will have a statutory duty to conduct elections using the malapportioned districts in the June Map.

**ANSWER: The allegations in Paragraph 101 comprise legal conclusions to which no response is required. To the extent that a response is required, the Representative denies the allegations, and implications from such allegations, in this paragraph 101.**

## COUNT II
### (Federal Declaratory Judgment Claim, 28 U.S.C. §§ 2201, 2202, with respect to the June Map)

102.     Plaintiffs re-allege the facts set forth in the paragraphs above as if set forth herein.

**ANSWER: The Representative repeats and re-alleges her answers to Paragraphs 1 through 101 as if fully set forth herein as her answer to this paragraph 102.**

103.     Despite lacking the official population counts from the census, the General Assembly passed the June Map on May 28, 2021, and Governor Pritzker signed the legislation containing the June Map on June 4, 2021.

**ANSWER: In response to the allegations in Paragraph 103, the Representative acknowledges that the General Assembly passed the June Map on May 28, 2021, and Governor Pritzker signed the June Map on June 4, 2021. T h e  Representative denies the remaining allegations contained in this paragraph.**

104.     An actual controversy exists between Plaintiffs and Defendants regarding whether the June Map is invalid, unconstitutional, and void *ab initio* and whether the June Map complies with the "one person, one vote" principle derived from the Equal Protection Clause in the Fourteenth Amendment to the U.S. Constitution.

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 104.**

105.     An actual controversy exists between Plaintiffs and the Leadership Defendants regarding whether the Leadership Defendants should be required to appoint members to a

legislative commission with the responsibility for enacting a redistricting plan pursuant to the procedures set forth in Article IV, Section 3 of the Illinois Constitution.

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 105.**

106.    An actual controversy exists between Plaintiffs and the Board Members regarding whether the Board Members may enforce the June Map or conduct any elections based on the June Map. Under Illinois law, the Board Members are required to conduct elections pursuant to the Illinois statutes during the upcoming election cycle, which begins in January 2022, only four months from now.

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 106.**

107.    Accordingly, Plaintiffs respectfully request that the Court grant declaratory relief under the Declaratory Judgment Act and declare the June Map invalid, unconstitutional, and void *ab initio* and that Defendants may not enforce or give any effect to the June Map, including conducting any elections with respect to the districts contained in the June Map.

**ANSWER: The Representative denies that Plaintiffs are entitled to any relief.**

108.    The dispute regarding the June Map is not moot because the legislation that contained the September Map did not purport to repeal the June Map. Instead, the legislation included a paragraph stating that the boundaries in the September Map "shall be construed to take precedence over any conflict of law in accordance with the Statute on Statutes." Thus, if this Court finds that the September Map is invalid, as Plaintiffs contend, then the June Map will not be superseded, and the Board Members will have a statutory duty to conduct elections using the malapportioned districts in the June Map.

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 108.**

## COUNT III

### (Federal Declaratory Judgment Claim, 28 U.S.C. §§ 2201, 2202, with respect to the September Map)

109.    Plaintiffs re-allege the facts set forth in the paragraphs above as if set forth herein.

**ANSWER: The Representative repeats and re-alleges her responses to Paragraphs 1 through 108 as if fully set forth herein as her answer to Paragraph 109.**

110.    The Illinois Constitution entrusts the General Assembly to pass a redistricting plan in the first instance.93 However, if a valid plan does not "become[] effective" by June 30th of the year following each year in which the decennial census is conducted (in this instance, June 30, 2021), then responsibility for drafting a plan shifts for the remainder of the current redistricting cycle from the General Assembly to a commission.94 The President of the Senate, the Speaker of the House, and the Senate and House leaders of the minority party each must appoint two members to the commission, with a ninth member to be added if the commission is unable to agree on a redistricting plan.

**ANSWER: The Representative admits that the General Assembly is entrusted with passing a redistricting plan by June 30th of the year following each year in which the decennial census is conducted. The Representative denies the remaining allegations contained in this paragraph.**

111.    The use of a commission in the legislative redistricting process has been the norm in Illinois. Since the latest version of the Illinois Constitution was adopted in 1970, five legislative redistricting plans have been enacted, but the General Assembly has directly approved a new plan only once—in 2011. Following each of the four decennial censuses before 2010 (i.e., 1970, 1980,

1990, and 2000), a commission was constituted to enact a plan.

**ANSWER: The Representative acknowledges that the latest version of the Illinois Constitution was adopted in 1970, that five legislative redistricting plans have been enacted, and the General Assembly approved a redistricting plan in 2011. Representative denies the remaining allegations in this paragraph.**

112.    Because the June Map is invalid and void *ab initio*, no redistricting map became "effective" as of June 30, 2021. Therefore, under the Illinois Constitution, the authority for drawing a new legislative map shifted for the remainder of this redistricting cycle from the General Assembly to a redistricting commission.

**ANSWER: The Representative denies the allegations, and implications from such allegations, in paragraph 112.**

113.    Leaders McConchie and Durkin have appointed members to serve on the commission. However, the Leadership Defendants have refused to make their selections of members to serve on the commission. Instead of appointing members to a commission, as required by the Illinois Constitution, on August 31, 2021, the Leadership Defendants reconvened the General Assembly for a special session, at which the General Assembly purported to pass legislation that includes the September Map of Senate and House Districts.

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 113.**

114.    Because the General Assembly did not have authority to pass a redistricting plan after June 30, 2021, the September Map is invalid and void *ab initio*.

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 114.**

115.    An actual controversy exists between Plaintiffs and the Leadership Defendants regarding whether the September Map is invalid and void *ab initio* and whether the Leadership Defendants should be required to appoint members to a commission with the responsibility for enacting a valid redistricting plan pursuant to the procedures set forth in Article IV, Section 3 of the Illinois Constitution.

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 115.**

116.    Accordingly, Plaintiffs respectfully request that the Court grant declaratory relief under the Declaratory Judgment Act and declare that the September Map is invalid and void *ab initio* and that the Leadership Defendants should be required to appoint members to a commission with the responsibility for enacting a valid redistricting plan.

**ANSWER: The Representative denies that Plaintiffs are entitled to any relief.**

### COUNT IV
### (Violation of Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, with respect to the September Map)

117.    Plaintiffs re-allege the facts set forth in the paragraphs above as if set forth herein.

**ANSWER:   The Representative repeats and re-alleges her responses to Paragraphs 1 through 116 as if fully set forth herein as her answer to this paragraph 117.**

118.    The September Map denies and abridges the rights of Latino voters to vote on the basis of their race. The September Map intentionally dilutes the votes of Latino voters by "packing" an excessive supermajority of Latino voters in a particular House District and "cracking" or separating other Latino communities to artificially limit the number of districts with a majority of Latino voters.

45

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 118.**

119.     Latino voters historically and consistently vote cohesively in the State of Illinois. Historically, elections in Illinois have been racially and ethnically polarized.

**ANSWER: The Representative admits Latino voters historically and consistently vote cohesively in theState of Illinois, in that they are able to elect the Latino or non-Latino candidate of their choice. Representative denies the remaining allegations in Paragraph 119.**

120.     The majority racial and ethnic population in Illinois, white non-Latinos, often vote sufficiently as a bloc that, in the absence of special circumstances or a large Latino voter population, the preferred candidates of Latino voters have been defeated.

**ANSWER: The Representative denies the allegations contained in Paragraph 120**.

121.     The discrimination against Latino voters and dilution of their voting power in the September Map is most evident in three specific geographic areas:

a.     **Southwest Chicago** – The September Map "packs" a Latino supermajority in House District 23 and "cracks" and separates Latino communities into non-Latino majority CVAP House Districts 21, 24, 6, and 32. Thus, many Latino voters in House District 23, including Plaintiff Dolores Diaz, will see their votes "wasted" because the September Map intentionally makes those votes unnecessary to elect a candidate of their choice. At the same time, Latino voters in House Districts 21, 24, 6, and 32, including Plaintiffs James Rivera, Anna De La Torre, and Felipe Luna Jr., will be prevented by their intentionally diminished numbers from having any significant influence in choosing primary and general election candidates.

b.     **Northwest Chicago** – The September Map "cracks" and separates Latino communities into non-Latino majority CVAP House Districts 3, 4, 19, 39, and 40. Latino voters in these House Districts, including Plaintiff Salvador Tremillo, will be prevented by their intentionally diminished numbers from having any significant influence in choosing primary and general election candidates.

c.     **Aurora** – The September Map "cracks" and separates Latino communities into House Districts 49, 50, 83, and 84. Latino voters in these House Districts, including Plaintiff Christopher Romero, will be prevented by their intentionally diminished numbers from having any significant influence in choosing primary and general election candidates.

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 121 a-c of the Complaint.**

122.     As shown in the tables and map excerpts in the text above, a map could be drawn that includes at least nine compact House Districts with a 50%+ Latino CVAP while still providing for at least as many majority-Black districts as the September Map.

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 122.**

123.     As a result, the September Map denies or abridges the right of Latino voters in the above-referenced House Districts to vote, on account of their race or color, and affords such voters less opportunities than other members of the electorate to participate in the political process and to elect representatives of their choice.

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 123.**

124.     Accordingly, the September Map violates Section 2 of the VRA, 52 U.S.C. § 10301.

**ANSWER: The allegations in Paragraph 124 are legal conclusions to which no response is required. To the extent that a response is required, the Representative denies the allegations, and implications from such allegations, in this paragraph.**

**COUNT V**
**(Violation of Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, with respect to the September Map)**

125.     Plaintiffs re-allege the facts set forth in the paragraphs above as if set forth herein.

**ANSWER: The Representative repeats and re-alleges her responses to Paragraphs 1 through 124 as if fully set forth herein.**

47

126.     In addition to the problems with Latino districts, the September Map also discriminates and dilutes the votes of Black voters. Specifically, there is a substantial, compact Black community in the East St. Louis area, which could form a compact 50%+ Black CVAP House District. Instead, the September Map "cracks" and separates this community into two non-Black majority districts: House Districts 113 and 114.

**ANSWER: The Representative admits there is a Black community in the East St. Louis area. The Representative denies the remaining allegations, and implications from such allegations, in Paragraph 126.**

127.     Under the September Map, Black voters in House Districts 113 and 114 will be prevented by their intentionally diminished numbers from having any significant influence in choosing primary and general election candidates of their choice.

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 127.**

128.     Black voters historically and consistently vote cohesively in the State of Illinois. Historically, elections in Illinois have been racially and ethnically polarized.

**ANSWER: The Representative lacks knowledge or information sufficient to form a belief about the truth of the allegations and, therefore, denies the allegations contained in Paragraph 128.**

129.     The majority racial and ethnic population in Illinois, white non-Latinos, often vote sufficiently as a bloc that, in the absence of special circumstances or a large Black voter population, the preferred candidates of Black voters have been defeated.

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 129.**

130.     As a result, the September Map denies or abridges the right of Black voters in Hous Districts 113 and 114 to vote, on account of their race or color, and affords such voters less opportunities than other members of the electorate to participate in the political process and to elect representatives of their choice.

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 130.**

131.     Accordingly, the September Map violates Section 2 of the VRA, 52 U.S.C. § 10301.

**ANSWER: The allegations in Paragraph 131 are legal conclusions to which no response is required. To the extent that a response is required, the Representative denies the allegations, and implications from such allegations, in this paragraph 131.**

### COUNT VI
**(Violation of the Equal Protection Clause, actionable under 42 U.S.C. § 1983, with respect to the September Map)**

132.     Plaintiffs re-allege the facts set forth in the paragraphs above as if set forth herein.

**ANSWER: The Representative repeats and re-alleges her responses to Paragraphs 1 through 131 as if fully set forth herein as her answer to this paragraph 132.**

133.     The September Map intentionally discriminates against Latino voters on the basis of their race. The September Map intentionally dilutes the votes of Latino voters by: (1) "packing" an excessive supermajority of Latino voters into House District 23, and (2) "cracking" and separating Latino communities into non-Latino majority CVAP House Districts 3, 4, 6, 19, 21, 24, 32, 39, 40, 49, 50, 83, and 84.

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 133.**

134.    Thus, many Latino voters in House District 23 will see their votes wasted because the September Map intentionally makes those votes unnecessary to elect a candidate of their choice. At the same time, many Latino voters into non-Latino majority CVAP House Districts 3, 4, 6, 19, 21, 24, 32, 39, 40, 49, 50, 83, and 84 will be prevented by their intentionally diminished numbers from having any significant influence in choosing primary and general election candidates.

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 134.**

135.    As a result, the September Map intentionally treats Latino voters in these House Districts differently and worse than it treats similarly situated voters who are not Latino, based upon the race of the affected voters.

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 135.**

136.    Accordingly, the September Map violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, made actionable in this suit by 42 U.S.C. § 1983.

**ANSWER: The allegations in Paragraph 136 are legal conclusions to which no response is required. To the extent that a response is required, the Representative denies the allegations, and implications from such allegations, in this paragraph.**

**COUNT VII**
**(Violation of the Equal Protection Clause, actionable under 42 U.S.C. § 1983, with respect to the September Map)**

137.    Plaintiffs re-allege the facts set forth in the paragraphs above as if set forth herein.

**ANSWER: The Representative repeats and re-alleges her responses to Paragraphs 1 through 136 as if fully set forth herein as her answer to Paragraph 137.**

138.    The September Map intentionally discriminates against Black voters on the basis of their race. The September Map intentionally dilutes the votes of Black voters by "cracking" and separating Black communities in House Districts 113 and 114.

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 138.**

139.    Thus, many Black voters in non-Black majority House Districts 113 and 114 will be prevented by their intentionally diminished numbers from having any significant influence in choosing primary and general election candidates.

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 139.**

140.    As a result, the September Map intentionally treats Black voters in these House Districts differently and worse than it treats similarly situated voters who are not Black, based upon the race of the affected voters.

**ANSWER: The Representative denies the allegations, and implications from such allegations, in Paragraph 140.**

141.    Accordingly, the September Map violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, made actionable in this suit by 42 U.S.C. § 1983.

**ANSWER: The allegations in Paragraph 141 are legal conclusions to which no response is required. To the extent that a response is required, the Representative denies the allegations, and implications from such allegations, in this paragraph.**

## DEFENDANT-INTERVENOR'S AFFIRMATIVE DEFENSES

Defendant-Intervenor for her affirmative defenses, states as follows:

## FIRST AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because they do not have standing to bring the causes of action in the Second Amended Complaint.

## SECOND AFFIRMATIVE DEFENSE

The September Map was signed into law by Governor Pritzker on September 24, 2021. The September Map supersedes the June Map. As a result, the June Map will never be used for any election. All of Plaintiffs' claims related to the June Map are therefore moot.

Respectfully Submitted,

By:     */s/ Veronica Bonilla-Lopez*
         Veronica Bonilla-Lopez
         *One of the Petitioner- Defendant's Attorneys*

Veronica Bonilla-Lopez (ARDC# 6281050)
Tiffany Nelson-Jaworski (ARDC #6278126)
DEL GALDO LAW GROUP, LLC
1441 S. Harlem Ave.
Berwyn, IL 60402
vblopez@dlglawgroup.com
jaworski@dlglawgroup.com
(708) 222-7000/ (708) 222-7001 Fax