# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| DAN MCCONCHIE, in his official capacity as Minority Leader of the Illinois Senate and individually as a registered voter, JIM DURKIN, in his official capacity as Minority Leader of the Illinois House of Representatives and individually as a registered voter, JAMES RIVERA, ANNA DE LA TORRE, DOLORES DIAZ, FELIPE LUNA JR., SALVADOR TREMILLO, CHRISTOPHER ROMERO, the REPUBLICAN CAUCUS OF THE ILLINOIS SENATE, the REPUBLICAN CAUCUS OF THE ILLINOIS HOUSE OF REPRESENTATIVES, and the ILLINOIS REPUBLICAN PARTY,<br><br>        Plaintiffs,<br><br>  vs.<br><br>IAN K. LINNABARY, CASANDRA B. WATSON, WILLIAM J. CADIGAN, LAURA K. DONAHUE, CATHERINE S. MCCRORY, WILLIAM M. MCGUFFAGE, and RICK S. TERVEN, SR., in their official capacities as members of the Illinois State Board of Elections, EMANUEL CHRISTOPHER WELCH, in his official capacity as Speaker of the Illinois House of Representatives, the OFFICE OF SPEAKER OF THE ILLINOIS HOUSE OF REPRESENTATIVES, DON HARMON, in his official capacity as President of the Illinois Senate, and the OFFICE OF THE PRESIDENT OF THE ILLINOIS SENATE,<br><br>        Defendants. | Case No. 1:21-cv-03091<br><br>Circuit Judge Michael B. Brennan<br>Chief District Judge Jon E. DeGuilio<br>District Judge Robert M. Dow, Jr.<br><br>Three-Judge Court<br>Pursuant to 28 U.S.C. § 2284(a) |

## PLAINTIFFS' BRIEF IN SUPPORT OF THEIR
## REMEDIAL LEGISLATIVE REDISTRICTING MAP

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 4

I.     THE SEPTEMBER MAP VIOLATES SECTION 2 OF THE VRA. .............................. 4

     A.    The three *Gingles* factors are satisfied with respect to the September Map. ......... 5

          1.    Minority populations in Illinois are sufficiently large and compact to constitute majorities in single-member districts (*Gingles* Factor 1). ..................................................................................................... 6

          2.    Minority populations in Illinois are politically cohesive (*Gingles* Factor 2). ............................................................................................... 8

          3.    The majority population in Illinois votes sufficiently as a bloc to usually defeat the minority's preferred candidates (*Gingles* Factor 3). ................................................................................................... 10

     B.    Under the totality of the circumstances, the September Map violates Section 2 of the VRA. ..................................................................................... 12

          1.    The extent of racially polarized voting in Illinois is significant (Senate Factor 2). ................................................................................. 14

          2.    In Illinois, a 50%+ minority CVAP is generally necessary for a minority candidate to win election in a district (Senate Factor 7). .......... 15

          3.    Minority voters have suffered past discrimination (Senate Factor 1). ...................................................................................................... 17

          4.    Minority voters continue to bear the effects of such discrimination (Senate Factor 5). ....................................................................... 18

II.    THE COURT SHOULD ADOPT PLAINTIFFS' REMEDIAL MAP. ......................... 19

     A.    Northern Cook County ...................................................................................... 21

     B.    Southern Cook County ..................................................................................... 26

     C.    Aurora .............................................................................................................. 31

     D.    Metro East ....................................................................................................... 36

CONCLUSION .................................................................................................... 39

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barnett v. City of Chicago*,
  141 F.3d 699 (7th Cir. 1998) ......................................................................2

*Bartlett v. Strickland*,
  556 U.S. 1 (2009)..................................................................................4, 6

*Baten v. McMaster*,
  967 F.3d 345 (4th Cir. 2020) ...................................................................12

*Bone Shirt v. Hazeltine*,
  461 F.3d 1011 (8th Cir. 2006) ..................................................................17

*Brnovich v. Democratic Nat'l Comm.*,
  ---U.S. ---, 141 S. Ct. 2321 (2021)..........................................................4, 5

*Buckanaga v. Sisseton Indep. Sch. Dist., No. 54-5*,
  804 F.2d 469 (8th Cir. 1986) ...................................................................15

*Cano v. Davis*,
  211 F. Supp. 2d 1208 (C.D. Cal. 2002) .......................................................2

*Georgia State Conference of NAACP v. Fayette Cnty. Bd. of Com'rs*,
  950 F. Supp. 2d 1294 (N.D. Ga. 2013), *aff'd in part, vacated in part, and
  remanded by* 775 F.3d 1336 (11th Cir. 2015).........................................14

*Harvell v. Blytheville Sch. Dist. No. 5*,
  71 F.3d 1382 (8th Cir. 1995) ...................................................................15

*Holloway v. City of Virginia Beach*,
  No. 2:18-cv-69, 2021 WL 1226554 (E.D. Va. Mar. 31, 2021)....................... *passim*

*Jenkins v. Red Clay Consol. School Dist. Bd. of Educ.*,
  4 F.3d 1103 (3d Cir. 1993).......................................................................12

*Missouri State Conference of the NAACP v. Ferguson-Florissant School Dist.*,
  201 F. Supp. 3d 1006 (E.D. Mo. 2016)......................................................15

*Montes v. City of Yakima*,
  40 F. Supp. 3d 1377 (E.D. Wash. 2014).................................................14, 15

*Ohio A. Philip Randolph Institute v. Householder*,
  373 F. Supp. 3d 978 (S.D. Ohio 2019) .......................................................7

## TABLE OF AUTHORITIES
continued

Page(s)

*Old Person v. Cooney*,
 230 F.3d 1113 (9th Cir. 2000) ...............................................................................10

*Perez v. Pasadena Indep. Sch. Dist.*,
 165 F.3d 368 (5th Cir. 1999) ...................................................................................6

*Pope v. Cnty. of Albany*,
 94 F. Supp. 3d 302 (N.D.N.Y. 2015)......................................................................17

*Rodriguez v. Harris Cnty., Tex.*,
 964 F. Supp. 2d 686 (S.D. Tex. 2013) ...................................................................17

*Ruiz v. City of Santa Maria*,
 160 F.3d 543 (9th Cir. 1998) .................................................................................10

*Thornburg v. Gingles*,
 478 U.S. 30 (1986)............................................................................... *passim*

**Statutes**

52 U.S.C. § 10301............................................................................................. *passim*

**Other Authorities**

Ill. Const. 1970, art. IV, § 2(b)...............................................................................3

S. Rep. No. 97-417 at 28-29, U.S.C.C.A.N. 177, 206-07 ...........................................13

## INTRODUCTION

On October 19, 2021, this Court held that the legislative redistricting map passed by the Illinois General Assembly and signed by Governor Pritzker in June 2021 (the "June Map") is "unconstitutionally malapportioned." Memorandum Opinion and Order ("Order") [Dkt. No. 131] at 38. The Court enjoined enforcement of the June Map and moved this case to a remedial phase, in which the Court will adopt a new map of Illinois "legislative districts for the next decade." *Id.* at 40. The Court stated that it would consider the map passed at a special session of the General Assembly and signed by Governor Pritzker in September 2021 (the "September Map") as a "starting point." *Id.* at 38. However, the Court also invited Plaintiffs to submit their own remedial map for the Court's consideration. *Id.* at 43.

Like the June Map, the General Assembly's September Map also is constitutionally invalid and should not be adopted by the Court. The September Map violates Section 2 of the Voting Rights Act of 1965 (the "VRA") by diluting the votes of minority citizens and by preventing such citizens from participating equally in the political process and having an opportunity to elect candidates of their choice. Among other problems with the September Map, the drafters committed a fundamental error by falsely assuming there is no racially polarized voting in Illinois and failing to properly consider race and ethnicity when drawing the districts in the map as required by the VRA. At a joint hearing of the Illinois Senate and House on May 25, 2021, Dr. Allan Lichtman, the expert hired by the Senate and House, testified regarding "the diminution of racially polarized voting in the State of Illinois":

> . . . there is no longer white/black voting that usually defeats the candidate of choice of minority voters, except, you know, in a very few overwhelmingly white districts and white areas that really [you] can't do anything about it.[1]

---

[1]     Transcript of Joint Committee Redistricting Hearing (May 25, 2021), at p. 25 (https://ilga.gov/senate/committees/Redistricting/102Redistricting/SRED/20210525%200400pm/

To the contrary, as shown below and in the attached expert reports and materials, when applying citizen voting age population ("CVAP"), there is significant racial polarization with respect to voting in Illinois. The Seventh Circuit has held that CVAP is the appropriate measure to use in analyzing claims under Section 2 of the VRA. *See Barnett v. City of Chicago*, 141 F.3d 699, 704 (7th Cir. 1998) ("citizen voting-age population is the basis for determining equality of voting power that best comports with the policy of [the VRA]"); *see also Cano v. Davis*, 211 F. Supp. 2d 1208, 1233 (C.D. Cal. 2002) ("The Ninth Circuit, along with every other circuit to consider the issue, has held that CVAP is the appropriate measure to use in determining whether an additional effective majority-minority district can be created."). As also shown in the attached expert reports, legislative districts with 50% or more minority CVAP are effective at providing minorities with an opportunity to elect the candidates of their choice.

The invalidity of the September Map is confirmed by the applicable test under Section 2 of the VRA. ***First***, the map satisfies all three of the prerequisite factors for invalidating a map as identified by the Supreme Court in *Thornburg v. Gingles*: (1) the minority groups at issue are "sufficiently large and geographically compact to constitute a majority in a single-member district," (2) the minority groups are "politically cohesive"; and (3) the majority votes "sufficiently as a bloc" such that it can "usually [] defeat the minority's preferred candidate." 478 U.S. 30, 44 (1986). ***Second***, the totality of the circumstances, including an analysis of the relevant "Senate Factors," demonstrates that the map impermissibly denies minorities equal participation in the political process and the ability to elect candidates of their choice. *Id.* at 45. Thus, the General Assembly's September Map violates Section 2 of the VRA and should not be adopted by the Court.

---

Transcript/Transcript%20for%20Joint%20Hearing%20of%20Senate%20Redistricting%20Committee%20and%20House%20Redistricting%20Committee%20-%20May%2025,%202021.pdf).

In contrast to the September Map, Plaintiffs are submitting a Remedial Map that appropriately accounts for racially polarized voting in Illinois, complies with the VRA, and provides minorities with an opportunity to participate in the political process and elect candidates of their choice. *See* Remedial Map, attached as Exhibit A hereto.[2]  Importantly, the Remedial Map accomplishes these constitutionally-mandated requirements while still following the Court's guidance to use the September Map as a "starting point" and giving deference to as many of the policy decisions of, and boundaries chosen by, the General Assembly as possible.  Indeed, the vast majority of the boundaries in the September Map—87 of the 118 House Districts—are not impacted by the changes in Plaintiffs' Remedial Map.  Nonetheless, the Remedial Map increases the number of effective minority-majority districts in four distinct regions:

- **Northern Cook County**.  The Remedial Map includes four House Districts with 50%+ Latino CVAP in Northern Cook County (House Districts 3, 4, 39, and 77), as opposed to zero such districts in this area in the September Map.  The Northern Cook County House Districts in the Remedial Map are also more compact than those in the September Map.

- **Southern Cook County**.  The Remedial Map includes seven House Districts with 50%+ Latino CVAP in Southern Cook County (House Districts 1, 2, 21, 22, 23, 24, and 32), as opposed to only four 50%+ Latino CVAP House Districts in the September Map.  The Southern Cook County House Districts in the Remedial Map are also more compact than those in the September Map.

- **Aurora**.  The Remedial Map includes a House District with over 65% total Latino population and 60% Latino voting-age population (House District 50).  Although the district is slightly less than 50% Latino CVAP, the district would provide Latino voters an opportunity to elect candidates of their choice.  The compactness of the Aurora-area House District in the Remedial Map (House District 50) is comparable to the average compactness scores of the districts in the September Map.

---

[2]  Page A1 of Exhibit A shows Plaintiffs' full Remedial Map of all Illinois House Districts. Under the Illinois Constitution, each Senate District is made up of two combined House Districts. Ill. Const. 1970, art. IV, § 2(b).  Page A2 provides a clearer view of the northeastern region of the Remedial Map, which includes both the Cook County and Aurora areas.  Page A3 provides a clearer view of the Metro East region of the Remedial Map.

- **Metro East**. The Remedial Map includes a 50%+ Black CVAP House District in this area (House District 114). In contrast, the September Map cracks the Black population in this area among three separate House Districts. The Metro East House Districts in the Remedial Map are also more compact than those in the September Map.

Description of Plaintiffs' proposed Remedial Map in each of these four regions and visual depictions of the maps are set forth in detail below at pages 19-39. For the reasons explained below, the Court should enter an order adopting Plaintiffs' Remedial Map as the effective map of Illinois legislative districts for the next decade. The Court can enter the order based on the record before it once briefing has been completed, but to the extent the Court has any remaining questions, Plaintiffs suggest that the Court may hold an evidentiary hearing or oral argument.

## ARGUMENT

The General Assembly's September Map violates Section 2 of the VRA by diluting the votes of minority citizens. In contrast, Plaintiffs' Remedial Map corrects the constitutional defects with the September Map, complies with the VRA, and provides minority citizens with an opportunity to participate in the political process and to elect candidates of their choice, all while paying deference to as many of the policy decisions and boundaries drawn by the General Assembly as possible. The Court should therefore adopt the Remedial Map as the map of Illinois legislative districts for the next decade.

## I. The September Map Violates Section 2 of the VRA.

"Congress enacted the landmark" VRA in an effort to enforce the protections of the Fifteenth Amendment and bring about "an end to the denial of the right to vote based on race." *Brnovich v. Democratic Nat'l Comm.*, ---U.S. ---, 141 S. Ct. 2321, 2330 (2021). Passage of the VRA "was an important step in the struggle to end discriminatory treatment of minorities who seek to exercise one of the most fundamental rights of our citizens: the right to vote." *Bartlett v. Strickland*, 556 U.S. 1, 10 (2009). Section 2 of the VRA, as amended, prohibits any "State or

4

political subdivision" from imposing or applying any "voting qualification or prerequisite to voting or standard, practice, or procedure" in a manner which "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).

> A violation of [Section 2 of the VRA] is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of [a racial group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C. § 10301(b).

The question posed by a Section 2 claim is whether, as a result of the challenged practice or structure, members of a protected class "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Brnovich*, 141 S. Ct. at 2332 (citing 52 U.S.C. § 10301(b)). The Supreme Court has set forth a framework for evaluating a Section 2 claim. **First**, a court examines whether the three threshold "*Gingles* factors" are satisfied. *Id.* at 2333. **Second**, the court will examine the totality of the circumstances, including certain non-comprehensive and non-exclusive "Senate Factors." *Id.* As shown below, all three of the *Gingles* factors are met and the totality of the circumstances demonstrates that the September Map violates Section 2 of the VRA.

### A. The three *Gingles* factors are satisfied with respect to the September Map.

The Supreme Court's decision in *Gingles* set forth three threshold conditions for establishing a violation of Section 2 of the VRA: (1) the minority group at issue must be "sufficiently large and geographically compact to constitute a majority in a single-member district," (2) the minority group must be "politically cohesive"; and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 50-51. All three *Gingles* threshold factors are met with respect to the September Map.

1.    Minority populations in Illinois are sufficiently large and compact to constitute majorities in single-member districts (*Gingles* Factor 1).

"To satisfy the first *Gingles* precondition, a plaintiff must show that it is possible to draw an election district of an appropriate size and shape where the [CVAP] of the minority group exceeds 50% of the relevant population in the illustrative district." *Holloway v. City of Virginia Beach*, No. 2:18-cv-69, 2021 WL 1226554, at *24 (E.D. Va. Mar. 31, 2021) (citing *Bartlett*, 556 U.S. at 18; *Perez v. Pasadena Indep. Sch. Dist.*, 165 F.3d 368, 372 (5th Cir. 1999)). "This requirement ensures that the minority group will possess the potential to elect representatives of its choice" in an appropriately drawn district. *Id.* (citing *Gingles*, 478 U.S. at 50, n.17).

Plaintiffs' expert, Dr. Jowei Chen, analyzed the minority population sizes in the districts in Plaintiffs' Remedial Map and compared them to the minority population sizes in the districts in the September Map. *See* Expert Report of Dr. Jowei Chen, attached as Ex. B hereto ("Chen Report"). Dr. Chen's report demonstrates that the Remedial Map draws a number of additional districts with minority populations that are sufficiently large and compact to constitute majorities in the relevant districts. *Id.* ¶¶ 12-13, and Table 1. Specifically, Dr. Chen's analysis shows that Plaintiffs' Remedial Map includes:

- Four House Districts in Northern Cook County with a Latino voting-age population and Latino CVAP above 50% (House Districts 3, 4, 39, and 77).

- Seven House Districts in Southern Cook County with a Latino voting-age population and Latino CVAP above 50% (House Districts 1, 2, 21, 22, 23, 24, and 32).

- One House District in Aurora with a Latino voting-age population of 62% and a Latino CVAP of 46.8% (House District 50).

- One House District in Metro East with a Black voting-age population and Black CVAP above 50% (House District 114).

6

*Id.* at Table 1.  Accordingly, Dr. Chen's analysis demonstrates that the minority populations in these areas are "sufficiently large" to constitute majorities in their respective districts.  *See Holloway*, 2021 WL 1226554, at *24 (districts with greater than 50% minority CVAP satisfy the population size requirement of the first *Gingles* factor).

Dr. Chen also has analyzed the compactness of the districts in Plaintiffs' Remedial Map. *See* Chen Report ¶¶ 15-18, and Tables 3-4.  Dr. Chen utilized two common quantitative measures: the Polsby-Popper score and the Reock score.  *Id.* ¶¶ 15-16.  These "metrics measure compactness on a scale of zero through one; the closer to one, the more compact the district."  *Ohio A. Philip Randolph Institute v. Householder*, 373 F. Supp. 3d 978, 1047 (S.D. Ohio 2019), *vacated and remanded by Chabot v. Ohio A. Philip Randolph Institute*, 140 S. Ct. 102 (2019).  "The Polsby-Popper score is a perimeter score over area of a district—the ratio of the perimeter and the area of a district generates the score."  *Id.* (internal quotation marks omitted).  "The Reock score is a ratio of an area for a circle drawn around the district."  *Id.* (internal quotation marks omitted).

Dr. Chen's report compares the compactness of the districts in Plaintiffs' Remedial Map with the districts in the September Map.  *See* Chen Report ¶¶ 19-24, and Figures 1-6.  The figures in Dr. Chen's report demonstrate that every single one of the twelve Cook County districts in the Plaintiffs' Remedial Map is more geographically compact than the least-compact district in the September Map.  *Id.* ¶ 23, and Figures 1-2.  The compactness of the Aurora-area House District in the Remedial Map (House District 50) is comparable to the average compactness scores of the districts in the September Map.  *Id.* ¶ 24, and Figures 3-4.  And the Metro East House District in the Remedial Map (House District 114) is more compact than the Metro East districts in the September Map.  *Id.* ¶ 24, and Figures 5-6.

Accordingly, Plaintiffs have shown that it is possible to draw additional minority-majority districts that are compact. *See, e.g.*, *Holloway*, 2021 WL 1226554, at *29 (finding that plaintiffs satisfied the first *Gingles* factor where the Polsby-Popper and Reock scores showed that the compactness between the current districts and proposed districts were virtually the same). Thus, there are minority populations in the relevant areas that are sufficiently large and compact as to constitute a majority in a district, and the first *Gingles* factor is satisfied.

       2.    <u>Minority populations in Illinois are politically cohesive (*Gingles* Factor 2).</u>

To satisfy the second *Gingles* factor, the minority group at issue must be "politically cohesive." *Gingles*, 478 U.S. at 51. This simply requires a showing that "a significant number of minority group members ***usually*** vote for the same candidates." *Id.* at 56 (emphasis added). Similarly, this factor can be established by showing "a consistent relationship between [the] race of the voter and the way in which the voter votes." *Id.* at 53, n.21.

As an initial matter, Defendants appear to concede that Plaintiffs have satisfied the second *Gingles* factor. In their Answer to the Second Amended Complaint, Defendants Emanuel Christopher Welch and Don Harmon, in their respective official capacities as Speaker of the House and President of the Senate (the "Leadership Defendants") concede that "Latino voters vote cohesively in the State of Illinois" and "Black voters historically and consistently vote cohesively in the State of Illinois." Answer [Dkt. No. 129], ¶¶ 9, 12, 68, 119.

Additionally, Plaintiffs' expert, Dr. Chen, analyzed election returns from recent elections for Latino-preferred candidates in Cook County and Aurora and election returns for Black-preferred candidates in Metro East. Chen Report ¶¶ 31-43. In his analysis, Dr. Chen used ecological inference ("EI"), a commonly-used and widely-accepted statistical technique for estimating different racial groups' political behavior. *Id.* ¶ 34; *see also Holloway*, 2021 WL

1226554, at *32 (explaining that EI "can be used to identify demographic and voting patterns to ascertain the Minority Community's preferred candidates").

Dr. Chen's analysis shows strong evidence of minority voter cohesion for Latino voters in Cook County and Aurora and for Black voters in Metro East. Certain illustrative examples include:

- **2015 runoff election for Mayor of Chicago**. Approximately 84% of Latino voters favored Jesus "Chuy" Garcia, as compared to only 28.8% of white voters.

- **2018 primary election for Cook County Assessor**. Approximately 63.2% of Latino voters favored Joseph Berrios, as compared to only 18.3% of white voters.

- **2014 primary election for House District 39**. Approximately 73.3% of Latino voters favored Toni Berrios, as compared to only 3.5% of white voters.

- **2016 and 2020 general elections for House District 114**. Approximately 83.9% and 98.7% of Black voters favored LaToya Greenwood in each election, as compared to only 30.1% and 25.8% of white voters in each election.

- **2018 general election for Senate District 57**. Approximately 97.6% of Black voters favored Christopher Belt, as compared to only 31.3% of white voters.

Chen Report ¶¶ 38-42, Tables 6-9.

In addition, another of Plaintiffs' experts, Dr. Anthony Fowler, analyzed election data and survey responses for prior statewide elections. Expert Report of Dr. Anthony Fowler, attached as Exhibit C hereto ("Fowler Report"), ¶¶ 6-16. Dr. Fowler's report concludes that there is significant racially polarized voting in Illinois and specifically finds significant differences in voting behavior between minority and white voters, which are even larger in Aurora and Metro East, as compared with the remainder of the state. *Id.* ¶¶ 13-16, and Table 2.

These analyses from Dr. Chen and Dr. Fowler establish that the Latino and Black communities vote cohesively in Illinois, as the Leadership Defendants concede. Answer ¶¶ 9, 12, 68, 119. The second *Gingles* factor is therefore satisfied. *See, e.g., Holloway*, 2021 WL 1226554, at *31-38 (finding second *Gingles* factor was satisfied through expert analysis, including EI analysis, of recent prior elections, showing cohesive minority voting for preferred candidates).

9

   3.   The majority population in Illinois votes sufficiently as a bloc to usually defeat the minority's preferred candidates (*Gingles* Factor 3).

To satisfy the third and final *Gingles* factor, there must be evidence that the majority votes "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50-51. The Supreme Court has acknowledged that "there is no simple doctrinal test for the existence of legally significant racial bloc voting." *Id.* at 58. Rather, "the degree of racial bloc voting that is cognizable as an element of a § 2 vote dilution claim will vary according to a variety of factual circumstances." *Id.* at 56-58. "[A] white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting." *Id.* at 56.

"Elections between white and minority candidates are the most probative in determining the existence of legally significant white bloc voting." *Old Person v. Cooney*, 230 F.3d 1113, 1123-24 (9th Cir. 2000). "The general reasoning behind this conclusion is that non-minority elections do not provide minority voters with the choice of a minority candidate and thus do not fully demonstrate the degree of racially polarized voting in the community." *Ruiz v. City of Santa Maria*, 160 F.3d 543, 552-53 (9th Cir. 1998).

Dr. Chen used EI to analyze election returns for Latino and white voters in recent Cook County elections. Chen Report ¶ 35, and Tables 6 and 7. Dr. Chen identified a number of elections in which minority candidates were defeated by majority white bloc voting:

- **2015 runoff election for Mayor of Chicago**. Although approximately 84% of Latino voters favored Latino candidate Chuy Garcia, white voters overwhelmingly favored Rahm Emanuel. White opposition to Garcia was sufficient to elect Emanuel, as Garcia received only 43.8% of the vote in the two-candidate runoff election.

- **2018 primary election for Cook County Assessor**. Although approximately 63.2% of Latino voters favored Latino candidate Joseph Berrios, white voters overwhelmingly favored Fritz Kaegi. White opposition to Berrios was sufficient to elect Kaegi, as Berrios received only 33.9% of the overall vote.

10

- **2014 primary election for House District 39**.  Although approximately 73.3% of Latino voters favored Latino candidate Toni Berrios, white voters overwhelmingly favored Will Guzzardi.  White opposition to Berrios was sufficient to elect Guzzardi, as Berrios received only 39.6% of the vote.

Chen Report ¶¶ 38-40, and Tables 6 and 7.

Also, the 2016 and 2020 general elections for House District 114 in Metro East demonstrate that white bloc voting could usually defeat the combined strength of minority support plus white crossover votes with a shift in the racial demographics of the district.  In those races, 69.9% and 74.2% of whites voted for the non-Black-preferred candidate.  Chen Report at Table 9.  The Black-preferred candidate eked out wins in the elections with 57.2% and 57.1%.  *Id.*  However, the Black VAP in House District 114 at the time was 42.04%.[3]  The picture has now drastically changed as the September Map dropped the Black VAP in House District 114 to 33.41 percent,[4] leaving the Black-preferred candidate susceptible to defeat by the white bloc in the district.

In addition, Dr. Fowler also analyzed the data on the race of electoral winners in Illinois state legislative elections between 2012 and 2020, focusing on districts which at least 15% of the CVAP is Black, Latino, or Asian.  Fowler Report ¶ 34.  Based on his analysis of these election returns, Dr. Fowler found that the relationship between a minority group's share of a district and the probability that a group member wins election is non-linear and the way in which districts are drawn can have large effects on minority representation.  *Id.* ¶¶ 36-37.  He also found that the likelihood that a district will elect a minority representative depends in large part on the proportion of minority citizens in that district.  *Id.* ¶¶ 37-38.  This analysis supports a finding that the majority population ***usually*** votes sufficiently as a bloc to defeat the minority's preferred candidates.  *See Holloway*, 2021 WL 1226554, at *39-40 (finding sufficient evidence of white bloc voting where

---

[3]     *See* 97th Ill. G.A., House Resolution 385, at p. 350, https://www.ilga.gov/legislation/97/HR/PDF/09700HR0385lv.pdf.

[4]     *See* https://ilhousedems.com/redistricting/wp-content/uploads/2021/08/House-data.pdf.

only 50% of minority-preferred candidates were successful and white voters generally could block minority-preferred candidates unless the white vote was split among several preferred candidates).

The analyses performed by Dr. Chen and Dr. Fowler demonstrate the majority population in Illinois typically votes sufficiently as a bloc to defeat the preferred minority candidate in Illinois generally and in Cook County, Aurora, and Metro East, in particular. Accordingly, all three *Gingles* prerequisite factors are satisfied, and the Court can therefore proceed to analyze whether the September Map violates Section 2 of the VRA under "the totality of the circumstances."

### B. Under the totality of the circumstances, the September Map violates Section 2 of the VRA.

Once a plaintiff has established the three *Gingles* factors, courts examine "the totality of the circumstances" to determine whether there has been a violation of Section 2 of the VRA. *Gingles*, 478 U.S. at 46. However, courts have recognized that "it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of the circumstances." *Jenkins v. Red Clay Consol. School Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993); *see also Baten v. McMaster*, 967 F.3d 345, 379 (4th Cir. 2020) (where "a plaintiff [has] established the *Gingles* prerequisites, that plaintiff is likely to succeed under the totality of the circumstances").

In examining the totality of the circumstances, courts consider both "past and present reality." *Gingles*, 478 U.S. at 45 (internal citations omitted). In particular, courts consider the factors set forth in the Senate Judiciary Committee Report accompanying the 1982 amendments to the VRA, which are known as the "Senate Factors." The typical factors relevant to the "totality of the circumstances" inquiry include:

1) the extent of any history of official discrimination in the state or political subdivision that touched the rights of the members of the Minority group to register, to vote, or otherwise to participate in the democratic process;

2)      the extent to which voting in the elections of the state or political subdivision is racially polarized

3)      the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4)      whether minority candidates have been denied access to any candidate-slating process;

5)      the extent to which minorities in the state or political subdivision bear the effects of discrimination in education, employment, and health, which hinder their ability to participate effectively in the political process;

6)      whether political campaigns have been characterized by overt or subtle racial appeals; and

7)      the extent to which minority group members have been elected to public office.

S. Rep. No. 97-417 at 28-29, U.S.C.C.A.N. 177, 206-07. The Senate Report also included two additional considerations that may have probative value:

8)      whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of members of the minority group;

9)      whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.* While the Senate Factors provide a framework for the analysis, they are "neither comprehensive nor exclusive." *Gingles*, 478 U.S. at 45. Accordingly, a court "may consider other facts" and "there is no requirement that any particular number of factors be proven, or that a majority of them point one way or the other." *Holloway*, 2021 WL 1226554, at *16. "In other words, the Court has broad discretion in examining factors it deems relevant to the inquiry of whether the . . . electoral system, socio-political and economic history, and/or political governance system result in voter dilution of minority groups." *Id.*

Nonetheless, in *Gingles*, the Supreme Court provided clear guidance as to the weight to be accorded to certain factors. The Court described "the most important Senate Report factors" as

Senate Factor 2 (the extent of racially polarized voting) and Senate Factor 7 (the extent to which minority group members have been elected). 478 U.S. at 48, n.15. While other factors might support a vote dilution challenge, they are "not essential to" such a claim. *Id.* "Indeed, courts have found vote dilution based solely on the existence of these two factors." *Georgia State Conference of NAACP v. Fayette Cnty. Bd. of Com'rs*, 950 F. Supp. 2d 1294, 1325 (N.D. Ga. 2013), *aff'd in part, vacated in part, and remanded by* 775 F.3d 1336 (11th Cir. 2015).

In this case, an analysis of the totality of the circumstances demonstrates that the September Map dilutes the voting power of Latino and Black citizens. At least four of the relevant Senate Factors, including the two most critical factors, weigh heavily in Plaintiffs' favor.

1. The extent of racially polarized voting in Illinois is significant (Senate Factor 2).

Senate Factor 2 is one of the two "most important" of the Senate Factors identified by the Supreme Court in *Gingles*. 478 U.S. at 48, n.15. "The concept of 'racially polarized voting' encompasses the second and third *Gingles* preconditions—whether the minority group votes cohesively and whether the majority votes sufficiently as a bloc to usually defeat the minority's preferred candidate." *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1410 (E.D. Wash. 2014).

As explained above at 8-12 with respect to the second and third *Gingles* threshold factors, there is significant racially polarized voting in Illinois. ***First***, the Latino populations in Cook County and Aurora and the Black populations in Metro East are politically cohesive because they consistently support the same minority-preferred candidates. *See, e.g.*, Chen Report ¶¶ 31-43, Tables 6-9; *see also* Answer ¶¶ 9, 12, 68, 119. ***Second***, the majority population in Illinois votes consistently in a bloc to defeat the minority's preferred candidates. *See, e.g.*, Chen Report ¶¶ 38-40; Fowler Report ¶¶ 34-41. Indeed, as Dr. Fowler notes, the extent of racially polarized voting in Illinois is significant and is likely understated by the available data. Fowler Report ¶¶ 6-23.

Accordingly, the second Senate Factor weighs strongly in Plaintiffs' favor. *See, e.g.*, *Holloway*, 2021 WL 1226554, at *44 (second Senate Factor weighed in plaintiffs' favor due to "evidence of racially polarized voting in the City's elections"); *Montes*, 40 F. Supp. 3d at 1410 (where Latino candidates were routinely defeated by bloc voting from non-Latino majority, Senate Factor 2 "weigh[ed] strongly in favor of a finding of vote dilution").

### 2. In Illinois, a 50%+ minority CVAP is generally necessary for a minority candidate to win election in a district (Senate Factor 7).

Senate Factor 7 "does not require the total absence of minority electoral success." *Missouri State Conference of the NAACP v. Ferguson-Florissant School Dist.*, 201 F. Supp. 3d 1006, 1064 (E.D. Mo. 2016). "In fact, even 'proportional or near proportional representation'" of a minority population "does not provide an absolute safe harbor in which a defendant can seek refuge from the totality of the circumstances." *Id.* (quoting *Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1388 (8th Cir. 1995)). "Instead, courts 'must conduct an 'independent consideration of the record' and a 'searching practical evaluation' of the circumstances surrounding minority electoral successes.'" *Id.* (quoting *Buckanaga v. Sisseton Indep. Sch. Dist., No. 54-5*, 804 F.2d 469, 476 (8th Cir. 1986)).

As explained above at 10-11 with respect to the third *Gingles* threshold factor, Dr. Chen used EI to analyze election returns for Latino and white voters in recent Cook County elections, and identified a number of elections in which minority candidates were defeated by majority white bloc voting, including (1) 2015 runoff election for Mayor of Chicago, (2) 2018 primary election for Cook County Assessor, and (3) 2014 primary election for House District 39. Chen Report ¶¶ 38-40. All of these examples demonstrate the challenges for minority candidates to win election.

Moreover, Dr. Fowler reviewed data on the race of electoral winners in Illinois state legislative elections between 2012 and 2020, focusing on districts for which at least 15% of the CVAP is Black, 15% is Latino, or 15% is Asian. Fowler Report ¶¶ 34-40. Dr. Fowler compared the elector results with the share of each district's minority CVAP and found that the probability that the electoral winner is from a minority group increases as the share of the district composed of that minority group increases. *Id.* ¶ 35. Moreover, Dr. Fowler concluded that the relationship between a group's share of a district and the probability that a group member wins the election is nonlinear. *Id.* ¶ 36. There is typically a weak relationship between demographics and descriptive representation when a group is a small minority of a district, but as the size of a group increases, the relationship becomes steeper. *Id.* And the relationship flattens out again at a certain point. *Id.*

Dr. Fowler concluded that the way in which districts are drawn can have large effects on minority representation. *Id.* ¶ 37. For example, a district that is 40% Black is predicted to have a 78% chance of electing a Black legislator. *Id.* But a district that is 20% Black is predicted to have a 15% chance of having a Black legislator. *Id.* Therefore, if a region is 20% Black and has the population for two districts, a map that places all Black citizens in one district will produce a black legislator 78% of the time, but a map that equally distributes black citizens between the two districts will produce at least one Black legislator only 28% of the time. *Id.*

Moreover, Dr. Fowler found that Latino districts are much less likely than a comparably Black district to elect a member of their group. *Id.* ¶ 38. A district that is 20% Latino is predicted to have a Latino winner just 6% of the time, and a district that is 40% Latino is predicted to have a Latino winner 45% of the time. *Id.* The nonlinear relationship between demographics and descriptive representation are such that districts that do not have a large share of Latino voters are very unlikely to see a Latino representative. *Id.*

16

Because minority candidates generally cannot be elected in Illinois outside of districts with a significant portion of minority voters, Senate Factor 7 is satisfied. *See Rodriguez v. Harris Cnty., Tex.*, 964 F. Supp. 2d 686, 787-797 (S.D. Tex. 2013) (comparing election results for Latino candidates in Latino majority districts and white majority districts and finding Senate Factor 7 was met because of the "long history of election failures" for Latino candidates in white districts); *Pope v. Cnty. of Albany*, 94 F. Supp. 3d 302, 346-47 (N.D.N.Y. 2015) (finding Senate Factor 7 weighed in favor of plaintiffs where minority candidates succeeded mainly in portions of the county where minorities made up a relatively high proportion of voters as compared to the county as a whole).

Accordingly, the two most predominant Senate Factors, factors 2 and 7, weigh in Plaintiffs' favor. Based on these two factors alone, the Court may find that the totality of the circumstances weigh in Plaintiffs' favor. *See, e.g.*, *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1022 (8th Cir. 2006) (totality-of-the-circumstances test satisfied simply through proof of racially polarized voting and absence of elected minorities). In any event, at least two additional factors weigh in Plaintiffs' favor and compel a finding that the September Map violates Section 2 of the VRA.

### 3. Minority voters have suffered past discrimination (Senate Factor 1).

Senate Factor 1 requires courts to examine the "extent of any history of official discrimination in the state or political subdivision that touched the rights of the member of the Minority group to register, to vote, or otherwise participate in the democratic process." *Gingles*, 478 U.S. at 44-45. In his report, Plaintiffs' expert, Dr. Charles Gallagher, explains that racial and ethnic minorities have been, and continue to be, subject to state sponsored discrimination in Illinois generally, and in Cook County, Aurora, and Metro East, in particular. Expert Report of Charles Gallagher, attached as Exhibit D hereto ("Gallagher Report"), ¶¶ 6-24.

Dr. Gallagher describes specific overt government acts, such as housing discrimination, redlining of minority neighborhoods by government actors, and racial profiling by police. *Id.*

17

¶¶ 38-48.  Dr. Gallagher also describes the lack of enforcement, or the selective failure to enforce, civil rights laws put in place to address and stop ongoing discrimination against racial minorities. *Id.*  Specifically, Latinos have been, and continue to be, discriminated against in the Illinois and Chicago region housing markets due to a lack of government enforcement of federal housing policies.  *Id.* ¶ 39.  Dr. Gallagher also notes specific instances of state action to dilute the voting rights of minorities, including drawing district lines to preserve the incumbencies of white politicians and implementing residency requirements for public office.  *Id.* ¶¶ 43-44.

Dr. Gallagher further notes how these forms of official discrimination have the effect of creating intergenerational, long-term socio-economic disadvantages, which create obstacles for minorities to vote, successfully run for office, or otherwise fully engage in the political process. *Id.* ¶¶ 6-11, 26-30.  Accordingly, Dr. Gallagher's Report clearly establishes ample evidence of a long history of official discrimination against minorities in Illinois, which impacts their ability to participate in the democratic process.  *See  Holloway*, 2021 WL 1226554, at *41-44 (holding that "evidence of official discrimination against Hispanic, Asian, and Black people" was "sufficient to satisfy the first Senate Factor in favor of Plaintiffs").

4.  <u>Minority voters continue to bear the effects of such discrimination (Senate Factor 5).</u>

Senate Factor 5 asks courts to examine "the extent to which minorities in the state or political subdivision bear the effects of discrimination in education, employment, and health, which hinder their ability to participate effectively in the political process."  *Id.* at 44-45.

Dr. Gallagher analyzed the ongoing effects of historical discrimination against minorities. Gallagher Report ¶¶ 6-25.  He explains that institutionalized discriminatory practices that were in place for multiple decades (or centuries) such as redline, restrictive covenants, and racial steering in the real estate market, continue to cause socioeconomic harm and deprivation today.  *Id.* ¶ 6.

18

Dr. Gallagher also notes that Chicago has the second highest black-white segregated index in the United States today. *Id.*

Dr. Gallagher finds that Latinos and Blacks in Illinois lag significantly behind whites in almost all socioeconomic measures, including health, income, education, employment, wealth, and becoming victims of firearm homicide. *Id.* ¶ 12. Among other things, Dr. Gallagher notes that: (1) Latinos and Blacks in Illinois have suffered higher death rates due to COVID-19, as compared to whites and Asians; (2) White families in Illinois tend to be wealthier, and (3) Latinos and Blacks in Illinois have higher unemployment rates. *Id.* ¶¶ 20-25. In summary, Dr. Gallagher finds that Latinos and Blacks in Illinois have significantly less wealth, income and education than whites, and suffer from increased health risks. *Id.* ¶ 25. Additionally, Dr. Gallagher explains that voting participation is strongly correlated with income and education. *Id.* ¶ 26. Therefore, the numerous social and economic disadvantages faced by Latino and Black citizens hinders their ability to vote or participate in the political process in Illinois. *Id.* ¶¶ 26-30.

Accordingly, Dr. Gallagher's Report clearly establishes ample evidence to support Senate Factor 5. *See Holloway*, 2021 WL 1226554, at *50 (finding "substantial evidence" that minority community "continues to face the consequences of discrimination which has a causal impact on their political participation" and "mobilization in elections").

As shown above, the three *Gingles* threshold factors are satisfied and the totality of the circumstances weighs heavily in Plaintiffs' favor. Plaintiffs have therefore met their burden of demonstrating that the September Map violates Section 2 of the VRA. Thus, like the prior June Map, the September Map is constitutionally invalid and should not be adopted by the Court.

## II. The Court Should Adopt Plaintiffs' Remedial Map.

In the October 19, 2021 Order, the Court invited Plaintiffs to submit their own remedial map for consideration. Order at 43. Plaintiffs' proposed Remedial Map is attached as Exhibit A.

In drafting their proposed Remedial Map, Plaintiffs followed the Court's direction to use the September Map as a "starting point." *Id.* at 38. As shown below, the differences between the September Map and the Remedial Map are limited to the four regions affected by the VRA violations in the September Map: (1) Northern Cook County, (2) Southern Cook County, (3) Aurora, and (4) Metro East. The Remedial Map treats these four regions as geographically distinct, and each region is severable from the rest of the map and could be removed or changed without creating a further impact to the other districts from the September Map. The vast majority of the boundaries in the September Map—87 of the 118 House Districts—are not impacted by the changes in the Remedial Map.

Plaintiffs' Remedial Map would create 12 Latino opportunity House Districts (House Districts 1, 2, 3, 4, 21, 22, 23, 24, 32, 39, 50, and 77) and one additional Black opportunity district (House District 114). Those 13 districts include territory that is divided among 24 House Districts in the September Map, including both territory populated by the relevant minority community and adjacent territory needed to ensure that the districts in the Remedial Map have substantially equal population. The 24 impacted House Districts are shown in pink below in Figure 1.

In addition to those 24 impacted House Districts, seven other House Districts from the September Map are impacted in order to ensure that all districts have substantially equal population. For example, the creation of a new district may leave some territory stranded; that stranded territory must then be absorbed into surrounding districts. Those seven districts are identified in blue below in Figure 1. In drafting the Remedial Map, Plaintiffs attempted to minimize the impact to both the number of impacted districts and the proportion of territory within these districts.

**Figure 1**
**House Districts Impacted by Plaintiffs' Remedial Map**



The four regions of the Remedial Map that were changed from the September Map are described below, along with descriptions of the purposes and effects of the changes.

### A. Northern Cook County

Plaintiffs' Remedial Map includes four House Districts with 50%+ Latino CVAP in Northern Cook County (House Districts 3, 4, 39, and 77), as opposed to zero such districts in Northern Cook County in the September Map. The September Map includes four Latino influence districts in Northern Cook County, but none of those districts would achieve 50%+ Latino CVAP. Moreover, as shown in Dr. Chen's Report, using either the Polsby-Popper or the Reock measure of compactness, every single one of the Northern Cook County House Districts in the Remedial

Map is more geographically compact than least-compact district from the September Map.  *See* Chen Report ¶ 23, and Figures 1-2.

The Latino community within the northern Cook County region resides primarily within House Districts 3, 4, 20, 39, 40, and 77 in the September Map.  A smaller portion of that regional community also resides within House District 56, along the north side of O'Hare International Airport.  Those districts are shown in pink in Figure 2 below.

**Figure 2**
**September Map: Northern Cook County**



Within the Northern Cook County region, the Latino community resides primarily within the northwest side of Chicago and adjacent suburbs, such as Franklin Park and Melrose Park. Figure 3 shows the concentration of the Latino population in the region and outlines of Plaintiffs' proposed remedial House Districts 3, 4, 39, and 77.  Those proposed remedial districts include all of those communities within this portion of Cook County; the western border of House District 77 is the western border of Cook County.  The eastern three districts fit almost entirely within the territory allocated for them by the September Map.

22

**Figure 3**
**Concentration of Latino Population and Plaintiffs' Remedial House Districts**



After creating remedial House Districts 3, 4, 39, and 77, the remaining territory must be re-constituted in three complete House Districts, as shown below in Figure 4. The new remedial House Districts 3, 4, 39, and 77 are depicted in green and outlined in red. The black lines are the borders of the September Map House Districts. The remaining territory, which is shown in white in Figure 4, cannot be assembled into contiguous and substantially equal districts without impacting other adjoining districts. September Map House District 20, which sits immediately west of House District 19, lost territory comprising approximately 27,000 people in the vicinity of Franklin Park to new remedial House District 77. House District 77 no longer includes territory within DuPage County, primarily Bensenville and Addison, which is shown in Figure 4 as the white territory immediately east of House District 48. In order to ensure districts have substantially equal population, the impact of these changes requires House District 20 to take territory from House District 55, which must then take territory from House District 56. Then the DuPage County

territory formerly included in House District 77 must be incorporated into the surrounding districts

(House Districts 46, 48, and 56).

**Figure 4**
**Territory to be Reassembled into Neighboring House Districts**



Figure 5 shows Plaintiffs' Remedial Map for House Districts 3, 4, 39, and 77. The

remainder of the territory is reconstituted into districts of substantially equal population that

substantially reflect the comparable districts of the September Map. The city of Bensenville is

contained almost entirely within House District 56, consistent with the legislature's goal of

keeping the community largely intact,[5] and together with other communities that border O'Hare

International Airport, like Elk Grove Village. The village of Addison is kept entirely within House

Districts 46 and 48, into which it had been included in the September Map, rather than being further

split and included in House District 56 (which contained none of Addison in the September Map);

this requires some adjustments to boundaries in the vicinity of Addison to ensure that the districts

---

[5]     *See* Illinois House Resolution HR0443 (https://www.ilga.gov/legislation/102/HR/
10200HR0443.htm), at 36.

have substantially equal population. In deference to the September Map "starting point," the significant majority of populations of the non-majority-minority districts (i.e. those shown in blue in Figure 5) that are impacted in this region (i.e. House Districts 20, 46, 48, 55, and 56) are unchanged, as shown in Table 1 below.[6]

**Figure 5**
**Plaintiffs' Remedial House Districts**



**Table 1**
**Unchanged Territory Within Non-Minority-Majority Districts**

| House District | Population Unchanged from September Map |
|:---:|:---:|
| 20 | 75% |
| 46 | 93% |
| 48 | 86% |
| 55 | 75% |
| 56 | 71% |

---

[6]     The population information in Tables 1, 3, and 4 can be derived from the Core Constituency Report attached as Exhibit E, which is a standard report run from the Autobound system.

B.  **Southern Cook County**

Plaintiffs' Remedial Map includes seven House Districts with 50%+ Latino CVAP in

Southern Cook County (House Districts 1, 2, 21, 22, 23, 24, and 32), as opposed to only four 50%+

Latino CVAP House Districts in the September Map.  Moreover, as shown in Dr. Chen's Report,

every single one of the Southern Cook County House Districts in the Remedial Map is more

geographically compact than the least-compact district from the September Map.  *See* Chen Report

¶ 23, and Figures 1-2.

The Latino community within the Southern Cook County region resides primarily within

House Districts 1, 2, 21, 22, 23, and 24 in the September Map.  A smaller portion of that regional

community also resides within adjoining areas in House Districts 6, 8, 31, 32, and 82.  Those

districts are shown in pink in Figure 6 below.

**Figure 6**
**September Map: Southern Cook County**



26

Within the southern Cook County region, the Latino community resides primarily within the southern side of Chicago and adjacent suburbs, such as Berwyn, Cicero, and Burbank. Figure 7 shows the concentration of the Latino population in the region and outlines of Plaintiffs' proposed remedial House Districts 1, 2, 21, 22, 23, 24, and 32.

**Figure 7**
**Concentration of Latino Population and Plaintiffs' Remedial House Districts**



The Latino opportunity districts were configured taking into account communities identified within House Resolution 443 for the September Map where possible. For example, House District 21 was drawn to retain as many of the same communities as that district included in the September Map, particularly around Berwyn and Riverside. House District 1 is centered on Archer Heights, as it is in the September Map. House District 2 was drawn around Midway International Airport and the community of Clearing, which were joined to form the center of House District 22 in the September Map. Where borders needed to be moved to create effective

districts, Plaintiffs followed natural communities boundaries, like the Chicago Sanitary and Ship Canal that separates House Districts 1 and 22.

After creating remedial House Districts 1, 2, 21, 22, 23, 24, and 32, the remaining territory must be re-constituted in four complete House Districts, as shown in Figure 8. The new remedial House Districts are depicted in green and outlined in red. The black lines are the borders of the September Map House Districts. The remaining territory, which is shown in white in Figure 8, cannot be assembled into contiguous and substantially equal districts without impacting other adjoining districts.

**Figure 8**
**Territory to be Reassembled into Neighboring House Districts**



The Remedial Map for this region also needs to take into account equity for the Black community, consistent with the legislature's intent. The remedial Latino opportunity districts absorb majority-Latino communities along their eastern border in Chicago and southern border

near Burbank, which territory had been included in House Districts 6, 31, and 32, as well as a small portion of territory from House District 8 on the north side of Berwyn. Figure 9 shows the concentration of the Black population in the region outside of the remedial Latino opportunity districts. House Districts 6, 8, 31, and 32 are intended by the legislature to be Black opportunity or influence districts. Plaintiffs' Remedial Map for this region restores the demographic characteristics of these districts (except that, for this purpose, September Map House District 32 is replaced by House District 36 in Plaintiffs' Remedial Map because House District 32 is a Latino opportunity district).

**Figure 9**
**Concentration of Black Population Adjacent to Latino Opportunity Districts**



Figure 10 shows Plaintiffs' Remedial Map for House Districts 1, 2, 21, 22, 23, 24, and 32, which are shown in green. Figure 10 also shows the re-constituted Black opportunity districts, which are shown in yellow. Table 2 shows the demographic characteristics of those districts under

both the September Map and Plaintiffs' Remedial Map. The remainder of the territory is reconstituted into districts of substantially equal population that substantially reflect the comparable districts of the September Map, which are shown in blue.

**Figure 10**
**Plaintiffs' Remedial House Districts**



**Table 2**

| September Map | | Plaintiffs' Remedial Map | |
|---|---|---|---|
| **House District** | **Black (Non-Hispanic) Voting Age Population** | **House District** | **Black (Non-Hispanic) Voting Age Population** |
| 6 | 45.4% | 6 | 53.6% |
| 8 | 49.5% | 8 | 49.4% |
| 31 | 51.9% | 31 | 54.7% |
| 32 | 50.5% | 36 | 51.5% |

In deference to the September Map "starting point," the significant majority of populations of the non-majority-minority districts (i.e., those shown in blue in Figure 10) that are impacted in this region (i.e., House Districts 35 and 82) are unchanged, as shown in Table 3 below.

**Table 3**
**Unchanged Territory Within Non-Minority-Majority Districts**

| House District | Population Unchanged from September Map |
|:---:|:---:|
| 35 | 70% |
| 82 | 91% |

In order to evaluate the performance of the Cook County House Districts in Plaintiffs' Remedial Map, Dr. Chen estimated the hypothetical performance of a Latino-preferred candidate in the Cook County House Districts under both Plaintiffs' Remedial Map and the General Assembly's September Map. Chen Report ¶ 44. Dr. Chen used the EI estimates he calculated for the 2018 primary election for Cook County Assessor, in which Fritz Kaegi defeated the Latino-preferred candidate, Joseph Berrios. *Id.* He used each precinct's EI estimates to generate Census block-level estimates of each racial and ethnic group's support for Mr. Berrios and applied those block-level EI estimates to each Cook County district in the Remedial Map and the September Map. *Id.* ¶ 45. Dr. Chen found that only four of the eleven challenged districts in the September Map would support Mr. Berrios, but that ten of the 12 Cook County districts in Plaintiffs' Remedial Map would support Mr. Berrios. *Id.* ¶¶ 47-48 and Tables 10-11. This analysis further supports a conclusion that the Cook County House Districts in the Remedial Map would allow Latino citizens to participate in the political process and elect candidates of their choice.

**C. Aurora**

Plaintiffs' Remedial Map includes a House District with over 65% total Latino population and 60% Latino voting-age population (House District 50). Although the district is slightly less

31

than 50% Latino CVAP, the district would provide Latino voters an opportunity to elect candidates of their choice. Moreover, as shown in Dr. Chen's Report, House District 50 in the Remedial Map is comparable to the average compactness scores of the districts in the September Map. *See* Chen Report ¶ 24, and Figures 3-4.

The Latino community within the Aurora region resides primarily within House Districts 49, 50, 83, and 84 in the September Map. Those districts are shown in pink in Figure 11 below.

**Figure 11**
**September Map: Aurora**



Within the Aurora region, the Latino community resides primarily within the communities of Aurora, Montgomery, and West Chicago. Figure 12 shows the concentration of the Latino population in the region and outlines of Plaintiffs' proposed remedial House District 50.

**Figure 12**
**Concentration of Latino Population and Plaintiffs' Remedial House District**



After creating remedial House District 50, the remaining territory must be re-constituted in three complete House Districts, as shown in Figure 13. The new remedial House District 50 is depicted in green and outlined in red. The black lines are the borders of the September Map House Districts. The remaining territory, which is shown in white in Figure 13, cannot be assembled into contiguous and substantially equal districts without impacting other adjoining districts. In particular, while the majority of House District 49 is north of remedial House District 50, there are two non-contiguous sections that sit south of House District 50, adjacent to House Districts 41 and 47. There are also significant areas from the September Map House District 50 that are not included in the Remedial Map district and therefore must be reallocated to other districts.

**Figure 13**
**Territory to be Reassembled into Neighboring House Districts**



Figure 14 shows Plaintiffs' Remedial Map for House District 50. The remainder of the territory is reconstituted into districts of substantially equal population that substantially reflect the comparable districts of the September Map. In order to ensure districts have substantially equal population, the impact of these changes requires House Districts 41 and 47 to absorb some territory to the southeast of House District 50, which had been included in House District 49 in the September Map but would now be non-contiguous. House District 49 must incorporate additional territory to the northwest of House District 50 in order to compensate for population lost in the West Chicago area. The border between House Districts 49 and 83 generally follows the Fox River in both the September Map, as intended by the legislature, and the Remedial Map. In deference to the September Map "starting point," the significant majority of populations of the

non-majority-minority districts (i.e. those shown in blue in Figure 14) that are impacted in this

region (i.e. House Districts 41, 47, 49, 83, and 84) are unchanged, as shown in Table 4 below.

**Figure 14**
**Plaintiffs' Remedial House Districts**



**Table 4**
**Unchanged Territory Within Non-Minority-Majority Districts**

| House District | Population Unchanged from September Map |
|---|---|
| 41 | 94% |
| 47 | 99% |
| 49 | 72% |
| 83 | 85% |
| 84 | 79% |

35

**D.   Metro East**

The Remedial Map includes a 50%+ Black CVAP House District in this area (House District 114). In contrast, the September Map splits the Black population in this area among three separate House Districts. In addition, as shown in Dr. Chen's report, the Metro East House District in the Remedial Map (House District 114) is more compact than the Metro East districts in the September Map. *Id.* ¶ 24, and Figures 5-6.

The Black community within the Metro East region resides primarily within House Districts 112, 113, and 114 in the September Map. Those districts are shown in pink in Figure 15 below.

**Figure 15**
**September Map: Metro East**



Within the Metro East region, the Black community resides primarily within the adjacent communities of East St. Louis, Brooklyn, and Venice, which lie along the Mississippi River, and

the adjacent interior communities of Washington Park, Centreville, and Fairview Heights, as well as parts of Belleville. Figure 16 shows the concentration of the Black population in the region and an outline of Plaintiffs' proposed remedial House District 114. That proposed remedial district includes all of those communities in a natural, compact district.

**Figure 16**
**Concentration of Black Population and Plaintiffs' Remedial House District**



After creating remedial House District 114, the remaining territory must be re-constituted in two complete House Districts, as shown in Figure 17. The new remedial House District 114 is depicted in green and outlined in red. The black lines are the borders of the September Map House Districts.

**Figure 17**
**Territory to be Reassembled into Neighboring House Districts**



Figure 18 shows Plaintiffs' Remedial Map for House Districts 112, 113, and 114. The boundary between House Districts 112 and 113 extends from their intersection with House District 114 eastward, along generally the same roads in the area of O'Fallon that serve as a border between districts in the September Map. House District 112, however, requires additional territory in order to have a substantially equal population and therefore is allocated territory consisting of Mascoutah township. In deference to the September Map "starting point," Plaintiffs sought to preserve as much of the core of House District 112 as possible; 74% of the population of that district is unchanged from the September Map. [7]

---

[7]    This population information can be derived from the Core Constituency Report attached as Exhibit E.

**Figure 18**
**Plaintiffs' Remedial House Districts**



In summary and in contract to the September Map, the Remedial Map complies with the VRA and provides Latino and Black citizens with an opportunity to participate in the political process and to elect candidates of their choice. Therefore, the Court should enter an order adopting Plaintiffs' Remedial Map as the effective map of Illinois legislative districts for the next decade.

## CONCLUSION

The General Assembly's September Map violates Section 2 of the VRA, dilutes the votes of minority citizens, and is invalid. The Court should therefore enter an order adopting Plaintiffs' Remedial Map as the effective map of Illinois legislative districts for the next decade. The Court can enter the order based on the record before it once briefing has been completed. If there are any questions remaining after the parties have completed their briefing, however, Plaintiffs suggest that the Court hold an evidentiary hearing or oral argument.

Dated: October 10, 2021

/s/ Phillip A. Luetkehans
Phillip A. Luetkehans
Brian J. Armstrong
LUETKEHANS, BRADY, GARNER &
ARMSTRONG, LLC
105 E. Irving Park Road
Itasca, Illinois 60143
Tel: (630) 760-4601
pal@lbgalaw.com
bja@lbgalaw.com

*Counsel for Plaintiffs Dan McConchie, in his
official capacity as Minority Leader of the
Illinois Senate and individually as a registered
voter, Jim Durkin, in his official capacity as
Minority Leader of the Illinois House of
Representatives and individually as a registered
voter, James Rivera, Anna De La Torre,
Dolores Diaz, Felipe Luna Jr., Salvador
Tremillo, Christopher Romero, the Republican
Caucus of the Illinois Senate, and the
Republican Caucus of the Illinois House of
Representatives*

/s/ Ricardo Meza
Ricardo Meza
Meza Law
161 N. Clark Street, Suite 1600
Tel: (312) 802-0336
rmeza@meza.law

*Counsel for Plaintiffs Dan McConchie, in his
official capacity as Minority Leader of the
Illinois Senate and individually as a registered
voter, Jim Durkin, in his official capacity as
Minority Leader of the Illinois House of
Representatives and individually as a registered
voter, James Rivera, Anna De La Torre,
Dolores Diaz, Felipe Luna Jr., Salvador
Tremillo, Christopher Romero, the Republican
Caucus of the Illinois Senate, and the
Republican Caucus of the Illinois House of
Representatives*

Respectfully submitted,

/s/ Charles E. Harris, II
Charles E. Harris, II
Mitchell D. Holzrichter
Thomas V. Panoff
Christopher S. Comstock
Heather A. Weiner
Christopher A. Knight
Joseph D. Blackhurst
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 782-0600
charris@mayerbrown.com
mholzrichter@mayerbrown.com
tpanoff@mayerbrown.com
ccomstock@mayerbrown.com
hweiner@mayerbrown.com
cknight@mayerbrown.com
jblackhurst@mayerbrown.com

*Counsel for Plaintiffs Dan McConchie, in
his official capacity as Minority Leader of
the Illinois Senate and individually as a
registered voter, Jim Durkin, in his official
capacity as Minority Leader of the Illinois
House of Representatives and individually
as a registered voter, James Rivera, Anna
De La Torre, Dolores Diaz, Felipe Luna
Jr., Salvador Tremillo, Christopher
Romero, the Republican Caucus of the
Illinois Senate, and the Republican Caucus
of the Illinois House of Representatives*

/s/ John G. Fogarty
John G. Fogarty
Clark Hill PLC
130 E. Randolph St., Suite 3900
Chicago, Illinois 60601
Tel: (312) 985-5900
jfogarty@clarkhill.com

*Counsel for Plaintiff the Illinois Republican
Party*

40