# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| DAN McCONCHIE, *et al.*, | ) Case No. 1:21-CV-03091 |
| | ) |
| Plaintiffs, | ) Circuit Judge Michael B. Brennan |
| v. | ) Chief District Judge Jon E. DeGuilio |
| | ) District Judge Robert M. Dow, Jr. |
| CHARLES SCHOLZ, *et al.,* | ) |
| | ) Three-Judge Court |
| Defendants, | ) Pursuant to 28 U.S.C. § 2284(a) |
| | ) |
| | ) |
| | ) |

| | |
|---|---|
| JULIE CONTRERAS, *et al.,* | ) Case No. 1:21-CV-03139 |
| | ) |
| | ) Circuit Judge Michael B. Brennan |
| Plaintiffs, | ) Chief District Judge Jon E. DeGuilio |
| v. | ) District Judge Robert M. Dow, Jr. |
| | ) |
| ILLINOIS STATE BOARD OF | ) Three-Judge Court |
| ELECTIONS, *et al.,* | ) Pursuant to 28 U.S.C. § 2284(a) |
| | ) |
| Defendants, | ) |
| | ) |
| | ) |
| | ) |

| | |
|---|---|
| EAST ST. LOUIS BRANCH | ) Case No. 1:21-CV-05512 |
| NAACP, *et al.,* | ) |
| | ) Circuit Judge Michael B. Brennan |
| Plaintiffs, | ) Chief District Judge Jon E. DeGuilio |
| v. | ) District Judge Robert M. Dow, Jr. |
| | ) |
| ILLINOIS STATE BOARD OF | ) Three-Judge Court |
| ELECTIONS, *et al.,* | ) Pursuant to 28 U.S.C. § 2284(a) |
| | ) |
| Defendants, | ) |
| | ) |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENTS AND PROPOSED REMEDIAL REDISTRICTING PLANS

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................... 1

II.   FACTUAL BACKGROUND ..................................................................... 4

    A.    The 2021 Legislative Redistricting Process ............................. 4
    B.    Procedural Background.......................................................... 13

III.  LEGAL FRAMEWORK............................................................................ 16

    A.    The State's Duty to Redistrict and the Remedial Phase. ..................... 16
    B.    The Voting Rights Act. .......................................................... 18
        1.    The *Gingles* preconditions. .......................................... 19
        2.    The totality of the circumstances test......................... 21
    C.    The Constitution's prohibition on "racial gerrymanders."................... 23

IV.  ARGUMENT ............................................................................................ 24

    A.    Plaintiffs Have Failed to Establish a Voting Rights Violation in the Districts in the Four Geographic Areas Challenged. .................... 24
        1.    Plaintiffs cannot establish the *Gingles* preconditions................. 25
            a.    Chicago Northwest and Southwest Side Districts........... 25
            b.    Metro East.................................................................... 34
            c.    Aurora........................................................................... 40
        2.    Plaintiffs do not prove the totality of the circumstances demonstrate a dilution of Latino voting strength. .................... 41
            a.    The history of voting-related discrimination in the State or political subdivision. ........................... 42
            b.    The extent to which voting in the elections of that State or political subdivision is racially polarized........... 43
            c.    The extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting. ................................................................... 44
            d.    The exclusion of members of the minority group from candidate slating processes. ..................... 44
            e.    The extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process. ............................................................... 45

f.    The use of overt or subtle racial appeals in political campaigns...........................................................46

g.    The extent to which members of the minority group have been elected to public office in the jurisdiction........46

h.    The extent to which "elected officials are unresponsive to the particularized needs of the members of the minority group..........................46

i.    Whether the policy underlying the State's or political subdivision's use of the contested practice or structure is tenuous.........................................46

B.    Plaintiffs Have Failed to Establish an Unconstitutional Racial Gerrymander in Senate District 11 and House Districts 21 and 114.....................................................................47

C.    The September Plan Was Drawn to Satisfy Compelling State Interests.................................................................58

V.    PLAINTIFFS' PROPOSED REMEDIAL PLANS DO NOT PROPOSE "REMEDIES"–THEY PROPOSE ILLEGAL RACIAL GERRYMANDERS AND ATTEMPTS TO POLITICALLY GERRYMANDER....................................................................58

A.    Northwest Side of Chicago...........................................59

    1.  *Contreras* Plaintiffs' Remedial Plan .........................60

    2.  *McConchie* Plaintiffs' Remedial Plan........................62

B.    Southwest Side of Chicago ...........................................66

    1.  *McConchie* Plaintiffs' Remedial Plan........................70

    2.  *Contreras* Plaintiffs' Remedial Plan .......................77

C.    Aurora ............................................................................80

D.    Metro East .....................................................................82

    1.  *NAACP* Plaintiffs' Remedial Plan............................85

    2.  *McConchie* Plaintiffs' Remedial Plan........................90

VI.    CONCLUSION ...............................................................92

Defendants Don Harmon, in his official capacity as President of the Illinois Senate, the Office of the President of the Illinois Senate, Emanuel "Chris" Welch, in his official capacity as Speaker of the Illinois House of Representatives, and the Office of the Speaker of the Illinois House of Representatives (collectively, "Defendants") hereby submit this response to the Plaintiffs' proposed remedial maps.[1]

## I.    INTRODUCTION

On September 4, 2021, SB 927 (referred to as "the September Redistricting Plan" or "September Plan") became law and amended Public Act 102-10 (the "June Redistricting Plan" or "June Plan") to incorporate the United States Census Bureau's decennial Census data that was released in August. The Supreme Court has repeatedly stressed that redistricting is "primarily the duty and responsibility of the State." *See, e.g., Perry v. Perez*, 565 U.S. 388, 392 (2012); *Branch v. Smith*, 538 U.S. 254, 261 (2003); *Chapman v. Meier*, 420 U.S. 1, 27 (1975). The state's legislative plan—even in the remedial phase of redistricting cases—is "the governing law unless it, too, is challenged and found to violate the Constitution.

Given the competing interests involved, the legislative redistricting process inevitably disappoints some constituencies. It is therefore no surprise that three groups of plaintiffs have challenged the law. Indeed, it is hard to imagine a map that

---

[1]    Due to overlap in Defendants' responses to the three Plaintiffs' submissions, Defendants are submitting a single responsive submission. To streamline record citations to the three actions, Defendants use the following shorthand: McConchie Dkt., Contreras Dkt., and NAACP Dkt.

would make everyone happy – but universal happiness is neither the goal nor the law of the redistricting process.

Recognizing the heavy burden they face in challenging the law, Plaintiffs resort to incendiary, but unsupported, allegations that those who voted for the September Plan did so with the objective of diluting minority voting power and engaging in unconstitutional racial gerrymandering. These allegations ignore that every single minority member of the Illinois General Assembly voted for this Plan, including Defendant Emanuel "Chris" Welch, the first African American to serve as Speaker of the Illinois House of Representatives.

Plaintiffs point to no evidence supporting such a serious charge. A decade ago, a three-judge panel of this Court found insufficient evidence to establish racial bloc voting existed to prove a Voting Rights Act challenge to the 2011 Illinois Congressional Map. *Committee for a Fair & Balanced Map v. Illinois State Board of Elections*, 835 F. Supp. 2d 563, 588 (N.D. Ill. 2011). In the decade since, the trend away from racial bloc voting in Illinois has continued. In the last ten years, minority candidates were consistently able to win elections in districts that are majority minority, but importantly, also in "crossover districts" that have less than 50% minority voting age population, and influence districts as well. As Defendants' expert, Dr. Allan Lichtman, explains in his attached report (Ex. 1, "Lichtman Report"), Plaintiffs' experts seek to obscure this fact by providing analyses that selectively pick elections, dismiss certain results, and over emphasize elections with candidates that had obvious problems which had nothing to do with race. Dr. Lichtman's report

explains Plaintiffs' experts' errors and provides his own analysis: racial bloc voting does not exist in a manner that can establish a violation of the Voting Rights Act.

Furthermore, Plaintiffs' analyses of the "totality of the circumstances" all but ignore the existence of the 21st Century. Tellingly, Plaintiffs focus on events that predate the passage of the Voting Right Act or its 1982 Amendments. The events they cite that post-date those Congressional enactments are closer in time to those legislative enactments than they are to the present day. Defendants concede that Illinois—as all states—struggled with racial equality in voting in the past. But events from 50 years ago are insufficient to establish relief under the Voting Rights Act claim. *See generally Shelby County v. Holder*, 570 U.S. 529 (2013). Today, Illinois, led by its General Assembly, has passed some of the most comprehensive laws aimed at eradicating racial injustice and expanding voter access, and much of that work has contributed to the elimination of racial bloc voting in Illinois. Plaintiffs therefore cannot establish a Voting Rights Act violation. And the same is true with Plaintiffs claims under the Federal Constitution, which require proof of a discriminatory intent. Plaintiffs provide none.

Finally, even if the Court were to reach an analysis of the proposed "remedial" maps submitted by Plaintiffs, they should be rejected. Plaintiffs collectively challenge 13 House districts and two Senate districts, but propose much broader changes that would impact 32 House districts and 20 Senate districts—changes that are driven by undisclosed political motives. Ironically, Plaintiffs criticize the General Assembly's process in drawing the September Plan for not being transparent enough,

yet Plaintiffs ask the Court to implement their extensive proposals—drawn without any public input or scrutiny, much less through the legislative process.

In no event should the Court adopt Plaintiffs' anti-democratic redistricting proposals. Instead, if changes to the redistricting plan drawn by the General Assembly must be made, this Court should follow the Supreme Court's direction that "[r]edistricting is primarily the duty and responsibility of the State," *Perry*, 565 U.S. at 392 (internal quotation omitted), and remand to the General Assembly to make changes, consistent with the direction provided from the Court and the well-established policy of deference to the elected legislature.

That, however, will be unnecessary, as Plaintiffs have failed to meet their threshold burden of establishing a statutory or constitutional violation as to any of the challenged districts. This Court should affirm the September Plan.

## II. FACTUAL BACKGROUND

### A. The 2021 Legislative Redistricting Process

The Illinois General Assembly consists of a Senate, elected from 59 Legislative Districts (also known as "Senate Districts" or "SD"), and a House of Representatives, elected from 118 Representative Districts (also known as "House Districts" or "HD"). *See* Ill. Const., art. IV, § 1. Each Senate district consists of two nested House districts. *Id.* The General Assembly is directed to use its legislative power to redistrict itself in the year following the decennial Census. *Id.* art. I, § 3. A redistricting plan must pass both chambers in the form of a bill, like all legislation, and must become effective by June 30th. *Id.* If a plan is not enacted and effective by June 30th, the Illinois Constitution triggers the creation of a Legislative Redistricting Commission. *Id.*

4

The Illinois General Assembly faced unprecedented circumstances in navigating the 2021 legislative redistricting process. Due in part to the global COVID-19 pandemic, the U.S. Census Bureau significantly delayed the release of 2020 Census data, known as P.L. 94-171 data. Federal law (13 U.S.C § 141(c)) requires this data to be delivered to the states by April 1 in the year after the decennial census, but the U.S. Census Bureau did not deliver the data to Illinois until August 12, 2021. *See* U.S. CENSUS BUREAU, *Decennial Census P.L. 94-171 Redistricting Data*, CENSUS.GOV (Aug. 12, 2021), https://www.census.gov/programs-surveys/decennial-census/about/rdo/summary-files.html.

Despite delays and uncertainty about the timing of the Census data's release, the General Assembly began taking steps to comply with the June 30th constitutional deadline. Both chambers established redistricting committees, comprised of Democratic and Republicans members from across the state. The redistricting committees were chaired by Latino members, Senator Omar Aquino and Representative Elizabeth Hernandez, and Black members, Senator Elgie Sims Jr. and Representative Curtis Tarver II. The committees were tasked with gathering information and accepting recommendations from the public, communities of interest, and members. *See Redistricting – Members 102nd General Assembly*, *Senate Committees*, ILGA.GOV, https://www.ilga.gov/senate/committees/members.asp?CommitteeID=2742 (last visited Nov. 22, 2021); *Redistricting – Members 102nd General Assembly*, *House Committees*, ILGA.GOV

https://www.ilga.gov/house/committees/members.asp?CommitteeID=2800&GA=102 (last visited Nov. 22, 2021).

Between March 2021 and late May 2021, the legislature held more than 50 public hearings that offered opportunities for individuals, groups, and members of the General Assembly to provide their recommendations for changes to the districts. *See* *Hearings*, ILSENATEREDISTRICTING.COM, https://www.ilsenateredistricting.com/hearings (last visited Nov. 22, 2021); *Illinois Redistricting; Public Hearings,* ILHOUSEDEMS.COM, https://ilhousedems.com/redistricting/public-hearings/ (last visited Nov. 22, 2021). The volume of hearings far exceeded the requirements of the Illinois Redistricting Transparency and Public Participation Act. *See* 10 ILCS 125/10-5 ("[E]ach committee or joint committee must conduct at least 4 public hearings."). The hearings were structured by geographical regions of the State, and each included a slide show presentation with an overview of the redistricting process, explanation of redistricting criteria, and instructions for the public or members as to how to provide testimony or submit draft maps. Ex. 2 ("Maxson Decl."), at ¶ 5. Nearly all hearings were held virtually or in person with virtual accessibility available for members and the public. *Id.* at 6. Hearings were broadcast live on the General Assembly's website (*Illinois General Assembly*, ILGA.GOV, https://www.ilga.gov (last visited Nov. 22, 2021)), and many were available on the video service website (*BlueRoomStream HD Video Streaming*, BLUEROOM STREAM, https://blueroomstream.com/ (last visited Nov. 22, 2021)), which continues to make those hearings accessible to the public. Any

person wishing to provide testimony was given an opportunity, and presenters could share their screens to provide for more interactive feedback in real time. Maxson Decl., at ¶ 7. Anyone unable to attend or watch the hearings could review the transcripts that were made available on the General Assembly's official website. *Id.* at 4, 6.

The General Assembly made the public aware of the hearings via its website, in press releases, through members' legislative emails and newsletters, and via public outreach. *Id.* at 6. House and Senate Democratic staff emailed or telephoned hundreds of community groups, community leaders, not-for-profit organizations, and anyone else identified as having an interest. *Id.* at 8. If an individual or representative of a group could not attend one or more hearings, they could contact any committee member or submit testimony through the general email address for the Committee. *Id.* at 7. Documents submitted for the Committee's consideration were available to the public on the General Assembly website and redistricting websites created by each chamber. *See Illinois Redistricting,* ILHOUSEDEMS.COM, https://ilhousedems.com/redistricting (last visited Nov. 22, 2021); *Illinois Senate Redistricting Committee*, ILSENATEREDISTRICTING.COM, https://www.ilsenateredistricting.com (last visited Nov. 22, 2021). The redistricting websites included hearing notices, hearings transcripts, access to 2011 redistricting maps and data, and a mapmaking portal that provided the public and members with an opportunity to draw and submit their own proposed maps. Maxson Decl. at ¶ 4.

On May 28, 2021, both chambers of the General Assembly passed HB 2777, the General Assembly Redistricting Act of 2021, with supermajority votes in each chamber, including votes in favor from every Asian American, Black, and Latino member. It was signed into law and became effective on June 4, 2021, as Public Act 102-10 (the "June Redistricting Plan" or "June Plan"). The June Redistricting Plan used estimated population data from the most recent available public source, the U.S. Census Bureau's American Community Survey. At the time of passage, the Illinois Senate passed Senate Resolution 326 ("SR 326") and the Illinois House passed House Resolution 359 ("HR 359"). *See Illinois General Assembly*, ILGA.GOV, https://www.ilga.gov/legislation/102/SR/PDF/10200SR0326enr.pdf; *Illinois General Assembly*, ILGA.GOV, https://www.ilga.gov/legislation/102/HR/PDF/10200HR0359lv.pdf. These resolutions, as well as the Public Act itself, explain in detail how the Senate and House districts were drawn and some of the considerations and decisions made by the General Assembly during the legislative process.

In June, two sets of Plaintiffs filed lawsuits challenging the June Plan: first, the Republican Legislative Leaders of the Illinois Senate and Illinois House of Representatives, as well as the Republican Caucuses of both chambers (collectively, "the *McConchie* Plaintiffs"); and second, Julie Contreras, Irvin Fuentes, Abraham Martinez, and Irene Padilla (collectively, "the *Contreras* Plaintiffs"). Both alleged the June Plan was malapportioned, although they sought different relief. *See* McConchie Dkt. 1 at 33-37; *see also* Contreras Dkt. 1 at 10-12. The *McConchie* Plaintiffs sought

8

the creation of a Redistricting Commission as provided by the Illinois Constitution of 1970, and the *Contreras* Plaintiffs sought for the court to order the legislature to redraw the map. *See* McConchie Dkt. 1 at 38; Contreras Dkt. 1 at 12. The cases were consolidated before a three-judge panel convened under 28 U.S.C. § 2284(a). McConchie Dkt. 30, Minute Order (June 25, 2021) at 1.

On August 12, 2021, the Census Bureau released the 2020 Census data. An analysis of the General Assembly Redistricting Act of 2021 revealed the maximum population deviation for the Senate districts and the House districts could be improved as compared to the official Census data. Maxson Decl., at ¶ 10. The President of the Senate and the Speaker of the House issued a joint proclamation convening a special session for the purpose of considering amendments to the June Plan to ensure compliance with the Equal Protection Clause of the U.S. Constitution.

As the Court urged, the Defendants sought recommendations for changes to the June Redistricting Plan from the *Contreras* and *McConchie* Plaintiffs. *See* McConchie Dkt. 88, Minute Entry (Aug. 23, 2021) at 1. The Redistricting Committees also invited input and recommendations from the Plaintiffs, as well as other individuals and groups, including those that eventually filed a third lawsuit and are now the *NAACP* Plaintiffs. *See* Yandell Decl., Exs. E and F; Maxson Decl., at ¶ 11. In response, named Plaintiff Julie Contreras and a representative of the Mexican American Legal Defense and Educational Fund ("MALDEF") provided testimony at a hearing on August 27, 2021, but did not offer any recommendations for changes to

the map.[2]  Plaintiff United Congress of Community and Religious Organizations ("UCCRO") also testified and submitted recommendations,[3] though none of their proposals included the Metro East district they now challenge.  None of the other Plaintiffs offered changes or their own proposals.

On August 31, 2021, nearly three weeks after the release of the Census data and after more hearings, the General Assembly reconvened and passed Senate Bill 927, which amended the June Plan. All Plaintiffs agree that SB 927 cured any previously alleged malapportionment issues in the June Plan, and therefore complies with the one-person, one-vote requirement of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.  *See* Ill. Public Act 102-0663; *see also* Ex. 3 ("Yandell Decl."), Ex. A (Hr'g Tr. (Sept. 1, 2021)), at 9:22-25.  SB 927 was signed into law and became effective on September 24, 2021.

As before, both chambers adopted resolutions that explained in detail how and why the Senate and House districts were drawn.  These resolutions, Senate Resolution 3 ("SR 3") of the First Special Session of the 102nd General Assembly (Contreras Dkt. 135-6) and House Resolution 443 ("HR 443") (Dkt. 135-7,) incorporated the previously adopted resolutions, but provided additional details

---

[2] *See Testimony by Plaintiff Contreras and MALDEF,* ILGA.GOV (AUG. 27, 2021) AT 13-22, https://ilga.gov/senate/committees/Redistricting/102Redistricting/SRED/20210827/Transcript/Transcript%20for%20Redistricting%20Committee%20-%20Will%20and%20Collar%20Counties%20Hearing%20-%20August%2027,%202021.pdf

[3] *See Testimony by United Congress of Community and Religious Organizations and Community and religious Organizations and Chicago Lawyers' Committee for Civil Rights,* ILGA.GOV (AUG. 28, 2021), https://ilga.gov/house/committees/Redistricting/102Redistricting/HRED/2021August/2021-08-28%20UCCRO%20Chicago%20Lawyers'%20Committee%20testimony.pdf.

related to the September Plan. Collectively, these documents provide an unprecedented amount of information related to the decision-making process for the legislative redistricting plan. Although they do not, and could not feasibly, include every recommendation or the rationale for each decision made while drawing a decennial legislative map, they provide the legislature's priorities and explain the redistricting principles adhered to, including prioritizing population equality, adherence to the core of existing districts, political subdivision boundaries, recognition of relevant communities of interest, balancing political factions, and partisan composition. *See* Dkt. 135-6 (SR 3); Dkt. 135-7 (HR 443).

Because it must consider and attempt to balance myriad competing interests, the legislative redistricting process inevitably disappoints some constituencies. Disagreement with the outcome, however, is not tantamount to being shut out of the process. To the contrary, many considerations and recommendations, including some made by representatives of the *Contreras* Plaintiffs, were included in both the June Plan and the September Plan. For example, representatives of MALDEF recommended creating Latino voting age majority House districts in Elgin and Waukegan. House Redistricting Comm. Tr., (Apr. 7, 2021) at 25:22-26:5; House Redistricting Comm. Tr. (Apr. 12, 2021), at 46:22-47:3; available at https://ilga.gov/house/committees/Redistricting/102RedistrictingTranscripts/HRED/ 20210407LC/Wednesday%20April%207%20-%20Lake.pdf and https://ilga.gov/house/committees/Redistricting/102RedistrictingTranscripts/HRED/ 20210412/Monday%20April%2012%20-%20Springfield.pdf. Those recommendations

were accommodated, and Latino voting age majority districts were created in Elgin (HD 43) and Waukegan (HD 60).

The 2021 redistricting process provided any community group, advocacy organization, member of the public, or member of the General Assembly—including those members who are *McConchie* Plaintiffs—ample opportunities to participate, provide feedback, and submit proposals. Indeed, named Plaintiff Senate Republican Leader McConchie was a member of the Senate Redistricting Committee, and he appointed the Republican members of the Committee. Plaintiff House Republican Leader Durkin was an ex-officio member of the House Redistricting Committee and appointed the Republican members of the Committee. Republican Leader Durkin personally attended several hearings, though transcripts reveal that despite the opportunity to do so, he did not provide any input as to how to draw districts. As Senator Steven Landek testified, before the legislature began drawing what ultimately became the June Plan, he approached Leader McConchie, and other Republican members, to discuss a bipartisan approach to redistricting, but McConchie declined. Leader McConchie informed Senator Landek that he intended instead to be a plaintiff in a lawsuit regarding the map. Yandell Decl., Ex. B (Landek Dep. Tr. (Nov. 4, 2021)), at 97:5-11. This was long before any map had even been drawn. The *McConchie* Plaintiffs spent hundreds of thousands of taxpayer dollars related to redistricting but chose not to submit any recommendations or file their own legislation. *See Mark Maxwell, Records Show House Republicans Outspending Democrats in Early Redistricting Efforts,* ILLINOIS CAPITAL NEWS (May 20, 2021, 6:16

12

PM), https://www.wcia.com/illinois-capitol-news/records-show-house-republicans-outspending-democrats-in-early-redistricting-efforts.

### B. Procedural Background

This action began on June 9, 2021, when the *McConchie* Plaintiffs filed their initial complaint against Defendants. McConchie Dkt. 1. The *Contreras* Plaintiffs initiated their lawsuit the next day. Contreras Dkt. 1. Both complaints alleged that the June Plan was constitutionally deficient for being malapportioned, and centered on Defendants' use of American Community Survey ("ACS") data to create the June Plan while the Census data remained unavailable.[4] Discovery began immediately, and on July 16, 2021, Defendants filed a motion to dismiss in each case. *See* McConchie Dkt. 45; Contreras Dkt. 33. Before briefing was completed, however, both sets of Plaintiffs amended their complaints. *See* McConchie Dkt. 51; Contreras Dkt. 37. On August 19, 2021, Defendants again filed a motion to dismiss each amended complaint. *See* McConchie Dkt. 80; Contreras Dkt 55. That same day, *McConchie* Plaintiffs filed a motion for summary judgment. *See* McConchie Dkt. 76. *Contreras* Plaintiffs' motion for summary judgment followed the next day. Contreras Dkt. 63. Briefing on dispositive motions was completed by September 17, 2021. *See* McConchie Dkt. 108-110; Contreras Dkt. 88-90.

After the Census Bureau released the official Census data on August 12, 2021, the General Assembly initiated the process to amend the June Plan. The

---

[4] Neither complaint raised Voting Rights Act claims or racially gerrymandering claims, as they do in response to the September Map.

Redistricting Committees of both the House and the Senate held several hearings, which were open to all members and the public, as discussed above. The General Assembly passed the September Plan on August 31, 2021. The Court held a status conference the next day, during which Plaintiffs acknowledged that the September Plan remedied the malapportionment issues that served as a basis for the claims in their complaints. Yandell Decl., Ex. A (Hr'g Tr. (Sept. 1, 2021)) at 9:22-25; 17:19-23. The Court directed that discovery begin on the September Plan and that Plaintiffs file any second amended complaints challenging the September Plan by October 1, 2021. The *McConchie* and *Contreras* Plaintiffs filed second amended complaints on October 1, 2021. McConchie Dkt. 116; Contreras Dkt. 98. The second amended complaints dropped the malapportionment claims previously made regarding the June Map, and brought entirely distinct claims under Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301 (the "VRA"), and for intentional racial gerrymandering in violation of the Equal Protection Clause of the Fourteenth Amendment. *See* McConchie Dkt. 116; Contreras Dkt. 98. These claims were raised for the first time in Plaintiffs' second amended complaints challenging the September Plan, even though Plaintiffs alleged and continue to argue that the June Plan served as a basis for much of the September Plan.

On October 19, 2021, the Court issued its order on the parties' dispositive motions, which concluded that the June Plan was invalid, denied the *McConchie* Plaintiffs' request to form a Redistricting Commission, and ordered that the litigation would then enter a remedial phase. *See generally*, Contreras Dkt. 117 (Mem. Op. &

14

Order (Oct. 19, 2021)). "[M]indful of the [Supreme] Court's repeated admonition that 'reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court,'" *id.* at 37, the Court determined that the September Plan should be considered the starting point for the "remedial phase" of the litigation. *Id.* at 40-43. The Court passed no judgment about the constitutionality of the September Redistricting Plan, which had not been challenged in any of the dispositive motions at issue. *Id.* On that note, the Court invited Plaintiffs, to the extent they believed the September Plan "does not pass muster . . . to submit proposed alternative maps for the Court's consideration accompanied by a statement explaining (1) the constitutional or statutory defects in the September Redistricting Plan and, (2) how the revision or alternative sure such defects." *Id.* at 40. The Court ordered any statements from Plaintiffs to be filed by November 8, 2021, and responses by Defendants to be filed by November 18, 2021. *Id.* at 43. Pursuant to the parties' agreement and Court order, Plaintiffs' submission were filed on November 10, 2021, Defendants submissions are due November 24, 2021 by 2:00 p.m., and Plaintiffs may file reply statements by December 1, 2021 at 10:00 a.m. *See* Contreras Dkt. 140 (Minute Entry (Nov. 17, 2021)).

The same day that the Court issued its order, the *NAACP* Plaintiffs initiated a new action bringing similar VRA Section 2 and Equal Protection racial gerrymandering claims related to the September Plan as the existing Plaintiffs. *See* NAACP Dkt. 1 (Complaint) at ¶¶ 67-86. Acknowledging that they were joining the

action at a late stage, the *NAACP* Plaintiffs agreed to follow the existing case schedule.

## III. LEGAL FRAMEWORK

### A. The State's Duty to Redistrict and the Remedial Phase.

The Supreme Court has repeatedly stressed that redistricting is "primarily the duty and responsibility of the State." *See, e.g., Perry*, 565 U.S. at 392; *Branch v. Smith*, 538 U.S. 254, 261 (2003); *Chapman v. Meier*, 420 U.S. 1, 27 (1975). The state's legislative plan—even in the remedial phase of redistricting cases—is "the governing law unless it, too, is challenged and found to violate the Constitution." *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978); *see also Upham v. Seamon*, 456 U.S. 37, 43 (1982) ("the District Court [i]s not free . . . to disregard the political program of the [] State Legislature" unless it finds a violation of the Constitution or the VRA). Plaintiffs have the burden to prove that the state's legislative plan violates the law on a "district specific basis." *See Comm. for a Fair & Balanced Map v. Illinois Bd. of Elections*, No. 1:11-CV-5065, 2011 WL 5185567, at *4 (N.D. Ill. Nov. 1, 2011) (citing *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986)). To this end, any remedy may "be imposed only in those specific districts where violations have been proven" and must "follow state policies except to the limited extent necessary to remedy the federal violations." *Clark v. Roemer*, 777 F. Supp. 445, 467 (M.D. La. 1990) (citing *White v. Weiser*, 412 U.S. 783, 795 (1973)).

A state's redistricting plan must not violate the VRA and must conform to the requirements of the Constitution, *see infra* Part IV.B–C. Within those bounds, there are a number of reasons and goals that can motivate redistricting which, as it well-

established, do not violate any law. For example, "when members of a racial group live together in one community, a reapportionment plan that concentrates members of the group in one district and excludes them from others may reflect wholly legitimate purposes." *Shaw v. Reno* ("*Shaw*"), 509 U.S. 630, 646 (1993). And, just as race and geography may align, so may race and politics: "political and racial reasons are capable of yielding similar oddities in a district's boundaries" because "racial identification is highly correlated with political affiliation." *Cooper v. Harris*, 137 S. Ct. 1455, 1473 (2017) (citation omitted). A legislature can also permissibly consider political realities when redrawing districts, and "[t]he fact that district boundaries may have been drawn in a way that minimizes the number of contests between present incumbents does not in and of itself establish invidiousness." *White*, 412 U.S. at 797 (reversing district court's decision to "broadly brush[] aside state apportionment policy" when the plan at issue had already been passed by the legislature and signed into law by the Governor) (citation omitted). Other forms of partisan gerrymandering also are not punishable under the Constitution. *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2506–07 (2019) ("[P]artisan gerrymandering claims present political questions beyond the reach of the federal courts."); *see also Luft v. Evers*, 963 F.3d 665, 671 (7th Cir. 2020) ("given the holding of *Rucho* [] legislators are *entitled* to consider politics when changing the rules about voting").

17

### B.     The Voting Rights Act.

First enacted in 1965, Congress amended Section 2 of the VRA in 1982 to its current form.[5]    "Section 2 concerns minority groups' opportunity to elect representatives of their choice." *Bartlett v. Strickland*, 556 U.S. 1, 24–25 (2009).  A group's "candidate of choice" need not be a candidate of the same race or ethnicity of the minority group.   Instead, a candidate of choice is simply the candidate the majority of the minority group supports.  *See Thornburg v. Gingles*, 478 U.S. 30, 68 (1986).

There are several types of districts considered under VRA claim. The first is a majority-minority district. "In majority-minority districts, a minority group composes a numerical, working majority of the voting-age population." *Bartlett*, 556 U.S. at 13. "At the other end of the spectrum are influence districts, in which a minority group can influence the outcome of an election even if its preferred candidate cannot be

---

5    Section 2 provides:

   (a)  No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

   (b)  A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U. S. C. §10301.

18

elected." *Id.* But "§ 2 does not require the creation of influence districts." *Id.* The third group of districts are referred to as crossover districts. "[A] crossover district is one in which minority voters make up less than a majority of the voting-age population. But in a crossover district, the minority population, at least potentially, is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate." *Id.*

Plaintiffs carry the burden of proving a Section 2 vote dilution claim, which has two steps. Here, Plaintiffs cannot carry this burden because they did not allege, and have not yet proven any violation of the VRA.[6] *First*, Plaintiffs must satisfy the three "*Gingles* preconditions," outlined in *Gingles*, 478 U.S. at 48–51. *Second*, they must meet the "totality of the circumstances" test as provided in Section 2(b) and also further elucidated by *Gingles*, 478 U.S. at 44–45.

### 1. The *Gingles* preconditions.

In the first step, plaintiffs must prove the three *Gingles* preconditions[7] by a preponderance of the evidence. The three preliminary *Gingles* preconditions are: (1) the racial group is "'sufficiently large and geographically compact to constitute a majority in a single-member district'"; (2) the racial group is "politically cohesive";

---

6   Plaintiffs' challenges to the June Plan, which were adjudicated by the Court's October 19, 2021 Opinion and Order, did not include claims under the VRA or for racial gerrymandering; those claims appear for the first time in Plaintiffs' second amended complaints (*McConchie*, *Contreras*) and the *NAACP* Plaintiffs' initial October 15, 2021 complaint.

7   The preconditions are also referred interchangeably as "*Gingles* requirements," and "*Gingles* prongs." *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 429, 431 (2006) ("LULAC")

and (3) the majority "vot[es] sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *LULAC*, 548 U.S. at 425 (quoting *Johnson* v. *De Grandy,* 512 U.S. 997, 1006-1007 (1994)). "[U]nless each of the three *Gingles* prerequisites is established, 'there neither has been a wrong nor can be a remedy.'" *Cooper*, 137 S. Ct. at 1472 (quoting *Growe v. Emison*, 507 U.S. 25, 41 (1993)). "[T]he *Gingles* factors cannot be applied mechanically and without regard to the nature of the claim." *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993).

The first *Gingles* requirement of a "geographically compact majority" and the second *Gingles* requirement of "minority political cohesion" "are needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district." *Growe*, 507 U.S. at 40. In order to meet the first precondition, a plaintiff must establish that a majority-minority district can be drawn. *Bartlett*, 556 U.S. at 17. The ability to draw a crossover district (*i.e.*, a district wherein the minority candidate could be elected, if aided by voters from the majority group) is not sufficient to meet the first *Gingles* precondition. *Id*. at 13–17. As the Supreme Court has found:

> Determining whether a § 2 claim would lie—i.e., determining whether potential districts could function as crossover districts— would place courts in the untenable position of predicting many political variables and tying them to race-based assumptions. The Judiciary would be directed to make predictions or adopt premises that even experienced polling analysts and political experts could not assess with certainty, particularly over the long term.

*Id*.

Furthermore, the first *Gingles* precondition is not to be read "to define dilution as a failure to maximize in the face of bloc voting," meaning that the legislature cannot be punished merely for failing to create as many majority-minority districts as possible. *Johnson*, 512 U.S. at 1016. "One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast." *Id*. at 1017.

To establish the third *Gingles* requirement of majority "bloc voting", a plaintiff must show "the *majority* votes as a bloc to defeat minority-preferred candidates." *Bartlett*, 556 U.S. at 16 (emphasis added). It is not sufficient that the population outside of the plaintiff-minority group vote as a bloc; *i.e.*, it is not sufficient to show that all non-Latinos vote as a bloc, since that group might contain multiple other minorities as well as the majority population. "As the *Gingles* Court explained, 'in the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters.'" *Id*. (quoting *Gingles*, 478 U.S. at 49 n. 15). Section 2 "does not assume the existence of racial bloc voting; plaintiffs must prove it." *Growe*, 507 U.S. at 42. The *Bartlett* plurality stated, "States can—and in proper cases should—defend against alleged § 2 violations by pointing to crossover voting patterns and to effective crossover districts. *Bartlett*, 556 U.S. at 24. Those can be evidence, for example, of diminished bloc voting under the third *Gingles* factor or of equal political opportunity under the § 2 totality-of-the-circumstances analysis." *Id*.

### 2. The totality of the circumstances test.

Even if the three *Gingles* preconditions are met, no Section 2 violation will be found if a plaintiff fails to meet the totality of the circumstances test. *Id*. The "statutory test directs [a court] to consider the 'totality of the circumstances' to determine whether members of a racial group have less opportunity than do other members of the electorate." *LULAC*, 548 U.S. at 425. The Supreme Court has further held that in applying this totality of the circumstances test, courts must consider a list of factors that were included in the Senate Report on the 1982 amendments to the VRA. These factors are:

> (1) "the history of voting-related discrimination in the State or political subdivision;"
>
> (2) "the extent to which voting in the elections of that State or political subdivision is racially polarized;"
>
> (3) "the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting;"
>
> (4) "the exclusion of members of the minority group from candidate slating processes;"
>
> (5) "the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;"
>
> (6) "the use of overt or subtle racial appeals in political campaigns;"
>
> (7) "the extent to which members of the minority group have been elected to public office in the jurisdiction;"
>
> (8) the extent to which "elected officials are unresponsive to the particularized needs of the members of the minority group;" and

(9) whether "the policy underlying the State's or political subdivision's use of the contested practice or structure is tenuous."

*Gingles*, 478 U.S. at 44–45; *see also LULAC*, 548 U.S. at 426.

These factors, however, are "neither comprehensive nor exclusive." *Gingles*, 478 U.S. at 45. As an example, "proportionality is not dispositive in a challenge to single-member districting, [but] it is a relevant fact in the totality of circumstances." *Johnson*, 512 U.S. at 1000.

## C.      The Constitution's prohibition on "racial gerrymanders."

"The Equal Protection Clause of the Fourteenth Amendment limits racial gerrymanders in legislative districting plans." *Cooper*, 137 S. Ct. at 1463–64. When a plaintiff brings a racial gerrymandering claim under the equal protection clause, the Court must perform a two-step analysis. *Id.* at 1464.

In the first step, the plaintiff must prove that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller v. Johnson*, 515 U. S. 900, 916 (1995); *see also Shaw v. Hunt* ("*Hunt*"), 517 U.S. 899, 905 (1996) (a plaintiff "bears the burden of proving the race-based motive"). That entails demonstrating the legislature subordinated all other factors—such as compactness, respect for political subdivisions, or partisan advantage—to racial considerations. *See Miller*, 515 U.S. at 916. This requires more than a showing that the "legislature [was] conscious of the voters' races" when making redistricting decisions. *Hunt*, 517 U.S. at 905.

The second step asks the Court to inquire into whether, *if* the first step is satisfied because racial considerations predominated over all others, the design of the

23

district withstands strict scrutiny. *Cooper*, 137 S. Ct. at 1464. At this step, the burden "shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Id.*

When a State asserts partisanship in explanation of redistricting decision made, the District Court "has a formidable task." *Id.* at 1473. Indeed, "political and racial reasons are capable of yielding similar oddities in a district's boundaries. That is because, of course, 'racial identification is highly correlated with political affiliation.'" *Id.* (quoting *Easley v. Cromartie*, 532 U.S. 234, 243 (2001)). Similarly, "when members of a racial group live together in one community, a reapportionment plan that concentrates members of the group in one district and excludes them from others may reflect wholly legitimate purposes." *Shaw*, 509 U.S. at 646.

## IV. ARGUMENT

### A. Plaintiffs Have Failed to Establish a Voting Rights Violation in the Districts in the Four Geographic Areas Challenged.

The three groups of Plaintiffs collectively challenge twelve House districts and two Senate districts in the September Plan. The challenged districts lay in four geographical regions in Illinois: (1) northwest side of Chicago (HDs 3, 4, 39 and SD 2); (2) southwest side of Chicago (HDs 1, 2, 21, 22, 23, 24, 32, and SD 11); (3) Aurora (HD 50); and (4) Metro East (HD 114).[8] *See* McConchie Dkt. 151 at 10; Contreras

---

[8] *Contreras* Plaintiffs challenge HDs 3, 4, 21, 24, 39, and HDs 2 and 11. *McConchie* Plaintiffs challenge HDs 1, 2, 3, 4, 21, 22, 23, 24, 32, 39, 50, and 114. Their statement challenges HD 77, but it is not mentioned in the Second Amended Complaint and not included in this list. *NAACP* Plaintiffs challenge HD 114.

Dkt. 139, 15-19; and East St. Louis NAACP Dkt. 44 at 6. Plaintiffs fail to prove the *Gingles* factors as to any region, and thus cannot establish that a remedy is necessary.

> **1.** **Plaintiffs cannot establish the *Gingles* preconditions.**

Plaintiffs claim that their experts establish the *Gingles* preconditions in the challenged areas. Each *Gingles* factor must be met, and Plaintiffs cannot satisfy either *Gingles* factor 1 (alternatively, "*Gingles* 1") or *Gingles* factor 3 (alternatively, "*Gingles* 3"). Plaintiffs' chief stumbling block is that their submissions fail to demonstrate that white bloc voting exists in any of the challenged areas sufficient to usually defeat minority-preferred candidates.

As Dr. Lichtman's report establishes, Illinois has nearly no racial bloc voting. In fact, for the challenged Chicago area districts, for example, Dr. Lichtman established that the Latino candidate of choice prevailed in 91% of the races analyzed. Lichtman Report, at 35. And in the Metro East Area, the Black candidates of choice were successful in 100% of the races analyzed. *Id*. at 99. Simply put, Plaintiffs have failed to establish all three *Gingles* preconditions, and their VRA claims must be rejected.

> a. <u>Chicago Northwest and Southwest Side Districts</u>

Plaintiffs cannot establish, based on the evidence presented, that either the *Gingles* 1 or *Gingles* 3 preconditions are met. As a result, the claims of Latino voter dilution in the challenged districts must fail.

> (1) *Plaintiffs have not established Gingles factor 1.*

The *Contreras* and *McConchie* Plaintiffs argue they can establish *Gingles* 1 by creating majority Latino districts, but their own experts' data contradicts that

conclusion. McConchie Dkt. 151 at 10–12; Contreras Dkt. at 15–19. As Contreras Plaintiffs concede, the Seventh Circuit has not adopted citizen voting age population (CVAP, which is derived from ACS data) as the benchmark on *Gingles* 1. Contreras Dkt. at 15 (citing *Barnett v. City of Chicago*, 141 F.3d 699, 706 (7th Cir. 1998)). Using voting age population (VAP, which is determined by the Census) instead, *all* of the House Districts Plaintiffs challenge are "majority-minority" Latino districts, with the exception of HD 24. *See* Maxson Decl. Ex. A. Because Section 2 claims are judged by the "majority-minority standard," Plaintiffs have no viable VRA claim where the existing district is majority-minority. *See Bartlett*, 556 U.S. at 18–20 (upholding the standard). Even the remaining district does not violate the rule because "minorities make up more than 50 percent of the voting age population in the relevant geographic area." *Id.*

For example, *McConchie* expert Dr. Chen's report provides a table of the enacted September Plan, which provides demographic data for Black and Latino populations (total population, VAP, and CVAP). McConchie Dkt. 151-2 at 8-9. The table omits any demographic data for Whites or Asians. Despite that, it shows that every challenged district in Dr. Chen's table is a majority-minority district, with the exception of HD 24 (48.5% Latino VAP). Had Dr. Chen included all the demographic data, his table would also show that HD 24 has 26.9% Asian VAP, which results in HD 24 having a "super" majority-minority VAP of 78.9%. Ex. Maxson Decl., at Ex. A. Thus, all of the challenged districts have a collective majority of minorities, though HD 24 does not have a majority of any one minority group.

Moreover, the Supreme Court has held that *Gingles* 1 cannot be established by proving a *crossover* district could be drawn; instead, a plaintiff must establish a *majority-minority* district could be drawn. *Bartlett*, 556 U.S. at 24. Plaintiffs' challenge to crossover districts like House Districts 24 runs counter to the Supreme Court's finding that "[i]f the lesson of *Gingles* is that society's racial and ethnic cleavages sometimes necessitate majority-minority districts to ensure equal political and electoral opportunity, that should not obscure the fact that there are communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice." *Johnson*, 512 U.S. at 1020.

Plaintiffs argue that the CVAP (instead of VAP) should be used as the benchmark for whether a district is "majority-minority." But Plaintiffs cannot cite to any case where the court relied on CVAP when the validity of the data was disputed. And Plaintiffs themselves originally brought this litigation before the Court on the *very basis* that CVAP is unreliable. Still, Plaintiffs use CVAP in *precisely* the way that they criticized Defendants for relying on it in the creation of the June Plan. Dr. Chen's report states: "The ACS 5-Year estimates are released only at the level of Census block groups. I thus disaggregate the ACS 5-Year estimates down to the block level, to estimate the racial and ethnic breakdown of the CVAP in each district. It is common for experts to disaggregate ACS 5-Year block group population estimates in this manner." McConchie Dkt. 151-2 at ¶ 11. Plaintiffs cannot now change their tune and treat CVAP as though it was created with mathematical

precision, simply because it serves their needs. Plaintiffs' proposed remedial districts are just 0.3% to 1.6% CVAP in excess of 50%—such slim margins cannot satisfy *Gingles* 1 given the level of inaccuracy in the data. This Court should find that Plaintiffs have not established *Gingles* 1 on the basis of data the Court has already found led to an unconstitutional malapportionment. If the ACS data was unreliable for drawing district based on population, it is unreliable to establish CVAP at the same district level.

Even suspending disbelief about CVAP accuracy, Plaintiffs still are confronted with the same issues. All the challenged House Districts on the northwest and southwest sides of Chicago are majority-minority CVAP, with HDs 1, 2, 22, and 23 being majority-Latino CVAP. Maxson Decl., Ex. A. And, the numerosity requirement is not the end of the *Gingles* 1 inquiry as traditional redistricting principles should be considered in determining compactness of the minority group. *LULAC*, 548 U.S. at 433. The *McConchie* and *Contreras* Plans disregard traditional redistricting principles prioritized by the General Assembly to create their revised majority-minority districts. For example, on the northwest side, the *McConchie* Plaintiffs completely alter the direction of the districts, pair four incumbents, including three Latino members, split communities of interest, cut up the cores of districts, and sacrifice a Latino influence district.

(2)     *Plaintiffs have not established Gingles factor 3.*

*Gingles* factor 2 requires a plaintiff to establish the racial group is "politically cohesive". *LULAC*, 548 U.S. at 425. Defendants accept that *Gingles* 2 has been met by *Contreras* expert, Dr. Grumbach. Contreras Dkt. 135-19. But *Contreras* Plaintiffs

28

use Dr. Grumbach's analysis on racial polarization to argue they have established *Gingles* 3 where "the majority "vot[es] sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *LULAC*, 548 U.S. at 425.

Though racial bloc voting almost certainly cannot exist without polarization, polarization does not always result in bloc voting by the majority to defeat the minority candidate of choice. In other words, polarized voting only matters where the result is that the candidate supported by minority voters loses the election. Section 2 "does not assume the existence of racial bloc voting; plaintiffs must prove it." *Growe*, 507 U.S. at 42. Here, Plaintiffs cannot do so because the September Plan contains effective crossover districts. *See Barlett*, 556 U.S. at 24.

As Dr. Lichtman's report establishes, minorities have been very successful in the last decade at electing their candidates of choice in Illinois. In fact, using the legislative races selected by Dr. Grumbach and Dr. Chen, Dr. Lichtman establishes the Latino candidate of choice won 91% of the elections analyzed. Lichtman Report, at 72. As Dr. Lichtman states in his report, "across five elections cycles since the post-2010 redistricting, only two Hispanic preferred candidates have been defeated in all districts with a minimum of 27.9% Hispanic CVAP." *Id*. at 92.

The Supreme Court has said "the ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." *LULAC*, 548 U.S. at 428 (quoting, *Johnson*, 512 U.S., at 1014 n. 11). "One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast." *Johnson*,

512 U.S. at 1017.  This Court need not determine whether a 91% success rate is a political feast, but it certainly cannot find it is a political famine.

Dr. Lichtman also establishes Plaintiffs' experts' conclusions are unreliable. For example, Dr. Chen reports he considered 26 total endogenous (legislative) and exogenous (other) races in Cook County.  McConchie Dkt. 151-2 at ¶ 32.  But, in actuality, Dr. Chen conducted his bloc voting analysis by selecting 5 races from 26 he identified based on criteria provided by *Plaintiffs' counsel*. *Id*. ¶ 32.  Counsel provided Dr. Chen with four criteria:

> 1) The election was a primary election or a non-partisan municipal election;
>
> 2) For endogenous (State House or Senate) elections, the district is substantially within the region covered by the Plaintiffs' Remedial Plan;
>
> 3) Over 50% of Latino voters favored a single candidate; and
>
> 4) Over 50% of White voters favored a candidate other than the Latino-preferred candidate.

*Id*.  Only five elections met counsel's criteria: the April 2015 Chicago Mayoral election, the 2018 Cook County Assessor Primary, the 2012 HD-39 Primary, the 2014 HD-39 Primary, and the 2018 HD-1 Primary.  *Id*. ¶ 36.  Dr. Chen ultimately relied on only *one* as a model for his analysis.  Each of these elections must be considered in context, especially before drawing any conclusions from such a small sample size.

The 2015 Chicago Mayoral election is an example of a how reality differs from the outcome of elections on paper.  That election pitted incumbent Mayor Rahm Emanuel against Jesus "Chuy" Garcia.  Lichtman Report, at 172.  Garcia was the

Latino candidate of choice and was defeated by Emanuel who was the white candidate of choice. However, Emanuel was backed by 59.5% of non-Latino minorities. *Id.* at 84. The white majority did not defeat the Hispanic candidate of choice in that race, rather the candidate was defeated by a coalition of white and non-Latino minorities. *Id.*

The election that Dr. Chen ultimately focused in on was the 2018 Cook County Assessor Primary. That race saw incumbent Joe Berrios (Latino) face challenger Fritz Kaegi (White). *Id.* at 158. But Dr. Chen conveniently omitted mention of the third challenger in that race, Andrea Raila, whose presence impacted the distribution of votes (she received 20% of total votes). *Id.* Additionally, the Latino candidate, Berrios, had significant political problems, including various scandals and allegations of accepting contributions from people who received tax breaks. Those tax breaks were accused of hurting low-income residents, which led prominent elected officials to speak out against Berrios, including Chuy Garcia (the now Congressman and former mayoral candidate). *Id.* at 159. In fact, the Little Village area with a large Latino population voted for the white candidate, Kaegi, over Berrios. Villenueva Decl., at ¶ 13. As a result of these factors, Berrios significantly underperformed with Latino voters in that election. Lichtman Report, at 158.

Despite the unusual circumstances in the 2018 Assessor primary, Dr. Chen used it as the sole election in his model to determine how the September Plan will perform for Latino candidates of choice. *McConchie* Dkt. 151-2 at 44-45. Dr. Chen estimated that, based on the 2018 Assessor primary, seven of the challenged districts

would not perform for Latino candidates of choice. *Id.* at 47 (Table 10). Dr. Lichtman, however, shows that even using this outlier election, Dr. Chen's analysis failed to account for all voters. Lichtman Report, at 165. Analyzing the model run in the challenged districts in the SB 927 Plan, Dr. Lichtman calculated that Dr. Chen failed to account for 6.3% to 32.7% of the population in those districts. *Id.* These are fatal flaws that render the Chen report unreliable.

As for *Contreras* Plaintiffs' expert, Dr. Grumbach, Dr. Lichtman found that Dr. Grumbach's declaration presents considerable information on Hispanic and non-Hispanic voting choices but does not directly address *Gingles* 3. Lichtman Report, at 38. As Grumbach explains in his declaration, he is assessing exclusively the existence of racially polarized voting in Illinois. Contreras Dkt. 135-19 at 1 ("I was retained by Plaintiffs in this action to provide expert testimony assessing whether racially polarized voting between Latinos and non-Latinos exists in Illinois."); *see id.* at 2 (noting he was hired to "quantitatively assess whether racially polarized voting exists in elections in the state of Illinois"). Dr. Lichtman states that "[a]n appropriate analysis of racially polarized voting might indirectly provide insight into *Gingles* Prong 3. However, Dr. Grumbach's approach to racially polarized voting precludes such insight." Lichtman Report, at 39. Dr. Lichtman has two main objections to Dr. Grumbach's analysis:

First, Dr. Grumbach did not examine polarization between Latinos and whites. Instead, he combined whites, Blacks, Asians, and other minorities into the single category of "non-Latino," thereby concealing the choices of whites as a specific group

within this larger category of voters. Lichtman Report, at 39. This also has the effect of making it impossible to differentiate between elections that were swayed by the white vote, as compared to the crossover vote of whites and a non-Latino minority.

Second, Dr. Grumbach adopts a misleading definition of "racially polarized voting" that is unhelpful in evaluating *Gingles* 3. Dr. Grumbach finds that racially polarized voting occurs whenever Hispanics and non-Hispanics differ in their voting choices, no matter the reason (*e.g.*, no matter whether the differences are small or, critically for *Gingles* 3, no matter whether the two groups have the same preferred candidate). Lichtman Report, at 39. As a result, Dr. Grumbach does not present evidence that satisfies *Gingles* 3, because he does not demonstrate significant white bloc voting, such that the Latino-preferred candidates would usually lose an election.[9] *Id.*

The Supreme Court has said "in the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters." *Johnson*, 512 U.S. at 1016. The three-judge panel in *Committee for a Fair & Balanced Map v. Illinois State Board of Elections* found that plaintiffs failed to establish *Gingles* 3 under evidence very similar to that presented to the this Court. The panel found:

> The more significant problem with [plaintiffs' expert] Dr. Engstrom's analysis is that he didn't examine actual election results to evaluate whether non-Latinos vote as a bloc to usually defeat the Latinos' candidate of choice. As correctly noted by Dr. Lichtman, proof of vote dilution requires two steps. The

---

[9] Dr. Lichtman also points to numerous mathematical flaws in Dr. Chen and Dr. Grumbach's reports. See, *e.g.*, Lichtman Report, at 40-42.

Committee must first show that Latinos and non-Latinos prefer different candidates, and second, that the non-Latino voting bloc is sufficiently strong to usually defeat the Latino candidate of choice. Dr. Engstrom fails to make a showing as to this latter requirement. His report, for example, ignores election results that Dr. Lichtman included in his report where Latino candidates of choice won in 15 out of 16 elections in jurisdictions that were 70 percent or more non-Latino in their voting age population, a success rate of 94 percent. When considering the elections included in Dr. Engstrom's and Dr. Lichtman's reports, Latino candidates of choice prevailed in 24 of 29 elections, a success rate of 83 percent. Dr. Lichtman's findings show that as a "practical," rather than theoretical, matter, Latino candidates have won more often than not in the challenged area.

835 F. Supp. 2d at 588.

The same is true here. To establish the *Gingles* 3 precondition, Plaintiffs had to establish that the non-Latino voting bloc is sufficiently strong to *usually* defeat the Latino candidate of choice. But overwhelmingly, Dr. Lichtman demonstrated that in the races analyzed by Plaintiffs' own experts, Latino candidates of choice won 91% of the time. Plaintiffs have failed to establish *Gingles* 3. And they can't and won't, because white voters routinely and consistently vote to elect minority candidates.

b.  Metro East

The *McConchie* and *NAACP* Plaintiffs both challenge House District 114 in the September Plan.

(1)  *Plaintiffs Fail to Satisfy Gingles factor 1 for HD 114.*

To satisfy the first *Gingles* condition, Plaintiffs must demonstrate that a minority group is "sufficiently large and geographically compact to constitute a majority of a single-member district." *Gingles*, 478 U.S. at 50. However, it is not enough for Plaintiffs to show that a majority-minority district can be drawn at any

cost. As the Supreme Court has observed, the compactness inquiry under the first *Gingles* condition should take into account traditional redistricting principles. *LULAC,* 548 U.S. at 433; *see also Reed v. Town of Babylon,* 914 F.Supp. 843, 871 (E.D.N.Y.1996).

The NAACP submitted expert Dr. Weichelt's report that presents *two* maps of proposed HD 114. NAACP Dkt. 44-1. The first map, identified as the "liability plan," shows a Black VAP exceeding 50% at 51.5%. *Id*. at 19. This is presumably submitted solely to show a district with over 50% Black VAP *could* be drawn—as is required under the first *Gingles* factor—to meet the *Bartlett* requirement (and the Supreme Court standard) of a majority-minority district. *See Bartlett*, 556 U.S. at 18–20. However, in attempting to meet this burden, the "liability" plan suffers from a fatal flaw: it is incomplete. As drawn, the "liability" plan includes a single district with no districts neighboring it. It does not account for any population changes to neighboring districts. It is non-contiguous in violation of the Illinois Constitution and traditional redistricting principles. *See* Ill. Const. art. IV, § 3(a); *Miller*, 515 U.S. at 916 (identifying compactness and contiguity as traditional redistricting principles). "A district court cannot implement an incomplete plan, containing only a single district, with the rest of the map left blank." *Negron v. City of Miami Beach, Florida*, 113 F.3d 1563, 1571 (11th Cir. 1997).

But Dr. Weichelt then presents a "remedial plan." *Id*. at 20. The map for the remedial plan has a Black VAP of only 49.45%, which does not meet the *Bartlett*

requirement that a plaintiff can only meet *Gingles* 1 by establishing a majority-minority district. *Id*. at 21.

Even assuming NAACP Plaintiffs are permitted to meet their *Gingles* burden piecemeal through multiple maps—which there is no basis for in precedent—*NAACP* Plaintiffs' plans improperly subordinate traditional redistricting principles and the legislative policies underlying the September Plan by pairing the Black female incumbent (who *NAACP* Plaintiffs' theoretically seek to protect) with a white male incumbent in a district in which less than half the population is in current HD 114. Exhibit 7 ("Greenwood Decl.") at ¶ 22. While East St. Louis is kept whole in the Plaintiffs' plans, East St. Louis is paired with larger portions of more populous cities, eliminating it as a base of its own district and harming its influence, while splitting other areas. *Id*.

> (2) *Plaintiffs Fail to Satisfy Gingles factor 3 for HD 114.*

The NAACP's own submission demonstrates that *Gingles* 3 has not been established. The first map, the "liability plan," shows a Black VAP exceeding 50% at 51.5%. NAACP Dkt. 44-1 at 20. The "remedial plan" has a Black VAP of only 49.45%, which does not meet the *Bartlett* requirement that a plaintiff can only meet *Gingles* 1 by establishing a majority-minority district. *Id*. at 20-21. The answer to why the *NAACP* Plaintiffs would propose a remedial map with less than 50% Black VAP (if they truly believe racial bloc voting exists) is answered by NAACP expert Dr. Laura Collingwood. She analyzed District 114 and stated as follows:

> While the Black Democratic candidate — who is preferred by
> Black voters in the reconstructed district — won the three

36

> elections, the over-time patterns suggest this district has trended from favoring Black Democratic candidates towards a toss-up. Indeed, the 2020 Board of Review election is essentially a coin flip. Given that Blacks have recently declined as a share of the population in the area, it seems reasonable that as Blacks move out, and/or turn out at even lower rates than they do now relative to whites, the likelihood that Blacks' candidate of choice will win will further reduce over time. Given that under the 2011 Plan, the Black candidate preferred by Black voters received between at least 57.1% of the total vote, the SB 927 version of HB 114 significantly reduces the opportunity for Black voters to elect their candidates of choice as the HB 114 has gone from a relatively safe seat to a toss-up.

NAACP Dkt. 44-2 at 18.

By Dr. Collingwood's own admission, HD 114 is at worst "a toss-up." *Id*. Therefore, it must fail *Gingles* 3. The fact that the remedial plan contains an increased Black VAP, but under 50%, demonstrates that the NAACP's case is not about allowing Black voters to elect their candidate of choice, but to ensure a "safe seat." *Id*. That is the not what the Voting Rights Act provides. "[T]he ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." *LULAC*, 548 U.S. at 428. As a result, the NAACP has not established the *Gingles* 3 precondition. *See Bartlett*, 556 U.S. at 24.

(3)     *An effective crossover district is permissible.*

In asking this Court to find that the Voting Rights Act requires a majority-minority district in the Metro East, the Plaintiffs' seek to alter an effective crossover district, which relief was recently rejected by the Supreme Court under very similar circumstances in *Harris v. Cooper*, 137 S. Ct. 1455 (2017). *Harris* concerned North Carolina's redrawing of two congressional districts that, prior to the 2011 redistricting, consistently elected the candidates preferred by Black voters despite

not having a majority Black VAP. In 2011, the State needed to adjust the population of the two districts to comply with the one-person, one-vote principle and added population from heavily black areas, drawing two majority Black VAP districts in the name of Voting Rights Act compliance. *Id*. at 1466. The Supreme Court found that the State engaged in unconstitutional racial gerrymandering as there was no justification for drawing a majority-minority district predominantly on the basis of race. In so finding, the Supreme Court stated:

> Here, electoral history provided no evidence that a § 2 plaintiff could demonstrate the third *Gingles* prerequisite—effective white bloc-voting. For most of the twenty years prior to the new plan's adoption, African–Americans had made up less than a majority of District 1's voters; the district's BVAP usually hovered between 46% and 48%. Yet throughout those two decades, as the District Court noted, District 1 was "an extraordinarily safe district for African–American preferred candidates." In the *closest* election during that period, African–Americans' candidate of choice received 59% of the total vote; in other years, the share of the vote garnered by those candidates rose to as much as 70%. Those victories (indeed, landslides) occurred because the district's white population did *not* "vote [ ] sufficiently as a bloc" to thwart black voters' preference; rather, a meaningful number of white voters joined a politically cohesive black community to elect that group's favored candidate. In the lingo of voting law, District 1 functioned, election year in and election year out, as a "crossover" district, in which members of the majority help a "large enough" minority to elect its candidate of choice. When voters act in that way, "[i]t is difficult to see how the majority-bloc-voting requirement could be met"—and hence how § 2 liability could be established. So experience gave the State no reason to think that the VRA required it to ramp up District 1's BVAP.

*Id*. at 1470 (internal citations omitted).

Similarly, in *Abrams v. Johnson*, the Supreme Court held that *Gingles* 3 was not satisfied to compel the drawing of additional majority-minority districts where "the average percentage of whites voting for black candidates across Georgia ranged

38

from 22% to 38%" and "[b]lack and black-preferred candidates in Georgia ha[d] achieved many electoral victories in local and statewide elections and ha[d] received significant—occasionally overwhelming—support from both black and white voters within the [applicable] district." 521 U.S. 74, 92 (1997) (internal citation omitted). Notably, the three black incumbents in the challenged districts had won reelection under the challenged plan, including a district with a Black VAP of 33%. *Id.* at 93.

Here, the General Assembly was operating in a similar position with HD 114, which has been an extraordinarily safe district for Black preferred candidates for the last four decades, despite being a majority-white district for at least 20 of those years, including the last 10 years. *NAACP* Dkt. 1 ¶¶ 2, 40, 69 (HD 114 has been "performing as an effective district affording Black voters an equal opportunity to elect their candidates of choice under the 2011 plan"). In fact, even though the 2020 Census showed that Black VAP of the current HD 114 dropped from 42% to 37%, Black candidates soundly won landslide victories with margins between 14% and 19% against white candidates in all three such elections over the last decade, including 2016 where the Black candidate was a new-comer, not the incumbent. NAACP Dkt. 1 at ¶¶ 43-47, 51; NAACP Dkt. 44 at 8.

As Dr. Lichtman's report shows, the district has been safe for Black preferred candidates because a significant share of the white population joined with the Black population to support Black voters' preferences in the area. Lichtman Report, at 156. Despite a decrease in Black VAP in HD 114 under SB 927, Dr. Lichtman's analysis shows the district will continue to be an effective crossover district for African

American preferred candidates for years to come. *Id.* Further, Plaintiffs' expert reports also confirm that Black candidates of choice win nearly all the elections analyzed in jurisdictions with CVAPs similar to or below the Black CVAP of HD 114. *Id.* As explained by Dr. Lichtman, "*plaintiffs have no reliable basis for claiming that any challenged district fails to provide Hispanic voters an equal opportunity to elect candidates. Moreover, the analysis of the one challenged black district, HD 114, by Dr. Collingwood shows that this district provides black voters more than an equal opportunity to elect candidates of their choice.*" *Id.* As such, Plaintiffs cannot prove the third *Gingles* prong, and the drawing of a majority-minority district was not required under the Voting Rights Act.

Moreover, although current HD 114 has functioned as a crossover district, Section 2 of the VRA does not require that the General Assembly to draw a majority-minority district instead of a crossover district absent a Section 2 violation. *Bartlett*, 556 U.S. at 14–15. Nor does Section 2 require the General Assembly to "greatly increase the chances" of a minority-preferred candidate winning, ensure that minority-preferred candidates win by greater margins, or guarantee that minority-preferred candidates run unopposed. *See De Grandy*, 512 U.S. at 1016-17. Section 2 of the VRA only requires that minority voters be given an *equal opportunity* to elect candidates of their choice. *Bartlett*, 556 U.S. at 25. HD 114, as drawn in the September Redistricting Plan, will continue to do just that.

c.   <u>Aurora</u>

Only the *McConchie* Plaintiffs challenge District 50 in Aurora, which they claim is drawn in a way that disadvantages the Latino population. But *McConchie*

40

Plaintiffs do not establish *Gingles* 1, at least not by their own definition.  As discussed above, *McConchie* Plaintiffs argue Latino CVAP is the standard to establish *Gingles* 1.  But in their proposed District 50 in Aurora, the CVAP is only 46.8%.  McConchie Dkt. 151-2.  If CVAP is the benchmark (which, to be clear—it should not be), this fails to meet the *Bartlett* 50% threshold.

*McConchie* Plaintiffs do claim a 62% Latino VAP for their proposed District 50.  But even if 50%+ Latino VAP is the benchmark, Plaintiffs have still failed to establish *Gingles* 3. Their experts provide no analysis of racial bloc voting of Aurora whatsoever.  *See McConchie* Dkt. 151-2, 151-3.  The only evidence related to racial bloc voting by any party is presented by Defendant's expert, Dr. Lichtman, who clearly demonstrates Latino candidates can be successful in Aurora, even with low Latino populations. Lichtman Report, at 10.  For example, as Dr. Lichtman notes, Sen. Karina Villa (Latino) won a Senate seat in the Aurora area SD 25 in 2020 despite the district having a 10.7% Latino CVAP.  *Id*. Though it is Plaintiffs' burden to establish the *Gingles* precondition, the Villa result compared to Plaintiffs' silence regarding Aurora elections results demonstrates a failure to establish the racial bloc voting precondition.

## 2. Plaintiffs do not prove the totality of the circumstances demonstrate a dilution of Latino voting strength.

Even if a plaintiff establishes the three *Gingles* preconditions, they still "must demonstrate that, under the totality of the circumstances, the devices result in unequal access to the electoral process." *Voinovich*, 507 U.S. at 155.  In applying this standard, courts must consider a list of factors that were included in the Senate

Report on the 1982 amendments to the Voting Rights Act (the "Senate Factors"). *LULAC*, 548 U.S. at 426.

Dr. Lichtman's report provides an exhaustive review of the Senate Factors. Lichtman Report, at 100. He starts by noting that Plaintiffs submitted "no report that systematically examines each factor. Rather, information and analyses relevant to individual factors are scattered throughout many different reports. The result is that plaintiffs have not presented proof of how the factors, taken together, impact the totality of circumstances regarding minority voting opportunities in Illinois." *Id.* at 102-03.

*McConchie* Plaintiffs' submission recognizes its lack of a comprehensive analysis of the Senate Factors by arguing the focus should rest primarily on just two factors. McConchie Dkt. 151 at 21. But the submission cites no proof from any expert report regarding either of these two factors. The *NAACP* Plaintiffs mention only five of the nine Senate Factors, omitting Factors 3, 4, 6, and 9. Only the *Contreras* Plaintiffs' submission mentions all nine of the Senate Factors.

Dr. Lichtman has analyzed the nine Senate Factors as applied to Illinois and concludes that "the totality of circumstances on democratic access are highly favorable in Illinois, especially when compared to Republican controlled states." Lichtman Report, at 152.

Dr. Lichtman analyzed the individual Senate Factors as follows.

      a.    <u>The history of voting-related discrimination in the State or political subdivision</u>**.**

For this factor, Dr. Lichtman cites scholarship from Contreras' expert, Dr. Grumbach. Dr. Grumbach published an article in April 2021 titled "Laboratories of Democratic Backsliding." Lichtman Report, at 104. In the article, Dr. Grumbach created a "State Democracy Index" using "electoral and liberal democratic quality, such as average polling place wait times, same-day and automatic voter registration policies, and felon disenfranchisement" to measure democratic performance. He says that "electoral democracy" as gauged by his index is important "especially for minority populations who have been historically subjugated." *Id*.

After conducting an analysis, Dr. Grumbach found that from 2000 to 2018, "Illinois and Vermont move from the middle of the pack in 2000 to among the top democratic performers in 2018." *Id*. at 133. He found that by 2018 Illinois ranked third best among the states, trailing only Colorado and Washington, two states that use mail-on only elections. *Id*.

Dr. Lichtman cites numerous legislative enactments passed by the General Assembly since 2005 to open access to voting in Illinois. Additional scholarship confirms Dr. Grumbach's findings. Illinois scored 4th highest in the nation for access to registration and voting. Lichtman Report, at 108. These findings strongly favor Illinois on this analysis.

       b.    <u>The extent to which voting in the elections of that State or political subdivision is racially polarized.</u>

Dr. Lichtman opines that this factor favors Illinois. He notes the Plaintiffs' experts find racial polarization, but do not dig further to find that white bloc voting actually works to defeat minority candidates of choice. Lichtman Report, at 122 ("the

43

assessment of numerical differences in minority and white voting patterns is the beginning not the end of a racially polarized voting analysis that illuminates minority electoral opportunities in Illinois.")  In fact, he finds that in Illinois results show that minorities overwhelmingly support Democratic candidate for the legislature, but that a majority of white voters backed Democratic candidates with considerable consistency as well: 56.8% for State Senate in 2020, 56.3% for State House in 2020, 53.9% for State Senate in 2018, and 53.4% for State House in 2018.  Lichtman Report, at 125-6.  As discussed in the *Gingles* 3 analysis above, white voters in Illinois do not vote to bloc minority candidates of choice in a manner sufficient to violate Section 2.

> c. <u>The extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting.</u>

Dr. Lichtman finds this factor is not relevant to Illinois.  "The state does not have unusually large election districts, majority vote requirements, or prohibitions against bullet voting. None apply to state legislative elections in Illinois. None of the expert reports submitted by plaintiffs analyze Senate Factor 3."  Lichtman Report, at 132-33.

> d. <u>The exclusion of members of the minority group from candidate slating processes.</u>

This factor, too, favors Illinois—at least as far the Democratic Party is concerned.  Minorities are well represented in high elected office.  As an example, of

the eight statewide elected officials,[10] five are minorities (Senator Duckworth (Asian), Lt. Governor Stratton (Black), Attorney General Raoul (Black), Secretary White (Black), and Comptroller Mendoza (Latina)). The Speaker of the House is Black. In addition, Chicago Mayor Lightfoot and Treasurer Conyears-Ervin are Black, and City Clerk Vallencia is Latina. Currently 33 members of the 50 person Chicago City Council (66%) are Black or Latino. In Cook County, County Board President Preckwinkle, State's Attorney Fox, and County Clerk Yarbrough are Black. Circuit Court Clerk Martinez is Latina. Nine of 17 County Board Commissioners (53%) are Black or Latino. Clearly minorities are not being excluded from the slating process in the Democratic party with this type of minority representation in elected office. *See* Lichtman Report, at 133-35.

> e. <u>The extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process.</u>

On this factor Dr. Lichtman does not contest (nor do Defendants) that there is economic disparity between Blacks, Latinos, and whites. But that is true of almost anywhere in the United States. If that were all this factor was concerned with then it would apply uniformly to all 50 states. Instead, Plaintiffs have failed to provide evidence of something Illinois specific that establishes this factor. Lichtman Report, at 135-40.

---

[10] This includes the state's two United States Senators and six state executive officers (Governor, Lt. Governor, Attorney General, Secretary of State, Comptroller, and Treasurer).

f. The use of overt or subtle racial appeals in political campaigns.

Dr. Lichtman and Plaintiffs' experts have found some evidence of this factor, but all such appeal in political campaigns were made by Republican candidates. Lichtman Report, at 141-43. Such appeals should not be held against the Democratic Defendants and their colleagues who voted for the September Plan.

g. The extent to which members of the minority group have been elected to public office in the jurisdiction.

This factor is largely covered by the discussion of factor 4 (whether minority members are excluded from slating processes) and favors Illinois.

h. The extent to which "elected officials are unresponsive to the particularized needs of the members of the minority group.

This factor was not analyzed by any of Plaintiffs' experts, but Dr. Lichtman notes that Illinois is a national leader in voter access; it was one of the first states to expand Medicaid to extend coverage to an additional 600,000 residents, including low-income residents; Illinois has enacted laws to expand the availability of affordable housing; and enacted laws to help and protect immigrant residents. Lichtman Report, at 150-52.

i. Whether the policy underlying the State's or political subdivision's use of the contested practice or structure is tenuous.

Dr. Lichtman finds the September Plan is not tenuous. He says "Soon after the federal government issued official U.S. Census population counts, the General Assembly amended earlier legislation to conform with the constitutional requirements for the apportionment of state legislative districts. There is no dispute

among experts that SB 927 created districts that are well within the deviations required for state legislative plans." Lichtman Report, at 153.

***

Dr. Lichtman's exhaustive analysis of the Senate Factors demonstrate that they favor Illinois. Even if this Court were to find the *Gingles* preconditions were met, Plaintiffs have failed to meet the second step. The Plaintiffs' VRA Section 2 claims should be denied.

### B. Plaintiffs Have Failed to Establish an Unconstitutional Racial Gerrymander in Senate District 11 and House Districts 21 and 114.

Plaintiffs' burden on a racial gerrymandering claim is a steep one: they must prove that race was the predominant factor, above all other factors, in drawing the district in question. *Cooper*, 137 S. Ct. at 1464. In other words, Plaintiffs must prove that the legislature subordinated legitimate redistricting considerations, including "compactness, respect for political subdivisions, partisan advantage" among others to "racial considerations." *Id*. at 1464-65. It is not enough for Plaintiffs to show that a legislature was "conscious" of voters' race when making decisions. *Hunt*, 517 U.S. at 905. A racial gerrymandering claim similarly cannot be proved based on inferences or through the absence of evidence to the contrary. Rather, Plaintiffs must present "evidence of intent" that "disentangle[s]" any racial motivations from partisan or other legitimate motivation's to prove that race was the predominant factor motivating the composition of each challenged district. *Cooper*, 137 S. Ct. at 1473 (citing *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999)).

47

No Plaintiff group has seriously attempted to meet the well-established burden on their racial gerrymandering claims.

***McConchie***.  The *McConchie* Plaintiffs abandon their racial gerrymandering claim entirely, as it is not mentioned in their statement.  *See generally McConchie*, Dkt. 151.

***NAACP***.  The NAACP Plaintiffs do not provide a single piece of direct evidence of racial intent by Defendants or anyone else in the General Assembly in drawing their challenged districts.  *See* NAACP Dkt. 44 at 10-22, 24-30.  Instead, *NAACP* Plaintiffs attempt to cobble together circumstantial evidence that race was the predominant factor in the September Plan's drawing of HD 114.  Plaintiffs' examples, however, do little more than highlight that *partisanship* predominated the legislature's drawing of HD 114. For instance, *NAACP* Plaintiffs highlight that "Senator Crowe . . . specifically told a staffer working on redistricting to make her district 'more Democrat'" and that a "House staffer testified that he redrew the lines in Metro East 'to enhance the Democratic performance of the 112th district.'" NAACP Dkt. 44 at 10.  The plain language of this evidence demonstrates that the legislature considered partisan and political factors, and says nothing about race.

Plaintiffs' accusation that Defendants "failed to maintain communities of interest," *id*. at 24, similarly does nothing to advance Plaintiffs' task of affirmatively proving racial intent.  Indeed, even if Plaintiffs' sharpest allegations were true—for instance that changes to HD 114 were "accomplished with the express understanding it would adversely impact HD 114," *id*. at 13, or that "Defendants deliberately ignored

48

evidence of racially polarized voting in the Metro east area," *id*. at 18-19—they would not get Plaintiffs where they need to be. Such allegations cannot prove that race, rather than partisanship, communities of interest, or other permissible redistricting goals, predominated the decisions on how HD 114 was drawn. This political priority is further confirmed by the current Representative of HD 114, Representative LaToya Greenwood, an African American female. As Representative Greenwood makes clear in her testimony, her intent was to maintain the Metro East region as a Democratic stronghold that continues to be influential in Springfield by maximizing Democratic performance between the districts. Greenwood Decl. at ¶¶ 16-18.

With absolutely nothing to rely on in the record, Plaintiffs ask the Court to find that the September Plan's population changes as compared to 2011 are everything they need to prove racial gerrymandering.[11] *See* NAACP Dkt. 44 at 26 ("These race-based population movements are apparent just from the numbers."); *id*. at 27 (arguing that the population shifts to HDs 112, 113, and 114 show that "the predominance of race in the scheme is readily obvious"). NAACP Plaintiffs argue that population shifts between HDs 112, 113, and 114 must have been made to decrease Black population in HD 114 and make HD 112 a "safe seat for a white Democratic incumbent." *Id*. at 27.

---

[11] The September Plan's changes decreased Democratic, Black population in HD 114—a district that has reliably elected a Black Democrat for decades, while increasing Democratic, Black population in nearby HD 112—a district that has become increasingly vulnerable to Republican control. *See id*. at 14-15 (describing the population changes and claimed VAP and CVAP changes).

*First*, these arguments ignore that both HD 114 and its neighbor, HD 113, were underpopulated as compared to the official 2020 Census data.  Greenwood Decl. at ¶ 13. Plaintiffs do not dispute these population deviations required the legislature to make adjustments to these districts, or that this reason is non-racially motivated. *See* NAACP Dkt. 44 at 1, 2.  *Second*, Plaintiffs omit that these districts, and those impacted by changes to these districts (HDs 111 and 112) were drawn to ensure their anchor cities remained in the districts: HD 111 contains all of Alton, HD 112 contains all of Edwardsville, HD 113 contains nearly all of Bellville, and HD 114 contain nearly all of East St. Louis.  *See infra* Part V.D; *see also* Greenwood Decl. at ¶ 17; Contreras Dkt. 135-7 (August 2021 House Resolution 443) at 104-05 (explaining that HD 114 makes whole several townships and school districts that were previously split with another representative district, follows township lines, and keeps Scott Air Force Base entirely in the district).  Maintaining a district's "core" from the outgoing plan and keeping together cities or townships that share community concerns and identities, are legitimate redistricting considerations.  These factors were important to the incumbent members of Metro East. *See* Greenwood Decl., at ¶ 17.

*NAACP* Plaintiffs do not even attempt to prove how race impacted, much less predominated, in these decisions.

*Third* and critically, *NAACP* Plaintiffs do not even attempt to meet their burden to "disentangle" any political motivations for these population changes from their alleged racial motivations.  *Cooper*, 137 S. Ct. at 1473.  Instead, Plaintiffs concede facts that make *partisanship* the most "readily obvious" explanation for the

changes. Specifically, Plaintiffs admit both that (i) the challenged district, HD 114, has been reliably electing a Democratic, Black candidate for decades, *see* NAACP, Dkt. 44 at 8, and (ii) HD 112, which gained Democratic, Black population was, under the 2011 Plan, "a highly competitive district in which candidates from both the Democratic and Republican Parties won between 2012 and 2020." *Id.* at 12; see also Greenwood Decl. ¶ 14. The "holistic analysis" Plaintiffs encourage therefore supports that Defendants' desire to further strengthen the Democratic base, regardless of what race comprises that population, was a primary motivating factor for changes to HD 114.

Even if it were a toss-up, which is not established on this record, the Supreme Court requires Plaintiffs to prove more than a toss-up between the two motivations because "racial identification is highly correlated with political affiliation." *Cooper*, 137 S. Ct. at 1473. Requiring Plaintiffs to provide affirmative evidence of a racial intent is necessary to protect legislatures from attack anytime they permissibly draw districts along party lines that happen to coincide with racial communities. In light of this requirement, the Supreme Court has recognized that racial gerrymander claims face an even steeper uphill battle when the Defendants assert, as here, a legitimate partisanship defense. *Id.*; *see infra* Part V.D. NAACP Plaintiffs simply have not met this challenge.

Tellingly, Plaintiffs try to shift the burden to disprove racial intent to Defendants, though they do not, and could not, cite a case for that proposition. *See* NAACP Dkt. 44 at 29 ("Defendants cannot offer evidence that changes the conclusion

that the domino effect of moving Black voters into HD 112 and moving Black voters out of HD 114 unconstitutionally sorted those voters based on their race."). It is well established in Supreme Court precedent that Plaintiffs have the burden to prove race was the predominant factor, and only then does the burden shift to Defendants to establish a compelling reason for the challenged districts. *Cooper*, 137 S. Ct. at 1464-65 (citing cases). Even so, the fact discovery record provides no evidence of a racial motive, and only affirms that legitimate redistricting principles drove changes to HD 114. *See*, *e.g.*, Greenwood Decl. at ¶¶ 16-32; Contreras Dkt. 135-7 (HR 443) at 104-05 (explaining that HD 114 "makes whole" several townships that were "previously split with another representative district"; its southern border now aligns with several townships lines; makes whole two previously split school districts; and keeps Scott Air Force Base entirely in the district); Yandell Decl. Ex. D (Maxson Dep.) at 204:5-11 (testifying that HD 112 incumbent Rep. Stuart asked for population shifts that would "keep[] the Edwardsville base of that district together" and otherwise "enhance the Democratic performance"); *id*. at 204:22-205:3 (testifying that HD 113 incumbent Rep. Hoffman expressed goals to "maintain the Belleville center of his district" and to be "politically in a position where he and Rep. Stuart would be at about an equal Democratic performance"); *id*. at 221:4-7 (Q: So are you telling me that you're not aware of the racial demographics of the area in the southern and eastern parts of Metro East? A: "It's not something that we were giving primary consideration to."); Greenwood Decl., at ¶ 17 ("Race was not a factor in determining the Democratic performance of the districts.").

**Contreras**.  The *Contreras* Plaintiffs' racial gerrymandering claim is limited to HD 21 and SD 11, where they complain that Defendants drew the September Plan "to protect those districts' two non-Latino white incumbents."  *Contreras*, Dkt. 135 at 43.

Like the *NAACP* Plaintiffs, the *Contreras* Plaintiffs seek to turn the well-established burden for a racial gerrymandering claim on its head.  *See id.* at 43 ("Defendants can offer no non-racial criteria that explain the configurations of these two districts in SB 927."); *see also id.* at 50 (arguing that a deponent failed to provide "a limiting rationale" for population shifts between districts); *id.* at 51 (discussing evidence of non-racial reasons Defendants did not provide).  But as discussed above, there can be no question that the burden is on Plaintiffs to prove that race was the "predominant" or "controlling" factor; only if and when they have proved such racial intent does the burden shift to Defendants to show changes were made in furtherance of a compelling state interest.[12]  *Cooper*, 137 S.Ct. at 1463-64.

*Contreras* Plaintiffs do not provide any direct evidence that race was a factor in drawing the September Plan, much less the predominant factor—despite issuing multiple rounds of written discovery and document requests, and leading four fact witness depositions.  They therefore seek to rely on circumstantial evidence to meet their burden.  While *Contreras* Plaintiffs complain about several aspects of the 2021

---

[12] The fact that this action is in a remedial phase does not alleviate Plaintiffs of this burden, especially because Plaintiffs did not bring racial gerrymandering (or VRA) claims regarding the June Plan, which means the Court has yet to adjudicated these claims.  Plaintiffs cannot skirt this well-established burden by holding claims in the merit phase and asserting them for the first time in the remedial phase.

redistricting process, none of their proffered evidence demonstrates that race predominated any decision, and is nonetheless insufficient under Supreme Court precedent to establish the same.

*First*, much of *Contreras* Plaintiffs' arguments center on the fact that changes to HD 21 and SD 11 appear to have been made to protect the white incumbents in those districts. Of course, those districts' incumbents are also Democrats. Swapping out the political label (Democrat) for the racial label (white) does not a racial gerrymandering claim make. As the Supreme Court has explained, "the fact that, as it happens, ... many of the voters being fought over [by the neighboring Democratic incumbents] were [members of the challenged minority], would not, in and of itself, convert a political gerrymander into a racial gerrymander, no matter how conscious redistricters were of the correlation between race and party affiliation." *Bush v. Vera*, 517 U.S. 952, 967-68 (1996). To the extent *Contreras* Plaintiffs' claim relies on Defendants' alleged protection of Democratic incumbents, they have failed to satisfy their burden. *See id*. at 964 ("[A]voiding contests between incumbents [i]s a legitimate state goal."); *see also White*, 412 U.S. at 797 (similar).

*Second*, *Contreras* Plaintiffs point to that the fact that the legislature had access to minority CVAP numbers in drafting the June Plan—though deposition testimony made clear CVAP was not considered for the September Plan. *Contreras*, Dkt. 135 at 45-47. In a stunning stretch, Plaintiffs argue that the fact that "Defendants *were aware* of the number of districts that were over 50% Latino CVAP . . . indicates that Defendants '*mechanically relied upon numerical percentages*'" to

redraw HD 21 and SD 11. *Id.* at 46-47 (citation omitted) (emphasis added). But being "aware" of CVAP numbers—which is all Plaintiffs have established—does not show that Defendants relied on those numbers, including for the specific districts Plaintiffs challenge as would be necessary for Plaintiffs' claim, or that the racial component of those numbers was the predominant factor in any decision. In recognition that mere awareness of racial composition proves nothing, the Supreme Court has held that a plaintiff's burden requires more than a showing that the "legislature [was] conscious of the voters' races" when making redistricting decisions. *Hunt*, 517 U.S. at 905.

*Third*, *Contreras* Plaintiffs attack the "north-south" shape of the challenged districts as "bizarre," arguing that a district's shape "may be persuasive circumstantial evidence that race" predominated. *Contreras,* Dkt. 135 at 50. Evidence of an irregular shape, however, "loses much of its value when the State asserts partisanship as a defense, because a bizarre shape . . . can arise from a 'political motivation' as well as a racial one." *Cooper*, 137 S. Ct. at 1473 (citing *Cromartie*, 526 U.S. at 547 n.3). "And crucially," the Court continued, "political and racial reasons are capable of yielding similar oddities in a district's boundaries." *Id.*

*Fourth*, the argument that the legislature was unable to accommodate all requests from one Latino advocacy organization, Latino Policy Forum, *id.* at 49, ignores the reality that myriad competing interests will always prevent the

legislature from satisfying all constituencies.[13]  It also says nothing about whether race was, affirmatively, the predominant factor in how those districts *were* drawn.

*Finally*, like *NAACP* Plaintiffs, *Contreras* Plaintiffs resort to relying on changes to population numbers, arguing, for instance, that a Latino CVAP decrease in SD 11 "indicates that it was drawn with race of the predominant factor." *Id*. at 48-49; *see also id*. at 47.  Such an inferential jump is not justified where, as here, the record is replete with non-racial reasons for the changes Plaintiffs challenge.  For instance, the two Resolutions explain that changes to HD 21 and SD 11 were necessitated in part by population shifts in neighboring districts, and were motivated by accommodating the Latino Policy Forum's suggestions and maintaining communities of interest—including Latino communities, those related to Midway Airport, and those related to the transportation industry.  *See* Contreras Dkt. 135-7 at 18-19; Contreras Dkt. 135-6 at 35-36.

Legislative staffers who participated in drawing the September Plan also testified to several of these facts.  *See, e.g.*, Yandell Decl., Ex. D (Maxson Dep.) at 130:1-4 (discussing a request from Rep. Guerrero-Cuellar to maintain Midway Airport in her district); *Contreras* Dkt. 135 at 50-51 (citing staffer deposition testimony that incumbent Senator Villanueva wanted more progressive democrats in her district).  Mr. Maxson further testified he never had a conversation about CVAP with the HD 21 incumbent, Yandell Decl., Ex. D at 181:10-13, and explicitly stated

---

[13] The Latino Policy Forum also requested majority or influence Latino districts in Elgin and Waukegan, which the legislature accommodated in the September Plan.  Maxson Decl., Ex. A (House Matrices).

that "while the [attorney's] question implies that there was a decision made to draw the district [based on] Citizen Voting Age Population, that is not a conversation that I ever had," *id.* at 129:12-20.

The testimony of the incumbent members of HD 21 and SD 11 who *Contreras* Plaintiffs deposed only further establishes that incumbents' preferences and other non-racial motivating factors drove changes to those districts. For instance, incumbent Latina Senator Celina Villanueva explained the importance of the Little Village neighborhood to her constituents' community, her "specific recommendations" to the legislature that Little Village be drawn in a single district to the extent possible (which was accommodated by the September Plan), and why keeping Little Village together is essential to "protect the political power of this neighborhood." Villanueva Declaration ¶¶ 11-12, 17-21; *see also* Yandell Decl., Ex. B (Landek Dep.) at 65:7-8 (explaining that changes that moved portions of the Little Village neighborhood were "to help Senator Villanueva, that's her home base, she had grown up there, that's her community"); *see also id.*, Ex. C (Zalewski Dep.) at 121:13-23 (explaining that Rep. Hernandez's requested more of Cicero shift into her district and his belief that this was because "her husband was the Cicero Township Democratic committeeman" and because she wished to avoid a certain political opponent who lived in neighboring Berwyn, which shifted out of her district in response).

In the face of this record, Contreras Plaintiffs' utterly failed (and did not even attempt) to "disentangle" Defendants' clear political motivations from any alleged

racial motivations. *Cooper*, 137 S. Ct. at 1473. Their racial gerrymandering claim therefore fails.

### C. The September Plan Was Drawn to Satisfy Compelling State Interests.

Because all Plaintiffs fall far short of proving race predominated any redistricting decision, the burden never shifts to Defendants to show a compelling state interest in support of those decisions. However, multiple compelling state interests dictated the September Plan, including establishing equal population, maintaining the core of districts, and preserving or uniting communities of interest. That these interests predominating the legislature's redistricting process is established by S.B. 927, its companion resolutions, and the fact discovery record.

## V. PLAINTIFFS' PROPOSED REMEDIAL PLANS DO NOT PROPOSE "REMEDIES"–THEY PROPOSE ILLEGAL RACIAL GERRYMANDERS AND ATTEMPTS TO POLITICALLY GERRYMANDER.

Collectively, Plaintiffs' allege constitutional or statutory defects with thirteen House districts (HDs 1, 2, 3, 4, 21, 22, 23, 24, 32, 39, 50, 77[14], 114) and two Senate districts (SDs 2 and 11). *See* McConchie Dkt. 151 at 3-4; Contreras Dkt. 135 at 9-12.; NAACP Dkt. 44 at 6-8.[15] Plaintiffs' remedial plans, by contrast, propose alterations to thirty-two House districts and twenty Senate districts in four regions: northwest Chicago (*McConchie* and *Contreras*), southwest Chicago (*McConchie* and *Contreras*),

---

[14] *McConchie* Plaintiffs' Second Amended Complaint does not include HD 77, but they include it in their submission as a challenged district.

[15] Support for the changes and ripple effects described in Section VI is provided in the Report of Allan Lichtman, attached hereto as Exhibit 1, and by the Declarations of Jonathon Maxson and Joseph Sodowski, attached hereto as Exhibits 2, 6.

Metro East (*McConchie* and *NAACP*), and Aurora (*McConchie*). *See* McConchie Dkt. 151 at 20-43; Contreras Dkt. 135 at 56.; NAACP Dkt. 44 at 38. Many of Plaintiffs proposed changes fail to consider the ripple effects on other districts, and therefore could necessitate changes to further districts if adopted. Though some Plaintiffs challenge the same districts in similar ways, none of Plaintiffs' proposed changes overlap. In other words, Plaintiffs have proposed three competing remedial plans, with no proposal for reconciling the differences.

As a threshold matter, there is no requirement that a legislature draw majority-minority districts in order to comply with the VRA; and as Plaintiffs admit, there is also no requirement that majority-minority districts be measured by CVAP versus VAP. *See* Contreras Dkt. 135 at 8-9 (citing cases). Yet, many of the Plaintiffs' changes propose to alter districts that under the September Plan are already majority minority VAP and CVAP. In some instances, Plaintiffs make changes that impact multiple districts to increase the CVAP by merely one or two percentage points without explaining how or why the proposed changes would perform more effectively than the September Plan.

Critically, nearly every boundary change Plaintiffs propose is made using race as the predominant factor, meaning many of Plaintiffs' changes are themselves textbook examples of unconstitutional gerrymandering.

## A. Northwest Side of Chicago

The northwest side of Chicago consists of Senate Districts 2 (HDs 3 and 4), Senate District 10 (HDs 19 and 20), and Senate District 20 (HDs 39 and 40). Except HD 20, all of the current districts are represented by Democrats, five of the nine of

whom are Latino (two Senators and three Representatives). In the September Plan, these districts were drawn to equalize population, maintain the district cores, preserve various communities of interest, maximize Democratic voting power, and ensure no incumbents were paired. Dkt. 135-7, HR 443, at 25. The September Plan creates four House districts and two Senate districts that ensure Latinos, as well as other communities of interest, have equal opportunities to elect candidates of their choice.

When analyzing these districts, Dr. Lichtman stated, "Consistent with the actual elections results in HD 3 and 4, applying the standard technique of reconstituted election analysis demonstrates that these districts provide Hispanic voters more than an equal opportunity to elect candidates of their choice." Lichtman Report, at 172. Further, he concluded that "[m]inorities comprise a higher 65.0% of the CVAP in District 4 because of a substantially higher Black CVAP percentage. These results indicate that minority candidates of choice of the predominant Hispanic citizens of voting age need not depend on white votes or can prevail with minimal white crossover voting." *Id.* at 173.

### 1. *Contreras* Plaintiffs' Remedial Plan

The *Contreras* Plaintiffs allege SD 2 and HDs 3, 4, and 39 violate Section 2 of the Voting Rights Act by diluting Latino voting strength because none of those districts have a majority Latino Citizen Voting Age Population ("CVAP").

The *Contreras* remedial plan makes several adjustments to the September Plan, all on the basis of race. Indeed, *Contreras* Plaintiffs do not even attempt to articulate another reason for their proposed changes, other than to "cure" the

September Plan's alleged but unproven deficiencies. Overall, the Contreras plan creates one Latino majority CVAP Senate district and three Latino majority CVAP House districts in northwest Chicago by reconfiguring districts in the September Plan which are already majority-minority Latino based on VAP and CVAP, and sufficient to allow Latinos to elect candidates of their choice. Lichtman Report, at 168-96.

**Figure 1: Latino CVAP in the September Plan and *Contreras* Plaintiffs' Proposal**

| District | September Plan CVAP | *Contreras* Plan CVAP |
|---|---|---|
| HD 3 | 47.4% | 51.5% |
| HD 4 | 45.2% | 50.1% |
| HD 39 | 45.3% | 50.5% |
| SD 2 | 46.6% | 50.8% |
| SD 20 | 40.1% | 36.01% |

The changes are accomplished by eliminating the base of HD 40, a Latino crossover district with a Latino incumbent, and moving its Latino population into neighboring districts. The plan proposes to move Latino populations from HD 40 into HDs 3, 4, and 39, which has the effect of decreasing the Latino CVAP of HD 40 from 34.6% in the September Plan to 22.7%–which is below the threshold for an *influence* district, as defined by MALDEF. Lichtman Report, at 34. The *Contreras* plan also moves precincts with a mix of Latino and Black population from HD 4 to HD 10, white population from HD 10 into HD 40, and Black population from HD 10 into HD 8. These changes are made to increase the white population in HD 40.

The ripple effect is that the *Contreras* plan reduces the Latino influence in SD 20, a majority-minority district that has elected a Latino since 2003. In the September Plan SD 20 has a Latino CVAP of 40.1% and a total minority CVAP of

61

50.6%. With the proposed changes, the Latino CVAP drops to 36.1% and the total minority CVAP is 46.9%. Maxson Decl., Ex. A; Exhibit 6 ("Sodowski Decl."), Ex. A.. The *Contreras* Plaintiffs provide no justification for these changes other than race, making the changes unconstitutional racial gerrymanders.

**Figure 2: September Plan and *Contreras* Plaintiffs' Proposal[16]**



#### 2. *McConchie* Plaintiffs' Remedial Plan

The *McConchie* remedial plan challenges HDs 3, 4, 39, and 77[17] as violating Section 2 of the Voting Rights Act. The *McConchie* plan purports to fix a racial

---

[16] The underlying colors represent the September Plan's district boundaries, and the red lines represent the *Contreras* Plan's district boundaries.

[17] *McConchie* Plaintiffs did not challenge HD 77 in their Second Amended Complaint, however it is addressed here given it is in their statement, despite not identifying specific objections to HD 77.

gerrymander on the northwest side by itself racially gerrymandering Latinos in and out of districts and politically gerrymandering throughout the region. Like *Contreras* Plaintiffs, *McConchie* Plaintiffs laud their ability to "create" four majority Latino CVAP districts, but ignore that, under the September Plan, all four districts are majority minority VAP and have Latino CVAPs sufficient to allow them to elect the candidate of their choice.

**Figure 3: Latino CVAP in the September Plan and *McConchie* Plaintiffs' Proposal**

| District | September Plan CVAP | *McConchie* Plan CVAP |
|----------|---------------------|------------------------|
| HD 3 | 47.4% | 50.8% |
| HD 4 | 45.2% | 51.6% |
| HD 39 | 45.6% | 50.3% |
| HD 77 | 43.6% | 51.4% |
| SD 2 | 46.3% | 51.0% |
| SD 20 | 40.1% | 33.0% |

The suggested *McConchie* changes are achieved by eviscerating the current Latino-majority districts and creating a ripple effect that spans all the way to a district in DuPage County. The Plan reconfigures the current districts which are arranged in an east to west format, which these districts have followed since at least 2001, to a north to south format. These changes create entirely new districts with no regard for the core of the current districts or communities of interest—or incumbents—that reside therein.

*First*, the *McConchie* plan would redistribute Latino population from HD 40, currently a Latino cross over district with a Latino incumbent, among HDs 3, 4, and 39 and replaces the HD 40 population with white population. These changes place *four* Democratic incumbents in one House district, including *three* Latino incumbents

63

(two of which are members of House leadership), and two Democratic Latino incumbent Senators in the same Senate District (including the Chair of the Senate Redistricting Committee).

**Figure 4: Comparison of House Districts in the September Plan and *McConchie* Plan for Northwest Chicago[18]**



These changes to the House districts impact the corresponding Senate districts. The core of two majority-minority VAP districts that have Latino Senators would be reconfigured, nearly split in half, and the VAP and CVAP altered. Dr. Lichtman said it best: "Plaintiffs highlight the importance of electing minorities to state legislative positions. But neither the plaintiffs' briefs nor any expert report

---

[18] The underlying colors represent the September Plan's district boundaries, and the red lines represent the *McConchie* plan's district boundaries.

reveals how the *McConchie* Plaintiffs' reorganization of northern districts devastates the Hispanic incumbents in the region." Lichtman Report, at 177.

**Figure 5: Comparison of Senate Districts in the September Plan and *McConchie* Plan for Northwest Chicago**



*Second*, by reconfiguring several districts to run north to south, rather than east to west, *McConchie* Plaintiffs bring HD 77, a suburban district, into Chicago. While they claim the result of this change is to increase the Latino CVAP of that district, they omit that the district is already majority-minority VAP in the September Plan (52.73%) and already has a Latino CVAP sufficient to elect a Latino candidate of choice (43.6%). Lichtman Report, at 181. Plus, the proposed changes map out the Democratic incumbent. In other words, the *McConchie* plan would improperly "pack" Latinos into HD 77 to "remedy" a "violation" that does not exist

and importantly, was not alleged in their second amended complaint. *See* McConchie Dkt. 116 at 6-7.

*Third*, the *McConchie* Plan moves population in and out of neighboring districts to benefit the Republican incumbent in HD 20 and give the Republicans a better opportunity to win HD 48 and HD 56. Specifically, it would move diverse Democratic-friendly precincts in Chicago out of HD 20 and into HD 3, and white Republican precincts out of HD 55 into HD 20. After losing white precincts, HD 55 received more diverse Democratic precincts from HD 56, and HD 56 received more Republican-leaning precincts from HD 77. These changes make HD 56 a swing district favoring Republicans.

In the end, the *McConchie* Plan moves population on the basis of race and illegally packs Latinos into fewer districts, thereby decreasing Latinos' opportunities to elect the candidates of their choice. The plan is a transparent attempt to maximize opportunities for Republicans to pick up seats in the General Assembly.

## B. Southwest Side of Chicago

Between 2010 and 2020, the southwest side of Chicago saw population declines, necessitating adjustments in the September Plan to achieve equal population and balance the many communities of interest. Contreras Dkt. 135-7, HR 443, at 15. This required the General Assembly to make many difficult decisions. There are many different political ideologies in southwest Chicago, and the racial and ethnic groups that predominate the area are not homogenous. *See* Ex. 4 ("Villanueva Decl."), at ¶ 10. This reality was front and center during the redistricting process, especially when making decisions regarding the communities known as Little Village

and Chinatown. Little Village, a neighborhood in the South Lawndale area, is the economic, ethnic, and political base for the Mexican community on the southwest side. *Id.* at 9. In 2011, the General Assembly was asked by several interest groups, including MALDEF, to honor this community of interest and place Little Village in its own single district. *See* Hr'g Tr. of Illinois Senate Redistricting Committee (March 28, 2011) at 63, https://www.ilga.gov/senate/Committees/Redistricting/Final%20Approved%20Trans cript%20for%20Senate%20Redistricting%20Hearing%203.28.11.pdf; Hr'g Tr. of Illinois Senate Redistricting Committee (April 30, 2011) at 45, https://www.ilga.gov/senate/Committees/Redistricting/Final%20Revised%20Transcr ipt%20for%20Senate%20Redistricting%20Hearing%204.30.11%20Chicago%20West %20Side.pdf. That request was not honored, in part to allow for the creation of an Asian American influence district in the adjacent areas of Chinatown. The Chinatown community has been expanding for decades with Chinese American population growing in the neighborhoods of Bridgeport, McKinley Park, Brighton Park, and Archer Heights along and near Archer Avenue which connects the more commercial center of Chinatown with the more residential communities to the southwest. *See* Ex. 5 ("Mah Decl."), at ¶ 21.

In 2021, the legislature resolved to recognize the importance of both communities of interest by placing Little Village in one Senate district. As explained by Senator Villanueva, she recommended placing Little Village in one district, and this recommendation was motivated by her desire to maintain the political, cultural

and ethnic core of the Little Village community, and to not dilute its ability to elect the candidate of its choice. *See* Villanueva Decl., at ¶¶ 18, 20. This decision also furthered the General Assembly's goal to maintain the core of 2011 districts as much as possible. Contreras Dkt. 135-7, HR 443, at 16. To a similar end, the General Assembly resolved to maintain Chinatown in one district with portions of current 11th Ward and other neighborhoods that share common interests. *See* Mah Decl., at ¶¶ 15, 17, 19. While the General Assembly considered alternatives, it chose to prioritize maintaining the core of HD 2 created in 2011 (Chinatown) and locate Little Village in one Senate district with the main corridor in one House district. Contreras Dkt. 135-7, HR 443, at 21-23. As a result, the Senate districts and the nested House districts retain their political identities. The General Assembly, understanding the different political factions in this area, worked to carefully balance the interest of progressive and moderate factions in separate Senate and House Districts to reduce political infighting among Latino groups. Villanueva Decl. at ¶¶ 19-21.

The decisions to maintain Little Village in one Senate District and keep the greater Chinatown community paired with portions of the current 11th Ward were pivotal decisions that impacted all the other southwest Chicago districts. The House of Representatives acknowledged this when adopting HR 443 by a super-majority vote, which was supported by every Asian American, Black, and Latino legislator:

> Some participants at public hearings of the House Redistricting Committee suggested changes to the region and the possibility of creating a new majority-Hispanic district. While the General Assembly cannot, and should not, create a district solely for race-based reasons, the request was considered. Any such configuration would have a major impact on neighboring districts

and create a ripple effect throughout the redistricting plan. The most probable proposal submitted to create a new district did so by fracturing Chicago's Little Village neighborhood. That change would have a dramatic effect on the redistricting plan as a whole and require substantial changes to other districts. As a result, other communities of interest would need to be fractured, and many of the redistricting principles used when creating the plan would have to be wholly ignored or altered to the detriment of other principles taken into consideration for the entire redistricting plan. The request to fracture Little Village was taken into consideration, as well as the request to keep Little Village intact, and located in one district, to maximize the voting power and this community of interest. In reviewing the possibilities, it was also clear that in order to achieve population targets, a reconfigured district extending north would cut into multiple districts, including several that provide representation opportunities for African-American communities, and result in the pairing of two or more incumbents. These adjustments would also likely cause disruption to the south, forcing these districts further south and fracturing other communities of interest.

Contreras Dkt. 135-7, HR 443, at 15-16.

**Figure 6: Little Village in the September Plan**



**Figure 7: Little Village in Plaintiffs' Proposals**



### 1. *McConchie* Plaintiffs' Remedial Plan

The *McConchie* Plaintiffs allege voter dilution claims in seven House districts on the southwest side of Chicago (HDs 1, 2, 21, 22, 23, 24, 32), and their remedial plan alters twelve districts from the southwest side to DuPage County (HDs 1, 2, 6, 8, 22, 23, 24, 31, 32, 35, 36, 82). The plan swaps populations between districts solely based on race until the domino effect reaches the suburban district of Plaintiff Republican Leader Durkin. The plan gives no deference to the decisions made by the legislature, and blindly dismantles communities of interest.

**Figure 8: Southwest Side Changes in *McConchie* Plan**



*Little Village*. The proposal would fracture Little Village into four House districts (HDs 1, 22, 23, and 24) and three Senate districts (SDs 1, 11, and 12). *Compare* Fig. 6 *with* Fig 7. This result alone is an unacceptable dismantling of a well-established community of interest, and one for which *McConchie* Plaintiffs provide no legitimate justification. The result is a new seat created out of portions of HDs 1, 2, 21, 22, and 23.

**Figure 9:  Detail of Little Village in *McConchie* Plan**



The plan would also pair an incumbent Latina Senator from Little Village in the same Senate District as a white incumbent Senator, such that they share a newly created district. Politically, the new district contains a substantial population of the white incumbent's current or former constituencies.

72

**Figure 10:  Proposed Incumbent Pairing in *McConchie* Plan**



*Chinatown.*  In the September Plan, the General Assembly chose to keep the core of the greater Chinatown community together, continuing to keep the Chinatown neighborhood connected to areas in Bridgeport, McKinley Park, and Brighton Park—all areas that have experienced significant increases in Chinese American population growth.  Mah Decl., at ¶¶ 17, 21.  The *McConchie* plan splits these two areas, pairing portions of Chinatown with divided portions of the dense populated Little Village—thereby diluting the ability of both communities of interest to elect the candidate of their choice and pitting them against one another.  *Id.* at 21.  In a further affront to the Chinatown community, the *McConchie* plan would draw the Asian-American incumbent out the district.

73

**Figure 11: Chinatown in *McConchie* Plan**



*Midway Airport Community of Interest*.  The General Assembly chose to keep the communities surrounding Midway with the airport in one district, at the request of members and several advocates that provided testimony at public hearings.  House Redistricting Comm. Tr., (Apr. 3, 2021) Pgs. 19-21, 33-34, 42-44; available at: https://ilga.gov/house/committees/Redistricting/102RedistrictingTranscripts/HRED/ 20210403BC/Saturday%20April%203%20-%20Berwyn%20Cicero.pdf;  House Redistricting Comm. Tr., (May 25, 2021) Pgs. 178-179; available at: https://ilga.gov/house/committees/Redistricting/102RedistrictingTranscripts/HRED/ 20210525SP/Tuesday%20May%2025%20Hearing.pdf. The *McConchie* plan would dismantle these carefully structured changes, and break these areas into three

74

separate districts, diluting the ability of those in this community of interest to advocate for shared concerns, such as noise abatement and traffic control.

The *McConchie* plan would also impact the minority incumbents representing this area, and in turn alter the constituent services received in these districts. First, the plan would draw the Latina incumbent out of her current HD 22, which represents the Midway area, and into a newly configured HD 32, which the plan created with portions of three current Chicago wards. Second, the plan would draw HD 32's current Black incumbent out of his district and into HD 31, pairing him with another Black incumbent, the House Deputy Majority Leader and the longest serving member of the House.

To achieve these effects, the *McConchie* plan moves areas highly concentrated with Black population in HD 32 into HD 31, and Black population from the eastern portion of HD 32 into HD 36. These changes also directly impact SD 16 by reducing its Black and Latino VAP. The current incumbent for SD 16 is Black female who has served the district since its creation in 2001 and is currently a member of Senate leadership; the *McConchie* plan places her home at the extreme edge of SD 16.

*Other Changes.* The *McConchie* plan makes additional, unnecessary changes to districts not subject to challenge that result in packing minorities and Democrats in several districts. HDs 35 and 36 both currently represented by Democrats. The plan would swap precincts between the two districts such that HD 35 becomes the most Republican district in Chicago.

The necessary packing of Democrats into HD 36 to achieve this result squishes two communities of interest with conflicting ideologies on policing in Chicago into one district. Specifically, the *McConchie* plan's HD 36 would be home to much of Chicago's 19th Ward, which is well known as an area heavily populated with Chicago police officers from all ethnic groups, and heavily populated Black precincts moved from HD 31. Though the changes result in the creation of a district with Black VAP of 51%, the pairing of these two distinct communities could result in the Black population being represented by someone with very different views on matters such as of criminal justice reform and policing should the Black population not vote entirely as a bloc. Maxson Decl., at ¶ 18.

*Plaintiff Republican Leader Durkin's District.* Finally, the *McConchie* plan's attempt to proclaim themselves the champions of minority interests are compromised by engaging in a brazen racial gerrymander to create a whiter district for named Plaintiff Republican Leader Jim Durkin. In HD 82, the plan swaps Black and white populations between three districts. White precincts in Proviso Township and Lyons Township are moved into HD 8, a district with a Black incumbent, to reduce the Black VAP of HD 8 from 49.51% to 48.29%. Maxson Decl., Ex. A. Several diverse precincts in Lyons Township are moved from HD 82 into HD 21, and the population loss in HD 82 is replaced by adding white precincts from Palos Township. The changes to Plaintiff Republican Leader Durkin's district are blatant racial gerrymanders that have the result of creating a whiter district, and therefore more politically stable, district for Rep. Durkin.

76

**Figure 12: Changes to HD 83 in *McConchie* Plan**



### 2. *Contreras* Plaintiffs' Remedial Plan

The *Contreras* Plaintiffs allege voter dilution and racial gerrymandering claims for Senate District 11 and HDs 21 and 24 in the south side of Chicago. Their remedial plan redraws five HDs (HD 1, 2, 21, 23, and 24) to create six Latino majority districts (HDs 1, 2, 21, 22, 23, and 24). Similar to the northwest side, these changes are not necessary to provide Latino voters with the opportunity to elect the candidate of their choice: four of these districts have a majority minority VAP in the September Plan (HDs 1, 2, 22, and 23) and the other two are Latino opportunity districts with a Latino CVAP over 40% (HDs 21 and 24).

77

The Contreras plan's proposed changes appear to be entirely race-based and pay no deference to various communities of interest or priorities set by the General Assembly.

*Little Village and Chinatown Communities of Interest.* Similar to the McConchie plan, the *Contreras* plan splits Little Village between three House districts (HDs 21, 23, and 24) and two Senate Districts (SDs 11 and 12), and removes a Latino incumbent from the core of his current district. The Plan fractures the political base for progressive Latinos in Little Village and alters the delicate balance between the moderate and conservative factions in the area. Villanueva Decl., at ¶ 27.

The Plan also splits the greater Chinatown community between two House Districts (HDs 23 and 24) while pairing the greater Chinatown community and a portion of Little Village in HD 24, which pits two significant political bases against each other and reduces the Asian American influence in the district. Mah Decl., at ¶ 21. Historically, the 11th Ward which contains much of the greater Chinatown community and the Little Village neighborhood (Wards 12 and 22) often support different candidates, and it's highly unlikely that these communities would coalesce around one candidate of choice. *Id.* This map creates a situation where candidates would be encouraged to cater to their own political bases at the expense of districtwide representation.

**Figure 13: Little Village in the *Contreras* Plan**



*Berwyn and Cicero Townships.* Plaintiffs' allege and argue that the September Plan's changes in Latino population between HD 1 and HD 21 cannot be explained by anything but a racial gerrymander. *See, e.g.,* Contreras Dkt. 98 at ¶ 97. While sworn deposition and declaration testimony dispel those claims, *see, e.g.* Yandell Decl., Ex. C (Zalewski Dep. Tr.) at 56:21-60:1; 70:16-72:23. Contreras Plaintiffs provide no justification for the population swapping in their other than race. The *Contreras* plan moves Latino population between Berwyn and Cicero and in and out of HD 2 and HD 21, and moves white precincts out of HD 21 and into HD 1—all necessary to achieve a higher Latino CVAP.

C.    Aurora

In Aurora, the September Plan made changes to HD 50 (formerly HD 83) to achieve equal population, address requests of the incumbent, and account for changes in neighboring districts. The enacted district retained 73.45% of the core of the 2011 district. HD 50 has a Latina Democratic incumbent, and has elected a Latina for nearly two decades despite being below 50% Latino CVAP during that time—again illustrating the reality that majority minority CVAPs are not necessary for minorities to elect a candidate of their choice.

Only the *McConchie* Plaintiffs propose changes to HD 50, claiming the September Plan dilutes Latino voting strength in violation of VRA Section 2.  In the September Plan, HD 50 has a Latino VAP of 48.78% and a Latino CVAP of 36.7%; the *McConchie* plan proposes a Latino VAP of 61.98% and Latino CVAP of 46.7%. Maxson Decl., at Ex. A. In his analysis Dr. Lichtman writes, "All three plaintiffs maintain that districts much achieve this threshold to provide minorities equal opportunities for minorities to elect candidates of their choice. Yet, the McConchie plaintiffs propose and defend a remedial plan for HD 50 that is 46.7% Hispanic CVAP." Lichtman Report, at 193.

These changes, which do not create a majority Latino CVAP in HD 50, require myriad changes to the surrounding districts, *see* McConchie Dkt. 151 at 33-34, all with the end goal of increasing Republicans' chances of unseating incumbents in neighboring districts.  Specifically, the *McConchie* plan boosts the Latino majorities of HD 50 by stretching HD 50 throughout unpopulated areas to West Chicago to capture additional Hispanic population from neighboring districts.  As a result, (i)

diverse Democratic precincts in Aurora are moved from HD 84 into HD 50; (ii) the removed population in HD 84 is replaced with Republican precincts from HD 41; and (iii) HD 49 is stretched into several Republican precincts to redistribute population. *McConchie* plaintiffs do not provide legitimate justifications for such far-reaching and complex changes—which are designed purely to increase Republican odds in HDs 41 and 84 and SD 42 at the expense of the Latino population, which is "packed" into fewer districts.

**Figure 14: Comparison of September Plan
and *McConchie* Plan Near Aurora**



### D.     Metro East

Metro East, a region of southern Illinois located near St. Louis, Missouri, consists primarily of Senate District 56 (HDs  111 and 112) and Senate District 57 (HDs  113 and 114). Both senators and three of the four representatives are

Democrats. Historically each district has been anchored to one of the larger Metro East cities.

In the September Plan, these districts were drawn to keep those districts tied to its anchor city: HD 111 contains all of Alton, HD 112 contains all of Edwardsville, HD 113 contains all of Bellville except a few precincts located in HD 114, and HD 114 keeps all East St. Louis intact (approximately 25 people are in HD 113). HD 114 retains 63.8% of the core of its current district and unites communities of interest by bringing together six cities previously split among four districts. Adjustments in this area were made to account for equal population and the partisan composition of the districts.

Legislative Defendants do not dispute that partisanship played a central role in drawing these districts. *See* Greenwood Decl., at ¶ 18. As the region has become more politically polarized, the Democrats in the General Assembly prioritized protecting the Democratic members elected in Republican southern Illinois, including the preservation of two districts that have elected Black Democrats for more than 40 years (SD 57 and HD 114). *See* Greenwood Decl., ¶¶ 14 -18.

**Figure 15: Metro East Region House of Representatives Districts**



The *McConchie* and *NAACP* Plaintiffs claim House District 114 ("HD 114")
dilutes the votes of Black voters in violation of Section 2 of the Voting Rights Act and
is unconstitutional purportedly because it was drawn as a result of racial
gerrymandering. The *McConchie* Plaintiffs claim the September Plan cracks the
Black population into two districts (HDs 113 and 114) rather than creating one Black
majority district. The *NAACP* Plaintiffs allege a violation of Section 2 of the Voting
Rights Act and a racial gerrymandering scheme that is pure fiction, claiming the
legislature strategically moved Black voters to protect white incumbents with no
regard for the Black voters in HD 114 and to the detriment of the Black incumbent.
NAACP Dkt. 44 at 10. Both Plaintiffs submitted alternative maps that would solely
impact the Democratic districts (SD 56 and 57, and HDs 112, 113, and 114), and that
present textbook examples of racial gerrymandering by subverting traditional

redistricting principles, including those followed by the General Assembly in the September Plan, to draw primarily based on race.

**Figure 16: Comparison of September Plan and Plaintiffs' Plans**



1. *NAACP* **Plaintiffs' Remedial Plan**

The *NAACP* Plaintiffs allege HD 114 "unlawfully diluted the votes of Black voters, and ultimately lessened the election prospects of the only Black state representative elected to the legislature from the entire Metro East area or even Southern Illinois, all in order to bolster the prospects of a white incumbent in nearby HD 112." NAACP Dkt. 44 at 1. Ironically the *NAACP* Plaintiffs propose to rectify this alleged violation by pairing that same Black incumbent with a white male incumbent, who happens to be incredibly well known in the Metro East and the second longest serving member of the House with more than $1.4 million in his

85

campaign account. Their liability plan proposes a new district with a population consisting of what appears to be more of the white incumbent's current or former constituents than those of the Black incumbent, and the remedial plan offers some balance between the two but still offers an advantage to the white incumbent. And the proposal further improves expected Democratic performance in HD 112 to the benefit of the white incumbent by moving Black voters into the district – the very conduct that the *NAACP* Plaintiffs alleged comprised racial gerrymandering in the September Plan.

Not to mention, the *NAACP* Plaintiffs asks this Court to find HD 114 violates Section 2 of the Voting Rights Act because the Black VAP of the district is less than 50%, then replace it with a district with a Black VAP of *less than* 50%. *See NAACP*, Dkt. 28 at 40 (noting the HD 114 would be 49.45%). The *NAACP* Plan proposes a "liability" map that uses race as the sole factor to pack Black voters from three district to form one Black majority district (without drawing any neighboring districts to account for population changes), but instead requests the Court adopt a "remedial" map with less than 50% Black VAP that pairs the two-term Black incumbent with a fifteen-term white incumbent and turns one district into a solidly Republican, white district. *See* Greenwood Decl. ¶ 22.

The *NAACP* Plaintiffs fail to meet the *Gingles* factors yet ask this Court to adopt a remedial plan that uses race as the predominant factor to create a new district without a majority Black voting age population. The proposed remedial map (i) pairs two-term Black incumbent LaToya Greenwood with fifteen-term white incumbent

Jay Hoffman in a district with many of Hoffman's current or former constituents; (ii) pairs East St. Louis with northern parts of Belleville by moving Black precincts into HD 114, which splits the largest city in Metro East rather than keeping it whole as the anchor of HD 113 as it has been for at least three decades; (iv) splits several other communities of interest; and (v) shifts the political composition of the districts to create a safe Republican House seat, reducing the number of Democratic representatives in the area, and jeopardizing Senate District 57, which has a Black incumbent. See Greenwood Decl. ¶¶ 17, 21-22. Interestingly, the changes would increase the Democratic index for the white incumbent in SD 56 and white incumbent in HD 112. *Id.* ¶ 22; Maxson Decl., Ex. A; Sodowski Decl., Ex. A..

The *NAACP* Plaintiffs attempt to argue that changes related to Washington Park were racially gerrymandered, but the Plaintiffs can point to no evidence of such a racial motivation because one does not exist. Not to mention the solely race-based changes they propose are far from "modest" and go far beyond simply rejoining Washington Park. The Plaintiffs state, "Unlike S.B. 927, this plan fully incorporates Washington Park," and, "The proposed remedy keeps the community of interest that is at the core of HD 114 together, without the need to make the District majority-Black." NAACP Dkt. 44 at 32, 40. They claim their proposal "cures the cracking of the Black Metro East community that is a principal source of both the constitutional and statutory violations" by "avoiding the split of Washington Park that occurs in the S.B. 927 Plan's boundaries for HD 114." *Id* at 40.

87

The Plaintiffs ignore that the community of Washington Park has been split between HDs 113 and 114 for at least two decades. In the 2011 map, the population is nearly split in half. When drawing the 2021 map and trying to achieve equal population, there was an opportunity to place more of the community in one district rather than split it equally across two districts.

**Figure 17: Washington Park in current HDs 113 and 114**



As explained by Mr. Maxson, the changes to Washington Park were made to equalize population and further consolidate the community of interest in one district. *See* Maxson Decl., at ¶ 14. The population changes were not race-based. The *NAACP*

Plaintiffs may disagree with the General Assembly's decision to move more of Washington Park to HD 113, but the decision certainly was not racially motivated.

As illustrated in Figure 18 the political composition of Washington Park is strongly Democratic. The population was nearly equally split between HDs 113 and 114 in the 2011 legislative map, and more of the population was moved to HD 113 in the September Plan. The additional population in Washington Park share the same political leaning as the Washington Park residents already in HD 113—it is overwhelmingly likely they are Democrats.

**Figure 18: Political Composition of Washington Park
(with lines of current and September Plan districts)**



89

Even under their own standards the Plaintiffs' proposed plan would not satisfy Section 2 of the Voting Rights Act. The drafter of the plan, Dr. Ryan Wiechelt, included this in his expert report: "Though *this plan does not meet the Section 2 requirements*, it is compact, follows one-person one-vote requirements, minimally avoids splitting municipalities, and addresses legislators' concerns such as including Scott Airforce Base in the district."  NAACP Dkt. 44 (Wiechelt Report) at 5 (emphasis added).

Historically HD 114 has been "an extraordinarily safe district for African-American preferred candidates" for the last four decades.  The *NAACP* Plaintiffs acknowledge HD 114 has been "performing as an effective district affording Black voters an equal opportunity to elect their candidates of choice under the 2011 plan." NAACP Dkt. 1 at ¶¶ 2, 40, 69.  Under the September Plan, HD 114 will continue to give Black voters an opportunity to elect their preferred candidate.  Lichtman Report, at 198. Yet, the *NAACP* Plaintiffs ask this Court to adopt a remedial plan that needlessly, and unconstitutionally, prioritizes race and limits the ability of Black voters to influence the outcome of elections.

### 2. *McConchie* Plaintiffs' Remedial Plan

The *McConchie* Plaintiffs propose redrawing the three Democratic seats in the Metro East to create (i) a Black majority district, (ii) a new safe Republican district, and (iii) a swing district that leans Republican.  The new Black majority district is created by packing traditionally Black precincts and the most Democratic precincts from HDs 112, 113, and 114 into a single new district.  The proposed Black majority district (i) pairs Democratic incumbents LaToya Greenwood and Jay Hoffman in a

new district with 46.7% of Hoffman's current district and 35.9% of Greenwood's current district; (ii) changes the core of the district to join together East St. Louis, Venice, Brooklyn, Cahokia, Fairmont, Fairview Heights, and the northwestern portion of Belleville; and (iv) shifts the political composition of the districts to make SD 57, which currently has a Black Democratic incumbent, more competitive for Republicans (risking that incumbent's seat) and making it more likely three of the four House districts and at least one of the two Senate districts elect Republicans. Plaintiffs' plan completely disregard traditional redistricting principles such as preserving the cores of prior districts or adhering to pre-existing political subdivisions by creating three entirely new districts and packing Black voters in one district. Under the September Plan, HD 113 has a Black CVAP of 29.56% and HD 114 has a Black CVAP of 33.41%. Under the *McConchie* proposal, HD 113 has a Black CVAP of 13.5% and HD 114 has a Black CVAP of 51.1%. Maxson Decl., Ex. A. The Plaintiffs' solution to alleged unconstitutional cracking is unconstitutional packing using race as the predominant factor used to redraw the district.

**Figure 19: Comparison of September Plan
and *McConchie* Plan in Metro East**



## VI.    CONCLUSION

The September Redistricting Plan, Public Act 102-0663, protects minority

voting strength and provides Hispanic and Black voters more than an equal

opportunity to elect candidates of their choice. The three Plaintiffs have failed to

provide evidence to support otherwise and have not demonstrated that the September

Redistricting Plan violates the Voting Rights Act or the U.S. Constitution. The Defendants request that the Court affirm Public Act 102-0663 and adopt the September Plan as the legislative redistricting plan for Illinois.

Should the Court find it necessary to amend the September Plan, the Defendants ask the Court to remand to the General Assembly, conforming with the Supreme Court's direction in *Perry*, 565 U.S. at 392.

Dated: November 24, 2021

Respectfully submitted,

*/s/ Elizabeth H. Yandell*

Michael J. Kasper
151 N. Franklin Street
Suite 2500
Chicago, IL 60606
(312) 704-3292
mjkasper@60@mac.com

Sean Berkowitz
Latham & Watkins LLP
330 N. Wabash, Suite 2800
Chicago, IL 60611
(312) 777-7016
sean.berkowitz@lw.com

*Counsel for Defendants Welch, Office of the
Speaker, Harmon, and Office of the
President*

Colleen C. Smith
Latham & Watkins LLP
12670 High Bluff Drive
San Diego, CA 92130
(858) 523-5400
colleen.smith@lw.com

Devon C. Bruce
Power Rogers, LLP
70 W. Madison St., Suite 5500
Chicago IL, 60606
(312) 236-9381
dbruce@powerrogers.com

Elizabeth H. Yandell
Latham & Watkins LLP
505 Montgomery St., Suite 2000
San Francisco, CA 94111
(415) 391-0600
elizabeth.yandell@lw.com

*Counsel for Defendants Welch, Office of the
Speaker, Harmon, and Office of the
President*

*Counsel for Defendants Harmon and
Office of the President*

Heather Wier Vaught
Heather Wier Vaught, P.C.
106 W. Calendar Ave, #141
LaGrange, IL 60625
(815) 762-2629
heather@wiervaught.com

Adam R. Vaught
Hinshaw & Culbertson LLP
151 North Franklin Street, Suite 2500
Chicago, IL 60606
(312) 704-3000
avaught@hinshawlaw.com

*Counsel for Defendants Welch, Office of
the Speaker, Harmon, and Office of the
President*

*Counsel for Defendants Welch, Office of
the Speaker, Harmon, and Office of the
President*

94