## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DAN MCCONCHIE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 21-cv-3091 |
| | ) | |
| v. | ) | Circuit Judge Michael B. Brennan |
| | ) | Chief District Judge Jon E. DeGuilio |
| CHARLES W. SCHOLZ, *et al.*, | ) | District Judge Robert M. Dow, Jr. |
| | ) | |
| Defendants. | ) | Three-Judge Court – 28 U.S.C. § 2284(a) |

_____

| | | |
|---|---|---|
| JULIE CONTRERAS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 21-cv-3139 |
| | ) | |
| v. | ) | Circuit Judge Michael B. Brennan |
| | ) | Chief District Judge Jon E. DeGuilio |
| ILLINOIS STATE BOARD OF | ) | District Judge Robert M. Dow, Jr. |
| ELECTIONS, *et al.*, | ) | |
| | ) | Three-Judge Court – 28 U.S.C. § 2284(a) |
| Defendants. | ) | |

_____

| | | |
|---|---|---|
| EAST ST. LOUIS BRANCH NAACP, *et al.*, | ) | |
| | ) | |
| | ) | Case No. 21-cv-5512 |
| Plaintiffs, | ) | |
| | ) | Circuit Judge Michael B. Brennan |
| v. | ) | Chief District Judge Jon E. DeGuilio |
| | ) | District Judge Robert M. Dow, Jr. |
| ILLINOIS STATE BOARD OF | ) | |
| ELECTIONS, *et al.*, | ) | Three-Judge Court – 28 U.S.C. § 2284(a) |
| | ) | |
| Defendants. | ) | |

_____

ARGUED DECEMBER 7, 2021 – DECIDED DECEMBER 30, 2021

*Per Curiam.* Plaintiffs in these three consolidated cases, *McConchie*, *Contreras*, and *East St. Louis NAACP*, challenge Illinois' legislative redistricting map[1] and ask this Court to order alterations that would create additional districts featuring majorities of either Latino or Black voters. All Plaintiffs bring statutory claims, arguing that the redistricting map impermissibly dilutes minority votes in violation of § 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, *et seq. Contreras* and *East St. Louis NAACP* Plaintiffs also present constitutional claims, contending that several legislative districts were racially gerrymandered in violation of the Fourteenth Amendment's Equal Protection Clause.

On § 2 Voting Rights Act claims, the Supreme Court has admonished that "[f]ailure to maximize cannot be the measure of § 2" because "reading § 2 to define dilution as any failure to maximize tends to obscure the very object of the statute and to run counter to its textually stated purpose." *Johnson v. De Grandy*, 512 U.S. 997, 1016–17 (1994). Nearly three decades later, those principles animate this Court's analysis of these three challenges to Illinois' legislative redistricting map. Many of Plaintiffs' proposed districts barely surpass the 50% mark. For all but one of the districts in SB 927, Latino voters maintain a census voting age population of 42.7% or higher, which Legislative Defendants insist allow for additional opportunities to form coalitions with voters of other races to elect their candidate of choice, enhancing the overall political power of Latinos in Illinois.

In light of these figures, these three cases are *not* about "the chance for some electoral success in place of none." *Johnson*, 512 U.S. at 1012–13. Rather, for many of the challenged

---

[1] Illinois' most recent legislative redistricting map, SB 927, was passed by the General Assembly on August 31, 2021, and approved by the Governor on September 24, 2021. See Public Act 102-0663 ("SB 927" or "September Redistricting Plan").

districts, these cases are about "the chance for more success in place of some." *Id.* at 1013. This disagreement also reflects competing views about how to guarantee Latino and Black voters, in their respective districts, equal opportunity to elect their candidate of choice when minority voters could form different permutations of majority-minority, coalition, and opportunity districts.[2]

Although there is debate about how to achieve the guarantees of the Voting Rights Act, one thing is clear: A federal court is not the arbiter of that dispute unless Plaintiffs carry their burden to prove that an elected legislature's approach violates the law. See *Voinovich v. Quilter*, 507 U.S. 146, 156 (1993) ("[T]he federal courts may not order the creation of majority-minority districts unless necessary to remedy a violation of federal law"). Cognizant that "judgments about inequality * * * become closer calls" in cases such as these, we conclude that Plaintiffs have not established any statutory defects in SB 927. *Johnson*, 512 U.S. at 1013. Our analysis in support of that conclusion forms the first part of this opinion.

As to the constitutional claims, *Contreras* Plaintiffs allege that House District ("HD" or "House District") 21 and Senate District ("SD" or "Senate District") 11 constitute racial gerrymanders, and *East St. Louis NAACP* Plaintiffs allege the same for HD 114. But neither set of Plaintiffs has proved that race predominated in the configuration of any of the challenged districts. Indeed, the record could not be more clear that partisan politics—a legally acceptable

---

[2] At the outset, we define several key terms. "In majority-minority districts, a minority group composes a numerical, working majority of the voting-age population." *Bartlett v. Strickland*, 556 U.S. 1, 13 (2009). An influence district is one "in which a minority group can influence the outcome of an election even if its preferred candidate cannot be elected." *Id.* "[A] crossover district is one in which minority voters make up less than a majority of the voting-age population. But in a crossover district, the minority population, at least potentially, is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate." *Id.*

criterion—controlled that decision. The second part of this opinion lays out our evaluation of those constitutional claims.

For the reasons that follow, we uphold the General Assembly's redistricting map under SB 927 and reject in full all three Plaintiffs' remedial proposals, denying Plaintiffs any further injunctive or declaratory relief.

## I.      Background

### A.      2021 Legislative Redistricting Process

As explained in the Court's October 19, 2021 decision in this case, the Illinois Constitution instructs the General Assembly to reconfigure the boundaries of the 59 Senate districts and 118 House of Representatives districts every 10 years to account for population changes ascertained through the decennial census. In 2021, Illinois' legislative redistricting process took place in two phases. In the first phase, the U.S. Census Bureau did not release data in the Spring of 2021, so the Illinois General Assembly reconfigured the legislative districts based on data from the American Community Survey's 5-year estimates. District maps were proposed, and in May 2021, the General Assembly passed House Bill 2777 and Senate Floor Amendment 1, which established the new map of House and Senate districts. The Governor signed the plans into law on June 4, 2021. See Public Act 102-0010 ("P.L. 102-0010" or "June Redistricting Plan").

But the Census Bureau's belated release of the latest, official census data revealed malapportionment in the enacted map. The state returned to the drawing board in August 2021 to account for the population changes revealed in the newly-available census numbers and equally

apportion the districts. Following several joint supplemental hearings, the General Assembly passed a second map, SB 927, or the September Redistricting Plan.[3]

### B.     Procedural Posture

Both of those legislative redistricting plans prompted legal action. In late May and early June 2021, two sets of plaintiffs filed suit against members of the General Assembly's Democratic leadership (the "Legislative Defendants") and the State Board of Elections. Various members of the General Assembly's Republican leadership filed the first case, *McConchie v. Scholz*, Case No. 21-cv-3091 (N.D. Ill. 2021). Individual Latino voters represented by the Mexican American Legal Defense and Educational Fund ("MALDEF"), filed the second suit, *Contreras v. Illinois State Board of Elections*, Case No. 21-cv-3139 (N.D. Ill. 2021). Although they requested different forms of relief, both sets of Plaintiffs alleged that the apportionment of the House and Senate districts in the June Redistricting Plan, P.L. 102-0010, violated the Equal Protection Clause's guarantee of one-person, one vote. The cases were consolidated, and this three-judge panel was convened pursuant to 28 U.S.C. § 2284(a).

The August 2021 release of the federal census data revealed significant malapportionment in the enacted map, prompting reactions from both sides of the "v." *McConchie* and *Contreras* Plaintiffs moved for summary judgment on the June Redistricting Plan. They sought to enjoin State Board of Elections Defendants from using the map in any future elections and a declaration that the plan was unconstitutional. *McConchie* Plaintiffs also sought to compel the handoff of the

---

[3] The parties, the witnesses including experts, and this Court use the acronyms "VAP" (voting age population), and "CVAP" (citizen voting age population), in these cases. The parties, the witnesses including experts, and this Court also use the terms "endogenous" to refer to legislative elections and "exogenous" to refer to other, non-legislative elections, such as municipal elections or elections for non-legislative offices.

mapmaking process from the General Assembly to a bi-partisan Commission under a provision of the Illinois Constitution.

As noted above, the General Assembly proposed and passed a new redistricting map, SB 927, the September Redistricting Plan, during this litigation. SB 927 did not allay Plaintiffs' constitutional and statutory concerns, however. Both *McConchie* and *Contreras* Plaintiffs filed amended complaints to add challenges to SB 927. Their complaints reincorporated their allegations that the June Redistricting Plan violated the one-person, one-vote principles, and they added new claims that SB 927 violated § 2 of the Voting Rights Act and constituted racial gerrymanders in violation of the Fourteenth Amendment's Equal Protection guarantee.

After finding that the June Redistricting Plan still presented a live case or controversy, this Court granted summary judgment on the one-person, one-vote challenge to the June Map. The Court declared the June Redistricting Plan unconstitutional and enjoined the Illinois State Board of Elections from using the map in future elections. The Court, however, declined *McConchie* Plaintiffs' request to turn the redistricting process over to a bi-partisan commission. Instead, the Court declared SB 927 to be the General Assembly's "second bite at the apple" and our starting point for selecting a replacement map. We thus invited *McConchie* and *Contreras* Plaintiffs to prove their allegations that SB 927 violated the Voting Rights Act and Fourteenth Amendment and to submit proposed remedial maps to cure any violations they could establish.

Days before the summary judgment opinion in *Contreras* and *McConchie*, a third redistricting case was filed. East St. Louis Branch NAACP and the United Congress of Community and Religious Organizations filed suit in federal court, *East St. Louis NAACP v. Illinois State Bd. of Elections*, Case No. 21-cv-5512 (N.D. Ill. 2021). Like *McConchie* and *Contreras* Plaintiffs, *East St. Louis NAACP* Plaintiffs alleged that the General Assembly violated

the Voting Rights Act and Fourteenth Amendment in configuring HD 114, located in an area in and around East St. Louis known as "the Metro East" region. After consolidation of the three cases, this Court instructed *East St. Louis NAACP* Plaintiffs to also brief their constitutional and statutory claims and to submit a proposed remedial map.

After extensive fact and expert discovery, Plaintiffs submitted briefs detailing the alleged § 2 and Fourteenth Amendment violations in SB 927, supported by fact and expert evidence, and proposing cures thereto with remedial plans of their own. See [*McConchie v. Scholz*, Case No. 21-cv-3091 ("*McConchie*"), dkt. 151 (*McConchie* Pls.' Br.) (N.D. Ill. 2021)]; [*Contreras v. Ill. State Bd. of Elections*, Case No. 21-cv-3139 ("*Contreras*"), dkt. 139 (*Contreras* Pls.' Br.) (N.D. Ill. 2021)]; [*East St. Louis NAACP v. Ill. State Bd. of Elections*, Case No. 21-cv-5512 ("*East St. Louis NAACP*"), dkt. 44 (*East St. Louis NAACP* Pls.' Br.) (N.D. Ill. 2021)]. Together, their claims center on three regions of Illinois: Cook County, Aurora, and Metro East. Legislative Defendants filed a brief in opposition to all three Plaintiffs' remedial maps and defending SB 927 in full. See [*McConchie*, 160 (Leg. Defs.' Br.)].[4]

Although this Court set aside time for oral argument or an evidentiary hearing, all three sets of Plaintiffs disclaimed the need for witness testimony and only *East St. Louis NAACP* Plaintiffs requested oral argument. Legislative Defendants, too, requested oral argument. The Court convened a one-day hearing on December 7, allotting each set of Plaintiffs an equal amount

---

[4] We note several housekeeping matters to avoid any confusion. First, we will refer to filings on *McConchie v. Scholz*, Case No. 21-cv-3091 (N.D. Ill. 2021) as "*McConchie*" (*e.g.*, [*McConchie*, 151 (Pls.' Br.) at 14]), on *Contreras v. Ill. State Bd. of Elections*, Case No. 21-cv-3139 (N.D. Ill. 2021) as "*Contreras*" and so forth. All page references are to the pagination listed on the docket and located at the top of the page (*e.g.*, "Case: 1:21-cv-03091 Document #: 175-1 Filed: 12/08/21 Page **34** of 53"), not the pagination assigned by the parties and located at the bottom of the page.

of time for opening and rebuttals, and Legislative Defendants an equal amount of time in aggregate to respond to each Plaintiffs' claims. The Court also set a schedule for post-hearing supplemental written submissions, but the parties all agreed subsequently, see [*McConchie*, 180], that no further submissions were necessary as the hearing had given counsel ample opportunity to make their points.

## II. Legal Standard

First, we describe the legal framework for considering the three sets of Plaintiffs' statutory claims that SB 927 impermissibly dilutes Latino and Black votes spanning various regions of the state and different permutations of the districts within those regions. Later, we describe the legal standard for racial gerrymandering in that portion of this opinion which addresses those claims.

Section 2, subsection (a) of the Voting Rights Act provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State * * * in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or * * * as provided in subsection (b)." 52 U.S.C. § 10301(a). Subsection (b) elaborates that "[a] violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State * * * are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § (b).

In *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986), the Supreme Court announced three "necessary preconditions" that apply to a § 2 claim: (1) The minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district;" (2) the

minority group must be "politically cohesive;" and (3) the majority must vote "sufficiently as a bloc to enable it * * * usually to defeat the minority's preferred candidate." These preconditions, also referred to as the "*Gingles* factors," apply with equal force to single-member district claims. *Growe v. Emison*, 507 U.S. 25, 40–41 (1993). "The burden of 'show[ing]' the prohibited effect, of course, is on the plaintiff * * *." *Voinovich v. Quilter*, 507 U.S. 146, 156 (1993) (alteration in original). And failure to satisfy any one of these factors is fatal to a § 2 VRA claim. See, *e.g.*, *Bartlett v. Strickland*, 556 U.S. 1, 11 (2009) ("Majority-minority districts are only required if all three *Gingles* factors are met and if § 2 applies based on a totality of the circumstances").

"When applied to a claim that single-member districts dilute minority votes, the first *Gingles* condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994). "[A] party asserting § 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent." *Strickland*, 556 U.S. at 19–20. The *Strickland* Court rejected the argument that a plaintiff can fulfill this precondition with a district below 50 percent minority voting age population. See *id.* at 23. That is true even if there is good reason to think that minority voters could surpass the 50-percent threshold by forming a so-called "coalition district" that combines minority voters with voters of other races to elect their candidate of choice.

The third *Gingles* precondition is designed "to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 56. "[T]he usual predictability of the majority's success distinguishes structural dilution from the mere loss of an occasional election." *Id*. at 51. "[I]n general, a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally

significant white bloc voting." *Id*. at 56. However, relevant here, "[i]n areas with substantial crossover voting it is unlikely that the plaintiffs would be able to establish the third *Gingles* precondition—bloc voting by majority voters." *Strickland*, 556 U.S. at 24. "[I]n the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters." *Voinovich*, 507 U.S. at 157–58 (quoting *Gingles*, 478 U.S. at 49, n.15) (reversing district court's finding that district violated § 2 without this showing).

Two cases, *Abrams v. Johnson*, 521 U.S. 74, 90–92 (1997), and *Cooper v. Harris*, 137 S. Ct. 1455 (2017), offer particularly germane guidance on *Gingles*' third precondition. In *Abrams*, the district court concluded that the state's redistricting plan did not violate § 2 in part because the record was insufficient to satisfy the third *Gingles* precondition. Plaintiffs had "fail[ed] to demonstrate * * * chronic bloc voting" because of the "significant degree of crossover voting," such as white crossover voting for Black candidates, which ranged from twenty-two to thirty-eight percent, "black and black-preferred candidates['] * * * many electoral victories in local and statewide election" and "significant—occasionally overwhelming—support from both black and white voters." 521 U.S. at 91–92 (some alterations in original). The Supreme Court upheld the lower court's findings, despite some evidence of racial polarization in voting, because of the electoral victories by Black incumbent candidates and the "general willingness of white voters to vote for black candidates in the challenged districts." *Id.* at 92–93.

Although *Cooper v. Harris* addressed a constitutional challenge, it too sheds additional light on the third *Gingles* precondition. There, state defendants sought to defend districts designed to meet race-based targets by claiming that they drew the challenged majority-minority districts to comply with § 2 of the Voting Rights Act, see 137 S. Ct. at 1469, but Black-preferred candidates

had won five successive general elections in the challenged districts under their prior configuration over the past decade with forty-eight and forty-two percent Black voting age population, *id.* at 1465–66.  The Court upheld the district court's conclusion that the state's plan did not demonstrate effective White-bloc voting, *id.* at 1470.  In fact, legislators had misinterpreted *Strickland* to require that "whenever a legislature *can* draw a majority-minority district, it *must* do so—even if a crossover district would also allow the minority group to elect its favored candidates."  *Cooper*, 137 S. Ct. at 1472.  As the Court explained, superimposing such a requirement onto § 2 "is at war with [the Court's] § 2 jurisprudence—*Strickland* included" because that view would render,

> the third *Gingles* condition * * * no condition at all, because even in the absence of effective white bloc-voting, a § 2 claim could succeed in a district (like the old District 1) with an under–50% BVAP. But this Court has made clear that unless *each* of the three *Gingles* prerequisites is established, "there neither has been a wrong nor can be a remedy."

*Id.*  The plan, therefore, could not withstand strict scrutiny.  *Id.* ("[N]either will we approve a racial gerrymander whose necessity is supported by no evidence and whose *raison d'être* is a legal mistake").

The three *Gingles* preconditions are not the end of the inquiry, however.  "If a plaintiff makes [the threshold] showing, it must then go on to prove that, under the totality of the circumstances, the district lines dilute the votes of the members of the minority group."  *Abbott v. Perez*, 138 S. Ct. 2305, 2331 (2018).  Among other factors, proportionality statewide is "a relevant fact in the totality of circumstances," but not a "safe harbor."  *League of United Latin Am. Citizens* (*LULAC*) *v. Perry*, 548 U.S. 399, 436 (2006) (quoting *Johnson*, 512 U.S. at 1000, 1017–18).  Rather, "the degree of probative value assigned to proportionality may vary with other facts."  *Id.* at 438 (quoting *Johnson*, 512 U.S. at 1020).  Our task, however, is not to assess a "failure to maximize the number of reasonably compact majority-minority districts."  See *Johnson*, 512 U.S.

at 1022. Thus, the Court has found no § 2 violation where, for example, "in spite of continuing discrimination and racial bloc voting, minority voters form effective voting majorities in a number of districts roughly proportional to the minority voters' respective shares in the voting-age population." *Id.* at 1000, 1014. Compare *LULAC*, 548 U.S. at 442, 447 (in holding the drawing of District 23 violated § 2, the "totality of the circumstances demonstrate[d] a § 2 violation").

We also note that our remedial authority is limited. Time and again the Supreme Court has warned that "[t]he federal courts may not order the creation of majority-minority districts unless necessary to remedy a violation of federal law." See *Voinovich*, 507 U.S. at 156. That is because "it is the domain of the States, and not the federal courts, to conduct apportionment in the first place." *Id.* These principles apply even "[w]hen faced with the necessity of drawing district lines by judicial order" because "a court, as a general rule, should be guided by the legislative policies underlying the existing plan, to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act." *Abrams*, 521 U.S. at 79.

## III. Analysis

Part A below addresses *McConchie*, *Contreras*, and *East St. Louis NAACP* Plaintiffs' statutory claims and demonstrates why the absence of majority bloc voting in each of the challenged districts dooms their § 2 allegations. Part B explains why *Contreras* and *East St. Louis NAACP* Plaintiffs have not shown that race predominated in the configuration of any district in SB 927.

Preliminarily, we address *McConchie* and *Contreras* Plaintiffs' joint motion to exclude Dr. Allan Lichtman's expert testimony regarding the third *Gingles* precondition for the alleged failure to produce data in violation of Federal Rule of Civil Procedure 26(a)(2)(B)(ii). See [*Contreras*, 180 (*Contreras & McConchie* Pls.' Joint Mot. to Exclude Dr. Lichtman's *Gingles*

Prong III Testimony)]; [*McConchie*, 173 (Pls.' Notice of Filing & Adoption of Mot. to Exclude)]. Plaintiffs argue that Dr. Lichtman's report refers to but omits the results of his regression analysis.

We took these motions [180] and [173] with the case and now deny them as moot. Dr. Lichtman's racial polarization study is not necessary to resolve any of Plaintiffs' claims. Our evaluation relies exclusively on Plaintiffs' experts' findings. To the extent Dr. Lichtman's report is considered, we rely on only data that is accessible to Plaintiffs' experts without particular formatting or coding and which therefore raise no reliability questions. For example, we consider Dr. Lichtman's commentary regarding methodology (Plaintiffs' experts' sample selection), publicly available data he has used to supplement Plaintiffs' tables (*e.g.*, win-loss rates), or where he has confirmed Plaintiffs' own findings (*e.g.*, confirming Dr. Grumbach's assessment of Latino-preferred candidates) because Plaintiffs presumably had access to the data underlying their own findings.

### A.    Vote Dilution

All three sets of Plaintiffs allege that SB 927 impermissibly dilutes minority votes in violation of § 2 of the Voting Rights Act. *Contreras* Plaintiffs argue that SB 927 denies Latino voters the opportunity to elect their candidate of choice in seven districts in the northwest and southwest portions of Cook County, which encompasses the City of Chicago. See [*Contreras*, 139 (Pls.' Br.)]. Meanwhile, *East St. Louis NAACP* Plaintiffs assert that the plan dilutes the strength of Black voting in one district in Metro East, a region in southern Illinois. See [*East St. Louis NAACP*, 44 (Pls.' Br.)]. *McConchie* Plaintiffs' claims overlap with many of the other Plaintiffs' claims, and then some, so we address their claims last. They challenge twelve Cook County districts on the north and south west sides of Chicago, together with one district in Aurora as

denying the rights of Latino voters, while also claiming impermissible vote dilution in Metro East. See [*McConchie*, 151 (Pls.' Br.)].

We conclude that Plaintiffs have not proved that the September Redistricting Plan violates § 2 of the Voting Rights Act. Plaintiffs have failed to show by a preponderance of the evidence that White or majority-bloc voting defeats minority candidates of choice, the third precondition for § 2 liability under *Thornburg v. Gingles*. Plaintiffs cannot show § 2 liability without meeting all three preconditions, so their § 2 challenges fail.

## 1.     CONTRERAS Plaintiffs

Despite an increase in the total citizen voting age population of Latinos in Illinois, under SB 927 the number of Latino-majority citizen voting age districts decreases from five to four in the Illinois House, and three to two in the Senate. See [*Contreras*, 139 (Pls.' Br.) at 8]. Under this new configuration, *Contreras* Plaintiffs contend that seven districts in northwest and southwest Cook County violate § 2 of the Voting Rights Act. On the north side of the county, they argue that House Districts 3, 4 and 39, together with Senate District 2, impermissibly dilute Latino votes. On the south side of Cook County, they launch similar challenges to House Districts 21, 24, and Senate District 11.

### a.     Northwest Cook County (HD 3, 4, 39, SD 2)

As to the challenged districts in northwest Cook County—HD 3, 4, 39 and SD 2— Legislative Defendants stipulate that the second *Gingles* precondition is satisfied, but they insist that *Contreras* Plaintiffs cannot prove either the first or third *Gingles* preconditions.

### i.     First *Gingles* Precondition

Plaintiffs submitted a remedial map drawn by expert David Ely that included reasonably compact districts with greater than 50% Latino CVAP for each of the proposed remedial districts,

reproduced in part below. The Latino CVAP is (1) 51.8% in HD 3, (2) 50.6% in HD 4; (3) 50.9%

in HD 39, and (4) 51.2% in SD 2. See [*Contreras*, 135-21 (Ely Expert Report), Ely Ex. 6, at 54

tbl.3 (Alternative Proposal)]. The potential districts included in *Contreras* Plaintiffs' remedial

plans easily "show by a preponderance of the evidence that the minority population in the potential

election district is greater than 50 percent." *Strickland*, 556 U.S. at 19–20.

| SB 927 Plan* | | | *Contreras* Plaintiffs' Remedial Plan* | | |
|---|---|---|---|---|---|
| **District** | **Latino VAP** | **Latino CVAP** | **District** | **Latino VAP** | **Latino CVAP** |
| **HD 3** | 54.13 | 47.4 | **HD 3** | 58.5 | **51.8**[5] |
| **HD 4** | 52.65 | 45.2 | **HD 4** | 55.6 | **50.6** |
| **HD 21** | 51.74 | 42.7 | **HD 21** | 64.3 | **53.3** |
| **HD 24** | 48.5 | 43.7 | **HD 24** | 58.5 | **51.4** |
| **HD 39** | 51.61 | 45.6 | **HD 39** | 55.0 | **50.9** |
| **SD 2** | 53.39 | 46.3 | **SD 2** | 57.1 | **51.2** |
| **SD 11** | 57.26 | 47.70 | **SD 11** | 66.1 | **54.6** |
| See [*McConchie*, 160-2 (Maxson Decl.) Ex. A (House Matrix) at 14; 160-6 (Sodowski Decl.) Ex. A (Senate Matrix) at 10]. | | | See [*Contreras*, 135-21 (Ely Expert Report), Ely Ex. 6, at 54 tbl.3 (Alternative Proposal)]. | | |

It is no answer to say that *Gingles*' first precondition fails because "*all* of the House

Districts Plaintiffs challenge are 'majority-minority' Latino districts." See [*McConchie*, 160

(Defs.' Br.) at 34]. Legislative Defendants rely on voting age population for this proposition. See

*LULAC*, 548 U.S. at 429. Here, as in *LULAC*, "Latinos, to be sure, are a bare majority of the

voting-age population" in the challenged districts, "but only in a hollow sense" because "the

relevant numbers must include citizenship" given that "only eligible voters affect a group's

opportunity to elect candidates." See *id*. See *Baldus v. Members of Wis. Gov't Accountability Bd.*,

---

[5] Legislative Defendants' CVAP estimates for all districts in *Contreras* Plaintiffs' remedial plan differ nominally. See [*McConchie*, 160-2 (Maxson Decl.) Ex. A (House Matrix) at 14; 160-6 (Sodowski Decl.) Ex. A (Senate Matrix) at 10]. These minor factual disputes do not alter our conclusion that *Gingles*' first precondition is satisfied because none of the differences between the Plaintiffs' and Defendants' estimates reduce the CVAP in the proposed districts below the majority-minority requirement under *Gingles*' first precondition.

849 F. Supp. 2d 840, 854 (E.D. Wis. 2012) ("For the obvious reason that non-citizens are not entitled to vote, we cannot ignore citizenship status, particularly given the Supreme Court's express endorsement of the centrality of this point"). None of the challenged districts feature majorities of Latinos of the citizen voting age population.

In any event, Defendants' reliance on *Strickland* for the proposition that "Plaintiffs have no viable VRA [Voting Rights Act] claim where the existing district is majority-minority" is misplaced. Unlike *Strickland*, Plaintiffs in this case do not "argue that § 2 requires a crossover district" to cross the fifty percent threshold to satisfy *Gingles*' first precondition. Rather, *Contreras* Plaintiffs have produced reasonably compact "majority-minority districts * * * compos[ing] a numerical, working majority of the voting-age population" as required by § 2. See 556 U.S. at 13. See, *e.g.*, *Dickinson v. Ind. State Election Bd.*, 933 F.2d 497, 503 (7th Cir. 1991) ("[T]he Supreme Court [at this stage] requires only a simple majority of eligible voters in the single-member district.")

### ii. Third *Gingles* Precondition

Nevertheless, *Contreras* Plaintiffs cannot fulfill *Gingles*' third precondition for HD 3, 4, 39, and SD 2. Legislative Defendants are correct that "Plaintiffs' chief stumbling block is that their submissions fail to demonstrate that white bloc voting exists in any of the challenged areas sufficient to usually defeat minority-preferred candidates." [*McConchie*, 160 (Defs.' Br.) at 33]. Even findings by Plaintiffs' own expert, Dr. Jacob Grumbach, reveal that the Latino candidate of choice won in seven of ten endogenous[6] elections[7] on the north side in the past decade. [*Contreras*,

---

[6] As noted above, an endogenous election concerns a state House or Senate district. An exogenous election concerns other partisan and non-partisan offices.

[7] Dr. Grumbach selected nineteen endogenous elections to reach these findings. To assess the level of majority bloc voting, Dr. Grumbach received precinct-level data covering "recent Illinois state legislative

135-19 (Grumbach Expert Report) at 13].  Dr. Grumbach's analysis also estimates significant crossover voting by non-Latino voters in those same elections, ranging from more than twenty-five to seventy percent non-Latino voter support for the Latino candidate of choice in at least eight of those elections.  See [*id.* at 12 fig.1, 27 tbl.A1].[8]

Accordingly, much like *Abrams*, *Contreras* Plaintiffs have "fail[ed] to demonstrate * * * chronic bloc voting" in HD 3, 4, and 39 because of the strong electoral record and prevalence of crossover voting.  See *Abrams*, 521 U.S. at 93–94 (alterations in original).  Latino-preferred candidates' electoral victories are powerful evidence that there is an absence of majority bloc voting (either by a White-bloc or by a non-Latino-bloc).  *Id.*  So is their "significant—occasionally overwhelming—support from" non-Latino voters, who voted at rates of twenty-five to seventy percent for Latino-preferred candidates in those elections.  See *id.* at 92–93 (internal quotation marks omitted) (characterizing White crossover voting ranging from twenty-two to thirty-eight percent as significant); *Strickland*, 556 U.S. at 24 ("In areas with substantial crossover voting it is unlikely that the plaintiffs would be able to establish the third *Gingles* precondition—bloc voting by majority voters").

The parallels here to *Cooper v. Harris* underscore our view.  Similar to *Cooper*, "[h]ere, electoral history provided no evidence that a § 2 plaintiff could demonstrate the third *Gingles*

---

elections with a Latino candidate," [*Contreras*, 135-19 (Grumbach Expert Report) at 8], and identified nineteen endogenous state legislative candidates, selecting "districts that geographically overlap challenged districts in which at least one Latino candidate ran against at least one non-Latino candidate," [*id.*; 162-1 (Grumbach Expert Rebuttal) at 6], and also excluded elections in which a candidate ran unopposed, [135-19 at 8].  In his report, he further drills down to produce findings in the north and south side districts, respectively.  See [*id.* at 11–15].  Nowhere does he, nor do the *Contreras* Plaintiffs, produce results at any higher level of specificity to show findings at the individual district level.

[8] To estimate voter preferences, by race, Dr. Grumbach uses a methodology called "ecological inference" (EI).  See [*Contreras*, 135-19 (Grumbach Expert Report) at 9].

prerequisite—effective white bloc voting." See 137 S. Ct. at 1470. Although the Latino citizen voting age population in several of these districts was "less than a majority" in the past decade, the districts were still "extraordinarily safe * * * for [Latino] preferred candidates" in part because a "meaningful number of white voters" and other minority voters "did *not* 'vote [] sufficiently as a bloc' to thwart [Latino] voters' preference." See *id.* "When voters act in [this] way"—forming a coalition district—"[i]t is difficult to see how the majority-bloc-voting requirement could be met." *Id.* (internal quotation marks omitted).

Even if we were to consider the broader sample of Cook County elections analyzed by Dr. Grumbach, our conclusion that Plaintiffs have not shown the existence of majority bloc voting would not change. Overall, Dr. Grumbach finds that for all Cook County elections analyzed, a Latino candidate of choice lost in 4 of 19 endogenous elections—or, in other words, the candidate of choice prevailed 78.9% of the time. See [*Contreras*, 162 (Pls.' Reply Br.) at 18]. Latino-preferred candidates lost in 8 of 17 exogenous elections, yielding a still respectable 52.9% win rate in exogenous elections. See [*id.* at 20]. Findings from Dr. Grumbach's meta-analysis of 19 endogenous elections across north and south west Cook County underscores crossover voting as well. In those challenged districts, on average, 37.5% of non-Latino voters supported Latino candidates of choice. See [135-19 (Grumbach Expert Report) at 15 fig.3, 16] (specifically, the results suggest that 68.7% of Latino voters supported Latino candidates of choice in these elections, whereas 37.5% of non-Latino voters supported Latino candidates of choice).[9]

---

[9] For his meta-analysis, Dr. Grumbach also used ecological inference (EI) to estimate how many people of each race/ethnic group voted for a candidate. See [135-19 (Grumbach Expert Report) at 10]. He conducted a meta-analysis, which is designed to provide an "overall estimate" of electoral support for Latino candidates of choice and their non-Latino electoral opponents because variations in geography, voter turnout, and political context render any average of racial polarization difficult. [*Id.*] (emphasis omitted).

*Contreras* Plaintiffs' contention that once we discount elections with special circumstances, majority bloc voting usually defeats Latino-preferred candidates is not persuasive. Specifically, they argue that we should winnow out any election involving an (1) incumbent, (2) appointments, and (3) majority Latino districts. [*Contreras*, 162 (Pls.' Reply Br.) at 18]. Under this analysis, we would disregard fourteen of the nineteen endogenous elections. In this narrower pool of only five races, the win rate for Latino-preferred candidates plummets to only twenty percent. See [*id.* at 19–20; 162-1 (Grumbach Expert Rebuttal) at 7] (reporting Latino-preferred candidate prevailed in one of five endogenous elections without special circumstances). Likewise, they insist we should ignore five of the original seventeen exogenous elections from Grumbach's sample, which would reduce the win percentage of Latino-preferred candidates to thirty-three percent. See [162 at 19–20; 162-1 at 7] (reporting Latino-preferred candidate prevailed in four of twelve exogenous elections).

As to the first argument, for two reasons we are not persuaded that we can simply toss out election results in which an incumbent ran. See, *e.g.*, *Abrams*, 521 U.S. at 92–93 (upholding district court's conclusion that rested on the "general willingness of white voters to vote for" all three Black incumbents who won elections under the court plan). It is true that "special circumstances, such as the absence of an opponent, incumbency, or the utilization of bullet voting, may explain minority electoral success in a polarized contest." *Gingles*, 478 U.S. at 57. But incumbency is not "special" in the Illinois General Assembly, in which 109 of 118 of House races in 2020 included an incumbent candidate. See, *e.g.*, *Illinois House of Representatives Elections, 2020*, Ballotpedia, https://perma.cc/5H9B-YQH6 (last visited Dec. 27, 2021). In other words, incumbency does not "play an unusually important role" in these elections. See *Clarke v. City of Cincinnati*, 40 F.3d 807, 813–14 (6th Cir. 1994) ("The Supreme Court has not yet had occasion to

19

describe the conditions under which incumbency may be a 'special circumstance.' But unlike other 'special circumstances,' incumbency plays a significant role in the vast majority of American elections").  Rather, to systematically eliminate from our analysis all races with incumbent candidates "would confuse the ordinary with the special, and thus 'make practically every American election a special circumstance.'"  *Id*. (quoting *Collins v. City of Norfolk*, 883 F.2d 1232, 1250 (4th Cir. 1999)).  Relatedly, *Contreras* Plaintiffs have not given any reason *why* incumbency diminishes the probative value of the elections here.  They have not, for example, pointed to any circumstance in which the General Assembly designed districts to "exclud[e] some voters from the district simply because they are likely to vote against the officeholder," or otherwise undermine "the interests of the constituents."  See *LULAC*, 548 U.S. at 440–41 ("Incumbency protection can take various forms * * * . If the justification for incumbency protection is to keep the constituency intact so the officeholder is accountable for promises made or broken, then the protection seems to accord with concern for the voters").

Contreras* Plaintiffs' second special circumstance—appointment—likewise misses the mark.  Plaintiffs have not pointed to any reason that appointments diminish the probative value of the elections in Dr. Grumbach's sample.  It might be another situation if, for example, there were *any* evidence in the record that the General Assembly has a history of doling out appointments only to White candidates or that Latino voters voted against appointees in subsequent elections, which *might* be evidence that the appointment process dilutes or denies Latino voters the opportunity to elect their candidate of choice.  Yet *Contreras* Plaintiffs have not furnished any evidence that the General Assembly has done so.  Rather, the only evidence in the record suggests that twenty-five percent of appointees in the Senate and twenty-four percent of appointees in the

House were Latino,[10] and that those Latino appointees garnered significant votes. See [*McConchie*, 179-1 (Leg. Defs.' Hr'g Exs. Pt. 1) at 6] (Latino members constituted three of twelve Senate appointments and seven of twenty-nine House appointments). If anything, the evidence suggests that the General Assembly has *favored* Latino-preferred candidates in its appointments.[11]

*Contreras* Plaintiffs also point to the sections of Dr. Grumbach's report in which he claims to have found evidence of widespread racially polarized voting. Specifically, Dr. Grumbach found that thirty-one of thirty-six elections featured racially polarized voting. [*Contreras*, 162 (Pls.' Reply Br.) at 24]. He also finds in a sample of eighteen elections that Latino voters are significantly more likely to vote for the Latino candidate of choice than are non-Latinos. See [*Contreras*, 135-19 (Grumbach Expert Report) at 15–16].

*Contreras* Plaintiffs' evidence of racial polarization is insufficient to overcome the pattern of electoral victories and crossover voting. In his report, Dr. Grumbach uses an over-inclusive definition of racially polarized voting, so his findings are not particularly helpful. He defines racially polarized voting as occurring when Latino and non-Latino voters differ in their voting choices. Thus, his results include elections in which Latino and non-Latino voters "voted overwhelmingly for the same candidate of choice." See [*McConchie*, 171-1 (Lichtman Expert

---

[10] Although Latino candidates are not synonymous with the Latino candidate of choice, there is evidence that Latino voters reelected those candidates in subsequent elections. See [*Contreras*, 162 (Pls.' Reply) at 17–18] (showing appointee Representative Andrade garnered 56 to 73% of Latino voters in three subsequent elections and appointee Senator Villanueva won 97% of Latino voters). In other words, this is not a situation in which evidence suggests the appointees are *not* the Latino-preferred candidate.

[11] At the December 7 hearing, counsel pointed out that appointments are made by local party officials, not by the General Assembly as a whole or by its leaders. But it would ignore reality, especially in Illinois, to suppose that local party officials do not consult closely with others in the party hierarchy before making appointments in most, if not all, instances in which a seat in the State House or Senate has been or soon will be vacated.

Report) at 40, 41 tbl.2] (Dr. Grumbach finds racially polarized voting, for example, even where 84.6% of non-Latino voters and 92.7% of Latino voters vote for the Latino-preferred candidate).

Other experts have rejected the definition employed by Dr. Grumbach. Dr. Lichtman, Legislative Defendants' expert, states in his report that racial polarization occurs when minority and non-minority groups vote for different candidates. See [*McConchie*, 171-1 (Lichtman Expert Report) at 40]. *East St. Louis NAACP* Plaintiffs' expert, Dr. Loren Collingwood, embraces the view that we should exclude elections in which minority and non-minority groups favor the same candidates. See [*East St. Louis NAACP*, 44-2 (Collingwood Expert Report) at 3] ("[I]f a majority of voters of one racial group back a particular candidate and so do a majority of voters from another racial group, then RPV is not present"). MALDEF appears to agree as well. See [*McConchie*, 171-1] (quoting MALDEF, NAACP Legal Def. & Educ. Fund (LDF) & Asian Am. Just. Ctr., *The Impact of Redistricting in Your Community: A Guide to Redistricting* 75, https://perma.cc/49LE-BZJH) ("Racially polarized voting is a pattern of voting along racial lines where voters of the same race support the same candidate who is different from the candidate supported by voters of a different race").

Dr. Grumbach's skewed data therefore shows "insufficient racial polarization in voting to meet the *Gingles* requirements." See *Abrams*, 521 U.S. at 93. Instead, the record as a whole confirms that Latino candidates have an equal opportunity to elect their candidate of choice given the relative success of Latino-preferred candidates and the general willingness of non-Latino voters to crossover and vote for these candidates.

In sum, *Contreras* Plaintiffs have not satisfied *Gingles*' third precondition, so they are not entitled to relief. "[U]nless *each* of the three *Gingles* prerequisites is established, 'there neither has been a wrong nor can be a remedy.'" See *Cooper*, 137 S. Ct. at 1472.

### iii.    Totality of the Circumstances

Even if *Contreras* Plaintiffs had satisfied *Gingles*' third precondition, the totality of the circumstances does not persuade us that SB 927 will dilute the strength of Latino votes in the north side districts for several reasons.  As already discussed, *Contreras* Plaintiffs have not produced sufficient evidence of racial polarization in voting, and the data for Cook County districts indicates persistent crossover voting.

Illinois is a leader in promoting ballot access.  The General Assembly has enacted a string of laws designed to increase voting access over the past two decades, and those measures apply across the state.[12]  Studies by *Contreras* Plaintiffs' expert as well as other publications conclude that Illinois is a leader in such access across the country.  See [*McConchie*, 171-1 (Lichtman Expert Report) at 105] (citing Jacob Grumbach, *Laboratories of Democratic Backsliding*, working paper (2021))[13] ("Illinois *** move[s] from the middle of the pack in 2000 to among the top democratic performers in 2018," *id.* at 12 fig.2, when measured for "democratic health * * * [u]sing 61 indicators of electoral and liberal democratic qualities, such as average polling place wait times, same-day and automatic voter registration policies, and felon disenfranchisement," *id.* at 3).

---

[12] As early as 2005, for example, Illinois authorized early voting in the state, established paid two-hour leave for voting by employees, and provided voter registration forms in English and Spanish.  See [*McConchie*, 171-1 (Lichtman Expert Report) at 108].  These voter-access measures have picked up speed in the past few years, with Illinois' authorization of election-day voter registration and automatic voter registration at state agencies, extension of early voting times, and establishment of high-traffic locations and elimination of voting identification requirements for doing so, to name a few.  See [*id.*] (citing Public Acts 94-0645, 98-0691, 100-0464).  Illinois has continued this trend during 2021, creating a state and school holiday on Election Day and authorizing a process to apply for permanent vote-by-mail status and curbside voting.  See [*id.* at 109] (citing SB 825).

[13] To access Dr. Grumbach's working paper, see Jake Grumbach, *Working Papers*, https://perma.cc/S8CW-MKVR (last visited Dec. 27, 2021).

Other factors, such as proportionality and evidence of present and historic discrimination, are insufficient in light of the evidence above. Latino representation in the state legislature dips below the state average, but Latino candidates occupy 10 of 118 (8.5%) of Illinois State House seats, and 6 of 59 (10%) of Illinois State Senate seats, which is just shy of Latinos' approximate 11.2% of citizen voting age population in Illinois. See [*McConchie*, 171-1 (Lichtman Expert Report) at 145, 150)]; *LULAC*, 548 U.S. at 438 ("There is, of course, no 'magic parameter,' and 'rough proportionality,' must allow for some deviations" (citation omitted) (quoting *Johnson*, 512 U.S. at 1017, n.14)). To be sure, *Contreras* Plaintiffs cite evidence of enduring economic and socioeconomic differences between Latinos and others. Regarding the former, it is not difficult to imagine ways those differences could impact elections. Nevertheless, Plaintiffs do not provide expert testimony nor themselves connect the dots as to how those disadvantages undermine Latino residents' ability to elect their candidates of choice. It was their burden to do so. We cannot assume, on this record, how or if those differences dilute the strength of Latino votes.

This is the type of case the Supreme Court envisioned when it explained in *Strickland* that "States can—and in proper cases should—defend against alleged § 2 violations by pointing to crossover voting patterns and to effective crossover districts." 556 U.S. at 23–24. Although more bare majority-minority districts *could* have been drawn as a matter of legislative prerogative in Illinois, § 2 does not require them unless "all three *Gingles* factors are met and if § 2 applies based on a totality of the circumstances." See *id.* at 24. Plaintiffs' challenge proves neither. We therefore conclude that none of the challenged districts in SB 927, HD 3, 4, 39 nor SD 2, violates § 2 of the Voting Rights Act.

### b.    Southwest Cook County (HD 21, 24, SD 11)

Next up are *Contreras* Plaintiffs' challenges to HD 21, 24, and SD 11 on the southwest side of Cook County.  Again, *Gingles*' first and second preconditions are straightforward.  As for *Gingles*' first precondition, expert Ely's map shows the potential to create three additional majority-minority districts in the proposed remedial map.  HD 21 features a Latino CVAP of 53.3%, HD 24 contains a Latino CVAP of 51.4%, and SD 11's LCVAP is 54.6%.  [*Contreras*, 135-21 (Ely Expert Report), Ely Ex. 6, at 54 tbl.3 (Alternative Proposal)].  See *Strickland*, 556 U.S. at 19–20.  On *Gingles*' second precondition, Defendants again stipulate that Latinos vote cohesively.

By their own metrics, though, *Contreras* Plaintiffs again have not satisfied *Gingles*' third precondition.  In these southwest Cook County districts, Dr. Grumbach finds that Latino candidates of choice won in 4 of 7 endogenous elections in the past decade.  See [*Contreras*, 135-19 (Grumbach Expert Report) at 15].  Put differently, Latino candidates of choice were defeated in roughly 42% of elections.  For the reasons stated above, we will not disregard the incumbent elections in this sample.  Even considering the election results for endogenous and exogenous districts, *Contreras* Plaintiffs' expert's own findings suggest an absence of non-Latino bloc voting. The only remaining evidence, then, to support *Contreras*' challenges to the southwest districts are (1) Dr. Grumbach's less-granular findings (that Latino candidates of choice won in 78.9% of 19 combined north and south side endogenous elections and 52.9% of north and south side exogenous elections), and (2) his evidence of racial polarization in voting.  As explained above in Part III.A(1)(a)(ii), that evidence does not undermine our conclusion as to the third *Gingles* precondition.

We have already discussed several reasons why the totality of the circumstances do not favor *Contreras* Plaintiffs. In the southwest districts, *Contreras* Plaintiffs also contend that the town of Cicero attempted to pass voter residency requirements in 1981 and point to witness testimony that in 2016, community members attempted to intimidate and dissuade members of the Latino community from voting. Any evidence that any community has tried to dissuade their neighbors from exercising this fundamental tenant of democracy is troubling. Even so, this isolated evidence in a single town of approximately 80,000 people within a county of more than 5 million is insufficient to upend the force of the other factors, which show an enduring pattern, over the past two decades, of Illinois' leadership in facilitating voting access, as well as a recent history of significant crossover voting.

*Contreras* Plaintiffs have not proved by a preponderance of the evidence that *any* of the challenged districts in SB 927 satisfy the third precondition articulated in *Gingles*. Even by *Contreras* Plaintiffs' own metrics, Latino-preferred candidates have prevailed in 52.9% of elections in the north side districts in the past decade, and 57% of the south side districts. That record, together with a substantial amount of White crossover voting, indicate an absence of majority bloc voting. With this "absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters." See *Voinovich*, 507 U.S. at 157–58 (quoting *Gingles*, 478 U.S. at 49, n.15) (reversing district court because plaintiffs had "failed to demonstrate *Gingles*' third precondition—sufficient white majority bloc voting to frustrate the election of the minority group's candidate of choice"). Even if they could, however, the totality of the circumstances does not indicate Latinos are being denied the opportunity to elect their candidate of choice.

Accordingly, we find that *Contreras* Plaintiffs have not shown that any of the challenged districts—HD 3, 4, 21, 24, and 39 and SD 2 and 11—violates § 2 of the Voting Rights Act. We therefore also decline to adopt any aspect of *Contreras* Plaintiffs' remedial plan. In the absence of a § 2 violation, "[t]he task of redistricting is best left to state legislatures, elected by the people and as capable as the courts, if not more so, in balancing the myriad factors and traditions in legitimate districting policies." *Abrams*, 521 U.S. at 101.

### 2. EAST ST. LOUIS NAACP Plaintiffs

*East St. Louis NAACP* Plaintiffs' challenge is limited to HD 114, located in and around East St. Louis in southern Illinois. They allege that as configured in SB 927, HD 114 denies Black voters the opportunity to elect their candidate of choice.

*East St. Louis NAACP* Plaintiffs submitted an "alternate liability plan" devised by expert Ryan D. Weichelt in which 50.80% of the voting age population is Black. See [*East St. Louis NAACP*, 60-2 (Weichelt Rebuttal Report) at 10 tbl.2].[14] This "potential election district" exceeds 50% and therefore satisfies the first *Gingles* precondition. See *Strickland*, 556 U.S. at 19–20. Because Legislative Defendants have stipulated that the minority population of HD 114 votes cohesively as a bloc to fulfill *Gingles*' second precondition, we can move directly to the third precondition.

---

[14] Although CVAP is the appropriate metric for evaluating the alleged Latino vote dilution in the challenged districts, *East St. Louis NAACP* Plaintiffs assert that VAP, not CVAP, is the correct metric for evaluating HD 114 and have only submitted VAP numbers to this Court. They maintain (1) that there are very few non-citizens in the Black population of Metro East, so there are not significant differences between the CVAP and VAP, and (2) VAP is a more precise metric. That notion seems sensible to this Court, and Legislative Defendants do not appear to dispute that there is not a significant difference between VAP and CVAP in HD 114. Even so, we may leave that issue for another day because Plaintiffs' claim falters on *Gingles*' third precondition.

Legislative Defendants again argue that *East St. Louis NAACP* Plaintiffs' case fails the third precondition and the totality of the circumstances do not suggest the dilution of Black voters in HD 114. Although the changing demographics of the area make this claim a closer call, *East St. Louis NAACP* Plaintiffs have not carried the burden to show HD 114's configuration denies Black voters the opportunity to elect their candidate of choice.

The record shows that Black-preferred candidates have not been defeated by White (or majority) bloc voting in actual elections in HD 114, nor has there been any evidentiary showing that Black-preferred candidates are likely to be defeated now or within the next decade. As for actual election results, *East St. Louis NAACP* Plaintiffs' own expert, Dr. Collingwood, selected seven elections probative for assessing electoral success of Black-preferred candidates. He found that Black-preferred candidates won six of seven elections. See [*East St. Louis NAACP*, 44-2 (Collingwood Expert Report) at 6 tbl.1]. As for present and future elections, Dr. Collingwood projects that Black-preferred candidates would win in three of three, or one-hundred percent, of elections if HD 114 were to go into effect.[15] [*Id.* at 17–18, 19 fig.9].

*East St. Louis NAACP* Plaintiffs raise three arguments against this evidence of Black-preferred candidates' electoral success, but none of them undermine our analysis. First, relying on Dr. Collingwood, they assert that under SB 927, Black voters' ability to elect their candidate of choice is actually on a razor's edge. He opines that even though Black candidates of choice will win in future elections, "the over-time patterns suggest this district has trended from favoring

---

[15] Dr. Collingwood performed a reconstructed election analysis to project how Black-preferred candidates would perform in HD 114 under these new parameters. He found that Black-preferred candidates would win in three of three elections in the newly configured HD 114. [*East St. Louis NAACP*, 44-2 (Collingwood Expert Report) at 17–18, 19 fig.9].

Black Democratic candidates towards a toss-up." See [*East St. Louis NAACP*, 44-2 (Collingwood Expert Report) at 18]. That is because the elections were too close to show the district is safe, as he projects the Black-preferred candidates would only garner wins by margins of 50.4–49.6% and 51–49%, respectively, in two of the elections analyzed. [*Id.* at 17–18]. Moreover, Black voters have declined as a share of the population, and those trends will undermine the performance of Black-preferred candidates. [*Id.*].

Second, *East St. Louis NAACP* Plaintiffs point to evidence of racially polarized voting, both retrospectively and prospectively. Dr. Collingwood concludes there is strong historic evidence of racial polarization in voting. See [*East St. Louis NAACP*, 44-2 (Collingwood Expert Report) at 6, 8 fig.1]. Through ecological inference analysis, Dr. Collingwood estimates that Black voters favor Black-preferred candidates between 85–99% of the time, whereas White voters favor White candidates 61–73% of the time in the 2011 HD 114, 2011 SD 57, and the county at large.[16] [*Id.* at 6]. He finds racially polarized voting in seven of seven contests analyzed. [*Id.* at tbl.1]. Prospectively, he opines that if SB 927 were to go into effect, there would be "strong and consistent evidence of" racially polarized voting. [*Id.* at 14]. Specifically, "Black voters back the Black candidate at rates between 90–99%, whereas white voters support the white candidate between 72%–74% of the time." [*Id.*].

Third, *East St. Louis NAACP* Plaintiffs contend that Black voters historically turn out at lower rates as compared to White voters. From a review of past election cycles, Collingwood finds

---

[16] The results of his homogenous precincts analysis reinforce this finding. Dr Collingwood finds that Black voters consistently voted for Black candidates at a rate above eighty percent and more often, greater than ninety percent, and White voters consistently support the White candidate at a rate of sixty-three to seventy-three percent while never giving majority support to a Black candidate. See [*East St. Louis NAACP*, 44-2 (Collingwood Expert) at 8–9 & fig.2].

a consistent pattern of turnout differential by race that holds across election year and office. [*East St. Louis NAACP*, 44-2 (Collingwood Expert Report) at 9–11 & fig.3] (enumerating for example, Black turnout even in 2016 election year difference of 8.14% (2016 IL 114) and 18.22% (2016 Circuit) between Black and White voters, ranging from maximum difference of 24.08% in 2020 Board of Review election).

After considering these arguments, we are not persuaded that *East St. Louis NAACP* Plaintiffs have demonstrated majority bloc voting in the Metro East region. Dr. Collingwood's forward-looking analysis shows that, even in the newly-configured HD 114, Black-preferred candidates face at worst a "toss up" in elections. In other words, Black opportunity to elect their candidate of choice appears roughly equal to majority-preferred candidates, even by Plaintiffs' own expert's projected worst-case analyses.

In arguing that *Gingles*' third precondition is satisfied, *East St. Louis NAACP* Plaintiffs either have to (a) show legally that a "toss up" district does not satisfy the Voting Rights Act, or (b) produce more facts and/or expert analysis supporting the proposition that HD 114 is not in fact a "toss up" for Black-preferred candidates. But *East St. Louis NAACP* Plaintiffs have not marshalled any law to suggest that the Voting Rights Act guarantees them anything beyond a "toss-up." Without that authority, we consider what evidence, if any, suggests that HD 114 under SB 927 offers less than an equal chance for electoral success. As noted above, *East St. Louis NAACP* Plaintiffs submit that Black-preferred candidates' performance is precarious because Black voters are leaving the district in droves and have a lower turnout rate. But *East St. Louis NAACP* Plaintiffs refer only to historical analyses. They have not provided any prospective estimates to show that the Black population within HD 114 will continue to drop or that the lower rate of voter turnout differentials will continue and by how much. There are no such facts before

us, and those facts cannot be assumed into the record. And this omission is especially stark in light of the enactment into law this year of SB 825, which according to Governor Pritzker, has the effect of "further expanding access to the ballot box for Illinoisans by increasing access to curbside voting, establishing permanent vote by mail registries, establishing a central polling location in counties across the state, strengthening cybersecurity standards for election authorities in Illinois, and providing viable voting opportunities for justice-impacted individuals."[17]  Mindful of the difficulty of accurately predicting electoral outcomes, we will not "risk[] basing constitutional holdings on unstable ground outside judicial expertise."  See *Rucho v. Common Cause*, 139 S. Ct. 2484, 2503–04 (2019) ("[A]ccurately predicting electoral outcomes is not so simple, either because the plans are based on flawed assumptions about voter preferences and behavior or because demographics and priorities change over time").

Dr. Collingwood's findings on racial polarization bolster our view that there is an absence of White (or majority) bloc voting that would need to be shown to satisfy *Gingles*' third precondition.  Despite the levels of polarization noted above, Dr. Collingwood also produced substantial evidence of White crossover voting.  Historically, he finds that White voters are voting for Black candidates at rates of 26.78 to 38.87%.  [*East St. Louis NAACP*, 44-2 (Collingwood Expert Report) at 8 fig.1].  His homogenous precincts analysis produces similar results.  See [*id.* at 9 fig.2] (White voters voting for Black candidates at rates of 27.2 to 37.46%).  Prospectively, Dr. Collingwood estimates that White voters are crossing over for Black-preferred candidates at rates of 26.56–28.68%.  See [*id.* at 15 fig.6].  In the end, therefore, we find that Plaintiffs "too far

---

[17] Press Release, *Governor Pritzker Signs Legislation Further Expanding Voting Protections for Illinois Residents* (June 17, 2021), https://perma.cc/4CHP-XPT6.

downplay[] the significance of a longtime pattern of white crossover voting in the area that would form the core of the redrawn District [114]." See *Cooper*, 137 S. Ct. at 1471.

In sum, Black-preferred candidates have successfully won at the polls in HD 114 over the past two decades even though the Black community has not constituted a majority of the voting age population there. Those trends reflect the general willingness of more than one quarter of White voters to cross over for Black-preferred candidates. Even with substantial shifts to the district under SB 927, experts project those victories and crossover voting will continue. And the record is devoid of evidence that the district will fall short of being at least a "toss-up" over the next decade. Accordingly, this Court concludes that *East St. Louis NAACP* Plaintiffs have not shown White (or majority) bloc voting. So, their § 2 claim under the Voting Rights Act falters on the third *Gingles* precondition.

### 3. MCCONCHIE Plaintiffs

We wrap up the vote dilution claims with *McConchie* Plaintiffs, who argue that districts in Cook County, Metro East, and Aurora, Illinois dilute Latino or Black votes. Although their challenge overlaps with most of the districts challenged by *Contreras* Plaintiffs, their claims center on a different combination of districts.

### a. Cook County (HD 1, 2, 3, 4, 21, 22, 23, 24, 32, 39, 77)

Like *Contreras* Plaintiffs, *McConchie* Plaintiffs challenge the configuration of districts in Cook County, although they challenge a broader array. We turn first to the northwest side districts

and then to the southwest side districts to explain why *McConchie* Plaintiffs' claims fail on *Gingles*' third precondition.

### i. Northwest Cook County (HD 3, 4, 32, 39, 77)

*McConchie* Plaintiffs challenge HD 3, 4, 32, 39, and 77 in northwest Cook County. Their submission easily satisfies the first *Gingles* precondition for each district. Plaintiffs submitted a remedial map drawn by expert Dr. Jowei Chen that included reasonably compact districts with greater than 50% CVAP for each of the challenged districts. See [*McConchie*, 151-2 (Chen Expert Report), at 7 tbl.1]. The Latino CVAP in each of the challenged Cook County districts is as follows: HD 3 with 50.8%, HD 4 with 51.6%, HD 32 with 51.1%, HD 39 with 50.3%, and HD 77 with 51.4%. [*Id.*]. Legislative Defendants concede that Latino voters in these districts vote cohesively to satisfy *Gingles*' second precondition, so we move to *Gingles*' third precondition.

*McConchie* Plaintiffs cannot satisfy the third *Gingles* precondition, however, because they have furnished no reliable evidence to show the majority votes cohesively as a bloc to defeat Latino candidates of choice. To support their view that the majority votes cohesively as a bloc, *McConchie* Plaintiffs point to expert findings by Dr. Chen that Latino-preferred candidates lost three of five elections in Cook County. See [*McConchie*, 151-2 (Chen Expert Report) at ¶ 37].

But *McConchie* Plaintiffs do not meet their burden to fulfill *Gingles*' third precondition because they provide no granular evidence of majority bloc voting for *any* of the districts in Cook County. Rather, they treat electoral patterns in Cook County as a monolith, referring to three Latino candidate losses to argue that Latino candidates of choice would be defeated in twelve Cook County elections. Yet, the Supreme Court tells us to conduct the analysis district-by-district. See *Gingles*, 478 U.S. at 59 ("[V]oters' ability to elect representatives of their choice, however, will vary from district to district according to a number of factors"); *Bethune-Hill v. Va. State Bd. of*

33

*Elections*, 137 S. Ct. 788, 800 (2017) ("We have consistently described a claim of racial gerrymandering as a claim that race was improperly used in the drawing of the boundaries of one or more *specific electoral districts*" (quoting *Ala. Leg. Black Caucus v. Alabama*, 575 U.S. 254, 262–63 (2015)).

Even if *McConchie* Plaintiffs had provided evidence, for example, of majority bloc voting on the northwest side of Cook County (as *Contreras* Plaintiffs have attempted), Dr. Chen's report and its results suffer from methodological flaws. First, as his starting point, Dr. Chen selects a sample of twenty-six total elections without any justification for how he selected those elections or explanation as to why they are probative for his analysis. See [*McConchie*, 151-2 (Chen Expert Report) at ¶ 31, p. 35 tbl.5]. As Dr. Lichtman points out, despite the fact that *McConchie* Plaintiffs' challenge includes all districts that *Contreras* Plaintiffs take issue with, Dr. Chen's sample of twenty-six elections mysteriously excludes five probative elections (Latino v. non-Latino candidate) that were studied by *Contrera*s Plaintiffs' expert, Dr. Grumbach, and includes seven elections that were not probative because they did not feature a Latino candidate at all. [*McConchie*, 171-1 (Lichtman Expert Report) at 63, 65].

Second, Dr. Chen winnows down the pool of elections from twenty-six to five elections to report Latino-preferred candidates' electoral victories, but without regard to a reliable rationale. According to Dr. Chen, he selected five of the twenty-six elections that fit four criteria identified by Plaintiffs' counsel: (1) primary or non-partisan municipal; (2) district substantially within region proposed by remedial plan; (3) more than fifty percent of Latino voters favored single candidate; (4) more than fifty percent of White voters favored candidate other than Latino-preferred candidate. [*McConchie*, 151-2 (Chen Expert Report) at ¶ 32]. The five elections yielded under these criteria include the 2015 Chicago Mayoral, 2018 Cook County Assessor Primary, 2012

HD 39 Primary, 2014 HD 39 Primary, and 2018 HD 1 Primary. See [*Id.* at ¶¶ 32, 37]. We agree with the view that Dr. Chen's analysis examines elections "chosen according to the [P]laintiffs' counsel's arbitrary and biased criteria provided to him." [*McConchie*, 171-1 (Lichtman Expert Report) at 37]. For example, his method does not distinguish between probative and endogenous state legislative elections and exogenous elections, as well as eliminates any election featuring coalition voting. See [*id.* at 83]. By repeating Dr. Chen's findings without addressing any of these shortcomings, *McConchie* Plaintiffs have not offered a persuasive rationale for why their sample helps our analysis.

To take one example, *McConchie* Plaintiffs focus on Dr. Chen's conclusion that if the September Redistricting Plan were to go in effect, only four of eleven districts would be expected to support the Latino-preferred candidate (HD 1, 2, 22, and 23) in a hypothetical election. [*McConchie*, 151-2 (Chen Expert Report) at ¶ 47, p. 47 tbl.10]. But Dr. Chen's findings draw on a largely unrepresentative and flawed sample because his projections flow from the results of the 2018 primary election for Cook County Assessor.[18] This single example is an unrepresentative and biased exogenous election for numerous reasons. First, major Chicago news outlets repeatedly ran stories about alleged corruption surrounding the Latino-preferred candidate, then-incumbent Assessor Joseph Berrios, prior to the election. See [*McConchie*, 171-1 (Lichtman Expert Report) at 160–61]. Second, Berrios garnered a less-than-usual degree of support from Latino voters, and an influential leader and Latino-preferred candidate, now-U.S. Representative Jesus "Chuy"

---

[18] To generate these findings, Dr. Chen estimates the hypothetical performance of Latino-preferred candidates. His projections are based on ecological inference (voting preferences, by race); he produced Census block-level estimates of each racial and ethnic group's support for the Latino-preferred candidate, Joseph Berrios, in the 2018 primary election for Cook County Assessor. See [*McConchie*, 151-2 (Chen Expert Report) at ¶¶ 44–45, p. 47 tbl.10]. He analyzed the following Cook County districts in the September Redistricting Plan (SB 927) (HD 1, 2, 3, 4, 19, 21, 22, 23, 24, 39, and 40). See [*id.*].

Garcia, did not endorse Berrios. [*Id.* at 159]. Third, the election involved a three-candidate race. [*Id.*]. Fourth, Dr. Chen used VAP, not CVAP for estimating his results. [*Id.* at 162]. Fifth, his results do not add up to one-hundred percent. [*Id.* at 163]. Even if the election had been representative, we are reassured this hypothetical evidence is insufficient to find majority bloc voting in the face of "uncontroverted evidence that Latino victories in fact outnumbered white victories" in the districts. See, *e.g.*, *Radogno v. Ill. State Bd. of Elections*, 836 F. Supp. 2d 759, 773 (N.D. Ill.), *aff'd sub nom.*, *Radogno v. Ill. State Bd. of Elections*, 568 U.S. 801 (2012) (concluding no § 2 liability where *Gingles*' third precondition not satisfied in spite of Plaintiffs' efforts to "circumvent the actual election results * * * and to premise their claim instead on experts' projections that "white candidates, as a group, *would have won* the elections").

As a backstop, *McConchie* Plaintiffs point to findings from another expert, Dr. Anthony Fowler, to show that majority-Latino districts are important for producing Latino election winners. Specifically, in districts that are forty to fifty percent Latino, Dr. Fowler opines that a Latino candidate won in fourteen out of thirty-one elections (approximately forty-five percent), and in districts that are fifty to sixty percent Latino, a Latino candidate won in seventeen out of twenty elections (eighty-five percent). [*McConchie*, 166-2 (Fowler Corrected Rebuttal) at ¶ 24, p. 14 fig.1]. But Dr. Fowler's analysis, too, is flawed and ultimately unpersuasive because he identifies racially polarized voting for Latino candidates, not Latino candidates of choice.

In sum, *McConchie* Plaintiffs offer almost no evidence to support their view that majority voters in any of the districts on the northwest side of Cook County vote sufficiently as a bloc to defeat the Latino candidate of choice. (Nor does it appear they could, given *Contreras* Plaintiffs' analysis that Latinos prevail in overlapping districts more often than not). Accordingly,

*McConchie* Plaintiffs' challenges to HD 3, 4, 32, 39, and 77 fail to satisfy *Gingles*' third precondition and therefore do not amount to a § 2 violation.

### ii. Southwest Cook County (HD 1, 2, 21, 22, 23, 24, 32)

We similarly reject *McConchie* Plaintiffs' challenge to HD 1, 2, 21, 22, 23, 24, and 32 on *Gingles*' third precondition. Although *McConchie* Plaintiffs have submitted a proposed remedial plan demonstrating that the Latino CVAP in the proposed districts exceeds fifty percent, and Legislative Defendants have stipulated to *Gingles*' second precondition, *McConchie* Plaintiffs cannot fulfill *Gingles*' third precondition. We have explained above why we are unpersuaded that their blanket and methodologically flawed effort to demonstrate majority bloc voting fulfills *Gingles* precondition three, and *McConchie* Plaintiffs offer no supplemental or different evidence to show that Latino-preferred candidates are defeated by majority bloc voting in any of the southwest side districts. We thus conclude that *McConchie* Plaintiffs fail to show HD 1, 2, 21, 22, 23, 24, or 32 violates § 2 of the Voting Rights Act.

### b. Aurora (HD 50)

*McConchie* Plaintiffs' challenge to HD 50 can be disposed of quickly, as *McConchie* Plaintiffs cannot satisfy *Gingles*' first precondition. We begin and end that inquiry by finding that HD 50 does not dilute Latino voting strength in violation of § 2 of the Voting Rights Act. *McConchie* Plaintiffs have not shown that Latinos could form a majority of the citizen voting age population. *McConchie* Plaintiffs proposed a potential replacement HD 50 shy of the 50% mark, with a Latino CVAP of only 46.8%. See [*McConchie*, 151-2 (Chen Expert Report), at 7 tbl.1]. As in *Strickland*, "because [Latinos] form only [46.8%]" of the district we cannot "recognize[] a § 2 claim in this circumstance" and insulate them "from the obligation to pull, haul, and trade to find common political ground" with other voters to elect their preferred candidate. 556 U.S. at 14–15

(quoting *Johnson*, 512 U.S. at 1020). "Without such a showing [the first *Gingles* requirement], 'there neither has been a wrong nor can be a remedy.'" See *id.* at 15 (quoting *Growe*, 507 U.S. at 40). The majority-minority standard honors "the need for workable standards and sound judicial and legislative administration." See *id.* at 17.

### c.        Metro East (HD 114)

We wrap up with *McConchie* Plaintiffs' claim that HD 114 violates § 2 of the Voting Rights Act. Here again, *Gingles*' first and second preconditions are satisfied. *McConchie* Plaintiffs submitted a remedial map with a 52.2% Black citizen voting age population in the proposed district HD 114, and Legislative Defendants concede *Gingles*' second precondition. [*McConchie*, 151-2 (Chen Expert Report), at 7 tbl.1].

Nevertheless, *McConchie* Plaintiffs marshal almost no evidence for the third *Gingles* precondition. Paradoxically, they conclude that "white bloc voting could usually defeat the combined strength of minority support" while glossing over the fact that Black-preferred candidates won in HD 114 in 3 elections cycles. [*McConchie*, 151 (Pls.' Br.) at 15]. Those elections show that Black candidates of choice are not defeated by the majority in Metro East. Rather, in 100% of those elections, the Black-preferred candidate won and garnered anywhere from an estimated 25.8 to 31.3% of White voters. [*Id.*] ("The Black-preferred candidate eked out wins in the elections"); [*McConchie*, 151-2 (Chen Expert Report) at 44 tbl.9].

*McConchie* Plaintiffs' remaining evidence does not otherwise overcome the absence of White or majority bloc voting. They suggest that Black-preferred candidates only "eked out wins in the elections with 57.2% and 57.1%" of the vote without explaining how, if at all, those rather comfortable margins of victory suggest that Black voters lack an equal opportunity to elect their candidate of choice. [*McConchie*, 151 (Pls.' Br.) at 15].

Nor is it an answer to point to Dr. Fowler's research to satisfy *Gingles*' third precondition because it is not necessarily probative for HD 114 or Black voters' preferences. Specifically, *McConchie* Plaintiffs focus on his finding that "the likelihood that a district will elect a minority representative depends in large part on the proportion of minority citizens in that district." [*McConchie*, 151 (Pls.' Br.) at 15]. That argument is not persuasive because Dr. Fowler's results do not indicate whether the increase in support relative to percentage share of Black CVAP refers to Black candidates of choice, rather than Black candidates. See [*McConchie*, 175-1 (Pls.' Hr'g Exs.) at 34 fig.1] (entitled "minority winners and district demographics[,]" "[t]he curves *** show[] how the probability that the general election winner is from a minority group"). Further, his sample is not specific to HD 114 nor does it purport to be limited to districts with overlap with HD 114. [*Id.*] ("[T]he sample includes all state legislative general elections (from both chambers) between 2012 and 2020 in districts where at least 15 percent of the *** CVAP *** is Black, *** Latino, *** or Asian *** ").

*McConchie* Plaintiffs had the burden to show all three of *Gingles* preconditions, yet they rely on selected evidence that is both over and under-inclusive for assessing Latino and Black voters' ability to elect their candidates of choice for every claim. Even so, and even though we do not rely on *Contreras* and *East St. Louis NAACP*'s record to assess whether *McConchie* Plaintiffs have established § 2 liability, our analyses as to the overlapping districts in those cases reinforce our view that even if *McConchie* Plaintiffs had presented more evidence to assess majority bloc voting for any of the overlapping districts, they could not have fulfilled *Gingles*' third precondition. Nor could they have shown, under the totality of the circumstances, that Latino and Black voters are being denied the equal opportunity to elect their candidate of choice in their

respective districts. For these reasons, we reject *McConchie* Plaintiffs' Voting Rights Act challenges in their entirety and decline to adopt their remedial map.

## B.    Racial Gerrymandering

The second category of claims before us are *East St. Louis NAACP* and *Contreras* Plaintiffs' allegations that SB 927 runs afoul of the Fourteenth Amendment to the United States Constitution by racially gerrymandering certain districts. We elaborate briefly on the map-drawing process and results with respect to those districts, discuss the legal framework for analyzing these claims, and then evaluate each set of Plaintiffs' claims.

### 1.    Redistricting Process

In the lead up to enactment of the June and September Redistricting Plans, the General Assembly held scores of public hearings and meetings, which featured not only private citizens, but also interest groups and testimony by redistricting expert Dr. Lichtman. A frequent expert in Illinois redistricting challenges, Dr. Lichtman assisted in the redistricting process and testified during redistricting committee hearings. To draw the boundaries of the June Redistricting Plan, the drafters originally used data from the American Community Survey ("ACS"), which they uploaded to a computer program called autoBound.

The current Democratic incumbents for several of the districts in or affected by the alleged racial gerrymanders occupied leadership roles in the Illinois House of Representatives and Senate during the 2021 redistricting process. Among others in the House of Representatives, Elizabeth Hernandez, State Representative for HD 24, was the Chair of the House Redistricting Committee. [*McConchie*, 171-1 (Lichtman Expert Report) at 202]. LaToya Greenwood, State Representative for HD 114, was the Majority Conference Chair. [*Id.*]. Likewise, Antonio Munoz, Senator for SD 1, was the Assistant Majority Leader of the Senate. [*Id.*].

40

Two staff persons ran point on the redistricting process. Those individuals, Jonathon Maxson and Joseph Sodowski, fielded requests, directly and indirectly, from state legislators regarding their preferences and priorities for Metro East and Cook County. Regarding the former, state legislators unabashedly put politics front and center. Maxson described the primary goals for the configurations of HD 112, 113, and 114 as shoring up Democratic seats. For example, Maxson testified that Representative Jay Hoffman, the current Democratic incumbent in HD 113, wanted to "maintain [] Belleville" "and as much as possible to be politically in a position where he and Representative Stuart – and Representative Greenwood's districts would be at about an equal Democratic performance, which is where they started at." [*McConchie*, 160-3 (Yandell Decl.), Ex. D (Maxson Dep.) at 53:22–54:3].

Maxson testified that other goals included "keeping the Edwardsville base of that district together" which "was important politically for Representative Stuart. And then beyond that what could be done within reason to enhance the Democratic performance of the 112th district." [*McConchie*, 160-3 (Yandell Decl.), Ex. D (Maxson Dep.) at 53:6–11]. Maxson went on to explain that to strategize to protect the Democratic incumbents, he looked at "some countywide election results and the individual results from Representatives Greenwood, Hoffman, and Stuart in their previous races" to help achieve those ends. [*Id.* at 54:18–22].

Conversations also centered on keeping communities of interest together. As for Representative Katie Stuart, Democratic incumbent of HD 112, Maxson explained in a declaration that in adjusting the configuration to achieve population equality, there was also an opportunity to consolidate Washington Park in one district, which had previously been split across two districts

for two decades.[19]   HD 114 Representative, LaToya Greenwood, also testified that she recommended keeping East St. Louis together.  See, *e.g.*, [*McConchie*, 160-7 (Greenwood Decl.) at ¶ 16] ("I recommended that the General Assembly prioritize keeping East St. Louis within one district *** while avoiding pairing the community with significant portions of larger cities *** and maintaining the Metro East region's influence as a Democratic stronghold").  Maxson also testified that the state elected officials did not "ever mention any concern about the racial demographics of HD 114." [*McConchie*, 160-3 (Yandell Decl.), Ex. D (Maxson Dep.) at 57:12–19].

Similarly, according to the parties' fact witnesses, map drawers received requests to keep certain communities of interest together in and around southwest Cook County.  For example, Senator Landek, Senator for SD 11 (formerly SD 12) under SB 927, testified that Senator Villanueva requested taking certain areas of Little Village from Landek's district.  Senator Landek believed Little Village comprised a progressive flank of the Democratic party that aligned with Senator Villanueva's legislative agenda.[20]   Representative Hernandez, meanwhile, asked Representative Zalewski, State Representative for HD 23 (renumbered under SB 927 as HD 21)

---

[19] Maxson described in his declaration that, "[w]ith respect to the community of Washington Park, that community has been split between RD 113 and RD 114 for at least twenty years.  When equalizing population, there was an opportunity to achieve population by consolidating the majority of Washington Park in one district, rather than having it split evenly between two districts.  Thus, the changes to the boundaries of RD 113 and RD 114 relevant to Washington Park were made to equalize population and further consolidate the community in one district."  [*McConchie*, 160-2 (Maxson Decl.) at ¶ 14].

[20] Senator Landek testified that Senator Villanueva "asked to take the Little Village area from [his] current district." [*McConchie*, 160-3 (Yandell Decl.), Ex. B (Landek Dep.) at 16:16–22; 17:1–11].  He explained he agreed "to help Senator Villanueva, that's her home base, she had grown up there, that's her community.  It was a progressive area, and she perhaps felt more comfortable in that section. * * * * I didn't ask her all the details."  [*Id.*].  He "th[ought] it's based on the legislative agenda of some of the representatives in that area" because "she wanted to join that common thought in her legislative district, Senate district."  [*Id.* at 18:4–23].

under SB 927, to include more of the town of Cicero, where her husband was the Township Democratic committeemen, in her district.[21] But that was not all. Maxson also testified during his deposition that Representative Guerrero-Cuellar, State Representative for HD 22, requested to include Midway Airport and several surrounding neighborhoods in HD 22.[22]

Meanwhile, Maxson also testified that the racial composition of the potential new districts was not part of the decision-making for Cook County. He testified both that he did not consider racial composition in drawing district lines and that representatives did not raise racial demographics. In his declaration, for example, Maxson stated:

> Review[ing] the proposed districts to ensure all House Districts achieved equal population throughout the map **** [he] did not consider the racial or ethnic composition of the population. However [he] did consider the Democratic index and adjust to account for political composition of a district or neighboring districts

[*McConchie*, 160-2 (Maxson Decl.) at ¶ 13].

In addition to testifying that he did not consider race in drawing the map as a whole, Maxson also testified about the role race played in certain districts. Regarding HD 21, when asked "whose decision was it * * * to put the Latino CVAP of that district at 42.2 percent," he responded "I think your question implies that there was a decision made to draw the district to that specific citizen voting age population, and that is not a conversation that I ever had." [*McConchie*, 160-3

---

[21] Zalewski testified that he and Representative Elizabeth Hernandez discussed the proposed district boundaries. [*McConchie*, 160-3 (Yandell Decl.), Ex. C (Zalewski Dep.) at 39:6–23 (discussions with Representative Hernandez included two components "her husband was the Cicero Township Democratic committeeman. As [he] recall[ed], there was a desire on her part to sort of get more turf *** in Cicero" and "in the 2018 primary she had an opponent who lived in Berwyn. We had a specific conversation of where that person lived, and we talked about the political nature of the district boundaries with relation to where that gentleman lives").

[22] "Representative Guerrero Cuellar wanted to include the Midway Airport and a number of the surrounding neighborhoods. That, obviously, had an impact on what the 21st district looked like." [*McConchie*, 160-3 (Yandell Decl.), Ex. D (Maxson Dep.) at 47:1–4].

43

(Yandell Decl.), Ex. D (Maxson Dep.) at 46:11–20].  He also testified that he did not discuss with state representatives the Latino CVAP of the proposed district.  Specifically, he testified that "[n]o member of the Democratic caucus mentioned the Latino or Hispanic voting age population of the 21st district to me" and he did not "ever have a discussion with Representative Zalewski about the Hispanic citizen voting age population of his district."  [*Id.* at 50:6–12].[23]

Notwithstanding this testimony from state legislators and legislative staff, several documents produced in or around that same timeline relevant to both regions raised questions in hindsight.  First, those documents included files and emails produced for or by staff of the General Assembly analyzing demographic information and highlighting the role of minority representation in the process.  Several documents turned over in discovery by Legislative Defendants aggregate the Latino, Black, and Asian CVAP for every House and Senate District.  See, *e.g.*, [*East St. Louis NAACP*, 44-23 (Ex. 17)].  One of those documents, dated April 2021 and connected to Mr. Maxson, is color-coded such that any district featuring a CVAP greater than fifty percent is highlighted in pink and any district featuring a CVAP between forty and fifty percent is yellow. See [*Contreras*, 135-8 (Existing District Demographics); 135-11 (District Demographics Excel File Properties)].

Second, email exchanges between Dr. Lichtman and members of the Illinois House of Representatives show that Lichtman requested and received "demographic data for each district in each plan, broken down according * * * to race" and election results in which minority candidates

---

[23] Although he testified that because only ACS, not census data, was available in May, that version changed sufficiently from May to August that the Latino citizen voting age population information that had been available "would not have been the final version of the district or a district that you could rightly characterize as being of a certain makeup because it's not the final * * * version of district equal population."  [*McConchie*, 160-3 (Yandell Decl.), Ex. D (Maxson Dep.) at 49:3–17].

ran against White candidates. See, *e.g.*, [*East St. Louis NAACP*, 44-17 (Ex. 11, Lichtman Email) at 2; 44-18 (Ex.12, Randazzo Email); 44-19 (Ex. 13, Cox Email)].

Third, the Chief of Staff for the Office of the Speaker circulated a memo summarizing findings from the 2011 redistricting hearings, which included public concerns about keeping communities together "so that minorities can have adequate representation" and "giv[ing] minorities a fair chance to participate." [*NAACP*, 44-16 (Ex. 10, Basham Email) at 12–14]. Similar concerns surfaced during public hearings for the 2021 redistricting cycle as well.

Ultimately, SB 927 resulted in changes to both regions. In Metro East, legislators changed the composition of three districts, HD 112, HD 113, and HD 114. The legislature added Black population into HD 112 from HD 113 and from HD 114 into HD 113, then moved White population into HD 114. [*East St. Louis NAACP*, 44 (Pls.' Br.) at 15]. As a result, under SB 927, HD 114 maintained East St. Louis and Centerville, but the newly drawn district expanded into far south and eastern fringes of comparatively more White, rural St. Clair County. [*Id.* at 14–15] (citing Weichelt Expert Report at 17). The district also lost footing to the east, including Belleville, which is more urban and has a larger Black population, to HD 113. [*Id.*]. Those shifts resulted in a net gain of 7,681 White voters and 254 Black voters in HD 114 as compared to the 2011 plan. [*Id.* at 15].

As a result of this shuffling of Black population into HD 112, the Black Voting Age Population of the three districts changed as well under SB 927. The Black Voting Age Population in HD 112, again held by Representative Stuart, increased by 4.15% as compared to the 2011 plan. [*East St. Louis NAACP*, 44 (Pls.' Br.) at 7]. The Black Voting Age Population in HD 113, held by Representative Hoffman, increased to 30.6%. [*Id*. at 18]. Finally, the Black Voting Age

Population of HD 114 under SB 927 is 33.55%, representing a 3.67% loss as compared to the 2011 plan. [*Id.* at 19–20].

As for Cook County, those processes produced several changes to HD 21 and SD 11, as well as the surrounding districts. Two districts in Cook County, HD 21 and SD 11, were renumbered from the 2011 iteration of the legislative redistricting map. Both districts incurred a drop in the Latino CVAP. The Latino CVAP of HD 21 decreased from 44.45% Latino CVAP in the 2011 plan to 42.7% under SB 927. See [*Contreras*, 139 (Pls.' Br.) at 56]. The Latino CVAP of SD 11 dropped from 54.52% Latino CVAP (numbered SD 12) in the prior plan to 47.7% under SB 927. See [*id.*]. Finally, the House districts nested within SD 11 changed such that SD 11 encompasses HD 21 and HD 22. See [*id.*]. Under SB 927, in other words, Representative Zalewski resides in HD 21, Senator Landek in SD 11, and Representative Zalewski's district is nested in Senator Landek's district. [*Id.* at 51]. These changes are summarized in *Contreras* Plaintiffs' table, reproduced below.

| Incumbent House Rep. | House District in 2011 Plan | House District in SB 927 Plan |
|---|---|---|
| Guerrero-Cuellar | 22 (60.4%) | **22 (52.7%)** |
| Zalewski | **23 (44.4%)** | **21 (42.7%)** |
| Hernandez | **24 (66.1%)** | 2 (55.1%) |
| **Landek's Senate District** | SD 12 **(54.5%)** | SD 11 **(47.7%)** |

See [*Contreras*, 182-1 (Pls.' Hr'g Exs.) at 20] (with highlighting representing paired districts that comprise SD 11 under SB 927).

Both iterations of the redistricting plan received overwhelming support from state legislators. The General Assembly passed HB 2777 (the General Assembly Redistricting Act of

2021) with supermajority votes in each chamber, including votes from every Black and Latino member.  See [*McConchie*, 160 (Defs.' Br.) at 16].  The Democratic members of the General Assembly voted in favor of SB 927 as well, including the changes discussed above.  SB 927 garnered support from, for example, the representatives of the districts challenged as racial gerrymanders in this case and adjacent districts.  See [*McConchie*, 160-7 (Greenwood Decl.) ¶ 21]; See Illinois General Assembly, *Voting History for SB 0927*, https://perma.cc/3X7R-STKX (house), https://perma.cc/YM68-C5X2 (senate) (last visited Dec. 21, 2021) (enumerating votes in favor of SB 927 by Senators Landek (SD 12) and Villanueva (SD 11), and Representatives Mah (HD 2), Guerrero-Cuellar (HD 22), Zalewski (HD 23), Hernandez (HD 24), Stuart (HD 112), Hoffman (HD 113), and Greenwood (HD 114)).

### 2.    Legal Standard

"The Equal Protection Clause of the Fourteenth Amendment limits racial gerrymanders in legislative districting plans. It prevents a State, in the absence of 'sufficient justification,' from 'separating its citizens into different voting districts on the basis of race.'"  *Cooper v. Harris*, 137 S. Ct. 1455, 1463 (2017) (quoting *Bethune–Hill*, 580 U.S. at 797).  To prevail, the plaintiff must make a two-part showing: (1) "the plaintiff must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district[,]'" and (2) "if racial considerations predominated over others, the design of the district must withstand strict scrutiny."  *Id.* at 1463–64 (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)).  We perform that analysis on a "district-by-district" basis.  *Bethune-Hill*, 137 S. Ct. at 800 ("[T]he basic unit of analysis for racial gerrymandering claims in general, and for the racial predominance inquiry in particular, is the district").  However, we have leeway to consider "statewide evidence," for example, to weigh evidence regarding "common redistricting policy

47

toward multiple districts" in neighboring districts.  *Id.*  See, *e.g.*, *Ala. Leg. Black Caucus*, 575 U.S. at 263.

Satisfying the first step—that race was the predominant factor—"entails demonstrating that the legislature 'subordinated' other factors—compactness, respect for political subdivisions, partisan advantage, what have you—to 'racial considerations.'" *Cooper*, 137 S. Ct. at 1463–64 (quoting *Miller*, 515 U.S. at 916).  "Race must not simply have been '*a* motivation for the drawing of a majority-minority district,' but 'the *predominant* factor motivating the legislature's districting decision." *Easley v. Cromartie* (*Cromartie II*), 532 U.S. 234, 241 (2001) (internal quotation marks and citation omitted) (quoting *Bush v. Vera*, 517 U.S. 952, 959 (1996)).  "The plaintiff may make the required showing through 'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Cooper*, 137 S. Ct. at 1464 (quoting *Miller*, 515 U.S. at 916).  "The ultimate object of the inquiry * * * is the legislature's predominant motive for the design of the district as a whole." *Bethune-Hill*, 137 S. Ct. at 800.

Legislative Defendants maintain that politics, not race, drove the configuration of all of the challenged districts, which muddies the predominance inquiry.  While in the "more usual" racial gerrymandering case, "the court can make real headway by exploring the challenged district's conformity to traditional districting principles, such as compactness and respect for county lines," a court entertaining a partisanship defense such as this faces a more "formidable task." *Cooper*, 137 S. Ct. at 1473.  Even a highly irregular shape "loses much of its value when the State asserts partisanship as a defense, because a bizarre shape * * * can arise from a 'political motivation' as well as a racial one." *Id*.

To ascertain whether "race (not politics) was the 'predominant consideration in deciding to place a significant number of voters within or without a particular district,'" *Cooper*, 137 S. Ct.

48

at 1479, we "make 'a sensitive inquiry' into all 'circumstantial and direct evidence of intent' to assess whether the plaintiffs have managed to disentangle race from politics and prove that the former drove a district's lines." *Id.* at 1473. The plaintiff's "burden of proof * * * is 'demanding'" in such cases. *Id.* (quoting *Cromartie II*, 532 U.S. at 241). "[T]he party attacking the legislature's decision bears the burden of proving that racial considerations are 'dominant and controlling' * * * ." *Cromartie II*, 532 U.S. at 257 (quoting *Miller*, 515 U.S. at 913). "Caution is especially appropriate * * * where the State has articulated a legitimate political explanation for its districting decision, and the voting population is one in which race and political affiliation are highly correlated." *Cromartie II*, 532 U.S. at 242.

As the foregoing discussion suggests, *Cromartie II* and *Cooper* are particularly instructive for assessing whether race predominated over partisanship in drawing district lines. In *Cromartie II*, the Supreme Court overturned a district court's determination that race had predominated the configuration of North Carolina's congressional map. 532 U.S. at 237. The Supreme Court reiterated its earlier holding that "the district's shape, its splitting of towns and counties, and its high African–American voting population" were insufficient, alone, for summary judgment that race predominated because there was "undisputed evidence that racial identification is highly correlated with political affiliation in North Carolina." *Id.* at 243 (citing *Cromartie v. Easley* (*Cromartie I*), 526 U.S. 541, 547–49 (1999)).

Nor could circumstantial and direct evidence adduced at trial rescue the constitutional claim in *Cromartie II*. Circumstantial evidence included that legislators had added more Democrats to the district than arguably necessary to create a safe seat, *Cromartie II*, 532 U.S. at 246, and included precincts with high percentages of Black Democratic voters while passing up those with White Democrats, *id.* at 246–47. The trouble was that such evidence could easily show

that politics were at play: as for the excess, "incumbents might have urged legislators * * * to make their seats, not 60% safe, but as safe as possible." *Id.* As for the exclusion of White Democrats, "none of the excluded white precincts were as reliably Democratic as the African–American precincts that were included in the district" and a legislature might have preferred "precincts that were reliably Democratic, not precincts that were *40%* reliably Democratic for obvious political reasons." *Id.* at 247. Nor had experts shown the legislature could have included those precincts "without sacrificing other important political goals" such as "to protect incumbents—a legitimate political goal." *Id.* at 247–48. As for direct evidence, statements and emails referencing "racial and partisan balance" and the movement of Black voters, certainly referred to race, but "as so read" merely "show[ed] that the legislature considered race, along with other partisan and geographic considerations; and as so read" said "little or nothing about whether race played a *predominant* role comparatively speaking." *Id.* at 253–54. Together, then, circumstantial and direct evidence relied on by the Court had provided a "modicum" of evidence that race predominated, but it was not enough to satisfy the plaintiff's demanding burden. *Id.* at 257.

In contrast, in *Cooper v. Harris*, the Supreme Court affirmed a district court's ruling that race, not politics, predominated the legislature's drawing of congressional districts. 137 S. Ct. 1455 (2017). There, the legislature had added tens of thousands of new voters and pushed others out, increasing the Black voting age population from 43.8% to 50.7% despite that the district was approximately the correct size under *Reynolds*' one-person, one-vote standards. *Id.* at 1474–75. Even more, the drafters had announced publicly and in preclearance material to the Department of Justice that they had set racial targets to comply with § 5 of the Voting Rights Act. *Id.* at 1475. The district court found that the only evidence to the contrary, expert testimony that legislators had instructed him to make the map as a whole "more favorable to Republican candidates," *id.* at

1476, was incredible given that the remainder of his testimony confirmed that legislators had "'decided' to shift African–American voters into [the challenged district] 'in order to' ensure preclearance under § 5," *id.* at 1476–77. The Supreme Court therefore upheld the district court's conclusions that race predominated in the district's design. *Id.* at 1481–82.

Finally, "[w]here a challenger succeeds in establishing racial predominance, the burden shifts to the State to 'demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest.'" *Bethune-Hill*, 137 S. Ct. at 800–01.

### 3. Analysis

Under this framework, we consider *East St. Louis NAACP* Plaintiffs' challenge to the constitutionality of HD 114 in Metro East, and *Contreras* Plaintiffs' challenge to the constitutionality of HD 21 and SD 11 in Cook County.

### a. EAST ST. LOUIS NAACP Plaintiffs

*East St. Louis NAACP* Plaintiffs contend that HD 114 as drawn by SB 927 denies the right guaranteed under the Equal Protection Clause of the Fourteenth Amendment. They allege the General Assembly racially gerrymandered HD 114 in violation of the principles articulated in *Shaw v. Reno*, 509 U.S. 630 (1993), and its progeny. Legislative Defendants maintain that the General Assembly drew HD 114 to protect Democratic incumbents in the adjacent districts and, to a lesser extent, to fix malapportionment and combine certain communities of interest.

Our evaluation begins and ends with step one because we agree with Legislative Defendants that *East St. Louis NAACP* Plaintiffs' evidence fails to show that race dominated the General Assembly's reconfiguration of HD 114. Rather, overwhelming evidence demonstrates that HD 114 was drawn to protect Democrats from Republican challenges in HD 114 and adjacent districts HD 112 and 113.

General Assembly staff and state legislators admit that they divided up HD 112, 113, and 114 to shore up the Democratic vote and to protect HD 112, which is particularly vulnerable to a viable Republican challenge. In their brief, *East St. Louis NAACP* Plaintiffs concede that a legislator explicitly told Senate staffer Sodowski to make the district more Democratic. [*East St. Louis NAACP*, 44 (Pls.' Br.) at 15]. The record confirms this fact. When asked about his meetings with Senator Crowe about redistricting for the 2021 cycle, Sodowski testified:

> **Q:** And did Senator Crowe give you any instructions regarding moving Senate district lines ***?
>
> **Sodowski**: Yes.
>
> **Q**: And what instructions did Senator Crowe give you?
>
> **Sodowski**: To have a more Democrat district.
>
> **Q**: Anything else?
>
> **Sodowksi**: No.

[*East St. Louis NAACP*, 44-10 (Ex. 4, Sodowski Dep.) at 3:11–20]. Maxson, Sodowksi's House counterpart, testified similarly that he redrew the lines to enhance Democratic performance and that all three Democratic incumbents for HD 112, 113, and 114 were preoccupied with protecting Democratic control of the districts:

> **Q**: What goals did you have? Did you or Mr. Reinhart identify any goals for district 112?
>
> **Maxson**: First and foremost, *** equal population. I think second of all keeping the Edwardsville base of that district together was important politically for Representative Stuart. And then beyond that what could be done within reason to enhance the Democratic performance of the 112th district.
>
> ****
>
> **Q**: How about Representative Hoffman, did he identify goals that he had with respect to district 113?
>
> **Maxson**: Representative Hoffman's goals were to maintain * * * Belleville * * * and as much as possible to be politically in a position where he and Representative Stuart – and Representative Greenwood's districts would be at about an equal Democratic performance, which is where they started at.

[McConchie, 160-3 (Yandell Decl.), Ex. D (Maxson Dep.) at 53:2–54:3]. The declaration of HD 114 Representative, LaToya Greenwood, also aligns with those explanations. She declared that "[t]o achieve maximization of Democratic performance in the Metro East region, I worked with fellow Democratic members from the region to increase the Democratic Index of House District 112 while maintaining an equal Democratic index for House Districts 113 and 114." [*McConchie*, 160-7 (Greenwood Decl.) at ¶ 18].

Testimony from elected representatives and staffers supports the conclusion that the General Assembly principally designed HD 114 and adjacent districts to accomplish political ends. HD 112 was "a highly competitive district in which candidates from both the Democratic and Republican Parties won between 2012 and 2020." [*East St. Louis NAACP*, 44 (Pls.' Br.) at 18]. Legislative Defendants were conceivably nervous about HD 112 in Metro East, an area which was graphically illustrated at the December 7 hearing as a blue dot in a sea of red that downstate Illinois has become in recent years. See [*McConchie*, 160-7 (Greenwood Decl.) at ¶ 14] (HD 114 Representative Greenwood testified that "[t]he Metro East region, a longtime Democratic stronghold, has become more Republican as the remainder of southern Illinois has lost Democratic voters and officials"). Although in *Cromartie II* the Supreme Court opined that "incumbents *might* have urged legislators * * * to make their seats * * * as safe as possible," *id.* at 246–47 (emphasis added), here testimony from representatives and map-drawers leave no doubt that Legislative Defendants drew districts "to protect incumbents—a legitimate political goal," see *id.* at 248.

Evidence was also presented that "traditional districting" criteria—keeping communities of interest together—figured prominently in the configuration of HD 114. Incumbents from adjacent HD 112, 113, and 114 and map drawers aimed to keep certain communities of interest together, either as an independent goal or by way of protecting Democratic votes. For example,

Representative Greenwood testified that she recommended keeping East St. Louis together. See, *e.g.*, [*McConchie*, 160-7 (Greenwood Decl.) at ¶ 16]. As for HD 112 and HD 113, Maxson testified that "it was important" to Representative Stuart that he "keep[] the Edwardsville base of that district together." [*East St. Louis NAACP*, 44-9 (Maxson Dep.) at 4:6–11]. HD 113 incumbent, Representative Hoffman, requested that Maxson "maintain * * * Belleville" and to be "politically in a position where he and Representative Stuart—and Representative Greenwood's districts would be at about an equal Democratic performance." [*McConchie*, 160-3 (Yandell Decl.), Ex. D (Maxson Dep.) at 204:22–205:3].

That those traditional districting goals were realized reinforces this point. As Legislative Defendants point out, "HD 112 contains all of Edwardsville, HD 113 contains nearly all of Belleville, and HD 114 contain[s] nearly all of East St. Louis." [*McConchie*, 160 (Defs.' Br.) at 58]. The House Resolution, adopted with the passage of SB 927, reaffirms that the General Assembly was preoccupied with keeping these communities of interest together. See [*Contreras*, 135-7 (H.R. 443) at 105– 06] (explaining that HD 114 "makes whole" several townships that were "previously split with another representative district"; its southern border now aligns with several townships lines; makes whole two previously split school districts; and keeps Scott Air Force Base entirely in the district).

Despite this evidence of political and traditional redistricting criteria, *East St. Louis NAACP* Plaintiffs maintain that four types of circumstantial and direct evidence indicate that race, rather than politics, actually controlled the General Assembly's approach to HD 114. First, they argue that race-based population movements speak for themselves. Specifically, the General Assembly moved Black voters from HD 113 to HD 112, and then moved Black voters from HD 114 to HD 113. To compensate for the population loss in HD 114, which was already

54

underpopulated, the map-drawers then added White voters from adjacent areas to the south of HD 114. Second, map drawers were aware that HD 114 was the only district in the region to elect a Black state representative and that the Black population had struggled to secure representation. Specifically, during the 2021 redistricting cycle a staff person circulated summaries of 2011 redistricting testimony to that effect, and during public hearings for the 2021 redistricting cycle, witnesses echoed those sentiments. Third, in anticipation of Legislative Defendants' partisanship defense, *East St. Louis NAACP* Plaintiffs insist that we should not infer that race was "anything but a top priority" to the General Assembly from the following evidence. [*East St. Louis NAACP*, 44 (Pls.' Br.) at 33]. Democrats issued a statement that refers to "racial and geographic diversity" as a "guiding principle" for the 2021 redistricting process and another that boasts that they had combined two historically Black populations in Evanston, a district located in a different part of the state from HD 114. [*Id.*]. Documents surfaced in discovery also provide racial demographic data for Black, Asian, and Latino populations and compare the percentage of minority populations of the 2011 and 2021 plans. [*Id.*]. Further, Dr. Lichtman, Legislative Defendants' expert, requested and received data to assess racially polarized voting during the 2021 redistricting process. [*Id.*].

None of these counterpoints change our reasoning or conclusion. *East St. Louis NAACP* Plaintiffs' concern about moving voters by race falls short because there is a high correlation between race and politics. When asked if "[t]here is no dispute among experts that minorities are overwhelmingly democratic in Illinois," Dr. Lichtman affirmed, "absolutely" and he agreed "that's true for Black voters as well." [*East St. Louis NAACP*, 65-3 (Excerpts from Lichtman Dep.) at 5:10–16]. In fact, Dr. Lichtman agreed that this "has *** always been the case, since [he had] been analyzing elections in Illinois, that black voters vote overwhelmingly democrat." [*Id.* at

5:20–6:4].  Accordingly, the inference *East St. Louis NAACP* Plaintiffs ask us to draw from the movement of Black voters "loses much of [its] value when the State asserts partisanship as a defense, because [the decision] * * * can arise from a 'political motivation' as well as a racial one." See *Cooper*, 137 S. Ct. at 1473.

Put another way, it is just as likely that there was *no* other way to protect the HD 112, 113, and 114 Democratic incumbents from Republican challengers without this configuration.[24]  One could infer the legislature had "dr[awn] its plan to protect incumbents—a legitimate political goal." *Cooper*, 137 S. Ct. at 1473; see also *Radogno*, 836 F. Supp. 2d at 769 (rejecting plaintiffs' racial gerrymandering challenge to Illinois congressional map where African-American voters' "strong[] tend[ency] to prefer the Democratic party * * * * ma[de] plaintiffs' already substantial burden of proving that 'race *rather than* politics *predominantly* explains' [the district's] boundaries even more difficult to meet").

Even more, although an alternative map is not necessary to show that race predominated, it does not appear there was any other viable way to protect the Metro East Democrats.  See *Cooper*, 137 S. Ct. at 1479–81 (observing that a "highly persuasive way to disprove a State's contention that politics drove a district's lines is to show that the legislature had the capacity to accomplish all its partisan goals without moving so many members of a minority group into the district" while rejecting state's argument that a challenger *must* do so).  Plaintiffs have not offered

---

[24] Testimony that legislators and experts knew about the high correlation between politics and race in Illinois bolsters, not undermines, our view that race did not predominate.  We read *Cromartie II* to acknowledge that so long as there is a high correlation between voting behavior and race, partisanship is an acceptable motivation in redistricting.  See, *e.g.*, *Cromartie II*, 532 U.S. at 247 ("[*N*]one of the excluded white precincts were *as* reliably Democratic as the African–American precincts that were included in the district. Yet the legislature sought precincts that were reliably Democratic, not precincts that were *40%* reliably Democratic, * * * for obvious political reasons").

any alternative way that Legislative Defendants could have drawn the district "without sacrificing" their legitimate goals. See *Cromartie II*, 532 U.S. at 248. To the contrary, even after submitting four different remedial maps (two alternate "liability" plans and two alternate "remedial plans"), *East St. Louis NAACP* Plaintiffs have not found a way to increase the BVAP of HD 114 "without sacrificing," or at least jeopardizing, all three seats. See *id.* at 247–48.

 *East St. Louis NAACP* Plaintiffs' insistence that legislators did not maintain East St. Louis together as a community of interest fares no better. Their argument does not tend to show that the legislature could have accomplished that while still achieving other political ends. Just as in *Cromartie II*, the fact that a certain configuration was used suggests that it was not possible to maintain the East St. Louis core "without sacrificing other important political goals" such as incumbency protection or keeping other municipalities, like Edwardsville and Belleville, together. 532 U.S. at 248.

 *East St. Louis NAACP* Plaintiffs' other arguments—that Dr. Lichtman assessed racial polarization, that the General Assembly announced that race was a "guiding principle" and lauded its own attempts to do so, and that staff, at some juncture, viewed the minority composition of the districts—also do not show that race predominated. To begin, Dr. Lichtman testified that he did not "think [he] presented any district-specific analyses * * * to the state legislature. Just generic results." [*East St. Louis NAACP*, 65-3 (Excerpts of Lichtman Dep.) at 9:8–12; 10:1–18]. Plaintiffs try to piece together evidence that, at some juncture, someone was aware of the composition of the districts and considered minority opportunity to elect their candidates of choice. Even in the most generous light, this evidence shows that race was *a*, not *the* decisive factor.

 Further, *East St. Louis NAACP* Plaintiffs effectively invite us to rule that any time legislators acknowledge the importance of racial diversity or pay attention to racial diversity, they

57

have shown race predominated in the decision-making process. This does not follow. To ignore race altogether in light of the Voting Rights Act and the relevant constitutional principles raised in this case would be unacceptable. And to punish a legislature for trying to comply with the Voting Rights Act would undermine that statute's purpose to ensure minority populations' opportunities to elect their candidate of choice. We decline those invitations.

Plaintiffs' reliance on *Cooper v. Harris* and *Bush v. Vera*, 517 U.S. 952 (1996), among other cases, is misplaced. This is not the type of case where legislators, on multiple occasions, set and implemented race targets. See *Cooper*, 137 S. Ct. at 1476 (staffer testified that "his leadership had told him that he had to ramp the minority percentage in [District 12] up to over 50 percent to comply with the Voting Rights Law"); *Bush*, 517 U.S. at 961 (upholding finding that race predominated where "testimony of individual state officials confirmed that the decision to create the districts now challenged as majority-minority districts was made at the outset of the process and never seriously questioned"). To the contrary, the map drawers testified that they did not discuss race, let alone set CVAP targets.

In the end, *East St. Louis NAACP* Plaintiffs' evidence amounts to a claim that "the district's shape, its splitting of towns and counties, and its high [White] voting population" together with various public statements that legislators were aware of race shows that race predominated the 2021 legislative redistricting cycle. See *Cromartie II*, 532 U.S. at 243. The Supreme Court's decisions since *Cromartie II* tell us that this direct and circumstantial evidence is not enough to support a finding that race predominated over politics where, as here, the record is replete with political and other traditional justifications for the districts that the legislature drew. Accordingly, we reject *East St. Louis NAACP* Plaintiffs' racial gerrymandering challenge to HD 114.

### b.     CONTRERAS Plaintiffs

We turn last to *Contreras* Plaintiffs' claim that HD 21 and SD 11 are impermissible racial gerrymanders.  *Contreras* Plaintiffs contend that "[t]he SB 927 Plan uses race as [the] predominant factor in the creation of House District 21 and Senate District 11 to protect those districts' two non-Latino white incumbents."  [*Contreras*, 139 (Pls.' Br.) at 50].  Under SB 927, in both districts, the Latino CVAP was reduced from the 2011 figures: SD 11 dropped to 47.7% Latino CVAP, and HD 21 dropped to 42.2% Latino CVAP.  See [*id.* at 56].

Again, we conclude that *Contreras* Plaintiffs have not shown that race predominated in the drawing of these districts.  There is even less evidence to support their view that race predominated in drawing HD 21 or SD 11[25] than was the case for HD 114.  Ample record evidence shows that interests in keeping communities of interest together and protecting Democratic incumbents drove the configuration of HD 21 and SD 11.  State representatives for the two challenged districts and the surrounding ones as well discussed and accommodated their goals of keeping together the Little Village neighborhood, areas in and around Midway airport, and "turf" in Cicero.

Senator Landek and State Representative Zalewski testified to the importance of keeping these various communities together during the 2021 redistricting cycle.  Senator Landek added that Senator Villanueva wanted to keep more progressives in her district, explaining that changes to the districts were designed to accommodate Senator Villanueva, who had "asked to take the

---

[25] We analyzed HD 21 and SD 11 as discrete districts, and we reach the same conclusion for each district. *Bethune-Hill*, 137 S. Ct. at 800 (instructing courts to proceed district-by-district).  Given that the two districts overlap, the evidence regarding Legislative Defendants' motives as to the configuration of HD 21, SD 11, and adjacent House and Senate Districts is relevant to both claims.  Plaintiffs presented their claims for both districts together, so we follow suit, discussing our findings for both districts together in the interest of efficiency.

Little Village area from [his] current district." [*McConchie*, 160-3 (Yandell Decl.), Ex. B (Landek Dep.) at 16:16–22, 17:1–11].

Representatives Hernandez and Guerrero-Cuellar voiced preferences of their own, too. Representative Hernandez asked Senator Zalewski to include more of the town of Cicero. See [*McConchie*, 160-3 (Yandell Decl.), Ex. C (Zalewski Dep.) at 39:6–23]. Similarly, Maxson testified that "Representative Guerrero Cuellar wanted to include the Midway Airport and a number of the surrounding neighborhoods. That, obviously, had an impact on what the 21st district looked like." [*Id.*, Ex. D (Maxson Dep.) at 47:1–4].

*Contreras* Plaintiffs try to cast doubt on whether these requests were really in play. But the reasons given by *Contreras* Plaintiffs for dismissing the testimony of the legislators and mapmakers are not persuasive. Primarily, they argue that the interests in keeping communities together surfaced during litigation, and that there is no evidence on the record that state legislators actually made these requests. They also submit that some of these requests are difficult to quantify. As for the record, *Contreras* Plaintiffs themselves concede that "the House Resolution[] * * * state[s] that Rep. Lisa Hernandez requested more of the town of Cicero." [*Contreras*, 139 (Pls.' Br.) at 58]. Any inference we could draw from other omissions in the legislative record does not outweigh the testimony of staffers and state legislators. These are all public officials; their statements certainly now are part of the public record and in fact have been reported in news articles as well as in this opinion. They can be held accountable for what they have said, and none of the statements seems outlandish or even inconsistent with the plausible, legitimate political objectives of the individuals to whom they are attributed.

As for the metrics, *Contreras* Plaintiffs insist, for example, that "Maxson could not give a limiting rationale for how much of Cicero Rep. Hernandez would get" and "Sodowski *** could

not say how progressive Democrats were identified or measured." [*Contreras*, 139 (Pls.' Br.) at 58; 162 (Pls.' Reply Br.) at 31]. The attempt to impeach the map drawers by arguing that it might be difficult to assess their responsiveness to Senator Villanueva's or Representative Hernandez's requests goes to the efficacy of the ultimate outcome, not to whether the map drawers were asked and attempted to accommodate those requests. We also note that *Contreras* Plaintiffs had the opportunity to cross-examine these witnesses, but they, not Legislative Defendants, moved to decide these matters on the papers.

The bigger problem with *Contreras* Plaintiffs' racial gerrymandering claim is that none of the circumstantial evidence they rely on is particularly persuasive to infer that race predominated. That evidence includes their alleged "smoking gun," an Excel file connected to Maxson, which highlights the Latino CVAP above and below fifty percent. See [*Contreras*, 135-8 (Existing District Demographics); 135-11 (District Demographics Excel File Properties)]. They also focus on the movement of Latino voters and the subsequent reduction in the Latino CVAP for non-Latino candidate Senator Landek's district. They explain that "swapping of larger areas of HD 21 and resulting changes in SD 11" and "[t]he switching of house districts paired in the renamed SD 11 in SB 927 * * * indicate[] movement of Latino population * * * on the basis of race." [*Contreras*, 139 (Pls.' Br.) at 54, 55]. They also point to the bizarre shape of the district.

None of this evidence persuades us that legislators subordinated other redistricting principles to race. Maxson testified that he never discussed CVAP with the HD 21 incumbent. See [*McConchie*, 160-3 (Yandell Decl.), Ex. D (Maxson Dep.) at 46:4–13; 50:6–8]. We have already explained, in Part III.B.2, why showing that race was *a* factor is insufficient to show that race predominated in the design of a certain district. See, *e.g.*, *Shaw v. Hunt*, 517 U.S. 899, 905 (1996) (plaintiff's burden requires more than a showing that the "legislature [was] conscious of

the voters' races"). *Contreras* Plaintiffs ask us to find that because a staff person, at some point in time, prepared CVAP data for Dr. Lichtman's analysis, race supposedly predominated. Yet, as we have already stated, we could equally infer from such an act that the General Assembly was attempting to comply with the Voting Rights Act. Without more, *Contreras* Plaintiffs have not shown that "race was the predominant factor" such that "the legislature 'subordinated' other factors—compactness, respect for political subdivisions, partisan advantage, what have you—to 'racial considerations.'" *Cooper*, 137 S. Ct. at 1464 (quoting *Miller*, 515 U.S. at 916).

In sum, there is ample evidence that the various General Assembly members in and around HD 21 and SD 11 sought to keep certain communities together. Those goals predominated when the map drawers, working in tandem with the House and Senate Democratic caucuses, designed HD 21, SD 11, and surrounding districts to achieve political objectives. With little in hand to meet *Contreras* Plaintiffs' demanding burden to show race was a factor—much less predominated—in the decisions to place Latino voters in certain districts, we find neither district amounts to an unconstitutional racial gerrymander.

## IV.   CONCLUSION

In the end, we find that the boundaries for Illinois House and Senate Districts set out in SB 927 neither violate the Voting Rights Act nor the Constitution. The record shows ample evidence of crossover voting to defeat any claim of racially polarized voting sufficient to deny Latino and Black voters of the opportunity to elect candidates of their choice in the challenged districts. And the record also shows that even if race was *a* factor in the drawing of at least some of these districts, it was not the *predominant* factor as to any single district, and thus the resulting maps do not violate the Equal Protection Clause. Instead, the voluminous evidence submitted by

the parties overwhelmingly establishes that the Illinois mapmakers were motivated principally by partisan political considerations.

We recognize that partisan gerrymanders are controversial. See, *e.g.*, Julia Kirschenbaum & Michael Li, *Gerrymandering Explained*, Brennan Center for Justice (Aug. 12, 2021), https://perma.cc/8AGN-SKUX; see also *Redistricting Report Card*, Princeton Gerrymandering Project, https://perma.cc/6789-UW3B (last visited Dec. 27, 2021). Critics maintain that they distort our democracy, noting that at its most extreme, "the practice amounts to 'rigging elections.'" *Rucho*, 139 S. Ct. at 2512 (Kagan, J, dissenting) (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 317 (2004) (Kennedy, J., concurring in the judgment)). Many states engage in the practice, though some do not.[26] See *Baldus*, 849 F. Supp. 2d at 860. An effort to create an independent redistricting commission in Illinois gained more than half a million signatures in support of a ballot initiative but was struck down by the Illinois Supreme Court as outside the scope of the citizen initiative power under Article IV of the Illinois Constitution. *Hooker v. Ill. State Bd. of Elections*, 63 N.E.3d 824, 838–39 (Ill. 2016).

These are matters for the people of Illinois to continue debating. Levers other than federal courts are available to them, whether they are state statutes, state constitutions, and even entreaties to Congress, if they wish to change the current process. See *Rucho*, 139 S. Ct. at 2507–08. Our role as federal judges is limited and does not extend to complaints about excessive partisanship in the drawing of legislative districts. In *Rucho*, the Supreme Court identified two areas – "one-

---

[26] Both major parties have engaged in the practice. In *Rucho*, for example, the Supreme Court considered two separate partisan gerrymandering claims, one challenging maps drawn by a Republican-controlled legislature in North Carolina and the other contesting maps adopted by a Democrat-controlled legislature in Maryland. In the current election cycle, one can point to, for instance, Texas as a counterweight to Illinois among state legislatures using redistricting to achieve partisan political objectives. See Zachary Wolf, *Gerrymandering: How it's Being Exposed and How it Affects Your State*, CNN Politics (Nov. 20, 2021, 8:00 AM), https://perma.cc/QYR2-8DW5 (interview with Sam Wang, Director of the Princeton Gerrymandering Project).

person, one-vote and racial gerrymandering"—in which there is a role for the federal courts with respect to at least some issues that could arise from a State's redistricting efforts. *Id.* at 2495–96. We addressed the former in our October 19 ruling [*McConchie*, 131] and the latter in today's decision. But the Supreme Court has declared partisan gerrymandering claims to present political questions beyond the reach of the federal courts. *Id*. at 2507. Having found no statutory or constitutional infirmities in the map adopted in SB 927, our involvement in the current disputes over Illinois redistricting must come to an end with the entry of a final judgment as follows: (1) against all Defendants and in favor of *McConchie* Plaintiffs on Counts I and II of their second amended complaint [dkt. 116 in Case No. 21-cv-3091], both of which relate to the June Redistricting Map, (2) against all Defendants and in favor of *Contreras* Plaintiffs on Count I of their second amended complaint [dkt. 98 in Case No. 21-cv-3139], which also relates to the June Redistricting Map, and (3) in favor of all Defendants and against all Plaintiffs on all other claims asserted in *McConchie* Plaintiffs' second amended complaint [dkt. 116 in Case No. 21-cv-3091], *Contreras* Plaintiffs' second amended complaint [dkt. 98 in Case No. 21-cv-3139], and *East St. Louis NAACP* Plaintiffs' complaint [dkt. 1 in Case No. 21-cv-5512]. To the extent that any Plaintiffs wish to seek attorneys' fees and costs in this matter, they may do so by filing a motion consistent with any applicable statutes.